UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:16-cv-01731-MCA-MAH |
| | ) | |
| v. | ) | |
| | ) | **CONSENT DECREE** |
| CITY OF NEWARK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................... 1
II.    DEFINITIONS ........................................................................................... 1
III.   POLICY REVIEW AND REVISION ....................................................... 8
IV.    TRAINING ................................................................................................ 9
V.     COMMUNITY ENGAGEMENT AND CIVILIAN OVERSIGHT ..................... 10
       A.   Civilian Oversight ........................................................................... 10
       B.   Community Engagement Measures and Training ........................... 10
       C.   Annual Community Survey ............................................................. 12
VI.    STOPS, SEARCHES, AND ARRESTS ...................................................... 13
       A.   Investigatory Stops and Detentions ............................................... 13
       B.   Searches .......................................................................................... 14
       C.   Arrests ............................................................................................. 15
       D.   Stop, Search, and Arrest Training ................................................. 16
       E.   Supervisory Review of Stops, Searches, and Arrests .................... 18
       F.   Stop, Search, and Arrest Data Collection and Review .................. 19
       G.   First Amendment Right to Observe, Object to, and Record Officer
            Conduct ........................................................................................... 21
VII.   BIAS-FREE POLICING ............................................................................ 22
VIII.  USE OF FORCE ....................................................................................... 24
       A.   Use of Force Policy ........................................................................ 24
       B.   Use of Firearms .............................................................................. 27
       C.   Use of Force Reporting and Investigation ..................................... 28
       D.   Use of Force Review ...................................................................... 32
       E.   Reporting and Investigation of Serious Force Incidents ................ 33
       F.   Use of Force Review Board ............................................................ 36
IX.    IN-CAR AND BODY-WORN CAMERAS ................................................. 38
X.     THEFT .................................................................................................... 39
XI.    COMPLAINT INTAKE AND INVESTIGATION ........................................ 41

ii

A.   Complaint Process ................................................................. 41
B.   Complaint Classification and Assignment of Investigative Responsibility .. 43
C.   Misconduct Complaint Investigation............................................. 44
D.   Parallel Administrative and Criminal Investigations of Officer
     Misconduct ........................................................................ 46
E.   Review and Analysis of Investigations......................................... 46
F.   Staffing and Training Requirements............................................ 47

XII.    COMPLIANCE REVIEWS AND INTEGRITY AUDITS ................................. 49
XIII.   DISCIPLINE....................................................................... 49
XIV.    DATA SYSTEMS IMPROVEMENT ..................................................... 50

A.   Early Warning System............................................................ 51
B.   Record Management System ("RMS") .......................................... 52

XV.     TRANSPARENCY AND OVERSIGHT ................................................... 53
XVI.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT......................... 54

A.   Selection and Role of Independent Monitor.................................... 54
B.   Compliance Reviews and Audits................................................. 55
C.   Outcome Assessments ........................................................... 55
D.   Monitoring Plan .................................................................. 59
E.   Monitor Recommendations and Technical Assistance.......................... 60
F.   Comprehensive Re-Assessment.................................................. 60
G.   Monitor Reports .................................................................. 61
H.   Communication Among the Parties, the Monitor, and the Public.............. 62
I.   Public Statements, Testimony, Records, and Conflicts of Interest............ 63
J.   Record Collection and Retention................................................ 64
K.   Consent Decree Implementation Unit .......................................... 64
L.   Access and Confidentiality ...................................................... 65
M.   Compensation and Term of the Monitor ....................................... 66

XVII.   COURT JURISDICTION, MODIFICATION, AND ENFORCEMENT ............ 69
XVIII.  TERMINATION OF THE AGREEMENT ............................................. 70

## I.      INTRODUCTION

1.      Pursuant to the authority granted under 42 U.S.C. § 14141, the United States has filed a complaint in the United States District Court for the District of New Jersey seeking declaratory or equitable relief to remedy a pattern or practice of conduct by the Newark Police Division that deprives individuals of rights, privileges, and immunities secured by the Constitution and federal law.

2.      In lieu of litigation, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the United States and the City of Newark ("City") (collectively "the Parties") enter into this Consent Decree ("Agreement" or "Decree") with the goals that police services delivered to the people of Newark fully comply with the Constitution and the laws of the United States, promote public and officer safety, and increase public confidence in the Newark Department of Public Safety and Newark Police Division (collectively "NPD") and its officers.  The Parties recognize that NPD is also committed to these objectives and is taking steps to better achieve them.

3.      The City and NPD do not admit to the allegations of the complaint.  Nothing in this Agreement will be construed as an acknowledgment, agreement, admission, statement, or evidence of liability of the City, NPD, or any of its officers or officials under 42 U.S.C § 14141.

## II.     DEFINITIONS

4.      The following terms and definitions apply to this Agreement:

   a.      "Active Resistance" means verbal or physical actions that are intended to prevent an officer from placing a subject in custody and taking control, but are not directed at harming the officer.  Examples include walking or running away or breaking the officer's grip.

   b.      "Aggravated Aggressive Resistance" means that a subject's actions are likely to result in death or serious bodily harm to an officer, the subject, or another person.  These actions may include use of a firearm, a blunt or bladed weapon, or extreme physical force.

1

c.   "Aggressive Resistance" means the intent to harm an officer, the subject, or another person, and to prevent an officer from taking control and placing a subject in custody.  The aggression may manifest itself through a subject's taking a fighting stance, or punching, kicking, striking, attacks with weapons, or other actions that present an imminent threat of physical harm to the officer or another person.

d.   "Arrest" means a seizure of greater scope or duration than an investigatory stop or detention.

e.   "Auditable form" or "auditable format" means a method of documentation or recordkeeping that is maintained consistently and uniformly and is readily accessible and verifiable for subsequent review and evaluation.

f.   "Best practices" are guidelines or standards that are recognized in policing, civil rights, or other relevant professional fields as the most efficient, effective, and current means for achieving constitutional and effective policing.  Recognition may include acceptance by nationally recognized police professionals or organizations in the relevant subject area.

g.   "City" means the City of Newark, including its agents, officers, and employees.

h.   "Collective bargaining agreement" means an agreement in effect as of the Effective Date of this Agreement that is negotiated by NPD and its employees' unions regulating the terms and conditions of employment.

i.   "Complainant" means any person, including an NPD officer or employee, who makes a complaint against NPD or an officer or employee of NPD.

j.   "Complaint" means any allegation from any source that an NPD officer or employee has engaged in criminal behavior or misconduct.

k.   "Court" means the United States District Court for the District of New Jersey.

2

l.     "Critical use of force" means any use of force by a law enforcement officer resulting in death or serious bodily injury to a person, or where deadly force is employed with no injury, or where any injury to a person results from the use of a firearm by a law enforcement officer.

m.    "Deadly Force" means any use of force likely to cause death or serious injury, including the use of a firearm, neck hold, or strike to the head, neck, or throat with a hard object, including a fist.

n.     "Demographic Category" means any shared common characteristic of a population including age, race, ethnicity, national origin, gender, gender identity, language ability, disability, or sexual orientation.

o.     "Detention" or "seizure" means any restriction on the liberty interest of an individual.  A seizure of the person occurs when an officer's words or actions convey to a reasonable person that he or she is not free to leave.  A seizure of property occurs when an officer's words or actions result in a meaningful interference with a person's possessory interest in that property.

p.     "Discriminatory policing" and "biased policing" mean selective enforcement or non-enforcement of the law, including the selection or rejection of particular policing tactics or strategies, based on a subject's demographic category that is not part of a specific suspect description from a trustworthy source that is relevant to the locality or time.

q.     "Discipline" means a personnel action for violation of a law, regulation, rule, or NPD policy, including an admonishment, written reprimand, suspension, demotion, or dismissal.

r.     "DOJ" means the United States Department of Justice's Civil Rights Division, the United States Attorney's Office for the District of New Jersey, and their agents and employees in their official capacity.

s.     "Effective Date" means the day this Agreement is signed by the Parties and

submitted to the Court for approval.

t.      "EWS" means Early Warning System.

u.      "Field Inquiry" or "Field Interview" means an investigatory stop as defined in this Agreement.

v.      "Implement" or "implementation" means the development or putting into place of a policy or procedure, and requires the appropriate training of all affected personnel and the consistent and verified performance of that policy or procedure in actual practice.

w.      "Including," "includes," and "include" mean "including, but not limited to."

x.      "Intermediate Force" or "Intermediate Use of Force" includes the use of chemical spray; use of an impact weapon to strike a person but where no contact is made; use of a baton for non-striking purposes (e.g., prying limbs, moving or controlling a person); or weaponless defense techniques (e.g., elbow strikes, kicks, leg sweeps, and takedowns).

y.      "Investigatory stop" or "Investigatory detention" means, for the purposes of this Agreement, a temporary restraint where the subject of the stop or detention reasonably believes that she or he is not free to leave within the meaning of *Terry v. Ohio*.[1] An investigatory stop or detention may be a pedestrian, vehicle, or bicycle stop.

z.      "Low Level Force" or "Low Level Use of Force" includes the use of hand controls or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury.

aa.     "Mere Inquiry" means a non-custodial interview that is voluntary and consensual about crime or quality of life issues.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

4

bb.  "Misconduct" means any action or inaction by an officer or other NPD employee that violates the law, NPD policy, procedure, rules, or regulations, or other standards of conduct required of City employees.

cc.  "Neck hold" means: (1) a bar-arm control hold, which inhibits breathing by compression of the airway in the neck; (2) a carotid restraint hold, which inhibits blood flow by compression of the blood vessels in the neck; (3) a lateral vascular neck constraint; or (4) a hold with a knee or other object to the back of a prone subject's neck. A neck hold is considered Deadly Force.

dd.  "Non-punitive corrective action" refers to action other than discipline by an NPD supervisor to enable or encourage a subordinate to modify or improve performance. It may include: oral or written counseling; training; increased field supervision for a specified period; mandatory professional assistance; referral to Behavioral Science Services or to the Employee Assistance Program; a change of an officer's partner; or a reassignment or transfer.

ee.  "NPD" or "the Department" means the Newark Police Division and its agents, officers, supervisors and employees (both sworn and unsworn).

ff.  "Operational Date" means the day that the Independent Monitor's team is approved pursuant to Paragraph 170.

gg.  "OPS" means the Office of Professional Standards, the NPD unit charged with conducting internal investigations of NPD officers and employees.

hh.  "Passive Resistance" occurs when a subject is uncooperative and is not complying with an officer's commands, but is taking only minimal physical action to prevent an officer from placing the subject in custody and taking control. Examples include refusing to move, going limp, locking arms, or holding onto a fixed object.

ii.  "Pedestrian stop" means an investigatory stop of an individual that does not involve an automobile.

5

jj.     "Police Officer" or "Officer" means any law enforcement agent of any rank employed by, or acting under the appointment of, NPD, including Special Police Officers.

kk.     "Policies" and "Procedures" mean regulations or directives, regardless of their official title, describing the duties, functions, and obligations of NPD officers or employees, specifically directing how to fulfill those duties, functions, or obligations.

ll.     "Precinct" means one of the five police service areas of NPD, which together cover the entire geographic area of the City of Newark and are each led by a Commanding Officer.

mm.     "Pretext stop or detention" means an investigatory stop or detention premised on an infraction or violation for which an officer has reasonable suspicion but where the officer's true motivation is to investigate a different offense for which there is no reasonable suspicion at the outset of the investigatory stop or detention.

nn.     "Probable cause" means reasonably trustworthy facts and circumstances that, within the totality of the circumstances, lead an officer to reasonably believe that there is a fair probability that an individual has committed or is committing a crime.

oo.     "Reasonable force" means force that is objectively reasonable under the circumstances and the minimum force necessary to effect an arrest or protect the officer or another person. In determining whether the force used by a police officer was reasonable under the circumstances, factors to be considered include: (1) the severity of the crime at issue; (2) whether the person poses an immediate threat to the safety of the police officers or others; (3) the physical size, strength, and weaponry of the officers as compared to the person; (4) the chance of the person's escape if the particular means are not employed; and (5) the existence of alternative methods of arrest. Force

6

that is not "reasonable" is "unreasonable."

pp.    "Reasonable suspicion" means specific, articulable facts that, within the totality of the circumstances, would lead an officer to reasonably suspect that an individual has or is about to be engaged in criminal activity. An individual's mere presence in a particular neighborhood or area is not sufficient to support reasonable suspicion.

qq.    "RMS" means the Record Management System used by NPD to enter, store, and retrieve official forms and reports.

rr.    "Serious Force" or "Serious Use of Force" means any use of force that results in loss of consciousness, any canine bite, any strike, blow, or kick against a handcuffed or restrained subject, or any head, neck, or throat strike or neck hold resulting in injury that is not investigated by the Essex County Prosecutor's Office pursuant to New Jersey Attorney General Directive 2005-06.

ss.    "Serious Injury" includes death or substantial risk of death, permanent harm to health, disfigurement or permanent loss of function to any organ of the body, broken bone, or any injury that requires hospitalization or treatment at a health care facility beyond a first-aid level of care.

tt.    "Serious Misconduct" includes but is not limited to:  criminal misconduct; excessive force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful stop or detention; unlawful search; retaliation; interference with civilians' First Amendment rights; sexual misconduct; domestic violence; and theft.

uu.    "Shall" or "will" means that the relevant provision imposes a mandatory duty; "should" does not indicate such a duty.

vv.    "Specialized unit" means any designated organization of officers within NPD engaged in issue-specific enforcement activities, such as narcotics, gang, and

7

street-crime units.

ww.  "Supervisor" means a sworn NPD employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers.

xx.  "Training" means traditional lecture formats, as well as methods incorporating role-playing scenarios and interactive exercises that instruct officers about how to exercise their discretion.  Training also includes testing, writings, or other measures that assess whether officers comprehend the material taught.

yy.  "Use of force" for the purposes of this Agreement means any physical coercion used to control an individual or gain compliance with an officer's order beyond the standard techniques used for unresisted handcuffing and escort.  Unholstering a firearm and pointing a firearm will be reported and tracked under this Agreement. Unholstering a firearm and pointing a firearm are considered Constructive Authority in the New Jersey Attorney General's Guidelines.

zz.  "Use of force report" means a written statement documenting a use of force as defined by this Agreement.

