UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

---

**UNITED STATES OF AMERICA,**

      Plaintiff,

vs.

**CITY OF NEWARK,**

      Defendant.

NO. 16-01731(MCA-MAH)

**CITY OF NEWARK'S**

**FOURTH STATUS REPORT**

---

## I.    INTRODUCTION

Within 180 days of the Effective Date, and every six months thereafter as long as this Agreement is in effect, the City implementation unit will produce a status report that will be filed with the Court, with a copy to the Monitor and DOJ, and shall be a public record. This report shall delineate the steps taken by NPD during the reporting period to implement this Agreement; the City's assessment of the status of its progress; plans to correct any problems; and response to any concerns raised in the Monitor's previous quarterly reports.

The "Effective Date" is defined in Section II, Paragraph 4(s) as followed: "Effective Date" means the day this Agreement is signed by the Parties and submitted to the Court for approval." The Consent Decree was approved on April 29, 2016. The initial status report was submitted on October 26, 2016. This report constitutes the fourth status report, which is covers the time period from October 28, 2017 to April 27, 2018.

**Response:**

This document is a Status Report explaining the progress· the City of Newark and the Newark Police Division have made for the reporting period of October 27, 2017 to April 27, 2018 to be in compliance with the Consent Decree. This Status Report will provide an update on all the activities undertaken by the Newark Police Division ("NPD") and the City of Newark during this reporting period.

## II.   CONSENT DECREE IMPLEMENTATION UNIT

The City and the NPD agree to hire and retain, or reassign current City or NPD employees to form an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation of this Agreement. This unit will serve as a liaison between the Parties and the Monitor and will assist with the implementation of and compliance with this Agreement. At a minimum, this unit will coordinate the City and NPD's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the City and NPD personnel to the Monitor and DOJ, as needed; direct all that data, documents, and records required by this Agreement and maintain in an auditable format; and assist in assigning implementation and compliance related tasks to NPD personnel, as directed by the Police Director or his designee. **(Paragraph 196)**

**Response:**

In response to the Consent Decree, the Newark Police Division established the Consent Decree and Planning Division (CDPD), and the Consent Decree Advisory Committee (CDAC), on July 15, 2016 to facilitate the mandates set forth therein. The CDPD works to develop new, or revise existing NPD policies, develop and assist in the development of Consent Decree related training curricula and other material, provide documentation as requested by the Independent Monitor, conduct Consent Decree related compliance audits, and implement any procedures or training that is mandated by the Consent Decree, and approved by the court appointed Independent Monitor, and the United States Department of Justice (U.S. DOJ).

The CDAC is a group of Subject Matter Experts (SME) from the Newark Police Division, who may assist the CDPD by offering their subject matter expertise in particular areas related to the Consent Decree. Members of the CDPD may confer with the advisory committee to assist in completing tasks relative to their area of expertise.

Since its inception, the members of the CDPD have worked diligently to meet the mandates of the Consent Decree.

The CDPD regularly receives electronic requests for information from the Independent Monitoring Team. During the period covered under the current status report, the following Monitor Requests have been provided:

100. OPS Case DVDs with Audio under:

    A.   IOP# 15-0003
    B.   IOP# 15-0113
    C.   IOP# 15-0132
    D.   IOP# 15-0354
    E.   IOP# 15-0383
    F.   IOP# 15-0469
    G.   IOP# 15-0476
    H.   IOP# 15-0481
    I.   IOP# 15-0492
    J.   IOP# 15-0506
    K.   IOP# 15-0573 Part 1 and 2
    L.   IOP# 16-0020
    M.   IOP# 16-0044
    N.   IOP# 16-0098
    O.   IOP# 16-0267
    P.   IOP#16-0307
    Q.   IOP#16-0315
    R.   IOP# 16-0359

101. DP1: 1755 Short Prisoner Property Forms stored at MAPS under:

    A.   CC# Cl7025996
    B.   CC# Cl7026308
    C.   CC# Cl7026650
    D.   CC# C17026886
    E.   CC# Cl7026978
    F.   CC# Cl7027085
    G.   CC# Cl7027190
    H.   CC# Cl7027362
    I.   CC# Cl7027478
    J.   CC# Cl7027629

102. Six Week Curriculum for New Officers

103. List of All State Mandated Training Programs

104. "Municipal Holding Prisoner Status Logs" and DPl: 1770 Forms under: A.

CC# Cl 7026308
B. CC# C17026978
C. CC# C17027478

The following are requests or required reporting incidents (either verbal or in electronic format), which were not assigned a formal request number; however, were provided to the Independent Monitoring Team:

- Weekly Community Policing After-Action Report
- Arrest of Police Officer by Little Falls PD
- Police Involved Firearms Discharge CC# C1810138
- Police Involved Firearms Discharge CC# Cl 812661
- Police Involved Firearms Discharge CC# C1814154
- Arrest of Police Officer CC# C1814681

The following pro-active actions, which are not specific mandates of the Consent Decree have been accomplished during this reporting period:

- The CDPD has reached out to leaders of the LGBT community within the City of Newark, and conducted a planning session on March 26, 2018 at Rutgers University. The purpose was to learn more regarding the specific issues and concerns of the LGBT community, and identify policy and training issues specific to that community. Additional meetings will be conducted in the future with the expectation that they will grow larger in size, and will attract as many people as possible. Next meeting is scheduled for May 21, 2018.