## III.  POLICY REVIEW AND REVISION

NPD policies and procedures will reflect and express its core values and priorities, and provide clear direction that officers and civilian employees will enforce the law effectively and constitutionally.

5.  NPD will develop comprehensive and agency-wide policies and procedures that are consistent with and incorporate all substantive requirements of this Agreement.  Unless otherwise noted, NPD will develop and implement all such policies, procedures, and manuals within two years of the Effective Date.

6.      NPD's policies and procedures will define terms clearly in accordance with applicable law and the requirements of this Agreement and comport with professional police standards and best practices.  NPD will provide drafts of all new or revised policies or procedures that are relevant to this Agreement to the Monitor and DOJ for review and approval prior to implementation.

7.      NPD will review its policies and procedures annually for consistency with the Agreement and current developments in law and police practice.

8.      Regardless of when promulgated, all policies and procedures will be readily accessible to all NPD personnel.

## IV.   TRAINING

NPD will enhance its academy, annual in-service, and other training so that they are sufficient in duration and scope to prepare officers to carry out NPD directives consistently, effectively, and in accordance with the law, NPD policy, and this Agreement.

9.      NPD will provide officers a minimum of 40 hours of in-service training each year.  NPD will provide additional training as necessary to address changes in the law, or issues identified through its review of use of force incidents, arrest reports, misconduct complaints, or other means.  All training will be consistent with and incorporate current law, professional police standards, and best practices.

10.      Within 90 days of the Operational Date, NPD will provide training to officers regarding the requirements of this Agreement, and the timeline for their implementation.

11.      Within 30 days of approval by the Monitor and DOJ of any new or revised policy or procedure that implements a requirement of this Agreement, NPD will provide appropriate training to officers.  NPD will provide drafts of new or revised training plans or training curricula related to the requirements of this Agreement to the Monitor and DOJ for review and approval prior to implementation.

12.      NPD will maintain complete and consistent training records for all officers.

9

## V.    COMMUNITY ENGAGEMENT AND CIVILIAN OVERSIGHT

NPD will engage constructively with the community to promote and strengthen partnerships and to achieve collaborative, ethical, and bias-free policing. As part of this effort, the City will establish a civilian oversight entity to enhance NPD's accountability and transparency and the public's confidence in the Division. In addition, NPD will integrate concepts of community and problem-oriented policing into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems to increase cooperation and trust between it and the community.

### A.    Civilian Oversight

13.    Within 365 days of the Operational Date, the City shall implement and maintain a civilian oversight entity. The duties and responsibilities of that entity shall, at a minimum, include the substantive and independent review of internal investigations and the procedures for resolution of civilian complaints; monitoring trends in complaints, findings of misconduct, and the imposition of discipline; and reviewing and recommending changes to NPD's policies and practices, including, but not limited to, those regarding use of force, stop, search, and arrest. The Monitor will evaluate and report on the City's implementation and maintenance of this civilian oversight entity to determine if it is helping to achieve the goals of this Agreement. This decree shall not be deemed to confer on the civilian oversight entity any powers beyond those permitted by law, including by civil service rules and collective bargaining agreements.

### B.    Community Engagement Measures and Training

14.    NPD will provide direction and training to officers on the benefits of and means to achieve effective community engagement, including which police tactics and strategies are more likely to alienate community members, and how to employ alternatives to those tactics and strategies where consistent with public safety. Within 60 days of the Operational Date and annually thereafter, the NPD will provide eight hours of structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives. This training shall include:

a.    methods and strategies to improve public safety and crime prevention through

10

community engagement, including how to establish formal partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with youth;

b.    scenario-based training that promotes the development and strengthening of partnerships between the police and community;

c.    leadership, ethics, and interpersonal skills;

d.    problem-oriented policing tactics; and

e.    conflict resolution, including verbal de-escalation of conflict.

15.    Within 180 days of the Operational Date, NPD will assess and revise its staffing allocation and personnel deployment to support community policing and problem-solving initiatives, and will modify any deployment strategy that is incompatible with effective community-oriented policing.  This assessment and modified deployment strategy will be provided to the Monitor and DOJ for review and approval.

16.    Pending completion of the above assessment, NPD will assign two officers for each precinct who will become familiar with the geographic area, its issues, problems, and community leaders; whose principal duty will be to identify and address the community's priorities; and who are not assigned to answer calls for service except in exigent circumstances.

17.    Within 90 days of the Operational Date, NPD will implement mechanisms to periodically measure the breadth, extent, and effectiveness of its community partnerships and problem-solving strategies, including officer outreach, particularly outreach to youth.

18.    Within 120 days of the Operational Date, and thereafter on a quarterly basis, NPD will prepare a publicly available report of its community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution.  This report shall also identify the results of the assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement.

11

19.     NPD and the City will implement practices to seek and respond to input from the community about this Agreement's implementation.  Such practices may include direct surveys, comment cards, and town hall meetings.

20.     All NPD studies, analyses, and assessments required by this Agreement will be made publicly available, including on NPD and City websites, in English, Spanish, and Portuguese, to the fullest extent permitted under law.

21.     NPD will implement a policy to collect and maintain all data and records necessary to facilitate transparency and wide public access to information related to NPD policies and practices, as permitted by law.

### C.     Annual Community Survey

22.     Within 180 days of the Operational Date, and every year thereafter, the Monitor will conduct a reliable, comprehensive, and representative survey, consistent with the criteria set out directly below, of the Newark community's experience with and perceptions of NPD and public safety.  The initial annual survey will be referred to as the "baseline survey."

23.     To assist the Monitor in conducting the baseline and annual surveys, the Monitor will retain an individual or entity, to be approved by the City and DOJ, that will:

     a.     develop measurements of public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;

     b.     identify representative samples of City residents, police personnel, and custodial arrestees;

     c.     review and consider prior law enforcement surveys in Newark and other cities;

     d.     engage in informal conversations with Newark residents, NPD officers and command staff, and DOJ representatives, and observe community meetings, to identify current and recent issues or concerns specific to Newark;

  e.  conduct the surveys in English, Spanish, and Portuguese as necessary, to ensure representation of the entire Newark community; and

  f.  formally discuss the methodology with NPD supervisors and DOJ and seek their input in the development of the baseline survey and in making improvements to the methodology used in the annual surveys.

24.  NPD and the City will cooperate with the design and conduct of the surveys by, for example, helping to organize focus groups of officers and obtaining and providing previous survey instruments and data. The reports of the baseline and annual surveys will be provided to the Court and be publicly distributed and available on the City's and NPD's websites.

## VI. STOPS, SEARCHES, AND ARRESTS

NPD will conduct all investigatory stops, searches, and arrests in accordance with the rights secured or protected by the Constitution and federal and state law. NPD will conduct investigatory stops, searches, and arrests fairly and respectfully as part of an effective overall crime prevention strategy that is consistent with community priorities for enforcement.

### A. Investigatory Stops and Detentions

25.  NPD will prohibit officers from conducting investigatory stops or detentions, when they lack reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime.

26.  NPD will require officers to articulate their reasonable suspicion for stops in a specific and clear manner in their reports. NPD will train officers to use specific and individualized descriptive language in reports or field inquiry forms when documenting investigatory stops or detentions, and NPD will evaluate whether officers have done so.

27.  NPD will prohibit NPD officers from:

  a.  Conducting "pretext" vehicle stops or detentions without prior approval of a supervisor.

b.  Using *pro forma* or conclusory language without supporting detail in documents or reports documenting investigatory stops or detentions.

c.  Using information known to be materially false or incorrect in effectuating an investigatory stop or detention;

d.  Using any demographic category as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause during routine or spontaneous enforcement activities, except that officers may rely on a demographic category in a specific suspect description from a trustworthy source that is relevant to the locality or time;

e.  Using an individual's geographic location, presence in a high crime area, or proximity to the scene of suspected or reported crimes without any other reliable indicator that an individual has or is engaged in criminal activity, as the basis for an investigatory stop or detention;

f.  Basing investigatory stops or detentions solely on an individual's response to the presence of police officers, such as an individual's attempt to avoid contact with an officer;

g.  Basing investigatory stops or detentions solely on information or evidence discovered after the stop was initiated (e.g., open warrants) or the fact that the individual was ultimately arrested; and

h.  Basing investigatory stops or detention solely on an individual's presence in the company of others suspected of criminal activity.

28.  NPD will require documentation of all investigatory detentions, field inquiries and mere inquiries, however they are described internally.

**B.  Searches**

29.  NPD will prohibit officers from considering any demographic category in determining whether to conduct a search or to seek a search warrant, except that officers may rely on a

14

demographic category in a specific suspect description, where the description is from a trustworthy source that is relevant to the locality and time.

30.     NPD will prohibit officers from relying on information known to be materially false or incorrect to justify a warrantless search or to seek a search warrant.

31.     NPD will prohibit officers from seeking consent to search a motor vehicle unless the officer has a reasonable and articulable suspicion that the search will reveal evidence of a crime, or the officer has legal authority for the search that is independent of consent.  Officers will document in writing the basis for this suspicion or other legal authority.

32.     NPD will require that officers obtain the approval of a supervisor on the scene prior to conducting a search of an individual or a home based upon consent.

33.     NPD will require that an officer seeking consent for a search will affirmatively inform the subject of the right to refuse and to revoke consent at any time.  The officer will record this notification and the subject's grant or denial of consent on his or her body-worn camera, and on a written form that explains these rights.  Supervisors will review the video and written documentation of consent prior to approving an arrest based on evidence obtained via a consent search.

34.     NPD will ensure that the consent to search form includes separate signature lines for officers to certify that they have advised the subject of the right to refuse a search and for the subject to affirm that they understand that right.

C.     **Arrests**

35.     NPD will prohibit officers from arresting an individual unless the officer has probable cause to do so, and from relying on information they know to be materially false or incorrect when effecting an arrest.

36.     NPD will prohibit officers from considering a subject's demographic category to justify an arrest, except that officers may rely on a demographic category in a specific suspect description, where the description is from a trustworthy source that is relevant to the locality and time.

37.     NPD will require that an officer notify a supervisor immediately after: effecting an arrest where the officer used force; an incident in which an officer unholstered or pointed a firearm; an arrest for obstructing or resisting an officer; any disorderly conduct type arrest; or a custodial arrest for a vehicle infraction.

38.     NPD will also require that, absent exceptional circumstances, a supervisor will immediately respond to the scene to approve an arrest for obstructing or resisting an officer, any disorderly conduct type arrest, or a custodial arrest for a vehicle infraction or as required by the use of force review provisions of this agreement.  In the event that a supervisor is unable to respond to the scene, the supervisor will document in the case file the circumstances preventing his or her presence.

39.     NPD will require that the responding supervisor approve or disapprove the officer's arrest recommendation, based on the existence of justifiable probable cause and NPD policy.

40.     NPD will require that the supervisor take appropriate action to address violations or deficiencies in the officer's arrest recommendation, including releasing the subject, recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation.

41.     NPD will require that, at the time of presentment at the NPD precinct or headquarters, a watch commander or supervisor visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives any necessary medical attention from an appropriate medical provider.  The watch commander or supervisor will document the results of the visual inspection in writing.

42.     NPD will require that officers complete all arrest reports, properly documenting the probable cause for arrests, by the end of their shifts.