## III.   POLICY REVIEW AND REVISION

NPD will develop comprehensive and agency-wide policies and procedures that are consistent with and incorporate all substantive requirements of this agreement. Unless otherwise noted, NPD will develop and implement all such policies, procedures and manuals within two years of the Effective Date. **(Paragraph 5)**

**Response:**

Since the establishment of the unit, members of the CDPD have been, and continue to work collaboratively with members of the Monitoring Team and the U.S. Department of Justice on revisions of existing policy, and/or drafting new policy regarding the below:

- Bias-Free Policing Policy (Approved 09/19/2017)
- Use of Force Policy (Approved 09/29/2017)
- Arrests with and without a Search Warrant Policy (Approved 03/15/2018)
- Consensual Citizen Contacts and Investigatory Stops Policy (Approved 03/15/2018) – Obtaining Community Input
- Searches with and without A Search Warrant Policy (Approved 03/15/2018)
- Use of Force Reporting, Investigation and Review Policy (Approved 03/16/2018)
- Firearms and other Weapons Policy (Approved 03/16/2018)

- Body-Worn Camera (Approved 03/21/2018)
- In-Car Camera Policy (Approved 03/21/2018)
- Draft - Disciplinary Matrix (Under Monitor & DOJ Review since 03/30/2018)
- Community Engagement Policy In Development (Obtaining Community input)
- Property and Evidence Management Policy (Being Consolidated and Revised)
- Prisoner Property and Inventory Policy (Being Consolidated and Revised)
- Property & Evidence Packing and Storage (Being Consolidated and Revised)
- Draft - 1st Amendment Right of Citizens to Observe, Object to, and Record Officer Conduct Policy (Under Monitor & DOJ Review since 03/12/2018)
- Internal Affairs: Complaint Intake Policy (Needs further NPD revision as per Monitor)

As members of the Monitoring Team, U.S. Department of Justice, and the CDPD identify an additional need for new policy or revision to current policy, it will be addressed in a collaborative and effective manner consistent with the Agreement.

## IV.  TRAINING

**A.** Within 90 days of the Operational Date, NPD will provide training to officers regarding the requirements of the Agreement, and the timeline for their implementation. **(Paragraph 10)**

**Response:**

The content pertaining to this topic was approved by the Monitoring Team and the U.S. DOJ. Training commenced on September 14, 2016, and has continued since. The entire Police Division has been trained. Training for newly appointed personnel is being conducted by NPD Training Division personnel immediately upon graduation from the Police Academy.

**B.** Within 60 days (Amendment to the CD, dated 12/22/2016) of approval by the Monitor and DOJ of any new or revised policy or procedure that implements a requirement of this Agreement, NPD will provide appropriate training to officers. NPD will provide drafts of new or revised training plans or training curricula related to the requirements of this Agreement to the Monitor and DOJ for review and approval prior to implementation. **(Paragraph 11)**

**Response:**

The date mentioned within this topic was modified by the Amendment to the Consent Decree, dated December 22, 2016. All training is developed in consultation with

members of the Independent Monitoring Team and U.S. Department of Justice, and is only implemented following their approval.

**C.** By July 9, 2017 (Amendment to the CD, dated 12/22/2016), and annually thereafter, the NPD will provide eight (8) hours of structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives. **(Paragraph 14)**

**Response:**

Training on Community Policing began on March 12, 2018 following approval of the curriculum by the Monitor and DOJ; however, as per Monitor request, additional revisions are being made to the training. The eight (8) hour training began with all Command and Administrative Staff, and has now proceeded to the entire Police Division. To date over seven hundred (700) officers have been trained (training is ongoing).

In addition to the above mentioned training, the NPD has been providing for the last (2) years "Trauma-Informed Responses to Violence Training" to groups of officers and citizens. This training uses a Restorative Justice approach to build trust between officers and civilians

This type of training hosted by Equal Justice USA (EJUSA) focuses on pairing small groups of community members and officers to work together. It has proven to be extremely valuable in the sense that it fosters police-community engagement, better understanding, establishes better working relationships, promotes trust-building, problem-solving, and the exchange of different points of view from the different perspectives of the community and law enforcement officers.

This training is very popular with all the community members and with police officers who have attended it. The training classes are small and the number of participants is limited.

**D.** NPD will provide all officers with at least sixteen (16) hours of training on stops, searches, arrests, and the requirements of this Agreement by November **1,** 2017, (Amendment to the CD, dated 12/22/2016), and at least an additional four (4) hours on an annual basis thereafter. **(Paragraph 43)**

**Response:**

The NPD has hired an experienced Training Officer who is assisting in the development of training curricula and lesson plans; who can further assist with teaching all subject matters as directed by the Public Safety Director or his/her designee.

The (16) hour training curriculum on Stops, Searches and Arrests has been developed

and is currently under Monitor and DOJ revision since 03/19/2018. The NPD has identified an attorney to conduct the training, subject to Monitor and DOJ approval. Division-wide training is expected to follow the Community Policing training.

**E.** NPD will provide all officers with a minimum of eight hours of comprehensive and interdisciplinary training on bias-free policing, including implicit bias, procedural justice, and police legitimacy, within 180 days of the Operational Date, and at least four hours annually thereafter. Such training will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selection or rejection of particular policing tactics or strategies, is prohibited by policy and will subject officers to discipline.