### D.     Stop, Search, and Arrest Training

43.     NPD will provide all officers with at least 16 hours of training on stops, searches, arrests, and the requirements of this Agreement, within 180 days of the Operational Date, and at least an

16

additional 4 hours on an annual basis thereafter.  Such training will be taught by a qualified legal instructor with significant experience in First and Fourth Amendment issues, and will address:

a.  the requirements of Fourth Amendment and related law, NPD policies, and this Agreement regarding investigatory stops and detentions, searches and seizures, including:

  i.  the differences among the scope and degree of intrusion of various police contacts; between probable cause, reasonable suspicion and mere speculation; and between voluntary consent and mere acquiescence to police authority;

  ii.  the types of facts and circumstances that may be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention;

  iii.  the level of permissible intrusion when conducting searches, such as "pat-downs" or "frisks";

  iv.  the permissible nature and scope of other pre-arrest searches, including those conducted pursuant to probation or parole release provisions; and

  v.  the permissible nature and scope of searches incident to arrest.

b.  First Amendment and related law in the context of the rights of individuals to verbally comment on, observe, and record officer conduct;

c.  procedures for executing searches, and the handling, recording, and taking custody of seized property or evidence; and

d.  the effect that differing approaches to stops, searches, and arrests can have on community perceptions of police legitimacy and public safety.

17

### E.    Supervisory Review of Stops, Searches, and Arrests

44.    NPD's first-line supervisors will review all documentation, including video from body-worn cameras as appropriate, of investigatory stops and detentions, searches, and arrests for completeness and adherence to law and NPD policy.

45.    NPD's desk lieutenant or unit commander will review each arrest report by officers under their command and will memorialize that review in writing within 24 hours of the arrest, absent exceptional circumstances.  Supervisors will review reports and forms for deficiencies including:

     a.    *pro forma* or conclusory language, inconsistent information, insufficient articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not correct or complete;

     b.    arrests following stops based solely on information or evidence discovered after the stop was initiated (e.g., open warrants) or on the fact that the individual was ultimately arrested, without plausible justification for the initial stop or search; and

     c.    arrests that are unsupported by probable cause, or are otherwise in violation of the law, NPD policy, or this Agreement.

46.    NPD's desk lieutenant or unit commander will document for review by their chain of command:  (1) investigatory stops and detentions that appear unsupported by reasonable and articulable suspicion, or that are otherwise in violation of NPD policy or this Agreement; (2) searches that appear to be without legal justification or are in violation of NPD policy or this Agreement; or (3) stops or searches that, while comporting with law and policy, indicate a need for corrective action or review of agency policy, strategy, tactics, or training to support effective and legitimate policing principles.

47.    For every search or arrest involving the recovery of contraband evidence, the desk lieutenant or unit commander will review the circumstances of the encounter, including video from body-worn cameras, to assess the adequacy of the seizure.  The supervisor will memorialize

that review in writing and will include an assessment of the circumstances under which the search was conducted, the evidence was recovered, and/or the probable cause for the arrest.

48.    NPD supervisors will take appropriate action to address all apparent violations or deficiencies in investigatory stops or detentions, searches, and arrests.  Appropriate action may include recommending non-disciplinary corrective action for the involved officers, or referring the incident for administrative or criminal investigation.  For each subordinate, the supervisor will maintain a record of each violation or deficiency and any corrective action taken.  The supervisor will document each violation or deficiency in the officer's performance evaluations and NPD's EWS to identify officers needing repeated corrective action.

49.    Within seven days, a command-level official will confirm in writing that her or she has reviewed any stop or detention, search, and arrest that another supervisor determined were:  not supported by probable cause; were in violation of NPD policy or this Agreement; or that indicated a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander will evaluate the supervisor's assessment and recommendations and take all appropriate corrective action, including referring the incident to the OPS for investigation if warranted.  The commander will also take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory detentions, searches, and arrests.

50.    Supervisory and commander performance evaluations will take into account the quality and completeness of supervisory and commander reviews of officer stops, searches, and arrests.

F.    **Stop, Search, and Arrest Data Collection and Review**

51.    NPD will modify its procedures as set out below to collect and preserve stop, search, and arrest data sufficient to determine the nature and scope of demographic disparities in stop and search practices, as well as which stop, search, and arrest practices are most effective and efficient.

52.    Within 180 days of the Operational Date, NPD will modify or develop a written or electronic report format to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a summons or citation.  This system will be integrated into

NPD's EWS and allow for the information in stop and search records to be searched and summarized electronically.  NPD's stop and search data collection system will be subject to the review and approval of the Monitor and DOJ, and will require officers to document the following:

     a.     the officer's name and badge number;

     b.     date and time of the stop;

     c.     location of the stop;

     d.     duration of the stop;

     e.     subject's apparent gender, race, ethnicity or national origin, and age;

     f.     if a vehicle stop, the presence and number of any passengers and the apparent gender, race, ethnicity, national origin, and age of each passenger; if a non-vehicle stop (e.g. pedestrian or bicycle), the number of individuals stopped and apparent gender, race, ethnicity, national origin, and age of each person;

     g.     reason for the stop, including a description of the facts creating reasonable suspicion and whether it was a pretext stop;

     h.     if a vehicle stop, whether the driver or any passenger was required to exit the vehicle, and the reason for doing so;

     i.     whether any individual was asked to consent to a search and whether such consent was given; whether a pat-down, frisk, or other search was performed on any individual, including a description of the facts justifying the action;

     j.     a full description of any contraband or evidence seized from any individual;

     k.     whether a probable cause search was performed on any individual, including a brief description of the facts creating probable cause; and

     l.     disposition of the stop, including whether a citation or summons was issued to

or an arrest made of any individual.

53.   NPD will develop a protocol for comprehensive analysis of stop, search, and arrest data. The protocol will establish steps for determining the nature and scope of demographic disparities in stop and search practices, and whether any such disparities can be decreased or eliminated, as well as steps for determining which stop, search, and arrest practices are most effective and efficient in increasing public safety and police legitimacy within the Newark community.  The analysis will include an assessment of the efficacy and any demographic disparities in the use of pretext stops and consent searches.  This protocol will be subject to the review and approval of the Monitor and DOJ.

54.   NPD will ensure that all databases comply fully with federal and state privacy standards governing personally identifying information.  NPD will restrict database access to authorized, identified users who will be permitted to access the information only for specific, legitimate purposes.

## G.   First Amendment Right to Observe, Object to, and Record Officer Conduct

55.   NPD will require that officers respect the legal rights of onlookers or bystanders to witness, observe, record, and comment on or complain about officer conduct, including stops, detentions, searches, arrests, or uses of force.  NPD will train officers that the exercise of these rights, secured and protected by the Constitution and laws of the United States, serves important public purposes.

56.   NPD will prohibit officers from detaining, arresting, or threatening to detain or arrest, individuals based on activity protected by the First Amendment, including verbal criticism, questioning police actions, or gestures.  NPD will also prohibit officers from using or threatening force in response to mere verbal criticism or gestures that do not give rise to reasonable fear of harm to the officers or others.

57.   NPD will require that officers take no law enforcement action against a bystander unless the bystander:

a.     violates the law;

b.     incites others to violate the law; or

c.     refuses to comply with an officer's order to observe or record from an alternate location and the bystander's presence would jeopardize crime scene integrity or the safety of the officer, the suspect, or others.

58.     NPD will permit individuals observing stops, detentions, arrests, and other incidents to remain in the proximity of the incident unless one of the conditions in paragraph 57 is met.

59.     NPD will permit individuals to record police officer enforcement activities by camera, video recorder, cell phone recorder, or other means, unless one of the conditions in paragraph 57 is met.

60.     NPD will prohibit officers from threatening, intimidating, or otherwise discouraging an individual from remaining in the proximity of or recording law enforcement activities and from intentionally blocking or obstructing cameras and recording devices.

61.     NPD will prohibit officers from detaining, prolonging the detention of, or arresting an individual for remaining in the proximity of, recording or verbally commenting on officer conduct directed at the individual or a third party, unless one of the conditions in paragraph 57 is met.

62.     NPD will prohibit officers from destroying, seizing, or otherwise coercing a bystander to surrender recorded sounds or images made of officers in the course of their duties, without first obtaining a warrant. Nor may officers order a bystander to destroy any such recording. Where an officer has a reasonable belief that a bystander or witness has captured a recording of critical evidence related to a felony crime, the officer may secure such evidence only as long as necessary to obtain a subpoena, search warrant, or other valid legal process or court order.

## VII.   BIAS-FREE POLICING

NPD will deliver police services that are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Division. In

conducting its activities, NPD will operate without bias based on any demographic category and in accordance with the rights, privileges, or immunities secured and protected by the Constitution and laws of the United States.  To achieve these outcomes, NPD will implement the requirements below.

63.     NPD will provide all officers with a minimum of eight hours of comprehensive and interdisciplinary training on bias-free policing, including implicit bias, procedural justice, and police legitimacy, within 180 days of the Operational Date, and at least four hours annually thereafter.  Such training will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selection or rejection of particular policing tactics or strategies, is prohibited by policy and will subject officers to discipline.  In addition, this training will address:

   a.      methods and strategies for more effective policing which rely upon nondiscriminatory factors;

   b.      the differences and similarities between police and community perspectives related to discriminatory policing;

   c.      constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;

   d.      the protection of civil rights as a central part of the police mission and as essential to effective policing;

   e.      the impact of arbitrary classifications, stereotyping, and implicit bias;

   f.      instruction in the data collection protocols required by this Agreement;

   g.      identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and

   h.      methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.

64.     NPD will prohibit officers from considering any demographic category when taking, or refraining from taking, any law enforcement action, except when such information is part of an actual and credible description of a specific suspect in an ongoing investigation that includes other appropriate non-demographic identifying factors.  NPD will also prohibit officers from using proxies for demographic category, including language ability, geographic location, mode of transportation, or manner of dress.

65.     NPD will conduct cumulative and quarterly demographic analyses of its enforcement activities to ensure officer, unit, and Division compliance with the bias-free policy through the identification of trends, outliers, or other relevant indicators.  In addition to collecting and analyzing stop data set out above in Section VI.F., NPD's analysis will include evaluations and assessments of enforcement activities by type, unit or assignment, demographics of the subject, the shift or time of day, location, the nature of offense, force used and resistance encountered, and comparisons of those factors among similar officers or units.  These analyses will be made publicly available pursuant to Section XV. below.

## VIII.   USE OF FORCE

NPD will develop and implement policies and training directing that the use of force by NPD officers accords with the rights secured and protected by the Constitution and state and federal law.  NPD will also develop and implement policies and review mechanisms that will promptly identify and appropriately respond to any unreasonable uses of force.  NPD will direct that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; and deescalate the use of force at the earliest opportunity.  To achieve these outcomes, NPD will implement the requirements set out below.

### A.     Use of Force Policy

66.     NPD will develop and implement a use of force policy or set of policies that comply with applicable law and requirements of this Agreement, including the Use of Force principles set out above.  The comprehensive use of force policy or policies will comprise all force techniques, technologies, and weapons that are available to NPD officers, including standard-issue weapons

that are made available to all officers and weapons that are made available only to specialized units. The comprehensive use of force policy will clearly define and describe each force option and the circumstances under which use of such force is appropriate and consistent with potential types of resistance. The policy will specify that the unreasonable use of force will subject officers to discipline, possible criminal prosecution, and/or civil liability.

67.    NPD's use of force policy will include the following requirements:

     a.    Officers will use advice, warnings, and verbal persuasion, when possible, before resorting to force;

     b.    Force will be appropriately de-escalated as resistance decreases;

     c.    When feasible, officers will rely on area containment; employ surveillance; wait out subjects; summon reinforcements; or call in specialized tactical units, in order to reduce the need for force and increase officer and civilian safety;

     d.    Officers will allow individuals the opportunity to submit to arrest before force is used wherever possible;

     e.    NPD will explicitly prohibit neck holds, except where lethal force is authorized;

     f.    NPD will explicitly prohibit head strikes with hard objects, except where lethal force is authorized;

     g.    NPD will explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to an officer or another person or persons, or, as objectively reasonable, where physical removal is necessary to overcome passive resistance;

     h.    NPD will explicitly prohibit the use of force beyond unresisted handcuffing to overcome passive resistance, except that physical removal is permitted as necessary and objectively reasonable;

i.   NPD will explicitly prohibit the use of retaliatory force by officers, including: force used after a threat has diminished or that is otherwise not reasonably necessary; force used to punish individuals for fleeing or otherwise resisting arrest; and force used in response to disrespectful language or actions.

j.   Unholstering a firearm and pointing a firearm at a person will be documented and tracked and used only when objectively and reasonably necessary to accomplish a lawful police objective;

k.   NPD will prohibit officers from using force to effect compliance with a command that is knowingly unlawful. A use of force is unreasonable when the initial arrest or detention was knowingly unlawful to the officer based on information that was known to the officer at the time of arrest or detention; and

l.   Immediately following a use of force, officers and, upon arrival, a supervisor will inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care. If qualified to do so, an officer will be expected to provide emergency first aid until professional medical care providers are on scene.

68.   NPD's use of force policies will include training and certification requirements that each officer must meet in order to carry and use any authorized weapon.

69.   NPD will provide initial and in-service training to officers to enable them to provide emergency first aid until professional medical care providers are on the scene.

70.   NPD will provide adequate opportunity and resources for officers to maintain proper weapons certifications. NPD will develop and implement effective sanctions for officers who do not keep their training and weapons certifications current.