In addition, this training will address:

a. Methods and strategies for more effective policing which rely upon nondiscriminatory factors;
b. The differences and similarities between police and community perspectives related to discriminatory policing;
c. Constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;
d. The protection of civil rights as a central part of the pol ice mission and as essential to effective policing;
e. The impact of arbitrary classifications, stereotyping, and implicit bias;
f. Instruction in the data collection protocols required by this Agreement;
g. Identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and
h.  Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem oriented policing strategies. **(Paragraph 63)**

**Response:**

The NPD has been exploring for some time different options to implement the best available training on Bias-Free Policing to its officers. The selection process has been narrowed down to two independent contractors, which offer very distinct products; both of which represent a state of the art approach to Bias-Free Policing instruction.
NPD will make a selection in the very near future and will forward to the Monitor and DOJ approval.

**F.** NPD will develop and implement policies and training directing that the use of force by NPD officers accords with the rights secured and protected by the Constitution and state and federal law. NPD will also develop and implement policies and review mechanisms that will promptly identify and appropriately respond to any unreasonable uses of force. NPD will direct that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; and deescalate the use

of force at the earliest opportunity. **(USE OF FORCE SECTION)**

**Response:**

Since approval of all policies related to the use, reporting and investigation of force, the CDPD has been working toward developing training. The training itself will also be subject to review and approval by the Monitor and U.S. DOJ before it can be implemented.

Currently the Newark Police Division is in the process of hiring an independent contractor "Force Concepts", who was selected among many highly qualified professionals following a very thorough selection process.

Once the hiring process is completed, the contractor will develop the Use of Force training curriculum and other training material.

The Newark Police Division has also retained an independent contractor "Warning Order LLC", who has developed a De-Escalation "Train the Trainer" course. This training which has already been reviewed and approved by the Monitor, was already taught to several identified NPD instructors, who will then deliver it to all NPD personnel

**G.** NPD will maintain complete and consistent training records for all officers. **(Paragraph 12)**

**Response:**

The NPD is in the process of implementing a Document Management System "Power DMS", which can track all officer training in an electronic, searchable format. To date, the NPD has trained 530 personnel on the use of Power DMS, and training is ongoing.

**G.** NPD will provide initial and in-service training to officers to enable them to provide emergency first aid until professional medical care providers are on the scene. **(Paragraph 69)**

**Response:**

First Aid & CPR training is initially provided to all personnel as part of the Police Training Commission requirements for all NJ Police Officers. However, ongoing training is scheduled by the Training Division on First Aid / Bleeding Control.

**V.      COMMUNITY ENGAGEMENT AND CIVILIAN OVERSIGHT**

**A.** By July 9, 2017 (Amendment to the CD, dated 12/22/2016), NPD will assess and revise its staffing allocation and personnel deployment to support community policing and problem-solving initiatives, and will modify any deployment strategy that is incompatible with effective community-oriented policing. This assessment and modified deployment strategy will be provided to the Monitor and DOJ for review and approval. **(Paragraph 15)**

**Response:**

The NPD hired an independent contractor to conduct a staffing assessment, and make recommendations. Any assessment and proposed modified personnel deployment will be provided to the Monitor and DOJ for review prior to implementation. At present the independent contractor has completed the last draft of the report; however, some final revisions are still being made to it with additional information being provided.

**B.** NPD and the City will implement practices to seek and respond to input from the community about this Agreement's implementation. Such practices may include direct surveys, comment cards, and town hall meetings. **(Paragraph 19)**

**Response:**

The CDPD has conducted a series of community meetings, where community members are explained what the Consent Decree is, what it means for the present and future of the community and the NPD, and what the expectations are, which is to build trust and enhance the relationship between the NPD and the community, as well as establishing productive working partnerships with all community stakeholders.

During these meetings the community is encouraged to express their opinions and concerns, and to become involved in future meetings, as well as provide their input to be taken into account as part of the NPD policy development process.

The following Community meetings have taken place during this reporting period:

- 2nd Precinct - Community Engagement - NPD Training Division at 1 Lincoln Avenue - 02/14/2018
- 5th Precinct - Community Engagement - Precinct Community Room at 480 Clinton Avenue - 02/20/2018
- 3rd Precinct - Community Engagement - Sport Club Portuguese at 55 Prospect Street - 02/21/2018
- 4th Precinct - Community Engagement - Clarke Gabriel Rest. at 795 Sanford Avenue - 02/25/2018
- 1st Precinct - Community Engagement - Community Center at 205 Spruce Street - 02/27/2018
- 3rd Precinct - LGBTQ Community Engagement - Rutgers University Newark Campus - 03/26/2018
- 5th Precinct - Community Engagement - Shani Baraka Women's Resource Center at 300 Clinton Avenue - 03/28/2018
- 4th Precinct - Community Engagement - Jehovah Jireh Praise & Worship Center at 505 S. 15th Street - 04/04/2018
- 4th Precinct – Consensual Citizen Contacts and Investigatory Stops - Jehovah Jireh Praise & Worship Center at 505 S. 15th Street - 04/25/2018
- 5th Precinct - Body-Worn Camera and In-Car Camera Community

Demonstration - NAN Tech World at 400 Hawthorne Avenue - 04/26/2018

**C.** Within 365 days of the Operational Date, the City shall implement and maintain a civilian oversight entity. The duties and responsibilities of that entity shall, at a minimum, include the substantive and independent review of internal investigations and the procedures for resolution of civilian complaints; monitoring trends in complaints, findings of misconduct, and the imposition of discipline; and reviewing and recommending changes to NPD's policies and practices, including, but not limited to, those regarding use of force, stop, search, and arrest.