**B.     Use of Firearms**

71.     NPD will prohibit officers from possessing or using unauthorized firearms or ammunition. In addition, all authorized firearms carried by officers will be loaded with the capacity number of rounds of authorized ammunition.

72.     NPD will prohibit officers from discharging a firearm at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force. A moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. Considering that firearms are not generally effective in bringing moving vehicles to a rapid halt, officers shall not fire from a moving vehicle unless the officer reasonably believes there exists an imminent danger of death or serious bodily harm to the officer or another person and no other means are available at that time to avert or eliminate the danger. Officers shall not fire a weapon solely to disable a moving vehicle. Officers shall not discharge their weapons at a moving vehicle unless it is absolutely necessary to do so to protect against an imminent threat to the life of the officer or others. When confronting an oncoming vehicle, officers shall make every effort to move out of its path, rather than discharge their firearms at the oncoming vehicle. Officers shall not intentionally place themselves in the path of an oncoming vehicle and attempt to disable the vehicle by discharging their firearms. Officers shall not discharge their firearms at a fleeing vehicle (a vehicle moving in the direction away from the officers) or its driver.

73.     NPD will prohibit officers from unholstering or exhibiting a firearm unless the officer reasonably believes that the situation may escalate to create an immediate threat of serious bodily injury or death to the officer or another person. Under those circumstances, the officer will place his or her finger outside the trigger guard and have it ready for self-defense. The finger is only to be placed on the trigger when on target and ready to engage a threat.

74.     NPD will require that officers successfully qualify at least twice a year with each firearm they are authorized to use or carry while on duty. Officers who fail to qualify will immediately relinquish the corresponding NPD-issued firearms. Those officers who still fail to qualify after remedial training within a reasonable time will be subject to disciplinary action, up to and including termination of employment.

## C.     Use of Force Reporting and Investigation

75.     NPD will adopt a use of force reporting system and a supervisor Use of Force Report that is separate from NPD's arrest and incident reports and includes individual officers' accounts of their use of force.

76.     NPD will require that officers notify their supervisor as soon as practicable following any reportable use of force.

77.     In consultation with DOJ and the Monitor, NPD will categorize force into levels for the purposes of reporting, investigating, and reviewing each use of force. These levels will be based on the following factors: potential of the technique or weapon to cause injury or disability; degree of actual injury or disability; duration of force; potential for abuse of misuse of weapon or force; and physical vulnerability of the subject. Each level of force will require increasingly rigorous reporting, investigation, and review.

78.     Lower or intermediate force will be investigated by officers' supervisors in the chain of command. NPD will establish a Serious Force Investigation Team ("SFIT") to review Serious Force incidents. NPD's response to every use of force, regardless of level, will include at least the following elements:

a.     Initial Reporting and Response:  requirements that describe officers' duty to report force and NPD supervisors' duty to respond and direct activities at the scene.

b.     Investigation and Supervisory Assessment:  requirements that describe who is responsible for the investigation and assessment as to the use of force and how that investigation or assessment is to be conducted. Intermediate and Serious Uses of Force will require a critical examination of the incident to assess whether the use of force was reasonable, as well as to identify any violations of policy, and any concerns regarding, training, tactics, equipment, or supervision.

c.     Departmental Review:  requirements that describe how use of force incidents

28

are reviewed by the NPD command and how information gathered about the incident could be used to increase the effectiveness of the officer and the Division as a whole.

d.   Record Keeping and Follow-up:  the force report, investigation, and review will be maintained, tracked, and used to inform NPD force-related practices and training.

79.   Every level of force reporting and review will include at least the following requirements:

a.   Every officer will complete a use of force form and narrative each time the officer uses force.  Officers observing force used by another officer will complete a supplemental narrative.

b.   Except for incidents involving only unholstering or pointing a weapon or unresisted handcuffing or Low Level uses of force, the supervisor of an officer using force will respond to the scene and determine, based upon policy and the facts then known, the level at which the use of force should be categorized.  A supervisor may opt for a higher level response than would usually be required for the level of the force used, depending upon the circumstances of the incident.

c.   When an incident involves multiple types of force or multiple officers, the entire incident will be reported and investigated at the highest level of force used by any officer during the incident.

d.   Whenever a supervisor uses, directs, or is otherwise personally involved in any type of force, a supervisor who was not involved in the use of force will conduct the investigation.

e.   The supervisor will notify the commanding officer by the end of the shift during which the force occurred.  The notification will contain basic information concerning the incident.

29

80.    Upon arrival at the scene, the supervisor will identify and collect evidence sufficient to establish the material facts related to the use of force, where reasonably available, including physical evidence, audio and video recordings, photographs, and other documentation of injuries or the absence of injuries.

81.    All officers who used force above Low Level will provide an oral Use of Force statement in person to the supervisor on the scene prior to the subject's being booked, or released, or the contact otherwise concluded, unless impractical under the circumstances.  If the subject is free to leave, the detention will not be extended to facilitate the screening process; however, the subject should be offered the opportunity to remain at the scene to speak with a supervisor.

82.    As appropriate pursuant to policy and necessary to complete a thorough, reliable investigation, the supervisor will:

   a.    Make reasonable attempts to locate relevant civilian witnesses including the subject and third parties, and arrange for those witnesses to be interviewed. Witnesses should be interviewed separately where possible.  Supervisors should use interview techniques taught in use of force investigation courses, including avoiding leading questions.

   b.    Use department-issued equipment to record interviews with civilian witnesses.  Interviews of the subject, or the subject's refusal to be interviewed, will be also audio or video recorded.

   c.    Conduct separate interviews of all officers involved in or witness to a use of force incident, unless unreasonable under the circumstances.

   d.    Require each officer at the scene to complete either a witness statement (if the officer did not use Intermediate Force) or a Use of Force Statement (if the officer did use Intermediate Force).  Each officer will describe comprehensively his or her conduct and that of other officers, identifying each officer involved in the incident, when possible.  The supervisor will assure such statements comply with NPD guidelines.

30

e.    Review any body-worn, in-car or other available video related to the incident, and red flag for retention any video that documents contact with the subject.

f.    Canvass the area for privately owned video that may have captured the contact, and attempt to obtain copies voluntarily. If the owner refuses, document the location and/or owner of the video. If no privately owned video is discovered, document that none was found.

g.    Photograph the location where the incident occurred, to determine damage, and ensure that relevant evidence is collected. Photograph any officer injuries or areas about which the officer complains, as well as any damaged government or private property.

h.    Respond to the subject's location, and photograph the subject for identification purposes, and any visible injuries or places where the subject complains of injury.

83.    The supervisor will investigate and evaluate in writing all uses of force for compliance with law and NPD policy, as well as any other relevant concerns (tactical, threat assessment, etc.). The supervisor will address any concerns with the officers involved. If it appears that misconduct may have been involved in the use of force, the supervisor will ensure that OPS is contacted and will consult the SFIT team regarding reclassification of the incident as Intermediate or Serious Use of Force.

84.    The supervisor's documentation of the investigation and evaluation will be completed within 72 hours of the use of force, unless the supervisor's commanding officer approves an extension. This documentation will include the following:

a.    The supervisor's detailed narrative description of the incident. The supervisor's narrative will describe the force used by the officers and the subject(s), any injuries sustained by the subject(s) and the officer(s), and the sequence of events comprising the incident. Additionally, it will document the supervisor's actions in reviewing or screening the incident. The summary should provide a commander, who is reviewing the report, a complete

31

understanding of the incident from beginning to end, including, crucially, when each officer used force, why the force was necessary at each point in time, and how each injury, if any, occurred.

b.   A use of force investigative report that contains documentation of all evidence that was gathered, including physical evidence; photographs; and names, phone numbers, addresses, and summaries of statements by all civilian and NPD witnesses to the incident. In situations in which there are no known witnesses, the report will so state. In situations in which witnesses were present but the author of the report did not determine their identities, phone numbers, or addresses of those witnesses, the report will explain the reasons for that failure.

c.   The supervisor's evaluation of the evidence, including a discussion and resolution of any material inconsistencies in the evidence or statements.

85.   NPD will analyze the data captured in officers' force reports and supervisors' investigative reports on an annual basis to identify significant trends, to correct deficient policies and practices, and to document its findings in an annual report that will be made publicly available pursuant to Section XV. below. NPD's analysis will include evaluations and assessments of use of force by type, unit or assignment, demographics of the subjects, the shift or time of day, location, the nature of offense, the resistance encountered, and comparisons among officers or units.

**D.    Use of Force Review**

86.   The chain-of-command supervisor reviewing the investigative report will ensure that the investigation is thorough, complete, and makes the necessary and appropriate findings of whether the use of force was lawful and consistent with policy. Each higher-level supervisor in the chain of command will review the investigative report to ensure that it is complete, the investigation was thorough, and that the findings are supported by a preponderance of the evidence.

87.    A supervisor should ensure that additional investigation is completed when it appears that additional relevant and material evidence may assist in resolving inconsistencies or improve the reliability or credibility of the findings.  When it appears that the findings are not supported by a preponderance of the evidence, the supervisor will recommend changes to the findings after consultation with the investigating supervisor and the previous reviewer, and document the specific evidence or analysis supporting the modification.  Any supervisor in the chain of command may discuss the modification with the investigating supervisor and/or reviewers.  If any investigative deficiencies exist, the reviewer will initiate corrective action where appropriate. Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors.

88.    When the precinct or unit commander finds that the investigation is complete and the evidence supports the findings, the investigation file will be forwarded to the Use of Force Review Board.

89.    At the discretion of the officer's chain of command, or OPS in the case of potential misconduct, a use of force investigation may be assigned or re-assigned for investigation to SFIT or to another supervisor, whether within or outside of the precinct or unit in which the incident occurred, or may be returned to the unit for further investigation or analysis.  Where, after investigation, a use of force is found to be inconsistent with NPD policy, or the investigation of the incident is lacking, the Director of Public Safety ("Director") or designee will direct and ensure appropriate corrective action, if warranted.  When the use of force raises policy, training, tactical, or equipment concerns, the Director or designee will ensure also that necessary training is delivered and that all other concerns are addressed.

### E.    Reporting and Investigation of Serious Force Incidents

90.    NPD will create a multi-disciplinary Serious Force Investigation Team ("SFIT") to conduct both the criminal and administrative investigations of Serious Force incidents, and to determine whether these incidents raise policy, training, tactical, or equipment concerns.  To guide SFIT practices and investigations, NPD will develop and implement a SFIT training curriculum and procedural manual.

33

91.   SFIT will respond to and investigate the following types of incidents:

   a.   all Serious Force incidents;

   b.   uses of force that potentially involve criminal conduct or misconduct on the part of the officer; and

   c.   uses of force referred to SFIT by any NPD supervisor (and approved by the SFIT commander), the Director, his/her designee, or OPS.  Response by SFIT to a scene does not assume a criminal or administrative violation has occurred.

92.   SFIT will investigate and document the incident with assistance from the on-scene supervisor.  SFIT will tailor its response to the circumstances but will normally include one to three SFIT detectives, the SFIT sergeant, a Homicide Unit command level officer, and a Training Section representative.  The Training Section representative will not have an investigative role at the scene of a use of force, but will attempt to identify any policy or training issues.  At least one member of SFIT or a homicide supervisor will be available at all times to evaluate potential referrals from NPD supervisors.  SFIT staff members will have appropriate expertise and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved; and that its investigations allow the Use of Force Review Board to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use of force.

93.   The on-scene supervisor shall take initial steps in response to the incident consistent with the requirements for Intermediate Force incidents until turning the scene over to the arriving SFIT personnel.  The scene will be left intact to be processed by SFIT personnel.  The supervisor will also make reasonable attempts identify civilian witnesses to the event and request that they stand by for the SFIT personnel's arrival.

94.   SFIT will have the following responsibilities in responding to a Serious Force incident:

   a.   SFIT personnel will assume control of the use of force investigation upon their arrival.