The Monitor will evaluate and report on the City's implementation and maintenance of this civilian oversight entity to determine if it is helping to achieve the goals of this Agreement. This decree shall not be deemed to confer on the civilian oversight entity any powers beyond those permitted by law, including by civil service rules and collective bargaining agreement. **(Paragraph 13)**

**Response:**

On April 30, 2015, the City of Newark issued an Executive Order, MEO-15-0005, establishing a Civilian Complaint Review Board. The City passed City Ordinance 16-0276, which sets forth the duties and responsibilities of the Civilian Complaint Review Board.

On November 2, 2016, the Fraternal Order of Police (FOP), requested a Preliminary Injunction under Docket Number: ESX-C-177-16, in State of New Jersey Superior Court, with the purpose to limit and/or stop the Civilian Complaint Review Board from performing their assigned function as established by the City Ordinance.

On March 19, 2018, Superior Court Judge Kessler rendered a final opinion indicating that the C.C.R.B. can serve strictly in an oversight capacity in accordance with paragraph 13 of the Consent Decree.
However, the C.C.R.B. is prohibited from engaging in investigations, hearings, adjudications, or issuance of subpoena power, in matters relative to officer misconduct or discipline. The City of Newark has filed an appeal of the court's decision.

On April 16, 2018 the Public Safety Director issued DPS Memorandum: 18-231, indicating that the Office of Professional Standards shall provide quarterly summaries of publicly available Internal Affairs data to the Office of the Public Safety Director to be forwarded for review to the C.C.R.B.

**D.** Within 120 days of the Operational Date, and thereafter on a quarterly basis, NPD will prepare a publicly available report of its community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution. This report shall also identify the results of the assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement.

**Response:**

The CDPD has begun to collect information to produce its first Community Policing Quarterly Report by the end of April 2018. The Staffing Assessment has not yet been completed by the independent contractor.


VI.   **BIAS-FREE POLICING**

A.  NPD will deliver police services that arc equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Division.  In conducting its activities, NPD will operate without bias on any demographic category and in accordance with the rights, privileges, or immunities secured and protected by the Constitution and laws of the United States.

B.  NPD will prohibit officers from considering any demographic category when taking, or refraining from taking, any law enforcement action, except when such information is part of an actual and credible description of a specific suspect in an ongoing investigation that includes other appropriate non-demographic identifying factors.

NPD will also prohibit officers from using proxies for demographic category, including language ability, geographic location, mode of transportation, or manner of dress. **(Paragraph 64)**

**Response:**

The Bias-Free Policing Policy was approved by the Monitor and DOJ on September 19, 2017. The policy covers all mandates of the Consent Decree.

Training is being developed to train all NPD personnel on the tenets of the policy.


VII.   **STOPS, SEARCHES, AND ARRESTS**

**A.**  NPD will prohibit officers from conducting investigatory stops or detentions, when they lack reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime. **(Paragraph 25)**

**B.**  NPD will require officers to articulate their reasonable suspicion for stops in a specific and clear manner in their reports. NPD will train officers to use specific and individualized descriptive language in reports or field inquiry forms when documenting investigatory stops or detentions, and NPD will evaluate whether officers have done so. **(Paragraph 26)**

**C.**  NPD will prohibit NPD officers from:

**a.** Conducting "pretext" vehicle stops or detentions without prior approval of a supervisor.

**b.** Using pro forma or conclusory language without supporting detail in documents or reports documenting investigatory stops or detentions.

**c.** Using information known to be materially false or incorrect in effectuating an investigatory stop or detention;

**d.** Using any demographic category as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause during routine or spontaneous enforcement activities, except that officers may rely on a demographic category in a specific suspect description from a trustworthy source that is relevant to the locality or time;

**e.** Using an individual's geographic location, presence in a high crime area, or proximity to the scene of suspected or reported crimes without any other reliable indicator that an individual has or is engaged in criminal activity, as the basis for an investigatory stop or detention;

**f.** Basing investigatory stops or detentions solely on an individual' s response to the presence of police officers, such as an individual' s attempt to avoid contact with an officer;

**g.** Basing investigatory stops or detentions solely on information or evidence discovered after the stop was initiated (e.g., open warrants) or the fact that the individual was ultimately arrested; and

**h.** Basing investigatory stops or detention solely on an individual's presence in the company of others suspected of criminal activity. **(Paragraph 27)**

**D.** NPD will require documentation of all investigatory detentions, field inquiries and mere inquiries, however they are described internally. **(Paragraph 28)**

**E.** NPD will prohibit officers from considering any demographic category in determining whether to conduct a search or to seek a search warrant, except that officers may rely on a demographic category in a specific suspect description, where the description is from a trustworthy source that is relevant to the locality     and     time. **(Paragraph 29)**

**F.** NPD will prohibit officers from relying on information known to be materially false or incorrect to justify a warrantless search or to seek a search warrant. **(Paragraph 30)**