34

b.  SFIT detectives will record all interviews with civilian witnesses.

c.  SFIT personnel will arrange for a canvass for any privately owned video that
    may have captured the contact, and attempt to obtain copies voluntarily.  If
    the owner refuses, they will document the location and/or owner of the video.
    If no privately owned video is discovered, they will document that none was
    found.

d.  The SFIT supervisor will arrange for photographing and processing of the
    scene.

e.  SFIT detectives will attempt to interview the subject of the use of force to
    determine whether the subject needs additional medical attention and to
    obtain the subject's account of what happened, if possible, as an audio-
    recorded interview.  They will also photograph areas of injury or complaint of
    injury.

f.  The SFIT supervisor or commander will respond to the SFIT office and
    arrange for body-worn or in-car camera video downloads as well as witness
    statements from all witness officers prior to the end of their shift(s) unless
    impracticable.

g.  SFIT detectives will conduct in-person interviews of the involved officers as
    soon as possible.

h.  The SFIT supervisor or commander will arrange for the involved officers to
    submit use of force written statements as soon as practicable.

i.  The SFIT supervisor or commander will be responsible for notifying the
    involved officers' chain of command up to the Director, as well as the OPS,
    no later than 12 hours after learning of the use of force, unless impractical.
    This notification will contain basic information about the incident.

j.  Within 30 days or as soon as possible thereafter, the SFIT commander will
    present the completed investigation to the commander of the OPS and the

officers' chain of command.  Upon completion of the review, OPS, the chain of command, and the SFIT commander, will be responsible for presenting the investigation to the Use of Force Review Board (UFRB) when it next convenes.  Consistent with current officer-involved shooting protocols, any presentations to the command staff will also be the responsibility of the SFIT commander.

k.   If the SFIT investigation indicates potential criminal conduct or administrative misconduct, the SFIT commander will be responsible for notifying the command staff and taking the following actions as appropriate:

    i.   If the investigation indicates potential criminal conduct by an NPD officer, the SFIT commander will confer immediately with OPS and the Director and refer the matter to the appropriate federal or state authorities for investigation.  Notwithstanding the referral and unless otherwise directed by the prosecutive agency, SFIT will proceed with its administrative investigations.  Under no circumstances will OPS compel a statement from the subject officer without first consulting with the Chief or Director and with the prosecuting agency.

    ii.   Any allegations of administrative misconduct that are discovered during the force investigation will be referred within five days to OPS, which will be responsible for the administrative misconduct investigation.  SFIT will retain responsibility for the force investigation.

## F.   Use of Force Review Board

95.   NPD has established and shall continue to maintain a Use of Force Review Board in a manner that is consistent with this Agreement.  The UFRB will conduct timely, comprehensive, and reliable reviews of all Intermediate and Serious Force incidents.  The UFRB also will conduct the administrative review of incidents in which the ECPO has completed an investigation pursuant to New Jersey Attorney General Directive 2006-05.  Where additional

investigation is necessary to reach administrative findings, the UFRB will refer to SFIT for additional investigation.

96.     The UFRB will include the Chief of Police or the Chief's designee (who will chair the UFRB); supervisors from the Training Section; one representative from each involved precinct, selected by each precinct captain; and a representative from the OPS. The UFRB may consult with any subject matter experts the UFRB feels would be helpful in reviewing particular incidents and other advisors as necessary.

97.     Each member will receive a minimum of eight hours of training on an annual basis, including legal updates regarding use of force and the Training Section's current use of force curriculum.

98.     Review of Intermediate Force investigations:  The UFRB will review each Intermediate Force investigation to determine whether the findings by the chain of command regarding the use of force are consistent with law and policy and supported by a preponderance of the evidence; whether the investigation is thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed.

99.     Review of SFIT Investigations:  The review of SFIT investigations is the same as for Intermediate Force investigations, except the SFIT investigation review will be chaired by the Director or his or her designee.

100.    Consistent with current practice and the provisions above, the UFRB will document its findings and recommendations for SFIT investigations.  Unless the UFRB Chair grants an extension, the review should be conducted within seven days of the SFIT presentation to the UFRB.

101.    The NPD will include the civilian oversight entity in the review of completed SFIT investigations, as permitted by law.

102.    The UFRB will not make recommendations concerning discipline; however, the Chair of the UFRB is obligated to ensure a referral to OPS if potential misconduct is discovered in the review process.  Should policy, equipment, or training deficiencies be noted in the review

process, the UFRB Chair will ensure that they are brought to the attention of the relevant commanding officer for appropriate action. The unit commander of the officer involved with the use of force will have the final responsibility regarding retraining or recommending discipline to the Director.

## IX.   IN-CAR AND BODY-WORN CAMERAS

NPD will develop, implement, and maintain a system of video recording officers' encounters with the public with body-worn and in-car cameras. The use of video cameras will be designed to increase officer accountability, improve NPD legitimacy in the community, and augment NPD's records of law enforcement activities.

103.   NPD will equip all marked patrol cars with video cameras, and require all officers, except certain officers engaged in only administrative or management duties, to wear body cameras and microphones with which to record enforcement activity. NPD will develop and implement a policy to designate cars and officers that will not be equipped with video cameras or that will be equipped with concealed cameras, because the visibility of a camera might compromise undercover work or other appropriate and lawful clandestine police activity. NPD will develop a policy to designate the categories of officers who will not wear body cameras because they are engaged only in administrative or management duties.

104.   In conjunction with the Monitor and DOJ, NPD will develop and implement a policy regarding body-worn camera video and audio recording that will address issues including use, retention, privacy issues, the use of recordings as evidence in force and complaint reviews, and the use of recordings for other criminal justice purposes (such as evidence in prosecutions). At a minimum, NPD's body-worn camera policy will:

a.   Clearly state which officers are required to use body-worn cameras and under which circumstances;

b.   Specify the location(s) on the body where the camera should be worn;

c.   Require officers to activate their cameras when responding to calls for service and during all law enforcement-related encounters and activities, with

38

appropriate exceptions (e.g., interviews with crime victims) that occur while on duty, and to continue recording until the conclusion of the incident(s) or encounter(s);

d.  Require officers to articulate in writing or on camera their reasons for failing to record an activity that NPD policy otherwise requires to be recorded;

e.  Require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible;

f.  Establish a download and retention protocol;

g.  Permit officers to review video of incidents in which they were involved;

h.  Require periodic random review of officers' videos; and

i.  Require supervisors to review videos of incidents involving use of force and consent searches.

## X.  THEFT

So that individuals are not deprived of property without due process and to increase NPD's legitimacy and confidence in the community, NPD shall take comprehensive efforts to prevent theft of property by officers.

105.  In all instances where property or evidence is seized, the responsible officer will immediately complete an incident report documenting a complete and accurate inventory of the property or evidence seized, and will submit the property or evidence seized to the property room before the end of tour of duty.

106.  As detailed in Section XII. below, NPD will conduct regular, targeted, and random integrity audits to detect and deter theft by officers.  NPD will employ tactics such as increased surveillance, stings, and heightened scrutiny of suspect officers' reports and video-recorded activities.

107.    NPD will conduct periodic reviews of the disciplinary histories of its officers who routinely handle valuable contraband or cash, especially those in specialized units, to identify any patterns or irregularities indicating potential risk of theft by officers.

108.    To the extent permitted by law and NPD's collective bargaining agreements, NPD will transfer officers with any sustained complaint of theft, or two not sustained or unfounded complaints of theft occurring within one year, out of positions where those officers have access to money, property, and evidence.  Aspects of officers' disciplinary histories that relate to honesty and integrity will be considered in making decisions regarding reassignment, promotions, and similar decisions.

109.    NPD will report all theft allegations to the New Jersey Department of Law and Public Safety and will continue to report such allegations to the Essex County Prosecutor.  Officers who have been the subject of multiple theft allegations will be identified as such in said reports.

110.    NPD will maintain policies and procedures for the intake, storage, and release of property.  To that end, NPD will:

   a.    direct that no fewer than two officers jointly process all cash and other property seized from or otherwise held for arrestees;

   b.    prohibit officers from allowing a detainee to sign a blank property form;

   c.    provide appropriate guidance for how seized property is to be packaged and labeled;

   d.    require that all seized property is to be stored in a secure property room, to which access will be limited to specifically designated personnel;

   e.    secure property room doors with mechanisms that automatically lock upon closing;

   f.    install and maintain working video cameras in the property room and other areas where property is stored, and establish a video retention policy that maintains recordings to support investigations of allegations of theft;

    g.     take appropriate precautions to effectively secure all money, precious metals, jewelry or other items of value; and

    h.     maintain an itemized inventory in a computerized database of all seized or held property.

111.    NPD will conduct and document periodic audits and inspections of the property room and immediately correct any deficiencies.

## XI.    COMPLAINT INTAKE AND INVESTIGATION

NPD and the City will establish policies and procedures directing that all allegations of officer misconduct are received and fully and fairly investigated; that all investigative findings are supported using the preponderance of the evidence standard and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.

### A.    Complaint Process

112.    Within 365 days of the Operational Date, the City and NPD, in collaboration with the civilian oversight entity or other community input, will develop and implement a program to effectively publicize to the Newark community how to make misconduct complaints.

113.    The City and NPD will make forms and other materials outlining the complaint process and OPS contact information available on their websites and at appropriate government properties, such as NPD headquarters and precincts, City Hall, and public libraries. Copies will also be made available for distribution through the offices or gathering places of interested community groups. Complaint forms and related informational materials will be available in English, Spanish, and Portuguese.

114.    NPD will accept all complaints, whether made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail. Individuals will also be able to submit misconduct complaints through the City's and NPD's websites. NPD will accept all misconduct complaints, including from anonymous, confidential, and third-party complainants.

115.    NPD will provide civilians, including complainants and witnesses to alleged police misconduct, with full access to NPD's complaint process.  NPD will revise its policies to prohibit practices that discourage complainants and witnesses from coming forward, including the following:

a.    Complaint forms and information materials will not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints;

b.    NPD investigators will not check the criminal history of a complainant or witness unless such information would be relevant to the allegations under investigation.  When criminal history checks are conducted, NPD investigators will document in writing the justification for doing so; and

c.    NPD investigators will not give complainants or witnesses *Miranda* warnings prior to or during non-custodial interviews.  If a complainant's allegation arises from a criminal arrest, investigators will communicate with the complainant's criminal defense attorney.

116.    Within 180 days of the Operational Date, NPD will train all police personnel, including dispatchers, to properly handle complaint intake, including how to provide complaint materials and information; the consequences for failing to take complaints; and strategies for turning the complaint process into positive police-civilian interaction.

117.    As detailed in Section XII. below, NPD will conduct regular, targeted, and random integrity audits to identify officers or other employees who refuse to accept or discourage the filing of misconduct complaints, fail to report misconduct or complaints, or provide false or misleading information about filing a misconduct complaint.  Any officer or employee who engages in such conduct will be subject to discipline, up to and including termination.  All allegations of such conduct will be documented and monitored in NPD's early warning system.

118.    NPD will review the results of these audits and take appropriate action to remedy any problematic patterns or trends.

119.    NPD will require that all officers and employees report allegations of criminal behavior or administrative misconduct by another NPD officer toward a member of the public that they may observe themselves or receive from another source to a supervisor or directly to OPS for review and investigation.  When a supervisor receives such allegations, the supervisor will promptly document and report this information to OPS.  Failure to report or document such allegations will be grounds for discipline, up to and including termination of employment.  The presumptive discipline for a failure to report such allegations will be commensurate with the presumptive discipline for the underlying misconduct.

120.    NPD will investigate as a misconduct complaint any information or testimony arising in criminal prosecutions or civil lawsuits that indicate potential officer misconduct not previously investigated by NPD.

**B.    Complaint Classification and Assignment of Investigative Responsibility**

121.    NPD will adopt a complaint classification protocol that is based on the nature of the alleged misconduct in order to guide OPS in determining where a complaint should be assigned for investigation.

122.    OPS will investigate all allegations of Serious Misconduct as defined in this Agreement.

123.    NPD shall develop a protocol for determining whether other complaints will be assigned to the subject officer's supervisor, the precinct's Integrity Compliance Officer, or retained by OPS for an administrative investigation.  OPS will also determine whether the misconduct complaint warrants a referral to federal or state authorities for a criminal investigation.

124.    OPS will routinely monitor investigations referred to officers' precincts and specialized units for quality, objectivity and thoroughness, and take appropriate action if investigations are deficient.  OPS will also identify trends in investigative or leadership deficiencies.

125.    NPD will maintain a centralized numbering and tracking system for all misconduct complaints.  NPD will promptly assign a unique identifier upon receipt of a complaint, which will be provided to the complainant at the time the complaint is made.  Where a misconduct complaint is received in the field, a supervisor will obtain the unique identifier and provide this

identifier to the complainant. NPD's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. The system will be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with NPD policies and procedures and this Agreement, including requirements of timeliness of administrative investigations.

### C.    Misconduct Complaint Investigation

126.    NPD will adjudicate all complaints based on the preponderance of the evidence. This standard will be clearly delineated in policies and procedures and be accompanied by extensive examples to ensure proper application by investigators.

127.    In each investigation, NPD will collect and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded video as it becomes available through NPD's implementation of in-car and body-worn cameras pursuant to this Agreement.

128.    NPD policy will require that investigators consider patterns in officer behavior based upon disciplinary history and other information in NPD's Early Warning System.

129.    Investigators will make efforts to resolve material inconsistencies in officers' and witnesses' statements and will not discount witnesses' statements solely due to minor inconsistencies.

130.    Investigators will apply the same criteria in assessing the credibility of all witnesses' testimony, whether they are civilians, officers, victims, or suspects. Investigators will not give greater weight or credibility to officers' statements merely because they are officers, nor will investigators discredit, disregard, or give less weight to a statement merely because of the relationship between a complainant or subject of police action and the person who made it. An individual's criminal history will not be solely dispositive in weighing his or her credibility.

131.    No investigation will be limited to the allegations that prompted it. NPD will evaluate all relevant police activity and evidence of any potential misconduct uncovered during the course of

the investigation, including each use of force (*i.e.*, not just the type of force complained about) and any stops, searches, or seizures that occurred during the incident.