**G.** NPD will prohibit officers from seeking consent to search a motor vehicle unless the officer has a reasonable and articulable suspicion that the search will reveal evidence of a crime, or the officer has legal authority for the search that is independent

of consent. Officers will document in writing the basis for this suspicion or other legal authority. **(Paragraph 31)**

**H.** NPD will require that officers obtain the approval of a supervisor on the scene prior to conducting a search of an individual or a home based upon consent. **(Paragraph 32)**

**I.** NPD will require that an officer seeking consent for a search will affirmatively inform the subject of the right to refuse and to revoke consent at any time. The officer will record this notification and the subject's grant or denial of consent on his or her body-worn camera, and on a written form that explains these rights. Supervisors will review the video and written documentation of consent prior to approving an arrest based on evidence obtained via a consent search. **(Paragraph 33)**

**J.** NPD will ensure that the consent to search form includes separate signature lines for officers to certify that they have advised the subject of the right to refuse a search and for the subject to affirm that they understand that right. **(Paragraph 34)**

**K.** NPD will prohibit officers from arresting an individual unless the officer has probable cause to do so, and from relying on information they know to be materially false or incorrect when effecting an arrest. **(Paragraph 35)**

**L.** NPD will prohibit officers from considering a subject's demographic category to justify an arrest, except that officers may rely on a demographic category in a specific suspect description, where the description is from a trustworthy source that is relevant to the locality and time. **(Paragraph 36)**

**M.** NPD will require that an officer notify a supervisor immediately after: effecting an arrest where the officer used force; an incident in which an officer unholstered or pointed a firearm; an arrest for obstructing or resisting an officer; any disorderly conduct type arrest; or a custodial arrest for a vehicle infraction. **(Paragraph 37)**

**N.** NPD will also require that, absent exceptional circumstances, a supervisor will immediately respond to the scene to approve an arrest for obstructing or resisting an officer, any disorderly conduct type arrest, or a custodial arrest for a vehicle infraction or as required by the use of force review provisions of this agreement. In the event that a supervisor is unable to respond to the scene, the supervisor will document in the case file the circumstances preventing his or her presence. **(Paragraph 38)**

**O.** NPD will require that the responding supervisor approve or disapprove the officer's arrest recommendation, based on the existence of justifiable probable cause and NPD policy. **(Paragraph 39)**

**P.** NPD will require that the supervisor take appropriate action to address violations or deficiencies in the officer's arrest recommendation, including releasing the subject, recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation. **(Paragraph 40)**

**Q.** NPD will require that, at the time of presentment at the NPD precinct or headquarters,

a watch commander or supervisor visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives any necessary medical attention from an appropriate medical provider. The watch commander or supervisor will document the results of the visual inspection in writing. **(Paragraph 41)**

**R.** NPD will require that officers complete all arrest reports, properly documenting the probable cause for arrests, by the end of their shifts. **(Paragraph 42)**

**Responses:**

The below policies, which specifically prohibit officers from engaging in this type of behavior, have recently been approved by the Monitor:

- • Arrests with and without an Arrest Warrant Policy
- • Bias-Free Policing Policy
- • Consensual Citizen Contacts and Investigatory Stops Policy
- • Searches with and without a Search Warrant Policy

In addition, the below listed policy has been developed and is currently under review by the Monitor and U.S. DOJ:

- • 1st Amendment Right to Observe, Object to, and Record Police Activity Policy

**S.** NPD will require that officers respect the legal rights of onlookers or bystanders to witness, observe, record, and comment on or complain about officer conduct, including stops, detentions, searches, arrests, or uses of force. NPD will train officers that the exercise of these rights, secured and protected by the Constitution and laws of the United States, serves important public purposes. **(Paragraph 55)**

**T.** NPD will prohibit officers from detaining, arresting, or threatening to detain or arrest, individuals based on activity protected by the First Amendment, including verbal criticism, questioning police actions, or gestures. NPD will also prohibit officers from using or threatening force in response to mere verbal criticism or gestures that do not give rise to reasonable fear of harm to the officers or others. **(Paragraph 56)**

**U.** NPD will require that officers take no law enforcement action against a bystander unless the bystander:

a. Violates the law;
b. Incites others to violate the law; or
c. Refuses to comply with an officer's order to observe or record from an alternate location and the bystander's presence would jeopardize crime scene integrity or the safety of the officer, the suspect, or others. **(Paragraph 57)**

**V.** NPD will permit individuals observing stops, detentions, arrests, and other incidents

14

to remain in the proximity of the incident unless one of the conditions in paragraph 57 is met. **(Paragraph 58)**

**W.** NPD will permit individuals to record police officer enforcement activities by camera, video recorder, cell phone recorder, or other means, unless one of the conditions in paragraph 57 is met. **(Paragraph 59)**

**X.** NPD will prohibit officers from threatening, intimidating, or otherwise discouraging an individual from remaining in the proximity of or recording law enforcement activities and from intentionally blocking or obstructing cameras and recording devices. **(Paragraph 60)**

**Y.** NPD will prohibit officers from detaining, prolonging the detention of, or arresting an individual for remaining in the proximity of, recording or verbally commenting on officer conduct directed at the individual or a third party, unless one of the conditions in paragraph 57 is met. **(Paragraph 61)**

**Z.** NPD will prohibit officers from destroying, seizing, or otherwise coercing a bystander to surrender recorded sounds or images made of officers in the course of their duties, without first obtaining a warrant. Nor may officers order a bystander to destroy any such recording. Where an officer has a reasonable belief that a bystander or witness has captured a recording of critical evidence related to a felony crime, the officer may secure such evidence only as long as necessary to obtain a subpoena, search warrant, or other valid legal process or court order. **(Paragraph 62)**

**Response:**

The CDPD has developed a draft policy entitled: "1st Amendment Right to Observe, Object to, and Record Police Activity" to satisfy paragraphs 55-62 of the Consent Decree. The draft was provided to the Monitor and U.S. DOJ on March 12, 2018 and is under review.