132.    In addition to determining whether an officer committed misconduct, administrative investigations will include an assessment of whether:  (a) the police action was in compliance with training and legal standards; (b) the use of different tactics should or could have been employed; (c) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and (d) the incident suggests that NPD should revise its policies, strategies, tactics, or training.  Any such assessments which identify policy, training, tactical, or other concerns will be promptly forwarded to the Police Director and, if the issue is force-related, to the UFRB, for review and appropriate action.

133.    NPD will not find make a finding that an allegation of misconduct is unfounded or not sustained, or otherwise exonerate an officer, simply because the complaint is withdrawn or the complainant is unavailable, unwilling, or unable to cooperate with an investigation, or refuses to provide medical records or proof of injury; rather, the investigation will continue as necessary to resolve the original allegation(s) where possible based on the evidence and investigatory procedures and techniques available.

134.    If a complainant pleads guilty or is found guilty of an offense, NPD will not consider the fact of conviction to be evidence whether an NPD officer engaged in misconduct, nor will it justify discontinuing the investigation.

135.    A misconduct complaint investigation may not be conducted by any supervisor or officer who authorized, engaged in conduct that led to, or otherwise participated in the incident complained of; who was on the scene at the time of the incident; or who has a conflict of interest as defined by NPD policy.

136.    The Police Director or Chief of Police will not be authorized to personally conduct an investigation of officer misconduct or violation of policy, or to prevent such an investigation.

**D.** **Parallel Administrative and Criminal Investigations of Officer Misconduct**

137.    If after a reasonable preliminary inquiry into an allegation of misconduct, or at any other time during the course of an administrative investigation, the OPS has cause to believe that an officer or employee might have engaged in criminal conduct, the OPS will refer the matter to the ECPO, DOJ, or other law enforcement agency as appropriate.

138.    Notwithstanding the referral and unless otherwise directed by the prosecutive agency, NPD will proceed with its administrative investigations.  Under no circumstances will OPS compel a statement from the subject officer without first consulting with the Chief or Director and with the prosecuting agency.

139.    Nor will NPD automatically end its administrative investigation in matters in which the prosecuting agency declines to prosecute or dismisses after initiation of criminal charges. Instead, NPD will require investigators to conduct a complete investigation and assessment of all relevant evidence.

140.    NPD will work with DOJ, the ECPO, and the New Jersey Attorney General's Office as appropriate to improve its processes for investigations of use of force incidents and referrals of complaints of police misconduct for criminal investigation.

**E.** **Review and Analysis of Investigations**

141.    NPD will train OPS supervisors to ensure that investigations are thorough and complete, and that investigators' conclusions and recommendations that are not adequately supported by the evidence will not be approved or accepted.

142.    NPD will develop and implement a protocol for regular supervisory review and assessment of the types of complaints being alleged or sustained to identify potential problematic patterns and trends.

143.    NPD's protocol shall include the following as separate categories of misconduct complaints:

46

a. Allegations that an officer has in any way interfered with a civilian's First and Fourth Amendment rights to:

i. verbally criticize officers' conduct; or

ii. observe and record officers' conduct in areas open to the public or where an individual has a right to be, such as a home or business.

Improper interference with these rights include: improperly detaining or arresting individuals on discretionary charges for engaging in protected conduct; seizing a cell phone or other photographic or recording equipment without a valid warrant; and using force against a person in response to verbal criticism.

b. Allegations of discriminatory policing, including allegations that an officer:

i. conducted a stop or arrest based on an individual's demographic category; or

ii. used a slur based on race, ethnicity, sexual orientation, or gender identity.

NPD will require that complaints of discriminatory policing are captured and tracked appropriately, even if the complainant does not so label the alleged misconduct.

c. Allegations of unlawful stops or detentions.

**F.   Staffing and Training Requirements**

144. Within 30 days of the Operational Date, NPD will review staffing of OPS and ensure that misconduct investigators and commanders possess appropriate investigative skills, a reputation for integrity, the ability to write clear reports with recommendations supported by the evidence, and the ability to assess fairly and objectively whether an officer has committed misconduct.

145.    Officers with a sustained complaint of, or who have been disciplined for, excessive use of force, false arrest, unlawful search and seizure, sexual harassment, discrimination, or dishonesty will be ineligible for assignment to OPS.

146.    NPD will use a case management system to track and maintain appropriate caseloads for OPS investigators and promote the timely completion of investigations by OPS.

147.    NPD will require and provide appropriate training for OPS investigators upon their assignment to OPS, with refresher training at periodic intervals.  At a minimum, NPD will provide 40 hours of initial training and eight hours additional in-service training on an annual basis.

148.    Training for OPS investigators will include instruction in:

    a.    investigative skills, including proper interview techniques and gathering and objectively analyzing evidence;

    b.    the particular challenges of administrative police misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; properly weighing the credibility of civilian witnesses and officers; using objective evidence to resolve inconsistent statements; and the proper application of the preponderance of the evidence standard; and

    c.    NPD rules and policies, including the requirements of this Agreement, and protocols related to criminal and administrative investigations of alleged officer misconduct.

149.    NPD will improve OPS's complaint tracking and assessment practices to achieve:

    a.    consistent tracking of civilian and departmental complaints by allegation and outcomes;

    b.    consistent tracking of penalties imposed;

48

c.   periodic assessments of the data to identify and address any deficiencies in the process (e.g., low rates of sustained complaints, patterns in types of allegation, etc.);

d.   periodic assessments of the data to determine the relative rates of complaints against officers from particular precincts, specialized units, etc.; and

e.   summaries of complaint data are routinely made available to the public in a manner consistent with the New Jersey Attorney General's guidelines.

## XII.   COMPLIANCE REVIEWS AND INTEGRITY AUDITS

NPD will develop and implement a schedule for planning and executing regular, targeted, and random internal reviews and integrity audits to promote compliance with NPD policy and constitutional policing.

150.   NPD will conduct integrity audits and compliance reviews to identify and investigate all officers who have engaged in misconduct including unlawful stops, searches, seizures (including false arrests); excessive uses of force; theft of property or other potential criminal behavior; racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgender persons.

151.   The integrity audits and compliance reviews will also seek to identify officers who discourage the filing of complaints, fail to report misconduct or complaints, or otherwise undermine NPD's integrity and accountability systems.  OPS will have the oversight responsibility within NPD for these operations.  OPS will use relevant EWS data and other relevant information in selecting targets for integrity audits.

## XIII.   DISCIPLINE

NPD will adopt policies that are consistent and fair in their application of officer discipline throughout the Division, including establishing a formal, written, presumptive range of discipline for each type of violation.

152.   NPD will apply discipline for sustained allegations of misconduct based on the nature and severity of the policy violation and defined mitigating and aggravating factors, rather than

49

the officer's identity, rank or assignment; relationship with other individuals; or reputation in the broader community.

153.    Within 90 days of the Operational Date, NPD will implement disciplinary guidance that:

    a.    establishes a presumptive range of discipline for each type of violation;

    b.    increases the presumptive discipline based on an officer's prior violations of the same or other rules;

    c.    sets out defined mitigating or aggravating factors;

    d.    requires that any departure from the presumptive range of discipline must be justified in writing;

    e.    prohibits taking *only* non-disciplinary corrective actions when the disciplinary matrix calls for the imposition of formal discipline; and

    f.    provides that NPD will consider whether additional non-disciplinary corrective action may be appropriate in a case where discipline is also imposed.

154.    NPD will establish a unified system for reviewing sustained findings and applying the appropriate level of discipline pursuant to NPD's disciplinary guidance. This disciplinary system will be subject to review and approval of the Monitor and DOJ. NPD will document all disciplinary decisions, including the rationale for any decision to deviate from the level of discipline set out in the disciplinary matrix.

155.    NPD will conduct annual reviews of its disciplinary process and actions, which will include an analysis of the implementation of a progressive discipline model, and whether the discipline system's mitigating and exacerbating factors are appropriate and effectively applied.

## XIV.   DATA SYSTEMS IMPROVEMENT

NPD and the City will develop, implement, and maintain contemporary records and management systems to allow the close and effective supervision necessary for officers to

improve and grow professionally; to police actively and effectively; and to identify, correct, and prevent misconduct.

### A.      Early Warning System

156.     Within one year of the Effective Date, and consistent with applicable law and best practices, NPD will enhance its Early Warning System (EWS) to support the effective supervision and management of NPD officers.  NPD will use the EWS to promote constitutional policing and professional police practices.  The EWS will use a relational database to track and analyze information regarding the activities of all NPD personnel.  The City will provide NPD with sufficient funding levels to implement and maintain the EWS, including its ongoing hardware and support requirements.

157.     NPD will develop and implement a data protocol describing in detail what information is to be recorded and maintained in the EWS.  The EWS and the data protocol will be subject to review and approval by the Monitor and DOJ.  At a minimum, the EWS will include all relevant information, including the results of any investigation or supervisory review related to:

a.      use of force incidents and allegations of use of force;

b.      all injuries to individuals in the custody or control of an NPD officer or injured as a result of an officer's actions;

c.      all allegations of unlawful arrest;

d.      all allegations of unlawful search or seizure;

e.      all allegations of theft, missing property, or planted evidence;

f.      all complaints of misconduct against officers;

g.      all arrests for disorderly conduct, resisting arrest, and assaulting a police officer;

h.      all disciplinary action taken;

51

    i.      all non-disciplinary or corrective action, including actions taken pursuant to the operation of the EWS;

    j.      officer rank, assignment, and training history; and

    k.      judicial determinations of officers' credibility.

158.    NPD will revise its use of EWS as an effective supervisory tool.  The EWS will use comparative data and peer group analysis to identify patterns of activity by officers and groups of officers for supervisory review and intervention.  The protocol will require supervisors to conduct a comprehensive written review of officers and groups of officers identified for potential intervention and will provide an array of individualized alternatives for resolving problems identified during the review, such as counseling, training, additional supervision or monitoring, and action plans for modifying future behavior.

159.    Additionally, the protocol will require commanders and supervisors to promptly review the records of all officers who are transferred to their command and to conduct periodic reviews of all officers and groups under their command to identify potential trends.  The EWS will produce reports for supervisors to use in these reviews.  The purpose of these evaluations will not be disciplinary, but to provide officers necessary support to police effectively and constitutionally and to prevent negative practices from developing or continuing.

160.    NPD will make reasonable efforts to ensure that the EWS makes use of available technologies, including the electronic transfer of information from other data systems, to maximize efficiency.  DOJ will advise NPD of other agencies with functioning EWS for ideas and technical assistance.

161.    NPD will continue to use its current IAPro software's alert and warning features to identify officers for intervention while further developing and implementing an EWS that is fully consistent with this Agreement.

    **B.**    **Record Management System ("RMS")**

162.    NPD will revise its use and analysis of the RMS to make more efficient and effective use of the data it contains and improve its ability to interface with other technology systems.  These

improvements will include the use of automation for transferring data to and from other systems (in particular, the EWS) and the development or implementation of reporting modules that allow more flexible queries of the police records and data contained in NPD's systems.

163.    The City will provide NPD with sufficient funding and personnel to implement and maintain the RMS, including ongoing hardware and support requirements.

## XV.    TRANSPARENCY AND OVERSIGHT

To ensure comprehensive, effective, and transparent oversight of NPD, NPD and the City will develop, implement, and maintain systems that are meant to be sustained after the completion of this Agreement.  To facilitate effective and constitutional policing and increase trust between NPD and the broader Newark community, these oversight systems shall ensure that improper incidents, practices, or trends are identified and corrected in an equitable and timely manner.

164.    To the extent permissible by law, including civil service rules and collective bargaining agreements, NPD will make its policies publicly available, and will regularly report information regarding officer use of force; misconduct complaints; and stop/search/arrest data.  Where NPD seeks to withhold a policy from the public, it will confer with DOJ and the Monitor to determine whether the particular policy, or any part of it, should be withheld from publication.

165.    NPD will work with the civilian oversight entity to overcome impediments to the release of information consistent with law and public safety considerations.  As part of this effort, NPD and the civilian oversight entity should consider NPD's policies and practices regarding disclosure of documents, videos, and other materials.

166.    To ensure transparency, all NPD audits, reports, and outcomes analyses as described in Section XVI.C. below, related to the implementation of the Agreement, will be made publicly available, including on the City and NPD websites, to the fullest extent permissible under law.

167.    The data points of such audits and reports will be posted on NPD's website in a readily accessible format, displayed as interpreted and not raw data.

168.    On at least an annual basis, NPD will issue reports summarizing and analyzing the stop, search, arrest, and use of force data collected, the analysis of that data, and the steps taken to correct problems and build on successes.

## XVI.   AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### A.     Selection and Role of Independent Monitor

169.    As described in greater detail below, the Independent Monitor will assess the City's progress in implementing, and achieving compliance with, the Agreement; report on the status of implementation to the Parties and the Court; work with the Parties to address any barriers to compliance; and assist the Parties to informally resolve any disputes or differences.