Some of these actions are also covered under "Prohibited Actions" in the Stops, Search and Arrest Policies.

## VIII. COMMUNITY ENGAGEMENT AND CIVILIAN OVERSIGHT

**A.** NPD will develop and implement a use of force policy or set of policies that comply with applicable law and requirements of this Agreement, including· the Use of Force principles set out above. The comprehensive use of force policy or policies will comprise all force techniques, technologies, and weapons that are available to NPD officers, including standard-issue weapons that are made available to all officers and weapons that are made available only to specialized units. **(Paragraph 66).**

**Response:**

The Monitor and U.S. Department of Justice have recently approved the following policies:

- Use of Force Policy
- Firearms and other Weapons Policy
- Use of Force Reporting, Review, and Investigation Policy

Additionally, a new NPD Conductive Energy Device (CED) Policy was approved by the Essex County Prosecutor on March 13, 2018.

B.  The UFRB will include the Chief of Police or the Chiefs designee (who will chair the UFRB); supervisors from the Training Section; one representative from each involved precinct, selected by each precinct captain; and a representative from the OPS.

The UFRB may consult with any subject matter experts the UFRB feels would be helpful in reviewing particular incidents and other advisors as necessary. **(Paragraph 96)**

**Response:**

A Risk Analysis Review Board was established, and their responsibilities were delineated under General Order 17-02, Re: Risk Analysis Review. The board meets several times a month to review incidents where force has been used, in addition to police involved motor vehicle accidents, and vehicular pursuits. Representatives of the board include:

- Public Safety Director or designee
- Chief of Police or designee
- Operations Bureau Deputy Chief or designee
- Office of Transparency & Risk Analysis Management Commander (Chairperson)
- Office of Professional Standards Commander or Executive Officer
- Advocate Office representative
- Each Precinct Commander or Executive Officer
- Communications Division / 911 Call Center Commander or Executive Officer
- Major Crimes Division Commander or Executive Officer
- Training Division Commander or Executive Officer
- Office of Transparency & Risk Analysis Management designee.

**C.**  The Risk Analysis Review Board through its chairperson is obligated to ensure a referral to OPS if potential misconduct is discovered in the review process. Should policy, equipment, or training deficiencies be noted in the review process, the Use of Force Review Board (Risk Analysis Review Board) Chairperson will ensure that they are brought to the attention of the relevant commanding officer for appropriate action, and final recommendation will be made to the Public Safety Director. **(Paragraph 102)**

**Response:**

The Risk Analysis Review Board and their responsibilities are established in General Order 17-02, Re: Risk Analysis Review. The Commander of the Office of Transparency and Risk Analysis Management who will act as the designated chairperson of the board prepares a summary report for the board, which includes the following regarding the Use of Force:

- Summary of each Use of Force report reviewed
- All relevant reports and information, including audio and video recordings
- Summary of any procedures violated
- Recommendation for corrective action
- Any incident that was directed to the Office of Professional Standards for further investigation

The Chairperson makes recommendations to the Public Safety Director following the board's review.

## IX.    IN-CAR AND BODY-WORN CAMERAS

In conjunction with the Monitor and DOJ, NPD will develop and implement policy regarding body-worn camera video and audio recording that will address issues including use, retention, privacy issues, the use of recordings as evidence in force and complaint reviews, and the use of recordings for other criminal justice purposes (such as evidence in prosecutions).

At a minimum, NPD's body-worn camera policy will:

- Clearly state which officers are required to use body-worn cameras and under which circumstances;
- Specify the location(s) on the body where the camera should be worn;
- Require officers to activate their cameras when responding to calls for service and during all law enforcement-related encounters and activities, with appropriate exceptions (e.g., interviews with crime victims) that occur while on duty, and to continue recording until the conclusion of the incident(s) or encounter(s);
- Require officers to articulate in writing or on camera their reasons for failing to record an activity that NPD policy otherwise requires to be recorded;
- Require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible;
- Establish a download and retention protocol;
- Permit officers to review video of incidents in which they were involved;
- Require periodic random review of officers' videos; and
- Require supervisors to review videos of incidents involving use of force and consent searches. **(Paragraph 104)**

**Response:**

The NPD has developed the body-worn and in-car camera policies addressing the requirements in paragraph 104. These policies were approved by the Monitor and DOJ on March 21, 2018.

The NPD implemented a "Body-Worn and In-Car Camera Pilot Program" in the 5th and 2nd Precincts. Personnel from both precincts received training on an interim NPD policy, based on New Jersey Attorney General Directive: 2015-1, Re: "Body Worn Cameras and

Stored Recordings", and on the use of the body-worn and in-car camera equipment.