170.    The Parties have jointly selected and the Court hereby appoints Peter C. Harvey to be the Independent Monitor. ("Monitor").   Within 60 days of the effective date, the Monitor will make a written proposal to the City and DOJ identifying the persons or entities he proposes to hire, employ, or contract with to perform the tasks assigned by the Agreement.  The Monitor may request that DOJ and the City grant up to a 15-day extension to provide the written proposal to the DOJ and the City.  The monitoring team will include persons or entities with subject matter expertise in police practices covered by the Agreement, police accountability, community engagement and civilian oversight, police data analysis, survey development and analysis, and project management.  The team will be comprised of persons or entities reflecting both local and national perspectives.  The City and DOJ will have 15 days to review the proposed monitoring team.  If both the City and DOJ approve the proposed monitoring team, they will notify the Court of their approval and the Monitor will proceed forthwith to hire or otherwise retain the team members.  If either the City or DOJ does not approve the proposed monitoring team, they will have 30 days to reach a resolution in consultation with the Monitor.  If they do not reach a resolution within 30 days, then the issue will be presented to the Court for resolution.  Any person or entity hired or otherwise retained by the Monitor will be subject to the provisions of the Agreement.

171.    The Monitor will be subject to the supervision and orders of the Court, consistent with this Agreement and the Monitoring Plan.  The Monitor will have only the duties, responsibilities,

and authority conferred by this Agreement. The Monitor will not, and is not intended to, replace or assume the role and duties of the City or NPD, including the Police Director or Chief of Police.

172. In order to assess and report on NPD's implementation of this Agreement, and whether implementation is resulting in constitutional policing, the Monitor will conduct compliance reviews and audits and outcome assessments as specified below, and such additional audits, reviews, and assessments that the Monitor or Parties jointly deem necessary. If there is disagreement over proposed additional audits, reviews, or assessments, the Parties and the Monitor may request that the Court resolve the issue.

**B.     Compliance Reviews and Audits**

173. The Monitor will conduct compliance reviews or audits as necessary to determine whether the City and NPD have implemented and continue to comply with the requirements of this Agreement. Compliance with a requirement of this Agreement requires that the City and NPD have: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) implemented the requirement in practice. The Monitor's compliance reviews and audits will consider all information necessary for a reliable and comprehensive assessment, and may rely on sampling and compilation of data where appropriate.

**C.     Outcome Assessments**

174. In addition to compliance reviews and audits to determine whether the specific requirements of this Agreement have been met, the Monitor will assess whether implementation of this Agreement is resulting in the desired outcomes (*i.e.*, policing that is consistent with the Constitution and that engenders effective cooperation and trust between NPD and the community it serves.) These outcome assessments will include collecting and analyzing the following data to establish a baseline and assess change over time:

    a.     Stop, Search, and Arrest:

        i.     stop rates by subject(s) race or ethnicity, gender, and age per sector,

precinct, shift, and unit;

ii.    post-stop activity rates, such as frisks, searches, requests for consent to search; in-car detentions, citations issued, by subject(s) race or ethnicity, gender and age per sector, precinct, shift, and unit; and

iii.    analyses of the frequency and effectiveness of stop and post-stop activities, including rates at which contraband is discovered pursuant to a search, by type of search, race or ethnicity, gender, and age per sector, precinct, shift, and unit.

b.    Use of Force

i.    the rate of force used per arrest by NPD;

ii.    the rate of force by types of force used;

iii.    the rate of force by geographic data and type of arrest;

iv.    the rate of force used, measured against the subject's race or ethnicity, gender, and age;

v.    the rate of force complaints that are sustained, overall and by force type; sources of complaint (internal or external); types of arrest; types of force complained of;

vi.    uses of force that were found to violate policy overall and by the following subsets: force type; type of arrest; force implement used; and number of officers involved;

vii.    the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

viii.    the number of officers who have more than one instance of force found to violate policy; and

56

    ix.    claims and lawsuits filed regarding uses of force, judgments entered, or cases settled.

c.    Theft Allegations

    i.    the rate of theft allegations over time by sector, precinct, unit, etc.;

    ii.    the success rate of targeted and random stings and integrity audits;

    iii.    the rate of sustained theft allegations; and

    iv.    the effectiveness NPD's other efforts to reduce theft by officers as reflected in the above information.

d.    Training

    i.    training effectiveness; and

    ii.    modifications or improvements to training resulting from review and analysis of uses of force, stops, searches, arrests, citizen complaints, community input or oversight, and other sources as required by the Agreement.

e.    Supervision

    i.    effectiveness of first-line supervisors' and the chain of commands' identification of and response to incomplete or insufficient reporting for stops, searches, arrests, and uses of force;

    ii.    ability of supervisors and commanders to identify trends related to use of force; or stops, searches, or arrests in violation of NPD policy or the law that go unaddressed by supervisors;

    iii.    the number and rates of civilian and administrative complaints against supervisors' and commanders' direct subordinates;

    iv.    effectiveness at implementing NPD's community engagement and law

enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas; and

 v. response to officers or units identified for supervisory review or intervention by NPD's Early Warning System.

f. Accountability

 i. the number of misconduct complaints (broken out by type of complaint), with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process;

 ii. the rates at which complaints are deemed to have been sustained, not sustained, unfounded, and exonerated.;

 iii. the number of officers who are subjects of repeated misconduct complaints, or have repeated instances of sustained misconduct complaints;

 iv. the number, nature, outcome, and settlement amount, if any, of civil suits against NPD officers related to use of force regardless of whether the City is a defendant in the litigation;

 v. arrests and summons of officers for off-duty conduct;

 vi. the results of and conclusions drawn from community surveys and outreach efforts; and

 vii. criminal prosecutions of officers for on or off-duty conduct.

175. In conducting these assessments, the Monitor may use any relevant data collected and maintained by NPD, and information available from claims and settlements filed against NPD, provided that it has determined, and the Parties agree, that this information is reasonably reliable and complete. The Monitor should also consider the annual community survey as an outcome measure in determining whether the implementation of this Agreement has had any unintended

negative consequences on either accomplishing the purposes of the Agreement or the ability of NPD to conduct effective and constitutional policing.

### D.   Monitoring Plan

176.   Within 90 days of the Operational Date of this Agreement, the Monitor will develop a monitoring plan, including proposed deadlines for conducting the above assessments, compliance reviews and audits.  This plan will:

    a.   clearly delineate the requirements of the Agreement to be assessed for compliance, indicating which requirements will be assessed together;

    b.   establish a schedule for assessing each outcome measure at least annually, except where otherwise noted, with the first assessment occurring within 365 days of the Operational Date;

    c.   establish a schedule for completing a compliance review or audit of each requirement of this Agreement within the first two years of the Agreement, and a compliance review or audit of each requirement at least annually thereafter; and

    d.   set out the method of communicating with the public and receiving public input.

177.   The Monitor will submit the initial and any revised Monitoring Plans to the Parties for review, and the Parties will have 30 days to either approve or propose changes.  If either Party proposes changes, the Monitor will have 15 days to accept or object to those changes.  If the Monitor objects to any of the proposed changes or the Parties suggest changes that are in conflict, either Party or the Monitor will provide the rationale for its proposal or objection, in writing, and the Parties and Monitor will confer to resolve the disagreement.

178.   The Parties may submit the Monitoring Plan to the Court after it is approved by the Parties.  If after good faith attempts, disagreements remain among the Parties and/or Monitor, either Party or the Monitor may petition the Court to resolve them.

179.    Where the Parties agree, and subject to Court approval, the Monitor will refrain from auditing a provision of this Agreement, provided that the City has been previously found to be in sustained compliance (*i.e.*, findings of compliance for two consecutive audits) with that provision by the Monitor, or where outcome assessments indicate that the intended effect of the requirement has been achieved.

180.    At least 45 days before initiating  any assessment, review, or audit, the Monitor will submit a proposed methodology to the Parties.  The Parties will submit any comments or concerns regarding the proposed methodology to the Monitor within 30 days of the proposed date of the assessment, review, or audit.  The Monitor will modify the methodology as necessary to address any concerns or inform the Parties in writing of the reasons it is not modifying its methodology as proposed.

### E.    Monitor Recommendations and Technical Assistance

181.    The Monitor may make recommendations to the Parties regarding any relevant issues, including measures the Monitor believes are necessary to ensure timely, full, and effective implementation of this Agreement and its underlying objectives.  Such recommendations may include proposals to change, modify, or amend a provision of the Agreement, subject to Court approval; additional training in any area related to this Agreement; or to seek technical assistance.  In addition to such recommendations, the Monitor may also, at the request of DOJ or the City and based on the Monitor's reviews, provide technical assistance consistent with the Monitor's responsibilities under this Agreement.

### F.    Comprehensive Re-Assessment

182.    Two years after the Operational Date, the Monitor will conduct a comprehensive re-assessment to determine whether and to what extent the outcomes intended by this Agreement have been achieved, and whether any modifications to the Agreement are necessary for continued progress.  This re-assessment also will address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating full and effective compliance.  The Monitor will file the re-assessment with the Court and it will be a public record.  Based upon this re-assessment, the

Monitor will recommend modifications to the Agreement that are necessary to achieve and sustain intended outcomes. Where the Parties agree with the Monitor's recommendations, the Parties will submit such stipulation to the Court and request approval. This provision in no way diminishes the Parties' ability to modify this Agreement, subject to Court approval, as set out in paragraph 218 below. Nothing in this re-assessment will empower the Monitor to unilaterally modify the terms of this Agreement.

### G.    Monitor Reports

183.   The Monitor will file with the Court quarterly written, public reports covering the reporting period that will include:

a.    a description of the work conducted by the Monitor during the reporting period;

b.    a listing of each Agreement requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NPD officers and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice, and the date of this finding;

c.    the methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns. An unredacted version will be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review will not be publicly available but will be retained by the Monitor and provided to either or both Parties upon request;

d.    for any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

e.    the methodology and specific findings for each relevant assessment

61

conducted; and

f.      a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement.

184.    The Monitor will provide a copy of quarterly reports to the Parties in draft form at least 15 business days prior to Court filing and public release to allow the Parties to comment informally on the reports.  The Monitor will consider the Parties' responses and make appropriate changes, if any, before filing the reports with the Court and issuing them to the public.

## H.    Communication Among the Parties, the Monitor, and the Public

185.    The Monitor will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the implementation of and compliance with this Agreement.  To facilitate this communication, the Monitor will conduct regular meetings, on a schedule agreed upon by the Parties that will include participation by the Police Director or designee when necessary, and other NPD representatives, and representatives of the City's Office of Corporation Counsel, the Department of Justice, and the police unions.

186.    The Monitor will hold additional meetings in an open, public forum at a location accessible to members of the community on a quarterly basis to explain the Monitor's reports, to inform the public about the implementation process, and to hear community perspectives of police interactions.

187.    The Monitor will meet with NPD officers on at least a quarterly basis to inform them about the implementation process and to hear their questions and concerns regarding policies and procedures and other matters related to this Agreement.

188.    NPD officers may report misconduct, including retaliation, to the Monitor either anonymously or on the record.  The Monitor will not investigate, but will convey information regarding any complaints to the appropriate agency or entity without revealing the officer's identity if anonymity has been requested.

62

## I.      Public Statements, Testimony, Records, and Conflicts of Interest

189.    Except as required or authorized by the terms of this Agreement, by the Parties acting together, or by authorization of the Court, the Monitor, including any agent, employee, or independent contractor thereof, will not make any public statements or issue findings of fact with regard to any act or omission of the City or its agents, representatives, or employees.  Nor will the Monitor, or any agent, employee, or contractor thereof, disclose non-public information provided to the Monitor pursuant to the Agreement.

190.    The Monitor may testify as to its observations, findings, and recommendations before the Court with jurisdiction over this matter, but will not testify in any other litigation or proceeding with regard to any act or omission of the City or any of its agents, representatives, or employees related to this Agreement or regarding any matter or subject of which the Monitor may have received knowledge as a result of its performance under this Agreement.  This paragraph does not apply to any proceeding before a court related to performance of monitoring services under this Agreement.

191.    The Monitor will not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including future retention (on a paid or unpaid basis) by any current or future private litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or its departments, officers, agents, or employees.

192.    Neither the Monitor nor any member of the Monitoring Team will be permitted to represent or work for any individual or organization in any criminal or civil matter adverse to the City of Newark or the United States Attorney's Office, District of New Jersey, including any individual or organization designated as a witness, consultant, victim, defendant, subject, target, or person of interest, for the duration of the monitorship.

193.    The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor will not be deemed public records subject to public inspection.  In the event that the Monitor receives a Freedom of Information Act, Open Public

63

Records Act, or common law right to access request, the Monitor will promptly notify and confer with the Parties regarding how to respond to the request.

194.    Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit, or demand arising out of and substantively related to the Monitor's performance pursuant to this Agreement.  This paragraph does not apply to any proceeding before a court related to performance of monitoring service under this Agreement.

### J.    Record Collection and Retention

195.    The City and NPD agree to collect and maintain all data and records necessary to: (1) document implementation of and compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable assessments, compliance reviews, and audits; and (2) allow NPD or other City entities to perform ongoing quality assurance in each of the areas addressed by this Agreement.