The NPD implemented an 8-hour training program based upon the approved BWC and In-Car Camera policies. Training began on April 9th, 2018. As of this report a total of 68 officers have received the 8-hour training.

In addition, the following is a list or NPD organizational components that were trained in the Arbitrator software in order evaluate and monitor the proper use of the equipment and compliance with procedure:

- Office of Professional Standards
- Legal Affairs
- Compliance Unit
- Risk Analysis and Transparency Unit
- Technology Division
- Integrity Control Officer

## VIII.  THEFT

**A.** NPD will conduct periodic reviews of the disciplinary histories of its officers who routinely handle valuable contraband or cash, especially those in specialized units, to identify any patterns or irregularities indicating potential risk of theft by officers. **(Paragraph 107)**

**B.** NPD will maintain policies and procedures for the intake, storage, and release of property. **(Paragraph 110)**

**C.** NPD will conduct and document periodic audits and inspections of the property room and immediately correct deficiencies. **(Paragraph 111)**

**Responses:**

On December 8, 2016, a review of the disciplinary histories of all personnel assigned to the Property and Procurement Division was conducted in the presence of the Compliance Unit.

On February 20, 2017, additional personnel were assigned to the Property and Procurement Division, a review of their disciplinary histories was conducted by the Compliance Unit.

CDPD personnel had developed a set of three policies dealing with property; however, the Monitor expressed concerns with the policies and requested that they be revised and consolidated into one. The CDPD is currently working with the members of the Monitoring Team and U.S. DOJ on the requested revision and consolidation of the following policies:

- Property and Evidence Management Policy
- Custody and Inventory of Prisoner's Personal Property Policy
- Property & Evidence Packing and Storage

All personnel assigned to the Property and Procurement Division have received training on the BEAST Software, which is a type of software utilized to properly, securely, and efficiently manage the intake, storage, and release of property.

The BEAST software is being utilized to electronically track property and evidence. Terminals and additional licenses were installed, and training has been imparted to personnel who handle property and evidence at the Property and Procurement Division, Crime Scene Unit, Ballistics Unit, Municipal Arrest Processing Section, Special Victims Division, 2nd Precinct and the Special Enforcement Division.

## IX.   COMPLAINT INTAKE AND INVESTIGATION

**A.** Within 365 days of the Operational Date, the City and NPD, in collaboration with the civilian oversight entity or other community input, will develop and implement a program to effectively publicize to the Newark community how to make misconduct complaints. **(Paragraph 112)**

**B.** The City and NPD will make forms and other materials outlining the complaint process and OPS contact information available on their websites and at appropriate government properties, such as NPD Headquarters and precincts, City Hall, and Public Libraries. **(Paragraph 113)**

**Responses:**

In December of 2016, the NPD revised the Office of Professional Standards' (OPS) Informational Brochure, and the NPD Citizen Informational Brochure, and provided the same to all police personnel to be handed out to citizens that they come in contact with, request such information, or can benefit from it.

The OPS Brochures contain information on how to make a complaint, and the address and telephone number of the Office of Professional Standards. However, the brochures were only completed in the English language, and translation into the Spanish and Portuguese languages is still pending.

Once the translation is completed, the brochures will be distributed to all Police Facilities, City Hall, and Public Libraries.

Posters in the English, Spanish and Portuguese languages were made informing citizens of how and where a misconduct complaint can be made. The posters have been delivered and conspicuously posted at (27) locations to include Municipal Buildings, Libraries, and Community Centers.

The website for the Department of Public Safety has been updated to include current

information regarding how citizens can file officer misconduct complaints. The website for the City of Newark provides a link to the Department of Public Safety's website.

A web-based Mobile Application was developed and launched; where in addition to obtaining important information, citizens are able to file officer misconduct complaints.

**C.** NPD will maintain a centralized numbering and tracking system for all misconduct complaints. NPD will promptly assign a unique identifier upon receipt of a complaint, which will be provided to the complainant at the time the complaint is made. **(Paragraph 125)**

**Response:**

IA-Pro is the software currently utilized by the Office of Professional Standards (OPS), among other things to track and analyze internal and external misconduct complaints. This system has been in use for approximately ten years.

The Police Division has recently purchased a software enhancement to IA-Pro, called "BlueTeam". This software is expected to allow for a more efficient and effective way of entering, and tracking misconduct complaints. On March 20, 2018 the Police Division issued DPS Memorandum: 18-161, ordering all personnel to assign a unique identifier in the form of an "Event Number" which shall be provided to the complainant upon receipt of a misconduct complaint.

## X.   DISCIPLINE

Within 90 days of the Effective Date, NPD will implement disciplinary guidance that:

- Establishes a presumptive range of discipline for each type of violation;
- Increases the presumptive discipline based on an officer's prior violations of the same or other rules;
- Sets out defined mitigating or aggravating factors;
- Requires that any departure from the presumptive range of discipline must be justified in writing;
- Prohibits taking only non-disciplinary corrective actions when the disciplinary matrix calls for the imposition of formal discipline; and
- Provides that NPD will consider whether additional non-disciplinary corrective action may be appropriate in a case where discipline is also imposed.
  **(Paragraph 153)**

**Response:**

A Disciplinary Matrix was developed by the CDPD. The document, which is the result of a collaborative effort with Subject Matter Experts from the Monitoring Team is currently under review by the Monitor and DOJ.