### K.    Consent Decree Implementation Unit

196.    The City and NPD agree to hire and retain, or reassign current City or NPD employees to form an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation of this Agreement.  This unit will serve as a liaison between the Parties and the Monitor and will assist with the implementation of and compliance with this Agreement.  At a minimum, this unit will coordinate the City and NPD's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the City and NPD personnel to the Monitor and DOJ, as needed; direct that all data, documents, and records required by this Agreement be maintained in an auditable format; and assist in assigning implementation and compliance related tasks to NPD personnel, as directed by the Police Director or his designee.

197.    Within 180 days of the Effective Date, and every six months thereafter as long as this Agreement is in effect, the City implementation unit will produce a status report that will be filed with the Court, with a copy to the Monitor and DOJ, and shall be a public record.  This report shall delineate the steps taken by NPD during the reporting period to implement this Agreement;

64

the City's assessment of the status of its progress; plans to correct any problems; and response to any concerns raised in the Monitor's previous quarterly reports.

### L.    Access and Confidentiality

198.    To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City and NPD.  The Monitor will have reasonable access to all necessary individuals, facilities, and documents, which will include access to trainings, meetings, and reviews, such as critical incident reviews, use of force review boards, and disciplinary hearings.

199.    NPD will notify the Monitor and DOJ as soon as practicable, and in any case within 24 hours, of any critical firearm discharge, in-custody death, or arrest of any officer.

200.    The City and NPD will provide the Monitor with timely, full, and direct access to all City and NPD staff, employees, facilities, and locations of events that the Monitor reasonably deems necessary to carry out the duties assigned by this Agreement.  The Monitor will cooperate with the City and NPD for access to individuals and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.

201.    The City and NPD will ensure that the Monitor has full and direct access to all City and NPD documents and data that the Monitor reasonably deems necessary, except any documents or data protected by the attorney-client privilege or other applicable law.  Such access includes, but is not limited to, internal affairs and criminal investigation files.  The Monitor shall be permitted to observe activities and trainings such as use of force review boards, or disciplinary hearings. Should the City and NPD decline to provide the Monitor access to documents or data based on privilege, the City and NPD will so inform the Monitor and DOJ and will provide the Monitor and DOJ with a log describing the documents or data and the basis of the privilege for withholding.  If the Monitor or DOJ disagrees with the basis for the privilege they may seek further relief from the Court.

202.    For the purpose of implementing this Agreement, DOJ and its consultants and agents will have full and direct access to all City and NPD staff, employees, facilities, documents, and data. DOJ and its consultants and agents will cooperate with the City and NPD for access to relevant personnel, facilities, and documents in a reasonable manner that, consistent with DOJ's

responsibilities to enforce this Agreement, minimizes interference with daily operations. Should the City and NPD decline to provide DOJ with access to documents or data based on privilege, the City and NPD will so inform DOJ that they are withholding documents or data on this basis and will provide DOJ with a log describing the documents or data and the basis of the privilege for withholding. If the Monitor or DOJ disagrees with the basis for the privilege they may seek further relief from the Court.

203.    The Monitor and DOJ will provide the City and NPD with reasonable notice of a request for copies of documents. Upon such request, the City and NPD will provide in a timely manner copies (electronic, where readily available) of the requested documents to the Monitor and DOJ.

204.    The Monitor will have access to all NPD records and information relating to criminal investigations of NPD officers as permissible by law. The Monitor will have access to all NPD documents in such files that have been closed by NPD after the Effective Date. The Monitor also will have reasonable access to all NPD arrest reports, warrants, and warrant applications initiated after the Effective Date whether or not contained in open criminal investigation files.

205.    The Monitor and DOJ will maintain the confidentiality of all non-public information provided by the City and NPD. Other than as expressly provided in this Agreement, this Agreement will not be deemed a waiver of any privilege or right the City and NPD may assert, including those recognized at common law or created by statute, rule or regulation, against any other person or entity with respect to the disclosure of any document.

## M.    Compensation and Term of the Monitor

206.    The Monitor will be appointed for a period of five years from the Operational Date. The appointment may be extended at the request of the Parties and with Court approval. The extension of the Monitor beyond five years will be allowed only if the Court determines that it is reasonably necessary in order to assess and facilitate full and effective compliance with this Agreement.

207.    The City will bear all reasonable fees and costs of the Monitor.  During the selection process for the Monitor, the Parties and Monitor agreed to an overall cap of $7,400,000.00 for the Monitor based on a five year term.

208.    Within 60 days of the Effective Date, the City will deposit $200,000.00 into the Registry of the Court as interim payment of costs incurred by the Monitor.  This deposit and all other deposits pursuant to this Agreement will be held in the Court Registry and will be subject to the standard registry fee imposed, if any, on depositors.  The Monitor will submit monthly statements to the Court, with copies to the Parties, detailing all expenses the Monitor incurred during the prior month.  The Court will order the clerk to make payments to the Monitor.  Upon receipt of an Order from the Court directing payment, the clerk will ensure timely payment of all approved statements received from the Monitor.  Within 45 days of the entry of each Order directing payment, the City will replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

209.    Before submitting monthly statements to the Court, the Monitor will submit them to the Parties.  The Parties will review such statements for reasonableness.  Upon completion of the Parties' review, but in no case more than 30 days after submission of the statements by the Monitor, the Parties will notify the Monitor of their approval.  Upon receipt of the Parties' approval, the Monitor may submit the statement to the Court for payment.  The statements submitted to the Court will indicate that they were reviewed and approved by the Parties.  In the event the Parties cannot agree on approval of a statement, the Parties will attempt to resolve such a dispute cooperatively prior to seeking the assistance of the Court.

210.    The Monitor, at any time after approval of the initial team members, may request to be allowed to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned by the Agreement, provided that any resulting expenditures fall within the approved budget.  The Monitor will notify the City and DOJ in writing if the Monitor wishes to select such additional persons or entities, and will identify and describe their qualifications and the need for their involvement.  The City and DOJ must both approve of the person or entity before they may be hired or employed, although substantial

deference will be afforded to the Monitor's choice.  Any person or entity hired or otherwise retained by the Monitor will be subject to the provisions of the Agreement.

211.    In the event that the Monitor is no longer able to perform his/her functions, the City and DOJ will together select and advise the Court of a replacement Monitor, acceptable to both, within 60 days unless extended by agreement of the Parties.  If the Parties are unable to agree on a replacement Monitor or a method of selection, each Party will submit to the Court the names of three candidates or candidate groups, along with resumes and cost proposals.  The Court will select and appoint the Monitor from among the qualified candidates/candidate groups.

212.    The City will provide the Monitor with permanent office space and reasonable office support such as office furniture, telephones, internet access, secure document storage, and photocopying.

213.    In the event that full and effective implementation of this Agreement requires technical assistance beyond the scope of the Monitor's duties,  DOJ, NPD, and/or the Monitor will so inform the City.  The Monitor, with assistance from the City, will arrange for the prompt acquisition of the required technical assistance, to be performed by the Monitor or its agent or independent contractor, or a separate entity.  The City will set aside $100,000.00 for this purpose, and will allocate additional funds as necessary.  If either Party disagrees with the need for the technical assistance requested, the Party will, within 15 days of being so informed in writing, inform the Court, which will resolve the dispute.

214.    Should either of the Parties to this Agreement determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by this Agreement, the Party will provide notice to the Monitor and a reasonable opportunity to cure.  If there is no satisfactory resolution, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors of the Monitor.  The Court will grant such relief upon a showing of good cause.

## XVII. COURT JURISDICTION, MODIFICATION, AND ENFORCEMENT

215.    This Agreement will become effective upon entry by the Court.  To ensure that the requirements of this Agreement are properly and timely implemented, the Court will retain jurisdiction of this action for all purposes until such time as the Court determines the City has achieved full and effective compliance with this Agreement and maintained such compliance for no less than two consecutive years.

216.    This Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

217.    The City and NPD will bear the burden of demonstrating full and effective compliance with this Agreement.  DOJ acknowledges the good faith of the City in trying to address measures that are needed to promote police integrity and ensure constitutional policing in Newark.  DOJ, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that the City has failed to fully comply with any material provision.  DOJ agrees to consult with officials from the City before instituting such enforcement proceedings.

218.    The City and  DOJ may jointly stipulate to make changes, modifications, and amendments to this Agreement, which will be subject to Court approval.  Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the reviews, assessments, and/or audits of the Monitor demonstrate that the Agreement provision as drafted is not furthering the purpose of the Agreement, or that there is a preferable alternative that will achieve the same purpose.  Where the Parties or the Monitor are uncertain whether a change to the Agreement is advisable, the Parties with Court approval may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension.  During this suspension, the Parties with Court approval may agree to temporarily implement an alternative requirement.  The Monitor will assess and report to the Court whether the suspension of the requirement and the implementation of any alternative provision is as, or more, effective at achieving the purpose as was the original/current Agreement requirement, and

the Parties will consider this assessment in determining whether to request that the Court approve the suggested change, modification, or amendment.

219.    The Parties will defend the provisions of this Agreement.  The Parties will notify each other and the Court of any court or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any court other than the Court, removal, transfer, or consolidation to this Case in the Court will be sought by the Parties, to the extent permitted by law.

220.    The City and NPD will promptly notify DOJ if any term of this Agreement becomes subject to collective bargaining and consult with DOJ in a timely manner regarding the position the City and NPD will take in any collective bargaining consultation connected with this Agreement.

221.    The City and NPD will require compliance with this Agreement by their respective officers, employees, departments, assigns, or successors.

222.    In the event the NPD or the City fails to fulfill any obligation under this Agreement, the DOJ shall, prior to pursuing any remedy with the Court, give written notice of the failure to the NPD and the City.  The NPD and the City shall have 30 days from receipt of such notice to cure the failure.  However, if DOJ determines that an emergency condition exists that places persons at risk of serious and imminent harm,  DOJ may immediately seek a remedial order from the Court.  At the end of the 30-day period, in the event  DOJ determines that the failure has not been cured,  DOJ may, upon three days notice to the City (excluding weekends and federal or state holidays), at its election seek a remedy from the Court.

## XVIII. TERMINATION OF THE AGREEMENT

223.    The City and NPD will endeavor to reach full and effective compliance with this Agreement within five years of its Effective Date.  The Parties may jointly ask the Court to terminate this Agreement after this date, provided that the City has been in full and effective compliance with this Agreement for two years.  "Full and Effective Compliance" will be defined to require sustained compliance with all material requirements of this Agreement and sustained

and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures, all as determined by the Court.

224.    If, after seven years from the Effective Date, the Parties disagree whether the City has been in full and effective compliance for two years, either Party may file a motion requesting that the Court terminate all or part of this Agreement.  In the case of termination sought by the City, prior to filing a motion to terminate, the City agrees to notify DOJ and the Monitor in writing when the City has determined that it is in full and effective compliance with this Agreement and that such compliance has been maintained for no less than two years.  Thereafter, the Parties and the Monitor will promptly confer as to the status of compliance.  DOJ and the Monitor will have a period of 45 days, unless extended by mutual agreement or order of the Court, for consultation and the completion of any audit or evaluation necessary to assess the City's compliance, including on-site observations, document review, or interviews with City and NPD personnel.  If the Parties and the Monitor cannot then resolve any compliance issues, the City may file a motion requesting that the Court terminate this Agreement.  If the City moves for termination of this Agreement, DOJ will have 60 days after the receipt of the City's motion to object to the motion.  The Court will hold a hearing on the motion and the burden will be on the City to demonstrate that it is in full and effective compliance with this Agreement and has maintained such compliance for at least two years.

225.    Upon the Court's determination that the City and NPD have achieved full and effective compliance and have maintained such compliance for at least two years, the Court will terminate the Agreement and dismiss the case.

IT IS SO ORDERED this _5_ day of _May_, 2016.

MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

72

FOR THE PLAINTIFF


_____
PAUL J. FISHMAN
U.S. Attorney for the District of New Jersey


_____
SABRINA COMIZZOLI
Executive Assistant United States Attorney
KRISTIN VASSALLO
Deputy Chief, Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, NJ 07102
(973) 645-2700


_____
VANITA GUPTA
Principal Deputy Assistant Attorney General
United States Department of Justice
Civil Rights Division


_____
STEVEN H. ROSENBAUM
Chief
Special Litigation Section


_____
CHRISTY E. LOPEZ
Deputy Chief
RASHIDA J. OGLETREE
Special Counsel
JEFFREY R. MURRAY
COREY M. SANDERS
PATRICK KENT
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
Telephone:  (202) 305-3712

FOR THE DEFENDANT

RAS J. BARAKA
Mayor
City of Newark, New Jersey

ANTHONY AMBROSE
Director of Public Safety
City of Newark, New Jersey

WILLIE L. PARKER, ESQ., L.L.M.
Corporation Counsel

AVION M. BENJAMIN
First Assistant Corporation Counsel
Department of Law
Room 316, City Hall
Newark, NJ 07102
Tel. (973)733-3880

74