Once the document is reviewed and revised if deemed necessary, it will require approval by the Monitor and DOJ. NPD personnel will have to receive training on the Matrix (subject to review and approval by the Monitor and DOJ), before its implementation.

NPD forwarded the draft matrix to the Police Unions for their review and to provide any comments. The Police Unions have taken the position that the Matrix is subject to mandatory negotiation and therefore a violation of their collective bargaining agreements. Their response is being reviewed by the City, the Monitor and DOJ.

## XI.  DATA SYSTEMS IMPROVEMENT

Within one year of the Effective Date, and consistent with applicable law and best practices, NPD will enhance its Early Warning System (EWS) to support the effective supervision and management of NPD officers. NPD will use the EWS to promote constitutional policing and professional police practices. The EWS will use a relational database to track and analyze information regarding the activities of all NPD personnel. The City will provide NPD with sufficient funding levels to implement and maintain the EWS, including its ongoing hardware and support requirements. **(Paragraph 156)**

**Response:**

The NPD utilizes an Early Warning System called "IA-Pro" to track and analyze information regarding the activities of all personnel. This system has been in use for approximately ten years. The Police Division has recently purchased a software enhancement to IA-Pro called "BlueTeam".

However, the Department of Public Safety is in the process of contracting an independent technology consulting firm "Gartner Group"; to conduct a study to determine if additional steps are necessary to meet the Consent Decree mandates as it relates to technology.

## XII.  TRANSPARENCY AND OVERSIGHT

To the extent permissible by law, including civil service rules and collective bargaining agreements, NPD will make its policies publicly available, and will regularly report information regarding officer use of force; misconduct complaints; and stop/search/arrest data. Where NPD seeks to withhold a policy from the public, it will confer with DOJ and the Monitor to determine whether the particular policy, or any part of it, should be withheld from publication. **(Paragraph 164)**

**Response:**

The Department of Public Safety's website is supposed to be regularly updated and revised to make the most up-to-date information available to all members of the community. However, the NPD is currently having technical issues to ensure this process is done regularly as required. The CDPD is currently working on these technical issues.

As the NPD continues the process of developing and revising all its policies and procedures in collaboration with the Monitoring Team and the U.S. DOJ, the NPD will publish all policies once they are completed, reviewed, approved, and implemented.

The following is additional data currently available on the website:

1. Sworn Personnel Rules and Regulations
2. Civilian Personnel Rules and Regulations
3. Comstat related information
4. Crime Statistical Data
5. Transparency Data

   • Discipline
   • Misconduct Complaints
   • Body Worn Camera Policy and Survey
   • Use of Force Data
       o Type of Force Used
       o Race of the person
       o Gender of the person
       o Injuries sustained by person/s and/or officer/s

6. Consent Decree

   • Monitor's First Year Monitoring Plan
   • Monitor's Quarterly Reports
   • NPD Status Reports to the Court
   • Monitor Approved Policies
   • Feedback
   • Events
   • Community Q & A
   • Link to the Independent Monitor's Website


## XIII.  COMPLIANCE REVIEWS AND INTEGRITY AUDITS

NPD will develop and implement a schedule for planning and executing regular, targeted, and random internal reviews and integrity audits to promote compliance with NPD policy and constitutional policing.

**A.** NPD will conduct integrity audits and compliance reviews to identify and investigate all officers who have engaged in misconduct including unlawful stops, searches, seizures (including false arrests); excessive uses of force; theft of property or other potential criminal behavior; racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgender persons. **(Paragraph 150)**

**B.** The integrity audits and compliance reviews will also seek to identify officers who discourage the filing of complaints, fail to rep01i misconduct or complaints, or otherwise undermine NPD's integrity and accountability systems. OPS will have the oversight responsibility within NPD for these operations. OPS will use relevant EWS data and other relevant information in selecting targets for integrity audits. **(Paragraph**

**151)**

**Responses:**

The CDPD has implemented compliance reviews to identify systemic problems, and ensure compliance with the Consent Decree mandates.

A review of Field Inquiry Reports for the month of February 2018 was conducted, and a review for the month of March 2018 is in the process of being conducted to ensure compliance by officers with Paragraphs 25-28 of the Consent Decree.

The CDPD is in the process of reviewing (900) BWC videos and the officer's corresponding Log-Sheets for the month of February, to measure how often officers are recording incidents as required, logging in, appropriately classifying videos, and ensuring supervisors are conducting checks of officers' videos.

The results of all reviews will be implemented as part of the Comstat process, where the results will show officer performance by tour and command, so supervisors can be held accountable for improving performance over time.

Additional integrity audits and compliance reviews will be conducted as it relates to the proper filing of citizen complaints and reports of officer misconduct.

<div style="margin-left: 50%;">

Respectfully submitted,

Kenyatta K. Stewart
Acting Corporation Counsel
City of Newark

</div>

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the City of Newark's Fourth Status Report was filed electronically on April 27, 2018. Notice of this filing will be sent to all parties via the Court's electronic filing system. Parties may access this filing through the Court's system.

Hard copies were also hand-delivered to the Independent Federal Monitor and the Department of Justice on April 27, 2018.

By:   */s/* Avion M. Benjamin

     Avion M. Benjamin
     First Assistant Corporation Counsel
     City of Newark