# United States v. City of Newark, et al., Civil Action No. 16-1731 (MCA) (MAH)

# CONSENT DECREE

## Independent Monitor - Eighteenth Quarterly Report

Peter C. Harvey
Independent Monitor
October 15, 2021



## TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY OF EIGHTEENTH QUARTER'S ACTIVITIES
    (APRIL 1, 2021 – JUNE 30, 2021)...........................................................................1

II. DETAILED STATUS UPDATES ...............................................................................2

    A.   First Use of Force Audit ...................................................................................2

    B.   First Community-Oriented Policing Audit .......................................................5

    C.   Internal Affairs..................................................................................................9

III. APPENDICES ..........................................................................................................11

    A.   Compliance Chart ...........................................................................................11

    B.   Audit Status Chart...........................................................................................11

    C.   *First* Use of Force Audit Report ....................................................................11

    D.   *First* Community-Oriented Policing Audit Report .........................................11

EIGHTEENTH QUARTERLY REPORT
(April 1, 2021 to June 30, 2021)

## I.    EXECUTIVE SUMMARY OF EIGHTEENTH QUARTER'S ACTIVITIES (APRIL 1, 2021 – JUNE 30, 2021)[1]

This is the Eighteenth Quarterly Report from Monitor Peter C. Harvey regarding the reforms to which both the City of Newark (the "City") and Newark Police Division ("NPD") agreed to implement as set forth in the Consent Decree.  This Quarterly Report covers the period from April 1, 2021 to June 30, 2021.

In this Quarterly Report, the Monitoring Team discusses the (1) results of the Monitoring Team's *first* Use of Force audit; (2) results of the Monitoring Team's *first* Community-Oriented Policing audit; and (3) status of NPD's Internal Affairs reforms.

**Appendix A** is the Monitoring Team's Compliance Chart, which shows NPD's progress with all Consent Decree tasks through the publication of this Quarterly Report.

**Appendix B** provides the status of the Monitoring Team's audits of the City's and NPD's compliance with Consent Decree requirements.

**Appendix C** is the Monitoring Team's *First Use of Force Audit Report*, which provides the results of the Monitor's first audit of NPD's use of force.

**Appendix D** is the Monitoring Team's *First Community-Oriented Policing Audit Report*, which provides the results of the Monitor's first audit of NPD's community-oriented policing and engagement practices.

---

[1] Unless otherwise stated, the City's and NPD's progress with respect to Consent Decree tasks, as described in this Quarterly Report, reflects developments as of June 30, 2021.

II.     **DETAILED STATUS UPDATES**

A.     **First Use of Force Audit**

The Monitoring Team has completed its *first* audit of NPD's compliance with certain provisions of the Consent Decree relating to the use of force.  The audit, covering the period from July 1, 2019, to September 30, 2019, assessed NPD's compliance with Consent Decree requirements relating to NPD's practices with respect to how it uses force on the streets. *See* Consent Decree Paragraphs 66-102.

The audit was conducted by the following members of the Independent Monitoring Team:

- Wayne Fisher, Ph.D.;

- Lieut.  Daniel Gomez (Ret.) of the Los Angeles Police Department;

- Linda Tartaglia, Director of the Rutgers University Center on Policing;

- Rosalyn Parks, Ph.D., Rutgers University Center on Policing; and

- Jonathan Norrell, Rutgers University Center on Policing.

From February 13, 2020, through March 11, 2020, the Monitoring Team reviewed NPD records and video footage in-person, at NPD offices.

Subsequently, on March 20, 2020, in response to growing public health concerns related to the COVID-19 pandemic, NPD's then-Public Safety Director requested that the Monitoring Team discontinue in-person Monitorship activities.  Subsequently, the Monitoring Team requested that NPD make copies of the relevant police records and video footage available to the Monitoring Team on a remote basis, using secure file sharing technology.  The Monitoring Team and NPD engaged in extensive discussions regarding how this data would be provided, but it took several attempts before NPD was able to provide the Monitoring Team with the data in a

usable format.  NPD was unable to fully provide such remote access until January 2021.  The Monitoring Team completed its review of the relevant video footage on March 11, 2021.

For this audit, the Monitoring Team analyzed whether (1) NPD's use of force policies contained the Consent Decree-required provisions; (2) NPD demonstrated routine adherence to its own use of force policies in its day-to-day operations, described here as "Operational Compliance;" and (3) NPD was able to produce police data concerning its use of force that would be sufficient for the Monitoring Team to establish a baseline for the quantitative analysis required by Consent Decree Paragraph 174(b), known as an "outcome assessment."

With respect to the first component of the audit, namely, NPD's use of force policies, the Monitoring Team previously determined in 2017 and 2018 that NPD's new or revised use of force policies embody each of the Consent Decree's requirements.[2]  Those policies remain compliant during the Audit Period.

The second component—whether NPD has demonstrated routine adherence to its own use of force policies in its day-to-day operations—was further separately categorized by an assessment of NPD's *substantive compliance* (meaning whether all officers involved in a use of force incident acted consistently with the NPD's use of force policies) **and** *reporting compliance* (meaning whether all officers involved in a use of force incident complied with the reporting requirements found in the NPD policy).

In assessing NPD's substantive compliance, the Monitoring Team examined NPD officers' actions for consistency with the following four fundamental principles, namely, whether

---

[2] NPD has not yet been able to implement one of the 77 Consent Decree requirements related to its use of force.  The lone missing policy requirement concerns the Civilian Complaint Review Board's (CCRB's) involvement in NPD's internal use of force reviews.  *See Consent Decree Paragraph 101*. That deficiency results *not* from any failure by NPD, but rather due to ongoing litigation brought by the Fraternal Order of Police (FOP), a Newark police union. NPD's use of force policies are otherwise compliant with the Consent Decree.

the officer using force: (1) initiated use of force consistent with NPD policy; (2) ceased using force consistent with NPD policy; (3) exhausted all other reasonable means before using force; and (4) applied the minimum amount of force necessary.

The Monitoring Team reviewed all relevant and available reports and body-worn camera video for 84 separate use of force incidents.[3]

The audit found that NPD achieved a commendable rate of substantive compliance.  NPD officers used force in a manner consistent with its policies 92.9% of the time, just shy of the 95% threshold for compliance.  That is, of the 84 force incidents reviewed, 78 were substantively compliant and only six (6) were not.  Notably, no force incidents reviewed by the Monitoring Team involved an officer's use of a firearm against a subject.

Of the six substantively non-compliant incidents, the most common violation involved officers' using more than the minimum amount of force necessary, which. occurred in three instances.  Additionally, in one incident, the officer did not exhaust all reasonable alternatives before using force.  And in another, the officer failed to cease using force at the appropriate time.[4]

**Table 1: Summary of Substantive Compliance with Use of Force Policy**

| Incidents Reviewed | Substantively Compliant | Score |
|:---:|:---:|:---:|
| 84 | 78 | 92.9% |

While NPD's compliance with the substantive provisions of its use of force policy was laudable, NPD's reporting compliance was substantially lower.  NPD officers complied with

---

[3] The 84 force incidents in the audit sample were comprised of all serious and intermediate force incidents as well as a sample of 50% of the low-level force incidents that occurred in the audit period.

[4] NPD reports that in five of the six instances where the Monitoring Team determined that NPD's use of force was substantively non-compliant, NPD's All Force Investigation Team took corrective action.

use of force reporting requirements in only 75.0% of incidents reviewed by the Monitoring

Team.  Of the incidents that were not compliant, most of the deficiencies involved missing

reports as distinguished from incomplete or inaccurate reports.  The Monitor believes that NPD

must show significant improvement in its compliance with its own reporting requirements.

**Table 2: Summary of Reporting Compliance with Use of Force Policy**

| Incidents Reviewed | Compliant with Reporting Requirements | Score |
|---|---|---|
| 84 | 63 | 75.0% |

With respect to the third component (NPD's ability to produce police data

sufficient for the Monitoring Team to establish a baseline for an outcome assessment), NPD was

able to produce all categories of use of force data required by the Consent Decree, and was

accordingly compliant.  This data allows the Monitoring Team to establish a baseline to be used

in future outcome assessments.

To see the aggregate data compiled by the Monitoring Team in connection with

the Use of Force audit, see **Appendix C**.

**B.      First Community-Oriented Policing Audit**

During this reporting period, the Monitoring Team completed its *first*

Community-Oriented Policing audit and provided the results of the audit in a report to NPD.

Since NPD entered the Consent Decree, one of its goals has been to transition to a community-

oriented policing model in which NPD officers regularly (quarterly) engage on a precinct-by-

precinct basis with leaders of the Newark community to develop both law enforcement and non-

law enforcement methods of meeting the community's public safety needs.  The Monitoring

Team's audit assessed NPD's compliance with Consent Decree provisions related to NPD's

reforms related to Community-Oriented Policing and Engagement.  *See Consent Decree Paragraphs 14-21, 24, and 174(e).*

The audit was conducted by the following members of the Monitoring Team:

- Brooke Lewis, Esq., New Jersey Institute for Social Justice;

- Robert Haas, Former Commissioner, Cambridge Police (Ret.);

- Robert Wasserman, Senior Vice President, Hillard Heintze;

- Linda Tartaglia;

- Rosalyn Parks, Ph.D.; and

- Jonathan Norrell.

The audit covered the period April 1, 2019 through September 30, 2019.

The goal of the audit was to determine whether NPD is complying with the requirements of the Consent Decree and with its own policies implementing those requirements. The Monitoring Team determined that NPD made significant improvements in its efforts to engage with the Newark community.  Specifically, NPD had (i) improved partnerships with community groups; (ii) hosted periodic events with Newark residents; and (iii) regularly discussed the quantity of community engagement during leadership meetings.

While NPD is to be commended for these efforts, they were largely *ad hoc* and inconsistent.  In other words, these community engagement practices are not institutionalized in the daily operations of the NPD, precinct by precinct.  As a result, NPD does not collect the data it needs to properly execute a successful community-oriented policing strategy.  This problem is compounded by NPD's inadequate record management system.  This audit revealed that NPD's records were disorganized, contradictory, and stored in hard copy, all of which inhibited efforts to evaluate its community engagement efforts.  Thus, despite having made significant progress in

its community engagement efforts, NPD has largely failed to fulfill the requirements of the Consent Decree in this area.

Consent Decree Paragraph 174(e)(iv) requires the Monitor to conduct outcome assessments that will include collecting and analyzing the following data to establish a baseline and assess change over time, including: NPD's "effectiveness at implementing [its] community engagement and law enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas."  During the Community Oriented Policing audit, NPD stated that it could produce, at a minimum, aggregate data for the following fields: (a) efficacy of community engagement, (b) arrest rates, (c) community contacts, and (d) crime rates in command areas as this information is collected pursuant to the COMSTAT process.

The Monitoring Team found in this audit that NPD's COMSTAT process does *not* measure the efficacy of NPD's community engagement practices.  Therefore, the Monitoring Team will reserve its assessment of NPD's compliance with Paragraph 174(e)(iv) until NPD has demonstrated its capacity to do so.  Once NPD advises the Monitoring Team that it is ready to have the efficacy of NPD's community engagement practices audited, the Monitoring Team will ask NPD to produce *all* the information cited by Paragraph 174(e)(iv) over the course of a multiyear period.  The Monitoring Team remains available to help NPD prepare for that data request, and, assist NPD develop a tool to measure the efficacy of its community engagement efforts.

Below is a summary of NPD's compliance with community engagement requirements.

| Consent Decree | Description | Compliance? |
|---|---|---|
| Paragraph 14 | NPD will provide "direction and training" to officers on how to achieve effective community engagement. | No |
| Paragraph 15 | NPD will assess and revise its staffing allocation to improve community-oriented policing practices. | Provisional |
| Paragraph 16 | NPD must assign two Community Service Officers to each precinct who will become familiar with community and not be assigned to calls for service except in exigent circumstances. | No |
| Paragraph 17 | NPD must implement a mechanism to measure the breadth, extent, and effectiveness of its community engagement practices. | No |
| Paragraph 18 | NPD must issue quarterly reports on community engagement efforts. One report must address the results of the staffing assessment required by Paragraph 15. | No |
| Paragraph 19 | NPD and the City must develop practices to seek and respond to input from the community regarding the Consent Decree's implementation. | No |
| Paragraph 20 | NPD and the City must make all studies, analyses, and assessments required by the Consent Decree available on NPD and City websites. | No |
| Paragraph 21 | NPD must adopt a policy to collect and maintain all data and records necessary to facilitate transparency around NPD's policies and practices. | Yes |
| Paragraph 24 | NPD and the City must cooperate with the annual surveys required by the Consent Decree and publish the survey results on NPD and City websites. | No |

Based on its observations, the Monitoring Team offers NPD four recommendations to help it achieve compliance with the Consent Decree and improve its community-oriented policing practices:

1.      NPD should ensure compliance with its policies and properly document its engagement efforts.  NPD should take immediate steps to ensure that supervisors understand the community-oriented policing policies.  NPD should also immediately take steps to correct the deficiencies in its documentation process. [5]

2.      NPD should develop tools to measure the efficacy of its community engagement efforts.

3.      NPD should organize and digitize its community engagement records.  A standardized digital reporting template would greatly aid NPD's efforts to engage the community and develop policies based on the data it collects.

4.      NPD should protect the time of its Community Service Officers ("CSOs"). The data showed that CSOs spent considerable time responding to calls for service that were either exigent nor related to their community-engagement roles. NPD leadership should clarify to its Precinct Commanders and supervisors how CSOs fit into NPD's overall policing strategy, and how they can help NPD fulfill its Consent Decree requirements.[6]

The Monitoring Team believes that many of the Consent Decree provisions relating to community-oriented policing are discrete and readily achievable.  The Monitoring Team is hopeful that NPD will focus its resources on this area of the Consent Decree, and that NPD will be able to demonstrate substantial improvements in the Monitoring Team's second audit.

## C.      Internal Affairs

As previously reported in the Monitoring Team's Sixteenth Quarterly Report (covering the period October 1, 2020 through December 31, 2020) and Seventeenth Quarterly

---

[5] After this reporting period, in response to findings in the *first* Community Policing audit, NPD assigned a Lieutenant to the Consent Decree Planning Unit to monitor NPD's community policing and community engagement activities to ensure that NPD is satisfying its reporting requirements in this area.

[6] While the Monitor may make recommendations to the Parties regarding any relevant issues, *see Consent Decree Paragraph 181*, the Monitor's recommendations are *not* Consent Decree requirements.

Report (covering the period January 1, 2021 through March 31, 2021), the Monitoring Team and NPD continue to work to complete NPD's first-ever Internal Affairs Standard Operating Procedural Manual ("IA Manual"). When complete, the IA Manual will serve as a foundational document for NPD's move towards a modern internal affairs unit and will ensure use of best practices in receiving and investigating complaints against officers.

During this reporting period, both NPD and the Monitoring Team have continued their collective work on the IA Manual. On June 16, 2021, the Monitoring Team shared with NPD a revised draft of certain chapters of the IA Manual along with a proposed table of contents. On July 8, 2021, Subject Matter Experts from the Monitoring Team participated in a conference call with NPD to discuss next steps for completing the Manual. NPD reported that it intended to share a draft of a portion of the Manual to the Monitoring Team within two weeks of the July 8 conference call. However, as of the publication of this report, NPD has not yet provided a revised draft of the IA Manual or a significant portion of it.[7]

As the Monitoring Team has previously reported in its Eleventh Quarterly Report (covering the period July 1, 2019 through September 30, 2019), after NPD adopted its revised Internal Affairs General Order and its Disciplinary Matrix, police unions filed grievances with the Public Employment Relations Commission ("PERC") challenging both measures on the grounds that they allegedly violate the current collective bargaining agreement between the union and the City. The City has postponed implementation of both its revised General Order

---

[7] The Monitoring Team understands that the NPD Captain assigned to complete the IA Manual retired from the Division shortly after the end of this reporting period; although he is expected to continue work on the Manual. The Monitoring Team expects NPD will continue to devote the resources necessary to complete this crucial task.

and Disciplinary Matrix until it obtains a final decision from PERC.  During this reporting period, the City reported that those legal challenges are ongoing.

Pursuant to the Monitoring Team's agreed-upon audit methodology, the Monitoring Team cannot begin audits of the area of Internal Affairs until NPD and the City have resolved its pending litigation with police unions and has administered Internal Affairs training.

## III.    APPENDICES

**A.**    **Compliance Chart**

**B.**    **Audit Status Chart**

**C.**    *First* **Use of Force Audit Report**

**D.**    *First* **Community-Oriented Policing Audit Report**

# Appendix A

**Consent Decree Compliance and Implementation**
**(March 30, 2016 to October 15, 2021)**

Table of Contents

Page

I. Definitions ....................................................................................................................................1

II. General Officer Training ..............................................................................................................1

III. Community Engagement and Civilian Oversight (including Community Policing) .................2

IV. Stops, Searches, and Arrests......................................................................................................5

V. Bias-Free Policing ......................................................................................................................8

VI. Use of Force ..............................................................................................................................9

VII. In-Car and Body-Worn Cameras ...........................................................................................15

VIII. Theft (including Property and Evidence Management).........................................................16

IX. Internal Affairs: Complaint Intake and Investigation.............................................................19

X. Compliance Reviews and Integrity Audits ..............................................................................26

XI. Discipline.................................................................................................................................27

XII. Data Systems Improvement ...................................................................................................28

XIII. Transparency and Oversight .................................................................................................30

XIV. Consent Decree Implementation and Enforcement...............................................................31

## I. Definitions

NPD's compliance with the deadlines set forth in the Consent Decree and the Second-Year Monitoring Plan will be assessed using the following categories: (1) not assessed, (2) initial development, (3) preliminary compliance, (4) operational compliance, (5) non-compliance, (6) administrative compliance, and (7) full compliance.  Each of these terms is defined below.

### 1.  Not Assessed

"Not Assessed" means that the Monitoring Team did not assess the Consent Decree provision during this reporting period. Acceptable reasons for why a requirement was not assessed may include that the deadline has not passed or some other substantive reason.

### 2.  Initial Development

"Initial Development" means that during the auditing period, NPD has taken meaningful steps toward achieving compliance with a Consent Decree requirement that is not yet scheduled for completion.  Initial Development will be noted only if NPD's efforts are consistent with established timeframes in the Monitoring Plan or Consent Decree.  Where NPD was expected to have achieved at least Initial Development during the auditing period, and has not, NPD has been found not to be in compliance.

### 3.  Preliminary Compliance

"Preliminary Compliance" means that during the reporting period, NPD has developed, and the Independent Monitor, DOJ, and City have approved, respective policies or standard operating procedures ("SOPs") and related training materials that are consistent with a Consent Decree requirement.  This category only applies to SOPs and training.

### 4.  Operational Compliance

"Operational Compliance" means that NPD has satisfied a Consent Decree requirement by demonstrating routine adherence to the requirement in its day-to-day operations or by meeting the established deadline for a task or deliverable that is specifically required by the Consent Decree or Monitoring Plan.  NPD's compliance efforts must be verified by reviews of data systems, observations from the Monitoring Team, and other methods that will corroborate its achievement.  In this report, the Monitoring Team only will assess NPD for compliance with established deadlines.

### 5.  Non-Compliance

"Non-Compliance" means that NPD has either made no progress towards accomplishing compliance, or has not progressed beyond Initial Development at the point in time when NPD is expected to have at least achieved Preliminary Compliance for the reporting period.

1

**6. Administrative Compliance**

"Administrative Compliance" means that during the auditing period, NPD has completed all necessary actions to implement a Consent Decree requirement, but General Compliance has not yet been demonstrated in NPD's day-to-day operations.

**7. Full Compliance**

"Full Compliance" means that all Monitor reviews have determined that NPD has maintained Operational Compliance for the two-year period.

**8. Effective Date**

The "Effective Date" is March 30, 2016.  *See* Consent Decree, Section II(4)(s).

**9. Operative Date**

The "Operational Date" is July 12, 2016.  *See* Consent Decree, Section II(4)(ff).

## II.  General Officer Training

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement[1] | Status | Discussion |
|---|---|---|---|---|
| NPD will provide officers at least 40 hours of in-service training each year. | ¶ 9 | Within two years of the Effective Date (March 30, 2018) and then annually thereafter | Ongoing | Eight hours of community policing training was provided in 2019. |
| NPD will provide training to officers regarding the requirements of the Consent Decree, and the timeline for their implementation. | ¶ 10 | Within 90 days of the Operational Date (October 10, 2016) | Preliminary Compliance | See First Quarterly Report, Section IV(B). |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of individual policies | N/A | The status for training requirements for each Consent Decree area (e.g., use of force, bias-free policing), are located in those sections of this Chart. |
| NPD will maintain complete and consistent training records for all officers. | ¶ 12 | Within two years of the Effective Date (March 30, 2018)[2] | Initial Development | See Sixteenth Quarterly Report, Appendix C. |

---

[1] Deadlines in the Compliance Chart reflect the original deadlines set forth in the Consent Decree. The deadlines do not reflect deadlines established as part of the First or Second-Year Monitoring Plans.

[2] Consent Decree Paragraph 5 provides that "NPD will develop comprehensive and agency-wide policies and procedures that are consistent with and incorporate all substantive requirements of this Agreement. Unless otherwise noted, NPD will develop and implement all such policies, procedures, and manuals within two years of the Effective Date."

## III. Community Engagement and Civilian Oversight (including Community Policing)

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will review and revise its current community policing policy or policies to ensure compliance with Consent Decree. | § V; ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |
| **Civilian Oversight (¶ 13)** | | | | |
| The City will implement and maintain a civilian oversight entity. | ¶ 13 | Within 365 days of the Effective Date (March 30, 2017) | Administrative Compliance | See Fifteenth Quarterly Report, Section II(C). |
| **Community Engagement Measures and Training (¶¶ 14-21)** | | | | |
| NPD will provide 8 hours of in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives, and at least 4 hours annually thereafter. | ¶ 14 | July 9, 2017 | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |
| NPD will assess and revise its staffing allocation and personnel deployment to support community policing and problem solving initiatives, and will modify deployment strategies that are incompatible with community policing.  NPD's assessment and modified strategy must be approved by the DOJ and Monitor. | ¶ 15 | July 9, 2017 | Administrative Compliance | See Eighteenth Quarterly Report, Appendix D. |
| NPD will assign two officers to each precinct to work with residents to identify and address communities' priorities, and who are not assigned to answer calls for service except in exigent circumstances. | ¶ 16 | Pending completion of the assessment required in ¶ 15 | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |

2

**Community Engagement and Civilian Oversight (including Community Policing) Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will implement mechanisms to measure the breadth, extent, and effectiveness of its community partnerships and problem-solving strategies, including officer outreach, particularly outreach to youth. | ¶ 17 | Within 210 days of the Operational Date (February 7, 2017) | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |
| NPD will prepare a publicly available report of its community policing efforts overall and in each precinct. | ¶ 18 | Within 240 days of the Operational Date March 9, 2017 | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |
| NPD and the City will implement practices to seek and respond to input from the community about the Consent Decree's implementation. Such practices may include direct surveys, comment cards and town hall meetings. | ¶ 19 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |
| All NPD studies, analyses, and assessments required by this Agreement will be made publicly available, including on NPD and City websites, in English, Spanish, and Portuguese, to the fullest extent permitted under law. | ¶ 20 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |
| NPD will implement a policy to collect and maintain all data and records necessary to facilitate transparency and wide public access to information related to NPD policies and practices, as permitted by law. | ¶ 21 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix D. |

**Community Engagement and Civilian Oversight (including Community Policing) Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD and the City will cooperate with the design and conduct of the Monitor's surveys by, for example, helping to organize focus groups of officers and obtaining and providing previous survey instruments and data. The reports of the baseline and annual surveys will be provided to the Court and be publicly distributed and available on the City's and NPD's websites. | ¶ 24 | N/A | Non-Compliance | See Eighteenth Quarterly Report, Appendix D. |

## IV. Stops, Searches, and Arrests

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Investigatory Stops and Detentions (¶¶ 25-28)** | | | | |
| NPD will review and revise its current stop, search, and arrest policy or policies to ensure compliance with Consent Decree, consistent with Paragraphs 25-28. | ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the stop, search, and arrest policies or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |
| NPD will train officers to use specific and individualized descriptive language in reports or field inquiry forms. | ¶ 26 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Fourth Quarterly Report, Section III(C)(3). |
| **Searches (¶¶ 29-34)** | | | | |
| NPD will review and revise its current stop, search, and arrest policy or policies to ensure compliance with Consent Decree, consistent with Paragraphs 29-34. | ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the stop, search, and arrest policies or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Preliminary Compliance | See Sixteenth Quarterly Report, Appendix C. |

**Stops, Searches, and Arrests Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Arrests (¶¶ 35-42)** | | | | |
| NPD will review and revise its current stop, search, and arrest policy or policies to ensure compliance with Consent Decree, consistent with Paragraphs 35-42. | ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the stop, search, and arrest policies or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Preliminary Compliance | See Sixteenth Quarterly Report, Appendix C. |
| **Stop, Search, and Arrest Training (¶¶ 43-50)** | | | | |
| NPD will provide 16 hours of training to all NPD personnel on the First and Fourth Amendments, including the topics set forth in ¶ 43 of the Consent Decree, and at least an additional 4 hours on an annual basis thereafter. | ¶ 43 | November 1, 2017 | Preliminary Compliance | See Ninth Quarterly Report, Appendix C. |
| NPD supervisors will take appropriate action to address violations or deficiencies in stops, detentions, searches, and arrests; maintain records; and identify repeat violators. | ¶ 48 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| **Stop, Search, and Arrest Data Collection and Review (¶¶ 51-54)** | | | | |
| NPD will implement use of data collection form, in written or electronic report form, to collect data on all investigatory stops and searches, as approved by the DOJ and Monitor. | ¶ 52 | September 9, 2017 | Initial Development | See Fourteenth Quarterly Report, Section II(A)(1)(b). |

**Stops, Searches, and Arrests Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will develop a protocol for comprehensive analysis of stop, search and arrest data, subject to the review and approval of the DOJ and Monitor. | ¶ 53 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | NPD provided the Parties with a disparity report and the Parties provided NPD with comments. NPD reports that it is proactively addressing this requirement. |
| NPD will ensure that all databases comply fully with federal and state privacy standards governing personally identifiable information. NPD will restrict database access to authorized, identified users who will be permitted to access the information only for specific, legitimate purposes. | ¶ 54 | Within two years of the Effective Date (March 30, 2018) | Not Assessed | |
| **First Amendment Right to Observe, Object to, and Record Officer Conduct (¶¶ 55-62)** | | | | |
| NPD will require or prohibit officer conduct to comply with ¶¶ 55-62 of the Consent Decree. | ¶¶ 55-62 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |

## V.  Bias-Free Policing

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will review and revise its current bias-free policing policy to ensure compliance with Consent Decree, consistent with Section VII. | ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Preliminary Compliance | See Ninth Quarterly Report, Appendix C. |
| NPD will provide all NPD personnel with a minimum of eight hours of training on bias-free policing, including implicit bias, procedural justice, and police legitimacy, and at least four hours annually thereafter. | ¶ 63 | July 1, 2017 | Preliminary Compliance | See Ninth Quarterly Report, Appendix C. |
| NPD will prohibit officers from considering any demographic category when taking, or refraining from taking, any law enforcement action, except when such information is part of an actual and credible description of a specific suspect in an ongoing investigation that includes other appropriate non-demographic identifying factors. NPD will also prohibit officers from using proxies for demographic category, including language ability, geographic location, mode of transportation, or manner of dress. | ¶ 64 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will conduct quarterly demographic analyses of its enforcement activities to ensure officer, unit and Division compliance with the bias-free policing policy. | ¶ 65 | Within two years of the Effective Date (March 30, 2018) and then Quarterly thereafter. | Non-Compliance | See Fourth Quarterly Report, Section III(B)(4). |

## VI. Use of Force

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Use of Force Policy (¶¶ 66-70)** | | | | |
| NPD will develop and implement a use of force policy or set of policies that cover all force techniques, technologies, and weapons that are available to NPD officers consistent with ¶¶ 66-70. The policy or policies will clearly define each force option and specify that unreasonable use of force will subject officers to discipline. | ¶ 66 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the use of force policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |
| NPD will provide resources for officers to maintain proper weapons certifications and will implement sanctions for officers who fail to do so. | ¶ 70 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits/reviews. |
| **Use of Firearms (¶¶71-74)** | | | | |
| NPD will develop and implement a use of firearms policy consistent with ¶¶71-74. | ¶ 5 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the use of force policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |

**Use of Force Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| Officers will be prohibited from using unauthorized weapons or ammunition in connection with or while performing policing duties. In addition, all authorized firearms carried by officers will be loaded with the capacity number of rounds of authorized ammunition. | ¶ 71 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will prohibit officers from discharging a firearm at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force. | ¶ 72 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will prohibit officers from unholstering or exhibiting a firearm unless the officer reasonably believes that the situation may escalate to create an immediate threat of serious bodily injury or death to the officer or another person. | ¶ 73 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will require that officers successfully qualify at least twice a year with each firearm they are authorized to use or carry while on duty. | ¶ 74 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| **Use of Force Reporting and Investigation (¶¶ 75-85)** | | | | |
| NPD will adopt a use of force reporting system and a supervisor Use of Force Report, separate from the NPD's arrest and incident reports, and which includes individual officers' accounts of their use of force. | ¶ 75 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will require that officers notify their supervisor as soon as practicable following any reportable use of force. | ¶ 76 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |

**Use of Force Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD, in consultation with Monitor and DOJ, will categorize force into levels to report, investigate, and review each use of force. The levels will be based on the factors set forth in ¶ 77. | ¶ 77 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will establish a Serious Force Investigation Team ("SFIT") to review Serious Force Incidents, conduct criminal and administrative investigations of Serious Force incidents, and determine whether incidents raise policy, training, tactical, or equipment concerns.  Lower or intermediate force incidents will be investigated by line supervisors. | ¶ 78 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| Every level of force reporting and review will include the requirements set forth in ¶ 79. | ¶ 79 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| Upon arrival at the scene, the supervisor will identify and collect evidence sufficient to establish the material facts related to use of force, where reasonably available. | ¶ 80 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| All officers who used force above Low Level will provide an oral Use of Force statement in person to the supervisor on the scene prior to the subject's being booked, or released, or the contact otherwise concluded, unless impractical under the circumstances. | ¶ 81 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| Pursuant to policy and as necessary to complete a thorough, reliable investigation, supervisors will comply with the requirements of ¶ 82. | ¶ 82 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |

**Use of Force Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| Supervisors will investigate and evaluate in writing all uses of force for compliance with law and NPD policy, as well as any other relevant concerns. | ¶ 83 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| Supervisors' documentation of the investigation and evaluation will be completed within 72 hours of the use of force, unless the supervisor's commanding officer approves an extension. | ¶ 84 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| NPD will analyze the data captured in officers' force reports and supervisors' investigative reports on an annual basis to identify significant trends, to correct deficient policies and practices, and to document its findings in an annual report that will be made publicly available pursuant to Section XV of the Consent Decree. | ¶ 85 | Within two years of the Effective Date and annually thereafter (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| **Use of Force Review (¶¶ 86-89)** | | | | |
| The chain-of-command supervisor reviewing the investigative report will ensure that the investigation is thorough, complete, and makes the necessary and appropriate findings of whether the use of force was lawful and consistent with policy. Each higher-level supervisor in the chain of command will review the investigative report to ensure that it is complete, the investigation was thorough, and that the findings are supported by a preponderance of the evidence. | ¶ 86 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |

**Use of Force Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| A supervisor should ensure that additional investigation is completed when it appears that additional relevant and material evidence may assist in resolving inconsistencies or improve the reliability or credibility of the findings. | ¶ 87 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| When the precinct or unit commander finds that the investigation is complete and the evidence supports the findings, the investigation file will be forwarded to the Use of Force Review Board. | ¶ 88 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| **Reporting and Investigation of Serious Force Incidents (¶¶ 90-94)** | | | | |
| NPD will create a multi-disciplinary Serious Force Investigation Team ("SFIT") to conduct both the criminal and administrative investigations of Serious Force incidents, and to determine whether these incidents raise policy, training, tactical, or equipment concerns. SFIT will operate consistent with ¶¶ 91-94. | ¶¶ 90-94 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C.[3] |
| NPD will develop and implement a SFIT training curriculum and procedural manual. NPD will ensure that officers have received, read and understand their responsibilities pursuant to the General Order establishing the AFIT and General Orders establishing line supervisors' responsibilities to investigate lower and intermediate use of force incidents and that the topic is incorporated into the in-service training required. | ¶¶ 11, 90 | Within 60 days after approval of policies | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |

---

[3] NPD has created an All Force Investigation Team ("AFIT") to address this Consent Decree requirement.

**Use of Force Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Use of Force Review Board (¶¶ 95-102)** | | | | |
| NPD will implement a General Order establishing the Use of Force review Board ("UFRB"), ensure that it is staffed consistent with the Consent Decree provisions, and ensure that the responsibilities assigned are consistent with Consent Decree provisions. | ¶¶ 95-102 | Within two years of the Effective Date (March 30, 2018) | Administrative Compliance[4] | See Eighteenth Quarterly Report, Appendix C. |
| NPD's UFRB will conduct timely, comprehensive, and reliable reviews of all Intermediate and Serious Force incidents. The UFRB also will conduct the administrative review of incidents in which the ECPO has completed an investigation pursuant to New Jersey Attorney General Directive 2006-05. | ¶¶ 95-102 | Ongoing | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| Each member of the UFRB will receive a minimum of eight hours of training on an annual basis, including legal updates regarding use of force and the Training Section's current use of force curriculum. | ¶ 97 | Within 60 days after approval of policies | Administrative Compliance | See Eighteenth Quarterly Report, Appendix C. |
| The NPD will include the civilian oversight entity in the review of completed SFIT investigations, as permitted by law. | ¶ 101 | Within two years of the Effective Date (March 30, 2018) | Not Assessed | The Monitor will assess this requirement during a future compliance audit/review. |

---

[4] NPD has not yet been able to implement Consent Decree Paragraph 101, which requires the Division to "include the civilian oversight entity in the review of completed SFIT investigations, as permitted by law."  That deficiency results not from any failure by NPD, but rather due to ongoing litigation brought by the Fraternal Order of Police (FOP), a Newark police union.

## VII.  In-Car and Body-Worn Cameras

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will develop, implement and maintain a system of video recording officers' encounters with the public with body-worn and in-car cameras. NPD will develop a policy to designate which cars and officers are exempt from the general in-car and body-worn camera requirements and a policy regarding footage and audio recordings from its in-car and body-worn cameras. | Section IX, ¶¶ 103-104 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D.

The Monitor will assess this requirement during compliance audits. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or policies and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Administrative Compliance | See Sixteenth Quarterly Report, Appendix C. |
| NPD will equip all marked patrol cars with video cameras, and require all officers, except certain officers engaged in only administrative or management duties, to wear body cameras and microphones with which to record enforcement activity. | ¶ 103 | Within two years of the Effective Date (March 30, 2018) | Initial Development | See Eighth Quarterly Report, Section II(C).

The Monitor will assess this requirement during compliance audits. |

## VIII. Theft (including Property and Evidence Management)

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will ensure that in all instances where property or evidence is seized, the responsible officer will immediately complete an incident report documenting a complete and accurate inventory of the property or evidence seized, and will submit the property or evidence seized to the property room before the end of tour of duty. | ¶ 105 | Within two years of the Effective Date (March 30, 2018) | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will conduct regular, targeted, and random integrity audits to detect and deter theft by officers. NPD will employ tactics such as increased surveillance, stings, and heightened scrutiny of suspect officers' reports and video-recorded activities. | ¶ 106 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will conduct periodic reviews of the disciplinary histories of its officers who routinely handle valuable contraband or cash, especially those in specialized units, to identify any patterns or irregularities indicating potential risk of theft by officers. | ¶ 107 | Ongoing | Non-Compliance | N/A |

**Theft (including Property and Evidence Management) Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| To the extent permitted by law and NPD's collective bargaining agreements, NPD will transfer officers with any sustained complaint of theft, or two not sustained or unfounded complaints of theft occurring within one year, out of positions where those officers have access to money, property, and evidence. Aspects of officers' disciplinary histories that relate to honesty and integrity will be considered in making decisions regarding reassignment, promotions, and similar decisions. | ¶ 108 | Ongoing | Initial Development | See First Quarterly Report, Section V(C)(6). |
| NPD will report all theft allegations to the New Jersey Department of Law and Public Safety and will continue to report such allegations to the Essex County Prosecutor. Officers who have been the subject of multiple theft allegations will be identified as such in said reports. | ¶ 109 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will create a chain of custody and inventory policy or policies to ensure compliance with ¶ 110 of the Consent Decree. | ¶¶ 5; 110 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the chain of custody and inventory policy or policies and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policies | Non-Compliance | See Ninth Quarterly Report, Appendix C. |

**Theft (including Property and Evidence Management) Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will conduct and document periodic audits and inspections of the property room and immediately correct any deficiencies. | ¶ 111 | Ongoing | Initial Development | See Seventh Quarterly Report, Section II(B) |

## IX. Internal Affairs: Complaint Intake and Investigation

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Complaint Process (¶¶ 112-120)** | | | | |
| NPD will create an Internal Affairs: Complaint Intake and Investigation policy or policies to ensure compliance with Section XI of the Consent Decree. | ¶ 5, Section XI | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the Internal Affairs: Complaint Intake and Investigation policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of policy | Non-Compliance | See Ninth Quarterly Report, Appendix C. |
| The City and NPD, in collaboration with the civilian oversight entity or other community input, will develop and implement a program to effectively publicize to the Newark community how to make misconduct complaints. | ¶ 112 | Within 365 days of the Operational Date (July 12, 2017) | Not Assessed | |
| NPD and the City will revise and make forms and other materials outlining the complaint process and OPS contact information available on their website and appropriate government properties. | ¶ 113 | Within two years of the Effective Date (March 30, 2018) | Initial Development | See Fifth Quarterly Report, Section III(C)(4). |
| NPD will accept all complaints, by all methods and forms detailed in ¶ 114. | ¶ 114 | Ongoing | Initial Development | See Fifth Quarterly Report, Section III(C)(4). |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will provide civilians, including complainants and witnesses to alleged police misconduct, with full access to NPD's complaint process. NPD will review and revise its policies for releasing complaints and misconduct allegations to make such complaints and allegations publicly available and ensure compliance with the Consent Decree. | ¶ 115 | Ongoing | Initial Development | See Eighth Quarterly Report, Section II(D)(2). |
| NPD will train all police personnel, including dispatchers, to properly handle complaint intake; the consequences for failing to take complaints; and strategies for turning the complaint process into positive police-civilian interaction. | ¶ 116 | Within 180 days of the Operational Date (January 8, 2017) | Non-Compliance | |
| NPD will conduct regular, targeted, and random integrity audits to identify officers or other employees who refuse to accept or discourage the filing of misconduct complaints, fail to report misconduct or complaints, or provide false or misleading information about filing a misconduct complaint. | ¶ 117 | Ongoing | Non-Compliance | See Seventh Quarterly Report, Section II(C). |
| NPD will review the results of the audits conducted pursuant to ¶ 117 and take appropriate action to remedy any problematic patterns or trends. | ¶¶ 117-118 | Ongoing | Not Assessed | See Sixth Quarterly Report, Section III(F)(2)(a). |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will require that all officers and employees report allegations of criminal behavior or administrative misconduct by another NPD officer toward a member of the public, that they may observe themselves or receive from another source, to a supervisor or directly to OPS for review and investigation. When a supervisor receives such allegations, the supervisor will promptly document and report this information to OPS. | ¶ 119 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Ninth Quarterly Report, Appendix D. |
| NPD will investigate as a misconduct complaint any information or testimony arising in criminal prosecutions or civil lawsuits that indicate potential officer misconduct not previously investigated by NPD. | ¶ 120 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| **Complaint Classification and Assignment of Investigative Responsibility (¶¶ 121-125)** | | | | |
| NPD will adopt and implement a complaint classification protocol that is based on the nature of the alleged misconduct, in order to guide OPS in determining where a complaint should be assigned for investigation. | ¶ 121 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | See Fifth Quarterly Report, Section III(A)(5). |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of protocol | Non-Compliance | |
| NPD's OPS will investigate all allegations of Serious Misconduct as defined in the Consent Decree. | ¶ 122 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD shall develop a protocol for determining whether other complaints will be assigned to the subject officer's supervisor, the precinct's Integrity Compliance Officer, or retained by OPS for an administrative investigation. OPS will also determine whether the misconduct complaint warrants a referral to federal or state authorities for a criminal investigation. | ¶ 123 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | |
| OPS will routinely monitor investigations referred to officers' precincts and specialized units for quality, objectivity and thoroughness, and take appropriate action if investigations are deficient. OPS will identify trends in investigative or leadership deficiencies. | ¶ 124 | Ongoing | Non-Compliance | See Sixth Quarterly Report, Section III(B)(6). |
| OPS will routinely monitor investigations referred to officers' precincts and specialized units for quality, objectivity and thoroughness, and take appropriate action if investigations are deficient. OPS will also identify trends in investigative or leadership deficiencies. | ¶ 124 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will maintain a centralized numbering and tracking system for all misconduct complaints. | ¶ 125 | Within two years of the Effective Date (March 30, 2018) | Initial Development | See Fifth Quarterly Report, Section III(C)(4). |
| **Misconduct Complaint Investigation (¶¶ 126-136)** | | | | |
| NPD will review and revise its policies for releasing complaints and misconduct allegations to incorporate the requirements set out in ¶¶ 126-136. | ¶¶ 126-136 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of protocol | Non-Compliance | |
| **Parallel Administrative and Criminal Investigations of Officer Misconduct  (¶¶ 137-140)** | | | | |
| If after a reasonable preliminary inquiry into an allegation of misconduct, or at any other time during the course of an administrative investigation, the OPS has cause to believe that an officer or employee might have engaged in criminal conduct, the OPS will refer the matter to the ECPO, DOJ, or other law enforcement agency as appropriate. | ¶ 137 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| Notwithstanding the referral and unless otherwise directed by the prosecuting agency, NPD will proceed with its administrative investigations. Under no circumstances will OPS compel a statement from the subject officer without first consulting with the Chief or Director and with the prosecuting agency. | ¶ 138 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will not automatically end its administrative investigation in matters in which the prosecuting agency declines to prosecute or dismisses after initiation of criminal charges. Instead, NPD will require investigators to conduct a complete investigation and assessment of all relevant evidence. | ¶ 139 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will work with DOJ, the ECPO, and the New Jersey Attorney General's Office as appropriate to improve its processes for investigations of use of force incidents and referrals of complaints of police misconduct for criminal investigation. | ¶ 139 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Review and Analysis of Investigations (¶¶ 141-143)** | | | | |
| NPD will train OPS supervisors to ensure that investigations are thorough and complete, and that investigators' conclusions and recommendations that are not adequately supported by the evidence will not be approved or accepted. | ¶ 141 | Within 60 days after approval of policy | Non-Compliance | |
| NPD will develop and implement a protocol for regular supervisory review and assessment of the types of complaints being alleged or sustained to identify potential problematic patterns and trends. | ¶¶ 142-143 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | |
| **Staffing and Training Requirements (¶¶ 144-149)** | | | | |
| Within 30 days of the Operational Date, NPD will review staffing of OPS and ensure that misconduct investigators and commanders possess appropriate investigative skills, a reputation for integrity, the ability to write clear reports with recommendations supported by the evidence, and the ability to assess fairly and objectively whether an officer has committed misconduct. | ¶¶ 144, 145 | Within 30 days of the Operational Date (August 11, 2016) | Operational Compliance (achieved after deadline) | See Second Quarterly Report. |
| NPD will use a case management system to track and maintain appropriate caseloads for OPS investigators and promote the timely completion of investigations by OPS. | ¶ 146 | Within two years of the Effective Date (March 30, 2018) | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will require and provide appropriate training for OPS investigators upon their assignment to OPS, with refresher training at periodic intervals. At a minimum, NPD will provide 40 hours of initial training and eight hours additional in-service training on an annual basis. | ¶¶ 147, 148 | Within 60 days after approval of protocol and annually thereafter | Non-Compliance | |

**Internal Affairs: Complaint Intake and Investigation Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will improve OPS' complaint tracking and assessment practices in accordance with ¶ 149. | ¶ 149 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Eighth Quarterly Report, Section II(C). |

## X. Compliance Reviews and Integrity Audits

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will conduct integrity audits and compliance reviews to identify and investigate all officers who have engaged in misconduct including unlawful stops, searches, seizures, excessive uses of force; theft of property or other potential criminal behavior' racial or ethnic profiling and bias against lesbian, gay bisexual and transgender persons. The integrity audits will also seek to identify officers who discourage the filing of complaints, fail to report misconduct or complaints, or otherwise undermine NPD's integrity and accountability systems. | ¶¶ 150, 151 | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | NPD has begun to conduct some integrity audits (e.g., body-worn cameras, and stops). See Seventh Quarterly Report, Section II(D)(2). |

## XI.  Discipline

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will adopt policies that are consistent and fair in their application of officer discipline, including establishing a formal, written, presumptive range of discipline for each type of violation. | Section XIII | Within two years of the Effective Date (March 30, 2018) | Preliminary Compliance | |
| NPD will ensure that officers have received, read and understand their responsibilities pursuant to the policy or procedure and that the topic is incorporated into the in-service training required. | ¶ 11 | Within 60 days after approval of guidance | Non-Compliance | See Ninth Quarterly Report, Appendix C. |
| NPD will apply discipline for sustained allegations of misconduct based on the nature and severity of the policy violation and defined mitigating and aggravating factors, rather than the officer's identity, rank or assignment; relationship with other individuals; or reputation in the broader community. | ¶ 152 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will implement disciplinary guidance for its personnel that addresses the topics addressed in ¶ 153 of the Consent Decree. | ¶ 153 | Within 90 days of the Operational Date (October 10, 2016) | Non-Compliance | |
| NPD will establish a unified system for reviewing sustained findings and applying the appropriate level of discipline pursuant to NPD's disciplinary guidance. | ¶ 154 | Within two years of the Effective Date (March 30, 2018) | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| NPD will conduct annual reviews of its disciplinary process and actions. | ¶ 155 | Annually | Non-Compliance | |

## XII.  Data Systems Improvement

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Early Warning System (¶¶ 156-161)** | | | | |
| NPD will enhance its Early Warning System ("EWS") to support the effective supervision and management of NPD officers. | ¶ 156 | Within one year of the Effective Date (March 30, 2017) | Non-Compliance | See Ninth Quarterly Report, Section II(A). |
| City will provide sufficient funding to NPD to enhance its EWS. | ¶ 156 | Within one year of the Effective Date (March 30, 2017) | Non-Compliance | See Ninth Quarterly Report, Section II(A). |
| NPD will develop and implement a data protocol describing information to be recorded and maintained in the EWS. | ¶ 157 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Ninth Quarterly Report, Section II(A). |
| NPD will revise its use of EWS as an effective supervisory tool. To that end, the EWS will use comparative data and peer group analysis to identify patterns of activity by officers and groups of officers for supervisory review and intervention. | ¶ 158-160 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Ninth Quarterly Report, Section II(A). |
| NPD will continue to use its current IAPro software's alert and warning features to identify officers for intervention while further developing and implementing an EWS that is fully consistent with this Agreement. | ¶ 161 | Ongoing | Not Assessed | The Monitor will assess this requirement during compliance audits. |
| **Records Management System ("RMS") (¶¶ 162-163)** | | | | |
| NPD will revise its use and analysis of its RMS to make efficient and effective use of the data in the System and improve its ability to interface with other technology systems. | ¶ 162 | Within two years of the Effective Date (March 30, 2018) | Non-Compliance | See Ninth Quarterly Report, Section II(A). |

**Data Systems Improvement Continued**

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| City will provide sufficient funding and personnel to NPD so NPD can revise its use and analysis of its Record Management System. | ¶ 163 | N/A | Non-Compliance | See Ninth Quarterly Report, Section II(A). |

## XIII.  Transparency and Oversight

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| NPD will make its policies publicly available, and will regularly report information regarding officer use of force; misconduct complaints; and stop/search/arrest data. | ¶ 164 | Ongoing | Not Assessed | |
| NPD will work with the civilian oversight entity to overcome impediments to the release of information consistent with law and public safety considerations. | ¶ 165 | N/A | Not Assessed | |
| On at least an annual basis, NPD will issue reports, summarizing and analyzing the stop, search, arrest and use of force data collected, the analysis of that data, and the steps taken to correct problems and build on successes. | ¶¶ 85, 168 | Annually | Non-Compliance | |

## XIV. Consent Decree Implementation and Enforcement

| Achievement | Consent Decree Paragraph | Consent Decree Deadline for Achievement | Status | Discussion |
|---|---|---|---|---|
| **Consent Decree Implementation Unit** | | | | |
| The City and NPD will form an interdisciplinary unit to facilitate the implementation of the Consent Decree. | ¶ 196 | Within 180 days after the Effective Date (September 26, 2016) | Operational Compliance | |
| The City implementation unit will file a status report with the Court, delineating the items set forth in the Consent Decree. | ¶ 197 | Within 180 days after the Effective Date (September 26, 2016) and every six months thereafter | Operational Compliance | |

# Appendix B

## STATUS OF CONSENT DECREE AUDITS

**Monitoring Team's Eighteenth Quarterly Report — April 1 to June 30, 2021**

The following chart notes the status of the Monitoring Team's Consent Decree audits that are either in progress or have been completed.

| Audit | Status | Audit Result |
|---|---|---|
| Training Records<br><br>Audited Consent Decree Area(s): Paragraphs 9, 12 and 173 | March 15, 2019: 45-day notice is issued for first audit<br><br>October 15, 2019: First audit report is issued in the Monitor's Tenth Quarterly Report<br><br>January 16, 2020: 45-day notice issued for second audit<br><br>January 28, 2021: Second audit report is issued in the Monitor's Fifteenth Quarterly Report<br><br>July 9, 2021: Amended Second audit report is issued in the Monitor's Sixteenth Quarterly Report. | *First* Training Records Audit: **Compliance with Paragraph 12 (Paragraphs 9 and 173 not audited)**<br><br>*Second* Training Records Audit: **Compliance with Paragraph 173[1] (Paragraphs 9 and 12 not audited)** |
| Community-Oriented Policing and Engagement<br><br>Audited Consent Decree Area(s): Paragraphs 14-21, 24, and 174(e) | March 6, 2020: 45-day notice is issued for first audit<br><br>June 27, 2020: First audit report is complete | See Eighteenth Quarterly Report, Appendix D. |
| Body-Worn Cameras<br><br>Audited Consent Decree Area(s): Paragraphs 103 and 104 | May 24, 2019: 45-day notice is issued for first audit<br><br>April 27, 2020: First audit report is issued in the Monitor's Twelfth Quarterly Report | *First* Body-Worn Camera Audit: **Non-Compliance** |

---

[1] The Monitoring Team concluded that NPD made significant progress implementing recommendations included in the *First* Training Records audit; however, the Monitoring Team was unable to assess compliance with Paragraph 12 during the Second Training Records audit because restrictions on in-person Monitorship activities prevented the Monitoring Team from determining whether training materials, including curricula, lesson plans and related course documents were being properly maintained at the Police Academy.  The Monitoring Team's next (third) training records audit will assess compliance with Consent Decree Paragraphs 12 and 173.  Additionally, the Monitoring Team's third training records audit will assess whether NPD has trained all relevant personnel with respect to Bias-Free Policing, which was administered after completion of the second training records audit.

| Audit | Status | Audit Result |
|---|---|---|
| | February 3, 2020: 45-day notice is issued for second audit<br><br>The *Second* Body-Worn Camera audit began in July 2021, after the end of this reporting period. | |
| In-Car Cameras<br><br>Audited Consent Decree Area(s): Paragraphs 103 and 104 | February 3, 2020: 45-day notice is issued for first audit<br><br>The *First* In-Car Camera audit began in July 2021, after the end of this reporting period. | |
| Use of Force<br><br>Audited Consent Decree Area(s): Paragraphs 66-102; 174 (b) | October 15, 2019: 45-day notice is issued for first audit<br><br>The *First* Use of Force audit has been completed. | See Eighteenth Quarterly Report, Appendix C. |
| Stops<br><br>Audited Consent Decree Area(s): Paragraphs 25-28, 43, 51-62, 65, 164, 168, and 174 (a), (d), and (e) | January 17, 2020: 45-day notice is issued for first audit<br><br>The First Stops audit was completed after this reporting period.  The Monitoring Team will report on the findings of the audit in its next Quarterly Report. | |

The following chart notes the remaining Consent Decree audits that the

Monitoring Team will begin after in-person monitorship activities resume.

| Subject Matter Area | Status |
|---|---|
| Property | This audit has been delayed due to limitations on in-person monitorship activities.  The Monitoring Team will resume this audit when it is safe to do so per public health guidance. |

| Subject Matter Area | Status |
|---|---|
| Internal Affairs: Complaint Intake | The Monitoring Team is currently working with NPD on its Internal Affairs Procedural Manual.  The Monitoring Team will provide anticipated timing for audits in this area once NPD has completed its Manual and related training. |
| Internal Affairs: Discipline | Portions of the Discipline audit are linked to the Complaint Intake requirements.  The Monitoring Team will provide an anticipated timing for these portions of the Discipline audit once we are able to provide dates for the Complaint Intake audit, as described above. |
| Searches With or Without A Warrant | This audit has been delayed due to limitations on in-person monitorship activities and technical limitations of the City and NPD. The Monitoring Team will resume this audit when it is safe to do so per public health guidance or when the City and NPD develop the technologies to allow the Monitoring Team to conduct this audit remotely. |
| Arrests With or Without A Warrant | This audit has been delayed due to limitations on in-person monitorship activities and technical limitations of the City and NPD. The Monitoring Team will resume this audit when it is safe to do so per public health guidance or when the City and NPD develop the technologies to allow the Monitoring Team to conduct this audit remotely. |
| Bias-Free Policing | NPD reports that its Bias-Free Policing training concluded on March 12, 2021.  Thus, NPD is eligible to be audited as of June 20, 2021. |
| Supervision, including All Force Investigations Team | The Monitoring Team will administer this audit following the initial completion of audits in other subject areas. |

# Appendix C

**Report of the Independent Monitor's First Audit of the City of Newark and Newark Police
Division's Use of Force**

Table of Contents

I.      Reviewers: ................................................................................................................. 3

II.     Introduction ............................................................................................................... 3

III.    Review Period ............................................................................................................ 3

IV.     Executive Summary ................................................................................................... 4

V.      Analysis ..................................................................................................................... 6

        A.      NPD's Use of Force Policies ......................................................................... 6

        B.      Operational Compliance:  Whether NPD is Complying with Its Use of Force Policies in
                Practice ......................................................................................................... 6

                1.      Substantive Compliance ................................................................... 6

                2.      Reporting Compliance ...................................................................... 9

        C.      Outcome Data ............................................................................................. 10

VI.     Observations and Recommendations ....................................................................... 12

This report presents the findings of the Independent Monitor, Peter C. Harvey, regarding the Independent Monitoring Team's first audit of the City of Newark's (the "City") and Newark Police Division's ("NPD") compliance with Consent Decree requirements relating to the use of force.

## I.     Reviewers:

The following members of the Independent Monitoring Team participated in this audit:

Wayne Fisher, Ph.D., Rutgers University Center on Policing
Daniel Gomez, Rutgers University Center on Policing
Linda Tartaglia, Rutgers University Center on Policing
Rosalyn Parks, Ph.D., Rutgers University Center on Policing
Jonathan Norrell, Rutgers University Center on Policing

## II.     Introduction

Paragraph 173 of the Consent Decree instructs the Independent Monitoring Team, led by Independent Monitor Peter C. Harvey, to audit the City's and NPD's compliance with Consent Decree reforms.  Consistent with the Consent Decree, the Independent Monitor issued notice to the City, NPD, and U.S. Department of Justice ("DOJ") (collectively, "the Parties"), by letter dated October 15, 2019, that the Monitoring Team would begin its first audit of NPD's compliance with certain provisions of the Consent Decree relating to the use of force, and specifically, Consent Decree Paragraphs 66-102 and 174(b).  *See* **Appendix A** (October 15, 2019 notice letter).

As a general matter, the above-referenced paragraphs of the Consent Decree require NPD to:

develop and implement policies and training directing that the use of force by NPD officers accords with the rights secured and protected by the Constitution and state and federal law . . .

develop . . . review mechanisms that will promptly identify and appropriately respond to any unreasonable uses of force . . . [and]

direct that officers use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians.

*See* Consent Decree Section VIII.

## III.     Review Period

In this audit, the Monitoring Team reviewed NPD's police activities and records for a three-month period, specifically, from July 1, 2019, through September 30, 2019 (the "Audit Period").

From February 13, 2020, through March 11, 2020, the Monitoring Team reviewed NPD records and video footage in person, at NPD offices. On March 20, 2020, in response to growing public health concerns related to the COVID-19 pandemic, NPD's then Public Safety Director requested that the Monitoring Team discontinue in-person Monitorship activities. Subsequently, the Monitoring Team requested that NPD make copies of the relevant police records and video footage available to the Monitoring Team on a remote basis, using secure file sharing technology. NPD was unable to fully provide such remote access until January 2021. The Monitoring Team completed its review of the relevant video footage on March 11, 2021.

## IV.   Executive Summary

This report contains the results of the Monitoring Team's comprehensive audit of NPD's use of force during the three-month Audit Period (July 1 – September 30, 2019). To that end, the Monitoring Team analyzed whether (1) NPD's use of force policies contained the Consent Decree-required provisions; (2) NPD demonstrated routine adherence to its own use of force policies in its day-to-day operations, described here as "Operational Compliance"; and (3) NPD was able to produce police data concerning its use of force that would be sufficient for the Monitoring Team to establish a baseline for the aggregate data analysis required by Consent Decree Paragraph 174(b), known as an "outcome assessment."

With respect to the first component of this audit, namely, NPD's use of force policies, the Monitoring Team previously determined in 2017 and 2018 that NPD's new or revised use of force policies embody each of the Consent Decree's requirements.[1] Those policies remain compliant during the Audit Period.

With respect to the second component of this audit—whether NPD had demonstrated routine adherence to its use of force policies in its day-to-day operations, thereby achieving Operational Compliance, the Monitoring Team considered (a) whether all officers who used force acted consistently with the fundamental principles of NPD's use of force policies, described in this audit as *substantive compliance*; and (b) whether all officers involved in a use of force incident, meaning those actually employing force, witnessing force, or present in a supervisory capacity, complied with the reporting requirements contained in NPD's policy, described in this audit as *reporting compliance*. NPD achieves Operational Compliance only when it satisfies *both* metrics 95% of the time among the sample that the Monitoring Team reviewed.

Here, the Monitoring Team found that NPD nearly achieved substantive compliance with its use of force incidents—meaning, that NPD officers used force in a manner consistent with its policies, the Consent Decree, New Jersey law, and federal law 92.9% of the time, just below the 95% threshold for compliance. In only 6 of the 84 incidents reviewed, NPD officers failed to exhaust all reasonable alternatives before using force, use the minimum amount of force

---

[1] As will be explained in the following, NPD has not yet been able to implement just one of the 77 Consent Decree requirements, concerning the Civilian Complaint Review Board's (CCRB) involvement in NPD's internal use of force reviews. That deficiency results not from any failure by NPD, but rather due to ongoing litigation brought by the Fraternal Order of Police (FOP), a Newark police union. NPD's use of force policies otherwise are compliant with the Consent Decree.

necessary or cease using force at the appropriate moment.  Thus, for the most part, NPD is complying with its use of force policy and training in that NPD officers are (i) initiating force, (ii) ceasing force, (iii) exhausting all other reasonable means before using force, and (iv) using the least amount of force necessary, consistent with its use of force policy.  Additionally, no force incidents reviewed by the Monitoring Team involved an officer's use of firearms on a subject.

In contrast, NPD's use of force reporting was only compliant for 75% of incidents reviewed.  Of the 25% deficient incidents, the majority of the deficiencies were missing reports. NPD must show significant improvement in its compliance with its own reporting requirements.

With respect to the third component of this audit—collecting and analyzing NPD's use of force data on an aggregate level as required by Consent Decree Paragraph 174(b)—the Monitoring Team considered whether NPD had provided the eight categories of use of force data required in Paragraph 174(b)(i)-(viii).  NPD was able to produce all eight categories of data.  As such, NPD has complied with this aspect of the Consent Decree.

This table presents an overview of NPD's compliance with the Monitoring Team's First Audit of NPD's Use of Force.

| Overview of First Use of Force Audit Results | | |
|---|---|---|
| **Audit Subject** | **Consent Decree Paragraph(s)** | **Compliance?<br>(Requirement: 95%)** |
| **Use of Force Policies** | Paragraphs 67-102 | Yes.[2] |
| **Substantive Operational Compliance**<br><br>*Whether all officers who employed force acted consistently with the fundamental principles of NPD's Use of Force policy.* | Paragraphs 67, 71 – 73 | No. 92.9% of use of force incidents reviewed by the Monitoring Team complied with the substantive requirements in NPD's applicable Use of Force Policy. |
| **Reporting Operational Compliance**<br><br>*Whether NPD officers complied with NPD's use of force reporting requirements.* | Paragraphs 75 – 84, 88 | No. 75% of use of force incidents reviewed by the Monitoring Team complied with the Reporting requirements in NPD's applicable Use of Force Policy. |
| **Outcome Assessments**<br><br>*NPD's production of aggregate use of force data required by the Consent Decree* | Paragraph 174(b)(i)-(viii) | Yes. |

---

[2] Subject to resolution of the CCRB litigation described below.

V.      **Analysis**

A.      **NPD's Use of Force Policies**

At the outset of the Consent Decree, NPD decided that it would address the Consent Decree's use of force requirements by creating or revising three Division-wide policies, known as General Orders, that govern how NPD officers use force, report use of force incidents, and maintain weapons.  The Monitoring Team approved NPD's *General Order 18-20, Use of Force* on September 29, 2017 (*see* **Appendix B**); NPD's *General Order 18-21 Use of Force Reporting, Investigation and Review* on March 16, 2018 (*see* **Appendix C**); and NPD's *General Order 18-22, Firearms and Other Weapons* on the same date, March 16, 2018 (*see* **Appendix D**).

Before approving these policies, the Monitoring Team conducted a formal review to determine whether the policies, collectively, contain each of the 77 use of force policy requirements specified in the Consent Decree.  (The full list of these requirements can be found in **Appendix E**.)  The Monitoring Team determined that 76 of the 77 requirements are embodied therein.  The only missing element, concerning the CCRB's involvement in NPD's internal review of uses of force by NPD's All Force Investigations Team ("AFIT"), *see* Consent Decree Paragraph 101, is pending resolution of litigation brought by the Fraternal Order of Police (FOP), a police union, challenging the scope of the CCRB's powers.  NPD intends to revise its use of force policies to address this last requirement when the law permits it to do so.

B.      **Operational Compliance:  Whether NPD is Complying with Its Use of Force Policies in Practice**

To determine whether NPD is complying with its use of force policies, the Monitoring Team analyzed the actions of each officer involved in a use of force incident, including whether all reporting requirements had been satisfied.  Should every officer involved with, supervising, or witnessing a use of force incident comply with the core aspects of NPD's use of force policies and the relevant state and federal laws 95% of the time, the Monitoring Team would find that NPD had achieved "incident compliance."

For this analysis, the Monitoring Team divided incident compliance into two components:  (1) **substantive incident compliance**, considering whether NPD had legal authorization to use force, used the minimum amount of force necessary after exhausting all other means, and stopped using force once it was no longer necessary; and (2) **reporting compliance**, considering whether NPD accurately completed and submitted all the reports concerning a use of force that are required by NPD policy.  The results of this analysis are discussed below.

1.      *Substantive Compliance*

To determine whether NPD has achieved substantive incident compliance, the Monitoring Team analyzed whether NPD officers' actions were lawful and compliant with four fundamental principles in NPD's use of force policy:  (1) *authorization to initiate force* (i.e., whether the officer initiated force consistent with NPD policy); (2) *appropriate cessation of force* (i.e., whether the officer ceased using force consistent with NPD policy); (3) *last resort* (i.e., whether the officer exhausted all other reasonable means, including de-escalation and

6

alternative resolution); and (4) *minimization* (i.e., whether the amount of force applied was the minimum amount necessary). *See* **Appendix B** (NPD *General Order 18-20, Use of Force*). An officer's actions were determined to be compliant if they satisfied each of these four criteria. A use of force incident was deemed compliant if each officer using force was compliant.

To perform this assessment, the Monitoring Team undertook a detailed review of 84 total use of force incidents during the three-month Audit Period. For a complete list of the use of force numbers associated with each use of force incident reviewed, *see* **Appendix F**. These 84 incidents included:

(1) All "serious" use of force incidents, of which there was only one during the Audit Period. The Consent Decree defines a "serious" force incident as one involving loss of consciousness; a canine bite; a strike, blow, or kick against a handcuffed or restrained person; or any head, neck, or throat strike or neck hold resulting in injury that is *not* investigated by the Essex County Prosecutor's Office pursuant to New Jersey Attorney General Directive 2005-06. *See* Consent Decree ¶ 4(rr). No force incidents reviewed by the Monitoring Team involved an officer's use of firearms on a subject.

(2) All "intermediate" use of force incidents, of which there were eleven during the Audit Period. The Consent Decree defines an "intermediate" use of force incident as one involving the use of chemical spray; use of an impact weapon to strike a person, but where no contact is made; use of a baton for non-striking purposes (e.g., prying limbs, moving or controlling a person); or weaponless defense techniques (e.g., elbow strikes, kicks, leg sweeps, and takedowns). *See* Consent Decree ¶ 4(x).

(3) A random sample of 50% of all "low" level use of force incidents that occurred during the Audit Period. Here, the sample totaled 72 incidents. The Consent Decree defines a "low" level use of force incident as one involving the use of hand controls or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury. *See* Consent Decree ¶ 4(z).

For the 84 total incidents reviewed, the Monitoring Team reviewed all available and relevant reports, documentation and video footage associated with each use of force incident, including: (1) Use of Force Reports; (2) Incident Reports (DPI 802); (3) Arrest Reports (DPI 800); (4) Continuation Reports (DPI 795); (5) Stop Reports (DPI 1388); (6) Supervisor Review Routing Reports; (7) Debriefing Forms (DPI 2004); (8) Body-Worn Camera ("BWC") Video; and (9) Supervisor Use of Force Investigation Reports (DPI 1005). Of course, not every use of force incident called for the creation of each category of record cited above. For example, arrest reports were not available for incidents where no arrest was made, and BWC video was not available for incidents involving officers not required to wear cameras.

In total, 78 of the 84 (92.9%) incidents reviewed were substantively compliant.

| Incidents Reviewed | Substantively Compliant | Score |
|:---:|:---:|:---:|
| 84 | 78 | 92.9% |

Below is a summary of the substantively non-compliant incidents reviewed by the Monitoring Team, including the pertinent circumstances attending each incident.

| Substantively Non-Compliant Incidents | |
|---|---|
| **Event Number** | **Circumstances** |
| 19-210 | Officer using force did not exhaust all reasonable means before using force. |
| 19-229 | Officer used more than minimum force necessary. |
| 19-235 | Officer used more than minimum force necessary. |
| 19-261 | Officers using force did not exhaust all reasonable means before using force. |
| 19-286 | Officer failed to cease using force at proper time. |
| 19-287 | Officer used more than minimum force necessary; did not exhaust all reasonable means before using force. |

The 84 use of force incidents reviewed involved 149 different NPD officers, some of whom were involved in multiple uses of force.  Hence, the Monitoring Team reviewed a total of 198 instances of an NPD officer using force upon a member of the public.  The following table shows the number of officers who used force in one or more incidents reviewed by the Monitoring Team.

| Individual Officer Reports of Force | |
|---|---|
| **Number of Officers Who Used Force in One or More Instances** | **Total Number of Instances of an Officer Using Force** |
| 114 Officers used force once | 114 |
| 26 Officers used force twice | 52 |
| 4 Officers used force three times | 12 |
| 5 Officers used force four times | 20 |
| Total | 198 |

Of the 198 instances of an officer using force, 188 (94.9%) were found to be *compliant* with NPD's General Order provisions across all four criteria.

In ten instances an officer's use of force was determined to be *non-compliant* when assessed against the four fundamental principles described above.  These ten instances are comprised of six separate *substantively non-compliant* force incidents.  Three of these six substantively non-compliant incidents involve more than one officer who was found to be non-compliant.  For example, in event 19-261, multiple officers failed to exhaust all reasonable alternatives, such as de-escalation, before using force.

Additionally, among the 149 officers who used force, *none* were found to be non-compliant *more than once*.  In other words, ten different officers are responsible for the ten substantive non-compliant instances of an officer using force.  All 35 officers who used force in more than one incident reviewed by the Monitoring Team did so each time in substantive compliance with applicable NPD policies.  Importantly, officers who were involved in more than one force incident were not more likely to violate policy than other officers.

2. *Reporting Compliance*

The Monitoring Team assessed whether each officer involved in the 84 use of force incidents had fulfilled the reporting requirements in NPD's *General Order 18-21, Use of Force Reporting, Investigation and Review*. *See* **Appendix C**. If one officer in a use of force incident did not comply, the Monitoring Team found the entire incident non-compliant, except for situations where NPD's own internal review process identified and remediated reporting deficiencies.

NPD's compliance rate for Reporting Compliance was 75.0%. In only 63 of the 84 incidents reviewed, did all officers involved—including those using force, witnessing the use of force, or supervising the use of force—document their actions consistent with applicable NPD policy.

| Number Of Use Of Force Incidents Reviewed | Number Of Compliant Use Of Force Incidents (Reporting) | Compliance % |
|---|---|---|
| 84 | 63 | 75% |

Of the 21 incidents that were *non-compliant*, 19 were deficient due to missing use of force, witness or superviosory reports. In fact, only two incidents were determined to be non-compliant due to an incomplete report as opposed to a missing report.

Because of the information contained in other reports and relevant materials, including reports filed by other officers and BWC video, the absence of reports that were required to be submitted was readily apparent in many cases. In 11 of the 19 incidents involving missing use of force or witness reports, the Monitoring Team determined, through review of BWC video or documentation submitted by other officers, that an officer had witnessed the use of force, but had nonetheless failed to file a report themselves. Additionally, seven officers who used force themselves did not submit the required use of force report.

A breakdown of the different types of reporting deficiencies found by the Monitoring Team is displayed in the table below.

| Categories of Reporting Non-Compliance | | |
|---|---|---|
| Type of Reporting Deficiency | Incidents | Percent Non-Compliant |
| Missing Witness Report(s) | 11 | 52.4% |
| Missing Use of Force Report(s) | 7 | 33.3% |
| Missing Supervisory Report(s) | 1 | 4.8% |
| Incomplete Report(s) | 2 | 9.5% |
| **Total** | **21** | 100.0% |

Below is a summary of the incidents that were determined to be *non-compliant* because of reporting deficiencies, and the pertinent circumstances attending each incident.

| Summary of Reporting Non-Compliant Incidents | |
|---|---|
| Event Number | Circumstances |
| 19-187 | Missing Report — Use of Force: no report from Police Officers identified in Incident |

| Summary of Reporting Non-Compliant Incidents | |
|---|---|
| **Event Number** | **Circumstances** |
| | Report as using force. |
| 19-196 | Report Failure — Supervisor: subject allegation not addressed in Supervisor Report. |
| 19-205 | Missing Report — Supervisor: no Supervisor Report from Supervisor. |
| 19-219 | Missing Report — Witness: no report from Police Officer identified in Incident Report as witnessing force. |
| 19-227 | Missing Report — Use of Force: no report from Police Officers identified in Incident Report as using force. |
| 19-231 | Missing Report — Use of Force: no report from Police Officers identified *via* BWC as using force. |
| 19-244 | Missing Report — Witness: no report from Police Officer identified in Use of Force report as witnessing force. |
| 19-255 | Missing Report — Use of Force: no report from Police Officer identified *via* BWC video as using force. |
| 19-258 | Missing Report — Initially no report by Police Officers using force, but corrected by supervisory review.<br><br>Missing Report — Witness: no report by Police Officers witnessing use of force. |
| 19-263 | Missing Report — Witness: no report from Police Officer identified in Use of Force report as witnessing force. |
| 19-272 | Missing Report—Witness: no report from Supervisor on scene identified *via* BWC as witnessing force. |
| 16-278 | Missing Report — Witness: no report from Supervisor on scene identified *via* BWC as witnessing force. |
| 19-279 | Missing Report — Use of Force: no report from Police Officer identified in Use of Force report and a Witness Report as using force. |
| 19-281 | Missing Report — Witness: no report from Police Officer identified via BWC video as witnessing force. |
| 19-283 | Missing Report — Use of Force: no report from Police Officer identified in Incident Report as using force. |
| 19-285 | Report Failure — Police Officer failed to report use of OC spray ("Pepper Spray") and baton mentioned in another officer's report.  Other officers used only low-level force. |
| 19-295 | Missing Report — Witness: no report from Police Officers identified *via* BWC video as witnessing force. |
| 19-298 | Missing Report — Use of Force: no report of using force on second subject in incident, there should be an additional Use of Force incident number. |
| 19-303 | Missing Report — Witness: no report from Supervisor identified in Use of Force Report and Incident Report as witnessing force. |
| 19-309 | Missing Report — Witness: no report from Supervisor identified in Use of Force Report as witnessing force. |
| 19-310 | Missing Report — Witness: no report from Police Officers identified in Use of Force Report as witnessing force. |

## C.    Outcome Data

Paragraph 174(b)(i)-(viii) of the Consent Decree requires NPD to provide the Monitor with eight (8) categories of use of force data to allow the Monitoring Team to undertake use of

force-related outcome assessments.  NPD will be compliant when it provides each of the eight (8) categories of data to the Monitoring Team.

NPD provided the Monitoring Team with all eight (8) categories of data required by Consent Decree Paragraph 174(b)(i)-(viii).  The Monitoring Team did not request data for "claims and lawsuits filed regarding uses of force, judgments entered, or cases settled."  *See* Paragraph 174(b)(ix).  NPD will need to provide this data during a future audit.  The data that NPD provided to the Monitoring Team is included in **Appendix G**.

| Data Required By the Consent Decree | Paragraph | Compliant? |
|---|---|---|
| The rate of force used per arrest by NPD. | 174(b)(i) | Yes. |
| The rate of force by types of force used. | 174(b)(ii) | Yes. |
| The rate of force by geographic data and type of arrest. | 174(b)(iii) | Yes. |
| The rate of force used, measured against the subject's race or ethnicity, gender, and age. | 174(b)(iv) | Yes. However, complete "Age" data was not readily available for all Use of Force incidents during this audit period. The Monitoring Team's review of use of force incidents allowed it to determine "Age" data for the cases under review. |
| The rate of force complaints that are sustained, overall and by force type; sources of complaint (internal or external); types of arrest; types of force complained of. | 174(b)(v) | Yes. |
| Uses of force that were found to violate policy overall and by the following subsets: force type; type of arrest; force implement used; and number of officers involved. | 174(b)(vi) | Yes. |
| The number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence. | 174(b)(vii) | Yes. |
| The number of officers who have more than one instance of force found to violate policy. | 174(b)(viii) | Yes. |

VI.    **Observations and Recommendations**

The Monitoring Team found NPD's rate of substantive incident compliance, the most consequential indicator of individual officer performance, to be commendable by any of the compliance measures used for that purpose in the audit.

The same cannot be said for NPD's rate of documentation compliance.  Specifically, the Monitoring Team believes that the issue of missing reports from officers who either used force or witnessed a use of force incident requires ***immediate*** attention from NPD command staff. Line Supervisors should be responsible for reviewing actions and reports of officers involved in use of force incidents *before* a use of force incident is referred to AFIT, NPD's internal review process.  The reporting deficiencies in use of force incidents reviewed by the Monitoring Team should be readily apparent to anyone, at any level.  Therefore, the Monitoring Team recommends that NPD take steps to re-emphasize the importance of a more diligent review of officer documentation by line supervisors in the involved officers' chain of command.

In the course of its individual incident review process, the Monitoring Team noted that a significant proportion of the use of force incidents in the sample (25.0%) contained documentation suggesting that the force subject was an emotionally disturbed person ("EDP"), meaning a person with social, mental, or behavioral problems that manifest as erratic behavior, including potentially hurting themselves or others.

The Monitoring Team also noted that in each incident involving an EDP, the actions of all the officers who used force were substantively compliant with applicable NPD policy. Additionally, the incidents involving an EDP were less likely than others to result in an arrest. There were 21 use of force incidents reviewed in which the subject was not arrested.  Of those, 16 (76%) involved a subject identified as an EDP.

Even though this audit found that officers acted appropriately in incidents involving an EDP when force was employed, given the relative frequency of EDP-involved incidents as a portion of all use of force incidents, the Monitoring Team recommends that NPD Supervisors examine in detail all EDP-involved incidents handled by its officers, whether or not force is used.  The Monitoring Team believes that such an undertaking will provide NPD with information useful in developing policy and training content regarding EDP-involved incidents to institutionalize its own best practices in these incidents.

The Consent Decree requires that both the City and NPD post this report on their websites.  *See* Consent Decree Paragraph 20 ("All NPD studies, analyses, and assessments required by this agreement will be made publicly available, including on NPD and City websites . . . to the fullest extent permitted under law."); Paragraph 166 ("all NPD audits, reports, and outcomes analyses . . . will be made available, including on City and NPD websites, to the fullest extent permissible under law.").  The Monitor expects the City and NPD to do so expeditiously.

Dated: June 7, 2021                                              Peter C. Harvey
                                                                 Independent Monitor

# APPENDIX A

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

October 15, 2019

Peter C. Harvey
Partner
(212) 336-2810
Direct Fax: (212) 336-1217
pcharvey@pbwt.com

**VIA EMAIL**

Kenyatta Stewart, Esq.
  Acting Corporation Counsel
Avion Benjamin, Esq.
  First Assistant Corporation Counsel
City of Newark, Department of Law
Room 316, City Hall
Newark, NJ 07102

Anthony F. Ambrose
  Public Safety Director
Department of Public Safety
480 Clinton Avenue
Newark, NJ 07108
(973) 733-6007

      **Re:**     **First Use of Force Audit: 45-Day Notice**

Dear Mr. Stewart and Director Ambrose:

      Pursuant to Consent Decree Paragraph 180, I write to provide notice that, starting no sooner than November 29, 2019, the Monitoring Team will conduct an audit of the Use of Force by members of the Newark Police Division ("NPD") during the following period: **July 1, 2019 through September 30, 2019 (the "audit period")** to assess whether NPD is in compliance with Section VIII of the Consent Decree.  (*See* ¶¶ 66-102)

      Section VIII of the Consent Decree requires, among other things, that "NPD will develop and implement policies and training directing that the use of force by NPD officers accords with the rights secured and protected by the Constitution and state and federal law." Paragraph 173 of the Consent Decree requires the Monitor to "conduct reviews or audits as necessary to determine whether the City and NPD have implemented and continue to comply with the requirements" of the Consent Decree.  The Monitoring Team must assess whether the City and NPD have "implemented the [Use of Force] requirements into practice."  (*See* Consent

October 15, 2019
Page 2

Decree ¶ 173.)  Additionally, Consent Decree Paragraph 174(b) requires the Monitor to collect and analyze the following data as part of its Use of Force outcome assessments:

    i.    the rate of force used per arrest by NPD;

    ii.    the rate of force by types of force used;

    iii.    the rate of force by geographic data and type of arrest;

    iv.    the rate of force used, measured against the subject's race or ethnicity, gender, and age;

    v.    the rate of force complaints that are sustained, overall and by force type; sources of complaint (internal or external); types of arrest; types of force complained of;

    vi.    uses of force that were found to violate policy overall and by the following subsets: type of arrest; force implement used; and number of officers involved;

    vii.    the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

    viii.    the number of officers who have more than one instance of force found to violate policy.

        For the audit period, the Monitoring Team will review:  (1) all Serious and Intermediate Level use of force incidents; (2) all use of force incidents in which NPD made a finding of "Policy Non-Compliant"; (3) all excessive force complaint incidents; and (4) a sample of all Lower Level use of force and constructive authority incidents.  To do so, the Monitoring Team will require workspace at the All-Force Investigations Team Office (22 Franklin St., 4th Floor Annex) and electronic access to body-worn and in-car video.

        In preparation for the audit, at least two (2) weeks prior to the start of the audit, and no later than November 15, 2019, the Monitoring Team will require the following data and records for the audit period:

- Records showing the total number of arrests made by the NPD;

- A list of all event numbers and Use of Force numbers for all Use of Force incidents including the level of force designation (General Order 18-20 Section VII.A.3; Consent Decree Paragraphs 4(x), 4(z), 4(rr)) for each incident;

October 15, 2019
Page 3

- A list of event numbers and Use of Force Numbers for all Use of Force Incidents in which there was a finding of "Policy Non-Compliant" for any officer;

- A list of all event and Constructive Authority numbers associated with all Constructive Authority incidents reported pursuant to General Order 18-12 Section V.A.1 (Consent Decree Paragraph 67(j); and

- A list of all IOP (Investigation of Personnel) numbers for all excessive force complaints, or complaints regarding any use of force policy violation, received or reaching disposition (Sustained, Not Sustained, Exonerated, Unfounded).

NPD should also provide the Monitoring Team with data sufficient to enable the Monitoring Team to conduct outcome assessments pursuant to 174(b). The Monitoring Team understands that the rates referenced in 174(b) will be compiled and computed from data provided by the NPD from IA Pro which is utilized by the Office of Professional Standards (OPS) and the All Force Investigation Team (AFIT).

One week after receiving this information, the Monitoring Team will provide the City and NPD with the Use of Force, Constructive Authority and IOP numbers of the cases it seeks to review. All reports and body-worn camera video associated with the event, Use of Force, and IOP numbers included in the sample will be made available to the Monitoring Team on the day(s) of the audit in the workplace provided to the Team.

Sincerely,

/s/ Peter C. Harvey

Peter C. Harvey

Enclosures

CC:     Jude Volek, Esq.
          Special Counsel
        Jeffrey R. Murray, Esq.
        Corey M. Sanders, Esq.
        Patrick Kent, Esq.
          Trial Attorneys
        Special Litigation Section
        Civil Rights Division
        United States Department of Justice
        950 Pennsylvania Ave., N.W.
        Washington, D.C. 20530

        Craig Carpenito, Esq.
          United States Attorney

October 15, 2019
Page 4

      Caroline Sadlowski, Esq.
        Counsel to the U.S. Attorney
      Kristin Vassallo, Esq.
        Deputy Chief - Civil Division
      Kelly Horan Florio
        Civil Rights Unit - Civil Division
      Office of the United States Attorney
      District of New Jersey
      Rodino Federal Building
      970 Broad Street
      Newark, NJ 07102

# APPENDIX B



# NEWARK POLICE DIVISION
# GENERAL ORDER



| SUBJECT: | GENERAL ORDER NO. |
|---|---|
| **USE OF FORCE** | **18-20** |
| SUPERSEDES: | DATED: |
| **G.O. 63-2** | **November 8, 2018** |

This Order consists of the following numbered sections:

I.      **PURPOSE**

II.     **POLICY**

III.    **DEFINITION OF TERMS**

IV.     **USE OF FORCE STANDARDS**

V.      **USE OF FORCE**

VI.     **USE OF DEADLY FORCE**

VII.    **USE OF FORCE LEVELS OF CONTROL**

VIII.   **DE-ESCALATION TECHNIQUES**

IX.     **EMOTIONALLY DISTURBED PERSON**

X.      **DUTY TO PROVIDE MEDICAL AID**

XI.     **USE OF FORCE REPORTING AND REVIEW**

XII.    **TRAINING**

XIII.   **EFFECTS OF THIS ORDER**



# NEWARK POLICE DIVISION
# GENERAL ORDER



## I.    PURPOSE

The purpose of this order is to establish Newark Police Division policy and procedures that are designed to guide Police Division members in the use of force, and to further ensure that Police Division members treat all persons with dignity and respect as they execute the duties they have been entrusted to perform. The provisions of this order shall apply to regular Police Division members, Newark Special Police Officers, Newark Auxiliary Police Officers, and Police Division members assigned to special details outside of the Police Division.

## II.   POLICY

The Police Division places the highest value on the sanctity of all human life. It is the policy of the Police Division that its members will in all instances attempt to exercise their responsibilities without the use of force. It is further the policy of the Police Division to de-escalate situations without using force when possible in order to decrease the likelihood that force will have to be employed. Police Division members shall de-escalate the use of force at the earliest opportunity, and will make efforts to exhaust all other reasonable means available before resorting to the use of force, as long as the member's safety or that of other persons is not compromised.

The Police Division limits the use of force by its members to those situations when it is objectively reasonable to effect an arrest or protect the safety of the Police Division member or another person. The use of force shall never be considered routine. In determining to use force the member shall be guided by the principle that the amount of force employed in any situation should be the minimum amount necessary. Any force used shall not create substantial risk of injury to bystanders. Therefore, it is imperative that members make every effort to ensure that each instance of use of force is not only legally warranted, but also rational and humane.

Police Division policy and training require that members not only follow the legal standard of using force, which was established in *Graham v. Connor*, 490 U.S. 386 (1989), but also strive to utilize the minimum amount of force necessary in order to bring about their lawful objectives. Members are reminded that a degree of force, which may have been justified earlier in an encounter, does not remain justified indefinitely. Force shall be decreased as the subject's resistance or threat decreases.

Police Division members are duty bound to prevent and or intervene when the use of force by other members or members from another law enforcement agency appears to be unreasonable and or illegal in type or amount. This policy sends a clear message that Police Division members share an obligation beyond the requirements of the law to intervene and prevent the application of unreasonable or unlawful use of force.

This policy is not intended to limit the lawful authority of Police Division members to use objectively reasonable force or otherwise fulfill their law enforcement obligations. However, members must remain mindful that they derive their authority from the U.S. Constitution, Federal



# NEWARK POLICE DIVISION
# GENERAL ORDER



Laws, the Laws of the State of New Jersey and the community. The use of unreasonable and or illegal force undermines the legitimacy of that authority and shall not be tolerated. Members are subject to discipline, possible criminal prosecution, and or possible civil liability for violations of the law or provision of this policy.

## III.    DEFINITIONS

### A.    Active Resistance

1.    Active resistance occurs when a subject is uncooperative and takes some level of physical action to resist and prevent a Police Division member from taking control of the subject and or placing the subject in custody.

2.    Examples include levels of resistance from non-assaultive actions such as pulling or running away all the way up to a lethal attack on the member.

### B.    Bodily Harm

1.    Bodily harm means physical pain, temporary disfigurement, or impairment of physical condition.

2.    An example is a subject who fell to the ground or was taken to the ground while resisting arrest and as a result he or she sustains minor scrapes and/or bruises to his knees and/or arms.

### C.    Constructive Authority

1.    Constructive authority, as defined in the State of New Jersey Attorney General Guidelines, means using the Police Division members' authority to exert control over a subject that does not involve actual physical contact.

2.    Examples include verbal commands, gestures, warnings, and un-holstering, exhibiting, or pointing a firearm. Pointing a firearm at a subject is an element of constructive authority to be used only in appropriate situations.

### D.    De-Escalation

1.    De-escalation means steps taken during a potential use of force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without use of force or with a reduction in the force necessary.



# NEWARK POLICE DIVISION
# GENERAL ORDER



2.   An example would be using verbal persuasion to calm down a person in crisis who is threatening to do harm to the member, but who has not actually taken any affirmative steps to harm the member.

E.   **Deadly Force (Synonymous w/Lethal Force)**

Deadly force is any use of force which a Police Division member uses that is likely to cause death or serious bodily harm, including, but not limited to using a firearm, neck hold, strike with a hard object to the head, neck or throat.

F.   **Enhanced Mechanical Force**

1.   Enhanced Mechanical Force is an intermediate force option between mechanical force and deadly force, requiring a greater level of justification than that pertaining to physical or mechanical force, but a lower level of justification than required for the use of deadly force.

2.   An example would be using a Conducted Energy Device (CED) against a person who the member reasonably believes poses an imminent danger of death or serious bodily injury to him/herself.

G.   **Feasible**

Feasible means capable of being done or carried out, reasonable.

H.   **Imminent Danger (Synonymous with Imminent Threat)**

1.   Imminent danger describes threatened actions or outcomes that may occur during an encounter without action by the Police Division member.

2.   The period of time involved is dependent upon the circumstances and facts evident in each situation and is not the same in all situations. The threatened harm does not need to be instantaneous.

I.   **Less-Lethal Force**

Less-lethal force is force employed that is less likely and not intended to cause death or serious bodily harm.

J.   **Mechanical Force**

1.   Mechanical force involves the use of some device or substance, other than a firearm, to overcome a subject's active resistance.



# NEWARK POLICE DIVISION
# GENERAL ORDER



2.   Examples include the use of a baton or other object, or chemical or natural agent spray.

## K.   Member

A sworn employee of the Newark Police Division.

## L.   Neck Hold

A neck hold is considered **deadly force** and includes:

1.   A bar-arm control hold, which inhibits breathing by compression of the airway in the neck (choke hold);

2.   A carotid restraint hold, which inhibits blood flow by compression of the blood vessels in the neck;

3.   A lateral vascular neck constraint; or

4.   A hold with a knee or other object to the back of a prone subject's neck.

## M.   Passive Resistance

1.   Passive Resistance occurs when a subject is uncooperative and is not complying with a Police Division member's lawful commands, but is not using physical force or minimal physical force to prevent a member from placing the subject in custody and taking control.

2.   Examples include but are not limited to verbal non-compliance – such as stating, "No", refusing to move, going limp, locking arms, or holding onto a fixed object.

## N.   Physical Contact

1.   Physical contact means routine or procedural contact with a subject necessary to effectively accomplish a legitimate law enforcement objective or an arrest.

2.   Examples include guiding a subject into a police vehicle, holding the subject's arm while transporting him or her, handcuffing a subject, and maneuvering or securing a subject for a frisk.

## O.   Physical Force



# NEWARK POLICE DIVISION
# GENERAL ORDER



1. Physical force means contact with a subject beyond physical contact that is used to effect an arrest or other law enforcement objective. Physical force is employed when necessary to overcome a subject's active resistance to the Police Division member's authority or to protect persons or property.

2. Examples include wrestling a subject to the ground, using wrist locks or arm locks, striking with hands or feet, or other similar methods of hand-to-hand confrontation.

## P. Serious Bodily Harm

Serious bodily harm means bodily harm that creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ or which results from aggravated sexual assault or sexual assault.

## Q. Substantial Risk

1. A substantial risk exists when an officer disregards a foreseeable likelihood that bystanders will be endangered by the use of force.

2. For example, firing a weapon into a confined space (room, vehicle, etc.) occupied by bystanders exposes those persons to a substantial risk of harm.

## IV. USE OF FORCE STANDARDS

### A. General Requirements

1. Policing at times requires that a member exercise control of a violent or resisting subject to make an arrest or to protect the member, other members, or members of the community from risk of imminent harm. Clearly, not every potential violent confrontation can be de-escalated. However, members do have the ability to impact the direction and the outcome of many situations they handle, based on their decision-making and the tactics they choose to employ. The member shall consider and use de-escalation techniques where appropriate.

2. Members should continually assess every situation with the goal of bringing the situation to a safe, peaceful conclusion. This conclusion may be accomplished by using time, distance, information, isolation, teamwork, force option, coordination, and other techniques to maximize a member's advantage.

### B. Objectively Reasonable Force



# NEWARK POLICE DIVISION
# GENERAL ORDER



1. The United States Supreme Court decided in *Tennessee v. Garner*, 471 U.S. 1 (1985), that apprehension by the use of deadly force by police officers is a seizure subject to the reasonable standard under the Fourth Amendment of the United States Constitution.

2. The test and analysis that courts will use to examine whether a use of force is constitutional was set forth in *Graham v. Connor*, 490 U.S. 386 (1989) and the test has been expanded by subsequent court cases.

3. The Court concluded in *Graham* that use of force by police officers during an arrest, investigatory stop, or other seizure of a person shall be analyzed under an objective reasonableness standard.

4. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than from 20/20 hindsight. The standard of reasonableness must take into account the fact that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.

5. The standard of reasonableness in reviewing use of force is an objective one: were the officer's actions objectively reasonable given the facts and circumstances confronting him or her? The facts available to the officer at the time, along with other objective factors that may impact the reasonableness of an officer's actions, must be considered. The courts analyze the reasonableness of an officer's use of force actions by utilizing the "test of reasonableness," which consists of the following "*Graham Factors*":

    a. "the severity of the crime at issue";

    b. "whether the suspect poses an imminent threat to the safety of the   officers or others"; and

    c. "whether he/she is actively resisting arrest or attempting to evade arrest by flight".

## C. Duty to Intervene

1. Police Division members present at the scene of a use of force incident shall ensure that the force used complies with the law and with Division policies, rules and regulations.

2. Any member who witnesses force being used unreasonably or unlawfully shall, when reasonable to do so:



# NEWARK POLICE DIVISION
# GENERAL ORDER



    a.    verbally and or physically intervene as necessary to prevent or stop    the use of unreasonable or unlawful force;

    b.    safeguard the person upon whom the force was used;

    c.    render aid (Ref. to section X – Duty to Provide Medical Aid);

    d.    notify a non-involved supervisor to respond to the scene; and

    e.    report and document the incident on Police Division authorized forms (BlueTeam, etc.).

## V.    USE OF FORCE

### A.    General Requirements

Force may be used by a Police Division member in the following situations, recognizing that when force is used the member will use the minimal force needed to accomplish the law enforcement objective:

1.    When the member reasonably believes that force is immediately necessary to make a lawful arrest and:

    a.    The member has advised the person of the reason for their arrest or reasonably believes that it is already known to the subject; or

    b.    The reason for the arrest cannot reasonably be made known to the person.

2.    When a person is actively resisting arrest.

3.    To prevent an escape under New Jersey statute, if it can be employed to effect an arrest for which the person is in custody:

    a.    The degree of force used shall be determined by the gravity of the offense committed, and

    b.    The force employed shall not be excessive in either type or amount.

4.    If immediately necessary to prevent escape of a person who has been charged with or convicted of a crime, committed to a jail, prison or other detention facility.



# NEWARK POLICE DIVISION
# GENERAL ORDER



5.  To prevent the commission of a crime involving the threatening of bodily harm, property damage, or suicide.

## B.  Restrictions

The Division strictly prohibits using force that is not objectively reasonable and proportional to the threat or resistance of the subject under the circumstances. For example:

1.  Members shall not use force to effect compliance with a command that is knowingly unlawful. The use of force is unreasonable when the initial arrest or detention was knowingly unlawful to the member based on information known to the member at the time of the arrest or detention.

2.  The Division strictly prohibits the use of force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to a member or another person/s, or as objectively reasonable, where physical removal is necessary to overcome passive resistance.

3.  Members shall not use force to overcome passive resistance, except that objectively reasonable force is permitted when necessary for the purposes of handcuffing and physically removing a passively resisting person.

4.  Members shall not use force to retaliate against a person, including, but not limited to:

    a.  force used after a threat has diminished or is otherwise not reasonably necessary;

    b.  force used to punish individuals for fleeing or otherwise resisting arrest; and

    c.  force used in response to disrespectful language or actions.

## VI.  USE OF DEADLY FORCE

### A.  General Requirements

1.  Police Division members are empowered to carry and use firearms in the exercise of their service to the citizens of the City of Newark. This power is based on trust, and therefore, must be balanced by a system of accountability.

2.  Purposely firing a firearm in the direction of another person or at a vehicle, building or structure in which another person is believed to be positioned



# NEWARK POLICE DIVISION
# GENERAL ORDER



constitutes deadly force unless the firearm is loaded with less-lethal ammunition and fired by a law enforcement officer in the performance of the officer's official duties (NJS 2C:3-11b). Further, this policy recognizes that the use of an impact weapon may constitute deadly force.

3. For that reason, firearms, and similar less-lethal means of deadly force, and impact weapons shall be used only under the limited circumstances described in this section.

4. Deadly force may be used when the Police Division member reasonably believes that such action is immediately necessary to protect the member or another person from imminent danger of death or serious bodily harm.

5. Deadly force may be used to prevent the escape of a fleeing suspect, if:

   a. The member has probable cause to believe the suspect has committed an offense that caused or attempted to cause death or serious bodily harm; and

   b. The suspect will pose an imminent danger of death or serious bodily harm should escape succeed; and

   c. When the use of deadly force presents no substantial risk of injury to bystanders.

6. When feasible, a Police Division member must identify himself/herself as an officer and state his/her intention to shoot before using the firearm.

7. Police Division members may use their firearms to protect themselves or the public from animals that pose an imminent threat to the safety of the member or the public.

8. Police Division members may also use their firearm to destroy a sick or injured animal after obtaining authorization from a supervisor.

9. Police Division members shall be familiar with, and strictly adhere to:  State of New Jersey Attorney General Guidelines, Division Memoranda and Orders, and the tenets of Chapter 8, of the Newark Police Division's Rules and Regulations, entitled:  **FIREARMS**, including, but not limited to using, carrying, handling, caring, storing, requalifying on all Division approved firearms, ammunition, and using special weapons.

**B.    Restrictions**



# NEWARK POLICE DIVISION
# GENERAL ORDER



1.  Police Division members shall not use deadly force to subdue persons whose actions are only destructive to property.

2.  Police Division members shall not use deadly force against persons whose conduct is injurious only to themselves.

3.  Police Division members shall not discharge a firearm as a signal for help or as a warning shot.

4.  Neck holds are prohibited, except under circumstances in which deadly force would be authorized.

### C.  Un-holstering, Exhibiting, or Pointing a Firearm

1.  Police Division members shall not un-holster, exhibit, or point a firearm except under the following circumstances:

    a.  Routine maintenance of a firearm,

    b.  To secure the firearm,

    c.  During firearms training exercises, qualifications, or re-qualifications, or

    d.  When the circumstances create an objectively reasonable belief that the un-holstering and exhibiting of a firearm or pointing of a firearm will help establish control over a subject during an encounter that has the potential to escalate to create a risk of death or serious bodily harm to the member or another person.

        i.  These tactics are intended to give members a tactical advantage and opportunity to protect themselves or others from death or serious bodily harm prior to the threat becoming immediate, which may be too late.

        ii.  The use of these tactics shall be reported and tracked (BlueTeam).

### D.  Motor Vehicle and Use of Deadly Force

1.  While any discharge of a firearm entails risk, discharging a firearm at or from a moving vehicle entails even greater risk of death or serious bodily injury to bystanders. Public safety is jeopardized when a fleeing suspect is disabled and loses control of his or her vehicle. There is also a substantial risk of harm to occupants



# NEWARK POLICE DIVISION
# GENERAL ORDER



of the suspect vehicle who may not be involved, or involved to a lesser extent, in the actions which necessitated the use of deadly force.

2.  Due to this greater risk, and considering that firearms are not generally effective in bringing moving vehicles to a rapid halt, Police Division members shall not fire from a moving vehicle or at the driver or occupant of a moving vehicle unless the member reasonably believes:

    a.  there exists an imminent danger of death or serious bodily harm to the member or another person; and

    b.  no other means are available at that time to avert or eliminate the danger.

3.  Police Division members shall not fire a weapon solely to disable a moving vehicle.

4.  When confronting an oncoming vehicle, Police Division members shall make every effort to move out of its path, rather than discharge their firearms at the oncoming vehicle.

5.  Police Division members shall not intentionally place themselves in the path of an oncoming vehicle and attempt to disable the vehicle by discharging their firearm.

## VII.   USE OF FORCE LEVELS OF CONTROL

### A.   Levels of Control Categories

1.  Police Division members shall consider a subject's level of resistance when using force. When feasible, members shall use the minimum force necessary to perform their duty and not expose themselves to unreasonable risk of injury. The level of control used shall be proportional to the threat or resistance the member encounters, whether passive or active.

2.  Police Division members are not limited to using equal force, but may use a higher level of force than the subject's resistance as long as it is necessary and objectively reasonable to accomplish a lawful purpose. Similarly, force shall be appropriately de-escalated as resistance decreases. When feasible, members shall allow individuals the opportunity to submit to arrest before using force.

3.  The Police Division classifies use of force into three categories based on the seriousness of any injuries that are likely to or actually result from the force



# NEWARK POLICE DIVISION
# GENERAL ORDER



employed. These categories determine the Police Division's supervisory and investigative response to a use of force incident. The three categories are:

a.   **"Low Level Force" or "Low Level Use of Force"** – any use of force that is not likely to and does not result in bodily harm or complaint of bodily harm. For example, the use of wrist or arm locks.

b.   **"Intermediate Force" or "Intermediate Use of Force"** – any use of force that is likely to or actually does result in bodily harm or complaint of bodily harm. For example, the use of OC spray.

c.   **"Serious Force" or "Serious Use of Force"** – any use of force that results or is likely to result in loss of consciousness; any canine bite; any strike, blow, or kick against a handcuffed or restrained subject; or any strike with a hard object to the head, neck, or throat; or neck hold resulting in serious bodily harm or death that is not investigated by the Essex County Prosecutor's Office pursuant to New Jersey Attorney General Directive 2005-06.

These three categories broadly encompass the more specific use of force **control tactics** defined in the State of New Jersey Attorney General Guidelines, which include: the *member's presence, physical contact, constructive authority, physical force, mechanical force, enhanced mechanical force, and deadly force* **(Cross Ref. G.O. #18-22 Firearms and Other Weapons)**. In all instances, members should exhaust all other reasonable means before resorting to using force tactics, recognizing that members will use only force which is objectively reasonable and necessary.

## VIII.   DE-ESCALATION TECHNIQUES

### A.   Tactics and Techniques

1.   De-escalation tactics and techniques are verbal and non-verbal actions used by members, when safe and without compromising law enforcement objectives, to minimize the likelihood of the need to use force during an incident and increase the likelihood of voluntary compliance.

2.   Division members shall look for opportunities to de-escalate situations. When reasonable and based on the totality of the circumstances and where it may be accomplished without increasing the risk of harm to the member or others, members shall:

a.   gather information about the incident;

Page 13 of 17



# NEWARK POLICE DIVISION
# GENERAL ORDER



        **b.**    assess the risks to the subject(s), officer(s) and general public;

        **c.**    assemble resources (e.g., EMS, ESU, SWAT);

        **d.**    communicate and coordinate a response; and

        **e.**    attempt to slow the momentum of the incident.

    **3.**    When feasible, members will rely on area containment; employ surveillance; wait out the subjects; summon reinforcements; or call in specialized tactical units in order to reduce the need for force and increase member and civilian safety.

**B.**    **Special Considerations**

    **1.**    Members shall use all available resources and training in determining what, if any, force is appropriate based on the following factors:

        **a.**    Medical Condition;

        **b.**    Mental Impairment;

        **c.**    Developmental Disability;

        **d.**    Physical Limitation;

        **e.**    Language Barrier;

        **f.**    Under the Influence of Drugs/Alcohol;

        **g.**    Behavioral Crisis;

        **h.**    Hearing, Speech, or Vision Impairment; or

        **i.**    Any other factor that may impair the person's ability to understand or comply with the member's instructions.

    Members shall consider these factors and make efforts to avoid or minimize the use of force and attempt to obtain appropriate assistance for the person.

    **2.**    Members are expected to recognize that their approach, such as tone and body language, to a civilian interaction may influence whether a situation escalates to the need of using force.



# NEWARK POLICE DIVISION
# GENERAL ORDER



3.   Supervisors will become involved as soon as practical in managing an overall response to potentially violent encounters by coordinating resources and members' tactical actions. Supervisors should possess a good knowledge of tactics and ensure that members under their supervision perform to Division standards.

4.   The number of Police Division members on scene may increase the available force options and may increase the ability to reduce the overall force used.

## IX.   EMOTIONALLY DISTURBED PERSON

Police Division members responding to or encountering a subject suffering from mental illness (E.D.P.- Emotionally Disturbed Person) and in need of assistance shall be guided by Newark Police Division G.O. #08-05.

## X.   DUTY TO PROVIDE MEDICAL AID

Police Division members are duty bound to ensure that injured persons or those alleging injury, including complaints of pain, as a result of the use of force, receive immediate medical aid.

Whenever a Division member observes or is made aware of the presence of an injury, including, complaints of pain, the member shall ensure that Emergency Medical Services (E.M.S.) is requested to respond.  This also applies to incidents in which a member uses any weapon against a person such as, but not limited to, less-lethal ammunition, OC spray, or a conducted energy device and contact is made with the subject with any of these weapons. Additionally, members shall render aid to the level in which they are trained until relieved by emergency medical responders.

If a person subjected to use of force exhibits signs of injury or complains of pain and refuses medical aid, the Division member shall still notify E.M.S. The member shall also document the refusal on the corresponding Police Division form (Use of Force Report/Incident Report/Arrest Report/etc.).

## XI.   USE OF FORCE REPORTING AND REVIEW

Police Division members shall report whenever a firearm is un-holstered or exhibited or pointed at a subject as an element of constructive authority.

Members shall also report every time they use physical force, mechanical force, enhanced mechanical force, or deadly force.

Members who **witness** the use of physical, mechanical, enhanced mechanical, or deadly force shall document their observations in a Continuation Report (DP1:795).



# NEWARK POLICE DIVISION
# GENERAL ORDER



Members are also required to immediately notify an on-duty supervisor who did not use, direct, or was otherwise involved in the use of force incident. The supervisor must then respond to the scene. If the immediate supervisor is not available any other on-duty supervisor must respond.

All reporting of use of force shall be documented on Police Division authorized forms (BlueTeam, etc.).

Use of force incidents will be referred to A-FIT Team for review and investigation pursuant to the Use of Force Reporting, Investigation, and Review General Order #18-21.

Members who fail to abide by the use of force reporting requirements shall be subject to disciplinary action.

All requirements associated with reporting, investigating, and reviewing of use of force incidents can be found in Use of Force Reporting, Investigation, and Review General Order #18-21.

## XII.   TRAINING

Police Division members are required to receive and maintain Police Division in-service training and weapons certification requirements in the proper use of firearms, as per the State of New Jersey Attorney General Guidelines; as well as all relevant Division policies, rules, and regulations.

In addition, Police Division members are required to attend in-service emergency first aid training to enable them to render first aid until professional medical care providers are on the scene.

Members must complete and pass a Division-approved certification course of instruction for all mechanical, enhanced mechanical or deadly force options.

Members are required to receive annual and/or biannual recertification training, or as directed, in order to maintain their certification to utilize any of the Division-authorized use of force options.

Any member who does not complete required certifications, and/or re-certifications will be prohibited from carrying/using any Division-authorized use of force option. Similarly, if a member fails any certification/re-certification course, the member shall be prohibited from utilizing the affected force option.

Members who do not pass their **required** annual or bi-annual re-certification requirements risk suspension and or termination.

For training and certification requirements and for all training in use of force options, please refer to the Newark Police Training Division and the State of New Jersey Attorney General Guidelines.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## XIII.  EFFECTS OF THIS ORDER

All previous Memorandums and Orders that are in conflict with this Order are repealed.

BY ORDER OF

**ANTHONY F. AMBROSE**
**PUBLIC SAFETY DIRECTOR**

AFA/BO:ma

C: Darnell Henry, Chief of the Police Division
**Related General Orders**
G.O. #67-04 Secondary Firearms
G.O. #84-01 Firearms Range
G.O. #05-03 Police Officers Carrying Firearms
G.O. #08-05 Emotionally Disturbed Persons
G.O. #94-03 Vehicle Pursuit Policy
G.O. #16-02 Officer Involved Critical Incident Management
G.O. #18-21 Use of Force Reporting, Investigation and Review
G.O. #18-22 Firearms and Other Weapons

**Related Rules and Regulations**
Chapters 8, 12, 15, and 18

**Department of Public Safety Police Division Memoranda**
DPS #16-737 Critical Incident Response Team
DPS #16-856 Ammunition Change

**Attorney General Guidelines & Directives**

# APPENDIX C



# NEWARK POLICE DIVISION
# GENERAL ORDER



| SUBJECT: | GENERAL ORDER NO. |
|---|---|
| **USE OF FORCE REPORTING, INVESTIGATION AND REVIEW** | **18-21** |

| SUPERSEDES: | DATED: |
|---|---|
| **NEW** | **November 8, 2018** |

This Order consists of the following numbered sections:

I.     **PURPOSE**

II.    **POLICY**

III.   **DEFINITIONS**

IV.   **ALL FORCE INVESTIGATIONS AND TRACKING TEAM (*A-FIT*) STRUCTURE AND RESPONSIBILITIES**

V.    **GENERAL REQUIREMENTS FOR USE OF FORCE REPORTING AND INVESTIGATION**

VI.   **NOTIFICATIONS**

VII.  **USE OF FORCE REPORTING AND INVESTIGATIVE RESPONSIBILITIES**

VIII. **USE OF FORCE REVIEW**

IX.   **TRAINING**

X.    **EFFECTS OF THIS ORDER**



# NEWARK POLICE DIVISION
# GENERAL ORDER



### I.    PURPOSE

The purpose of this Policy is to set out the reporting, analytical, and investigatory responsibilities for use of force incidents involving Newark Police Division members, and to create one central team known as the *All-Force Investigations & Tracking Team (A-FIT).*

This policy is intended to supplement the Newark Police Division's (NPD) Use of Force General Order by expanding on the provisions regarding use of force reporting and supervisor use of force investigations.

All definitions in the Use of Force General Order shall apply to this order.

### II.   POLICY

Newark Police Division members will report anytime they use force.

The Newark Police Division will investigate and review all uses of force.

The *All-Force Investigations & Tracking Team* will be responsible for the review of all uses of force, and will conduct the administrative investigations of more serious uses of force. *A-FIT Team's* response to a use of force incident does not assume criminal or administrative violations have occurred.

Use of force incidents will be categorized into three levels based on seriousness, and will be investigated accordingly.

Violations of established Newark Police Division Rules & Regulations, General Orders, policies, federal & state law, the U.S. Constitution, or Attorney General Guidelines will result in disciplinary sanctions, which can include counseling (verbal warnings), written warning, fines, civil liability, criminal charges, suspension, /or up to termination.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## III.    DEFINITIONS

For the purpose of providing supervisors with a standard for the reporting and investigating of use of force incidents by Division members, the following terms and definitions apply.

### A.    Low-Level Use of Force

"Low-Level Force" or "Low-Level Use of Force" – any use of force that is not likely to and does **_not result in bodily harm_** or complaint of bodily harm.

Includes the use of:

   1.    *physical force* to overcome resistance (e.g., hand controls or escort techniques such as elbow grip, wrist grip, or shoulder grip applied as pressure point compliance technique). (Ref. Use of Force G.O. #18-20 def.).

### B.    Intermediate-Level Use of Force

"Intermediate-Level Force" or "Intermediate-Level Use of Force" – any use of force that is likely to or actually does **_result in bodily harm_** or complaint of bodily harm.

Includes the use of:

   1.    *physical force* to overcome resistance (as described above) or wrestling a person to the ground, elbow strikes, fist strikes not likely to cause death or serious injury, kicks, leg sweeps, or other hand-to-hand physical maneuvers, etc.;

   2.    *mechanical force,* baton strikes to non-lethal areas, use of some device or substance, other than a firearm, to overcome a subject's active resistance (Ref. Use of Force G.O. #18-20)

### C.    Serious-Level Use of Force

"Serious-Level Force" or "Serious-Level Use of Force" – *any use of force* that *results* or is *likely to result __in serious bodily harm__* or *__death.__*

Including but not limited to:

   1.    use of less-lethal weapons (e.g., firing of bean bag rounds);



# NEWARK POLICE DIVISION
# GENERAL ORDER



2.    use of enhanced mechanical force (e.g., conducted energy devices such as stun guns and Tasers);

3.    firearm discharges (not pointing);

4.    **any use of force** that results in **loss of consciousness**;

5.    any canine bite;

6.    any strike, blow, or kick against a handcuffed or restrained subject;

7.    any strike with a hard object to the head, neck, or throat; or

8.    neck holds (Ref. Use of Force G.O. #18-20);

D.    **All-Force Investigations and Tracking Team (*A-FIT Team*)**

The All-Force Investigations and Tracking Team is a subcomponent of the Office of Professional Standards (OPS). The *A-FIT Team* is responsible for reviewing, tracking, and analyzing all Police Division members' use of force incidents. The *A-FIT Team* is also responsible for investigating "serious use of force" incidents not investigated by the Essex County Prosecutor's Office, and any other use of force incident as directed by the *A-FIT Team Commander*.

E.    **Risk Analysis Review Board (RARB)**

The Risk Analysis Review Board is a panel of Police Division command and executive-level members responsible for reviewing and analyzing a variety of Division matters (ref. G.O. #17-02), which include all use of force investigations, to ensure compliance with the United States Constitution, the State of New Jersey Constitution, law, rules, regulations, policies, and procedures; to identify deficiencies in procedures, policies, or supervision; and to recommend training/retraining or discipline to correct deficiencies and address improper patterns of behavior.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## IV. ALL-FORCE INVESTIGATIONS AND TRACKING TEAM (*A-FIT TEAM*) STRUCTURE AND GENERAL RESPONSIBILITIES

### A. Structure

The *A-FIT Team* will be a subcomponent of the Office of Professional Standards (OPS) and shall be placed accordingly on the Newark Police Division Organizational Plan.

The *A-FIT Team* shall be staffed by highly trained, experienced investigators from various areas of the Police Division.

The *A-FIT Team* will include a commander, supervisory, and investigative personnel.

### B. General Responsibilities

1. The *A-FIT Team* is responsible for investigating serious use of force incidents, except for use of force incidents investigated by the Essex County Prosecutor's Office or other Law Enforcement Agencies (Ref. Attorney General Directive 2006-5).

2. The *A-FIT Team* shall respond to and where appropriate will investigate the following types of use of force incidents:

   a. **"Serious use of force"** incidents;

   b. Any use of force incident, where the incident potentially involves criminal conduct or misconduct on the part of the member; or

   c. Any other use of force incident as directed by the *A-FIT Team* **Commander**.

3. The *A-FIT Team* will assist and guide field supervisors with the handling of use of force incidents.

4. When the *A-FIT Team* is contacted by a field supervisor for assistance concerning a use of force incident he or she is investigating, the *A-FIT Team* member shall be responsible for providing guidance to that supervisor, and shall be responsible for ensuring that the supervisor follows the instructions given.

5. The *A-FIT Team* shall review and analyze all use of force incidents.

Page 5 of 20



# NEWARK POLICE DIVISION
# GENERAL ORDER



6.  The **A-FIT Team** shall be responsible for developing and maintaining a system to track all use of force incidents, including those incidents investigated by the Essex County Prosecutor's Office or other Law Enforcement Agencies.

7.  The **A-FIT Team** shall be responsible for the administrative investigation of use of force incidents after the completion of investigations by the Essex County Prosecutor's Office or other Law Enforcement Agencies.

8.  If the **A-FIT Team** determines that administrative charges are being recommended for violations of N.J. Attorney General Guidelines, Newark Police Division General Orders, or Rules and Regulations, **A-FIT Team** will contact OPS to generate a Complaint Against Personnel (C.A.P.) number.  OPS is the central repository for all C.A.P. numbers.

9.  **A-FIT Team** shall forward findings for use of force investigations to the RARB.

C.  **A-FIT Team Members**

1.  **Commander**

    a.  The **Commander** of the **A-FIT Team** will oversee the day-to-day operations of the Team in accordance with established Police Division policies, procedures, rules, and regulations.  The Commander shall also be responsible for tracking, analyzing, and reviewing all use of force investigations.

    b.  The **Commander** shall ensure that the data captured in members' use of force reports and supervisors' investigative reports is analyzed as necessary to identify significant trends, to correct deficient policies and practices, and to document the findings in an **annual report** that will be made **publicly available**.  The analysis will include evaluations and assessments of use of force by type, unit or assignment, demographics of the subjects, the shift or time of day, location, the nature of offense, the resistance encountered, and comparisons among officers or units.



# NEWARK POLICE DIVISION
# GENERAL ORDER



2. **Supervisor**

   **Supervisors** will be guided by established Police Division policies, procedures, rules and regulations concerning supervisory and investigative responsibilities. They shall lead the investigations of use of force incidents assigned to the *A-FIT Team*.

3. **Investigative Personnel**

   **Investigative Personnel** will conduct use of force investigations assigned to *A-FIT Team*, and report to the *A-FIT Team* supervisor.

V. **GENERAL REQUIREMENTS FOR REPORTING AND INVESTIGATING USE OF FORCE INCIDENTS**

A. <u>Reporting and Investigating the use of Constructive Authority</u>

   1. Un-holstering, exhibiting, or pointing a firearm at a person as an act of constructive authority shall be reported (BlueTeam).

   2. Incidents involving use of the member's presence, physical contact, verbal persuasion, commands, or threats to use force—shall not be considered reportable incidents and will not require a use of force report or investigation.

   3. However, although some incidents do not require a use of force report or investigation, Police Division members will accurately and thoroughly document their encounter on the appropriate Division form (e.g., Incident Report, Arrest Report).

B. <u>Reporting & Investigating the use of Physical, Mechanical, Enhanced Mechanical, or Deadly Force</u>

   1. Any use of physical, mechanical, enhanced mechanical, or deadly force by Division members shall be reported and investigated.

   2. When an incident involves multiple levels of force applied, the incident shall be investigated and documented based on the highest level of force used.



# NEWARK POLICE DIVISION
# GENERAL ORDER



3.    Whenever a supervisor uses, directs, or is otherwise personally involved in any type of force, another supervisor who was not involved in the use of force will conduct the investigation.

4.    At the discretion of the Public Safety Director, Chief of Police, or OPS Commander, a use of force investigation may be assigned or reassigned to the *A-FIT Team* or another supervisor for further investigation or analysis.

## VI.    NOTIFICATIONS

Division members involved in a use of force incident shall notify the Communications Division/911 Call Center as soon as feasible.

The Communications Division/911 Call Center shall notify an uninvolved supervisor to respond to the scene.

Supervisors notified of a use of force incident shall respond to the scene and assess the incident. Once the supervisor makes a preliminary determination as to what level of force was used, he or she shall make immediate notification to the appropriate use of force investigative component (*A-FIT Team*, O.P.S., and/or E.C.P.O.) and be guided by that component.

In accordance with N.J. Attorney General Directive 2006-5, certain types of incidents require immediate notification to the Essex County Prosecutor's Office. Division members may not participate in those investigations, except that nothing shall preclude any Division member from helping to secure the scene, providing medical assistance to injured person, or from participating in the search for or pursuit of any person suspected of a crime related to the use of force incident. This provision applies to:

1.    **any use of force** by a member involving death or serious bodily injury to a person;

2.    where deadly force is employed by a member with no injury; or

3.    where any injury to a person results from the use of a firearm by the member;

4.    **Additionally**, the Essex County Prosecutor's Office will be notified on every firearm discharge by Police Division members, acting in the performance of their law enforcement authority, either on-duty or off-duty,



# NEWARK POLICE DIVISION
# GENERAL ORDER



including "no hit" incidents, animal shootings, and accidental discharges **(Ref. DPSM #16-737).**

All notifications have to be made through the Communications Division/911 Call Center. The Communications Division/911 Call Center Supervisor shall be responsible for making all requested and required notifications in accordance with established Division procedures and the N.J. Attorney General Directive 2006-5.

The Communications Division/911 Call Center supervisor shall also make immediate notification to the Public Safety Director and the Chief of Police on **all** incidents of **"serious use of force"** by Division members.

## VII.  USE OF FORCE REPORTING AND INVESTIGATIVE RESPONSIBILITIES

### A.  Low-Level Use of Force Investigation

#### 1.  Member

- Shall, complete a use of force entry in BlueTeam or Use of Force Report.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05).
- Notify the field supervisor.
- When feasible, remain on the scene of the use of force incident and wait for the field supervisor to respond. If it is not reasonable or safe to remain on the scene, notify the field supervisor accordingly.

#### 2.  Witnessing Member

- Witnessing member, if any, will document their observations on a Continuation Report (DPI:795), and forward same to the uninvolved supervisor conducting the use of force review/investigation.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05).
- Ensure that a supervisor is notified to respond.



# NEWARK POLICE DIVISION
# GENERAL ORDER



   3.   **Field Supervisor**

- Respond to the scene or, if he/she is not available, another on-duty supervisor shall respond.
- Evaluate and assess the use of force incident, and make a preliminary determination as to the level of force used (Low, Intermediate, or Serious).
- Visually check for signs of injury.
- Review member's Body Worn Camera video and or In-Car Camera video, and ensure that the footage is uploaded, properly classified, and saved (Ref. Body-Worn Cameras G.O. #18-05).
- Ensure that members report and document the incident.
- Review the use of force reports for thoroughness, clarity, and completeness.
- Document steps taken and findings in BlueTeam or Use of Force Report.
- If, after review of completed reports, the field supervisor finds cause to upgrade a low-level use of force investigation to intermediate or serious, he or she shall do so.

   4.   *A-FIT Team*

- All completed members' reports and field supervisor reports with findings will be forwarded to the *A-FIT Team* for review, analysis, and tracking. The *A-FIT Team* is not required to respond to the scene for low-level uses of force.

**B.**   **Intermediate-Level Use of Force Investigation**

   1.   **Member**

- Shall complete a use of force entry in BlueTeam or Use of Force Report.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05).
- Notify the field supervisor.



# NEWARK POLICE DIVISION
# GENERAL ORDER



- When feasible, remain on the scene of a use of force incident and wait for the field supervisor to respond. If it is not reasonable or safe to remain on the scene, notify the field supervisor accordingly.
- If there is a crime scene, secure the scene.
- Render aid consistent with training and qualifications, and request E.M.S. to respond to the scene where injuries are observed or alleged **(including complaints of pain)**.
- Identify potential witnesses to the use of force and request they remain on the scene until the supervisor responds.

### 2.    **Witnessing Member**

- Witnessing member, if any, will document their observations on a Continuation Report (DPI:795), and forward same to the uninvolved supervisor conducting the use of force review/investigation.
- If there is a crime scene, assist with securing the scene.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05)
- Ensure a supervisor is notified to respond.

### 3.    **Field Supervisor**

- Respond to the scene, if he/she is not available another on duty supervisor shall respond.
- Evaluate and assess the use of force incident, and make a preliminary determination as to the level of force used (Low, Intermediate, or Serious).
- Visually check for signs of injury.
- Ensure medical aid is provided to any injured parties, and that E.M.S. is notified.
- If there is a crime scene and or injuries are being reported, ensure the scene is secured and arrange for Crime Scene Unit to respond to photograph and process the scene. *This includes photographing any injuries.*
- Review member's Body Worn Camera video and or In-Car Camera video, and ensure that the footage is uploaded, properly classified, and saved (Ref. Body-Worn Cameras G.O. #18-05).



# NEWARK POLICE DIVISION
# GENERAL ORDER



- Canvass area for privately owned video that may have captured the incident, and attempt to obtain copies voluntarily. If the owner refuses, document the location and/or owner of the video. If no privately-owned video is discovered, document that none was found.
- As soon as practicable, interview member and any witnessing members for investigative purposes and to gather information to provide to the *A-FIT Team*.
- If the incident is determined to be an intermediate use of force, notify the *A-FIT Team.*
- Ensure that members report and document the incident.
- Review the use of force reports for thoroughness, clarity, and completeness.
- Document steps taken and findings in BlueTeam and complete a Supervisor Use of Force Investigation Report (DPI:1005F).

4.    *A-FIT Team*

Upon being notified by the field supervisor, or through the Communications Division/911 Call Center, and being provided with the circumstances surrounding an intermediate use of force incident, the *A-FIT Team* supervisor shall apprise their commander of the incident to determine if a response is necessary. If instructed to respond, the *A-FIT Team* shall do so with sufficient personnel to conduct the investigation.

The *A-FIT Team* supervisor shall do the following:

- Assume control of the investigation.
- Interview the field supervisor on the scene to obtain any and all information gathered concerning the incident.
- Interview Police Division members on the scene involved in the use of force and those who witnessed the use of force.
- Review all BlueTeam entries relevant to the incident, which include the Use of Force Report (i.e., BlueTeam entry).
- Review member's Body Worn Camera video and or In-Car Camera video (Ref. Body-Worn Cameras G.O. #18-05).



# NEWARK POLICE DIVISION
# GENERAL ORDER



- Document thoroughly, clearly, and in detail all the information collected on the Supervisor Use of Force Investigation Report (DPI:1005F).
- Forward all relevant reports to the *A-FIT Team* commander for review.

If at any point during the investigative process the *A-FIT Team* supervisor learns of possible <u>criminal conduct</u> involving Police Division members' use of force he/she will immediately notify <u>OPS</u> and will be guided by their instructions.

C.   **Serious-Level Use of Force Investigation**

  1.   **Member**

- Shall complete a use of force entry in BlueTeam or Use of Force Report.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05).
- Notify the field supervisor.
- When feasible, remain on the scene of a use of force incident and wait for the field supervisor to respond.  If it is not reasonable or safe to remain on the scene, notify the field supervisor accordingly.
- If there is a crime scene, secure the scene.
- Render aid consistent with training and qualifications, and request E.M.S. to respond to the scene where injuries are observed or alleged **(including complaints of pain)**.
- Identify potential witnesses to the use of force and request they remain on the scene until the supervisor responds.
- Remain at the scene until instructed otherwise by the investigating component supervisor taking the lead in the serious use of force investigation.
- Be available to provide written or audio statements to *A-FIT Team* or the E.C.P.O. investigators concerning the serious use of force incident.



# NEWARK POLICE DIVISION
# GENERAL ORDER



2. **Witnessing Member**

- Witnessing member, if any, will document their observations on a Continuation Report (DPI:795), and forward same to the uninvolved supervisor conducting the use of force review/investigation.
- If there is a crime scene, assist with securing the scene.
- If equipped with B.W.C. & IN CAR CAMERA(S), shall upload, classify, and save the video footage in accordance with Division policy (Ref. Body-Worn Cameras G.O. #18-05).
- Ensure a supervisor is notified to respond.

3. **Field Supervisor**

- Respond to the scene and, if he/she is not available, another on-duty supervisor shall respond.
- Evaluate and assess the use of force incident, and make a preliminary determination as to the level of force used (Low, Intermediate, or Serious).
- Visually check for signs of injury.
- Ensure medical aid is provided to any injured parties, and that E.M.S. is notified.
- Manage the scene by ensuring that it is properly secured.
- As soon as practical, secure any weapons used by Division members during the use of force incident.
- Quickly and efficiently gather pertinent information, and then notify *A-FIT Team*.
- Ensure that members involved in the use of serious force or who witnessed the use of serious force remain on the scene, unless medical aid is immediately necessary. (Refer to Officer Involved-Critical Incident Management G.O.# 16-02.)
- If the member involved in the use of serious force needs to go to the hospital, the supervisor will assign a unit/member to escort/standby at the hospital with the member.
- Upon response by either E.C.P.O. or the *A-FIT Team* to the scene, the supervisor will provide investigators with any and all information gathered concerning the incident.
- The field supervisor shall cooperate fully with and follow instructions given by the *A-FIT Team* investigators or E.C.P.O. investigators.
- Ensure that members report and document the incident.



# NEWARK POLICE DIVISION
# GENERAL ORDER



- Review the use of force reports for thoroughness, clarity, and completeness.
- The field supervisor shall complete entries in BlueTeam. No Supervisor Use of Force Investigation Report (DPI:1005F) is needed because it will be completed by *A-FIT Team* investigators.

4. **A-FIT Team**

- Assume control of the investigation.
- Ensure that EMS was notified to address any injuries being reported.
- If there is a crime scene and or injuries are being reported, ensure the scene is secured and arrange for Crime Scene Unit to respond to photograph and process the scene. *This includes photographing any injuries.*
- Interview the field supervisor on the scene to obtain any and all information gathered concerning the incident.
- Interview Police Division members on the scene involved in the use of force, as well as those who witnessed the use of force.
- Interview the subject of the use of force.
- Canvass area for privately owned video that may have captured the incident, and attempt to obtain copies voluntarily. If the owner refuses, document in detail specific information such as the location and/or owner of the video. If no privately owned video is discovered, document that none was found.
- Review all BlueTeam entries relevant to the incident.
- Review member's Body Worn Camera video and or In-Car Camera video (Ref. Body-Worn Cameras G.O. #18-05).
- Document thoroughly, clearly, and in detail all the information collected on the Supervisor Use of Force Investigation Report (DPI:1005F).
- Forward all relevant reports to the *A-FIT Team* commander for review.
- The *A-FIT Team* will lead all serious use of force investigations not handled by the E.C.P.O.
- The *A.-FIT Team* will tailor its response to the incident, but will normally include at a minimum a supervisor and investigative personnel.



# NEWARK POLICE DIVISION
# GENERAL ORDER



- The *A-FIT Team* supervisor or commander will be responsible for notifying the involved member's chain of command up to the Public Safety Director, as well as OPS as soon as reasonably possible.
- Within 30 days, or as soon as possible thereafter, the *A-FIT Team* commander will present the completed investigation to the commander of OPS, the officer's chain of command, and the Risk Analysis Review Board (RARB), when it next convenes.
- If the investigation reveals potential criminal conduct or administrative misconduct, the *A-FIT Team* commander will be responsible for notifying the command staff and confer with OPS and the Public Safety Director as appropriate, as well as referring the matter to the appropriate authority for investigation if necessary, while proceeding with the administrative investigation after conferring with the prosecuting authority. Under no circumstance will the *A-FIT Team* or OPS compel a statement from the subject member without first consulting with the prosecuting agency, Public Safety Director, and Chief of Police.

## VIII.    USE OF FORCE REVIEW

### A.    *A-FIT Team* Review

1.    The *A-FIT Team* supervisor shall review all completed use of force investigations that were assigned to *A-FIT Team* investigators, as well as completed investigations conducted by field supervisors. He/she shall:

    a.    Review pertinent reports from use of force incidents to ensure the investigations are complete and thorough.

    b.    Ensure that the findings are supported by the preponderance of the evidence.

    c.    Determine whether the force used was lawful, the minimal amount necessary, whether de-escalation techniques were used where appropriate, and consistent with policy.

    d.    Forward the investigation to the *A-FIT Team* Commander for further review.

2.    The *A-FIT Team* commander shall also review all completed use of force investigations. He/she shall:



# NEWARK POLICE DIVISION
# GENERAL ORDER



a.   When it appears that findings are not supported by a preponderance of the evidence, recommend in writing changes to the findings after consultation with the investigating supervisor and previous reviewer, the evidence or analysis supporting the modification will be documented. If deficiencies are noted, the reviewer will initiate corrective action where appropriate.

b.   If the use of force investigation is complete, supported by the evidence, and free from deficiencies he/she will forward the use of force investigation to the Risk Analysis and Review Board (RARB) for final review.

3.   Serious use of force investigations conducted by and completed by the *A-FIT Team* will be forwarded to the RARB for review and findings.

4.   If after review the RARB finds the investigation to be complete, thorough, and supported by the evidence, the Board shall make the necessary and appropriate finding of whether the force was lawful and consistent with policy.

## B.   **Risk Analysis Review Board (RARB)**

The Risk Analysis Review Board (RARB) shall consist of members from various commands (Ref. Risk Analysis Review Board G.O. #17-02).

The Commanding Officer of the Transparency and Risk Analysis Management Unit shall be the Chairperson for the RARB.

The RARB shall be responsible for timely, comprehensive, and reliable reviews of all use of force investigations to determine whether the findings are consistent with the law and policy and supported by a preponderance of evidence; whether the investigations are thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed.

All completed use of force investigations shall be forwarded to the RARB within **5 Days** so that the RARB is able to review during its next monthly meeting.

The RARB shall also include in its review investigations completed by the E.C.P.O. pursuant to New Jersey Attorney General Directive 2006-05 that were referred back to the *A-FIT Team* for administrative investigation.

The RARB shall review *A-FIT Team* investigations and ensure that they are



# NEWARK POLICE DIVISION
# GENERAL ORDER



complete, thorough, and supported by the preponderance of the evidence. If an investigation is found to be deficient, the RARB shall send it back to *A-FIT Team* to complete any additional investigation.

The RARB will document its findings and recommendations for *A-FIT Team* investigations. Unless the RARB Chairperson grants an extension, the review should be conducted within seven days after the *A-FIT Team* presentation of the completed investigation to the RARB.

It shall be the responsibility of the Chairperson of the RARB to provide a summary report to the Public Safety Director.

The summary report shall be due to the Public Safety Director by 1100 hours on the Tuesday after the review date and shall include the following:

     a.    Summary of each Use of Force Report reviewed
     b.    Summary of any procedures violated
     c.    Corrective action recommendations
     d.    Any incident that was directed to the Office of Professional Standards or *A-FIT Team* for further investigation.

The RARB will not make recommendations concerning discipline; however, the Chairperson of the RARB is obligated to ensure referral back to *A-FIT Team* if potential misconduct is uncovered in the review process. The *A-FIT Team* supervisor will then ensure to coordinate with the OPS Commander concerning the alleged misconduct.

Should policy, equipment, or training deficiencies be noted in the review process, the RARB Chairperson will ensure that such deficiencies are brought to the attention of the relevant commanding officer for appropriate action. The unit commander of the member involved with the use of force will have the final responsibility regarding retraining or recommending discipline to the Public Safety Director.

If the use of force incident is found to be inconsistent with Division policies or if deficiencies are identified in training, tactics, or the use of equipment, the Public Safety Director or designee will ensure that appropriate remedial action is taken.

Likewise, if the use of force incident investigation and review is found to be deficient in any way, the Public Safety Director or designee shall ensure that appropriate remedial action is taken.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## XII. TRAINING

As a component of use of force training, all members shall be trained on the use of the BlueTeam database for use of force reporting and investigation purposes.

All new supervisors shall be trained on the tenets of this General Order during their supervisor academy training program.

New *A-FIT Team* members shall receive specialized use of force investigations training. The training will include but will not be limited to: Division Use of Force Policy, Rules and Regulations, state and federal law concerning the Use of Force, N.J. Attorney General Guidelines on Use of Force, Division Policy on Firearms and Other Weapons, De-Escalation Techniques, and Interview Techniques.

The commander of the *A-FIT Team* shall be responsible for the coordinating and tracking of all training for *A-FIT Team* members.

The RARB members assigned to review use of force investigations shall receive a minimum of eight **(8) hours of training on an annual basis**, to include legal updates regarding use of force and the Training Division's current use of force curriculum.

## XIII.    EFFECTS OF THIS ORDER

All previous Memorandums and Orders that are in conflict with this Order are repealed.

**BY ORDER OF**

**ANTHONY F. AMBROSE**
**PUBLIC SAFETY DIRECTOR**

AFA: BO/ma

c:  Darnell Henry, Chief of the Police Division

**Related General Orders**
G.O. #67-04 Secondary Firearms
G.O. #05-03 Police Officers Carrying Firearms Out of State

Page 19 of 20



# NEWARK POLICE DIVISION
# GENERAL ORDER



G.O. #08-05 Emotionally Disturbed Person
G.O. #94-03 Vehicle Pursuit Policy
G.O. #16-02 Officer Involved Critical Incident Management
G.O. #18-20 Use of Force
G.O. #18-22 Firearms and Other Weapons
G.O. #17-02 Risk Analysis Review

## Department of Public Safety Police Division Memoranda

DPS #16-737 Critical Incident Response Team
DPS #16-856 Ammunition Change

# APPENDIX D



# NEWARK POLICE DIVISION
# GENERAL ORDER



| SUBJECT:<br>**FIREARMS AND OTHER WEAPONS** | GENERAL ORDER NO.<br>**18-22** |
|---|---|
| SUPERSEDES:<br>**NEW** | DATED:<br>**November 8, 2018** |

This Order consists of the following numbered sections:

I.     **PURPOSE**

II.    **POLICY**

III.   **DEFINITIONS**

IV.   **FIREARMS AND AMMUNITION**

V.    **FIREARMS RANGE**

VI.   **OTHER WEAPONS**

VII.  **TRAINING**

VIII. **EFFECTS OF THIS ORDER**



# NEWARK POLICE DIVISION
# GENERAL ORDER



## I. PURPOSE

The purpose of this policy is to identify the types of firearms and other weapons sworn Newark Police Division (NPD) members are authorized to carry and use while in the performance of their lawful duties.

The policy also addresses the pre-deployment and post-deployment considerations as they pertain to using weapons as instruments of force.

All definitions in the Use of Force G.O. #18-20 and Use of Force Reporting, Investigation, and Review G.O. #18-21 apply to this Order.

## II. POLICY

It is the policy of the Newark Police Division to ensure that Division members are properly trained and equipped with the weapons they need to perform their official duties as law enforcement officers and guardians of the community.

Members are **prohibited** from carrying and using any weapon that has not been authorized by the Police Division's Public Safety Director or Chief of Police.

Members shall be mindful that the use of force is never routine, and that the same applies to the use of authorized weapons.

Members shall be guided by New Jersey State Laws, Federal Laws, Police Division Policies, Rules, and Regulations, N.J. Attorney General Guidelines, and Newark Police Training Division/Firearms Range training regarding the carrying, and use of authorized weapons.

Supervisors shall, consistent with the responsibilities of their rank and assignment, inspect members within their command for compliance with NPD Policies, Rules and Regulations concerning certifications, proper care, maintenance, and carrying of Division-authorized weapons and ammunition. Discrepancies shall be documented and addressed immediately.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## III.    DEFINITIONS

### A.    Conducted Energy Device (CED)

Any device that is capable of firing darts/electrodes that transmit an electrical charge or current intended to temporarily disable a person.

CEDs are categorized under N.J. Attorney General Guidelines as a form of enhanced mechanical force (Ref. def. in Use of Force G.O. #18-20).

### B.    Firing of Conducted Energy Device

Causing the darts/electrodes of a conducted energy device to be ejected from the main body of the device and to come into contact with a person for the purpose of transmitting an electrical charge or current against the person.

### C.    Discharge of Conducted Energy Device

Cause an electrical charge or current to be directed at a person in contact with the darts/electrodes of a conducted energy device.

### D.    Distraction Devices

Distraction Devices, also referred to as Flash Bang/Flash/Sound Diversionary Devices, are less-lethal mechanical devices, which emit a bright flash, loud report, and heat on detonation, with the purpose of creating a distraction or diversion to the intended target, allowing for a safer environment for tactical team members to operate.

### E.    Firearm

Any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances.  It shall also include, without limitation, any firearm, which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or

Page 3 of 28



# NEWARK POLICE DIVISION
# GENERAL ORDER



missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

**F.**     **Less-Lethal Ammunition**

Any ammunition approved by the Attorney General which is designed to stun, temporarily incapacitate or cause temporary discomfort to a person without penetrating the person's body. The term shall also include ammunition approved by the Attorney General, which is designed to gain access to a building or structure and is used for that purpose.

**G.**     **Oleoresin Capsicum (i.e., OC, pepper spray)**

Oleoresin Capsicum (OC) spray is an essence of cayenne peppers. OC is an inflammatory agent, classified as a lacrimator (producer of tears), that causes an intense burning sensation of the skin, eyes, and mucous membranes. OC canisters are color coded for immediate identification (color code: black).

The proper use of OC spray may reduce or eliminate the need for substantial physical force to make an arrest or gain custody. It may reduce the potential for injuries to members and subjects.

**H.**     **Chloracetophenone (i.e., CN, tear gas)**

Chloracetophenone is a chemical irritant that is deployed as a gas. Classified as a lacrimator (producer of tears), that causes irritation to the eyes, and skin. CN canisters are color coded for immediate identification (color code: red).

The proper use of CN is generally an effective and safe method to disperse unruly or riotous crowds.

**I.**     **Orthochlorobenzalmalononitrile (i.e., CS, tear gas)**

Orthochlorobenzalmalononitrile is a chemical irritant that is deployed as a gas. Classified as a lacrimator (producer of tears), that causes irritation to the eyes, respiratory tract, and skin. CS is stronger and safer than CN. CS canisters are color coded for immediate identification (color code: blue).

The proper use of CS is generally an effective and safe method to disperse unruly or riotous crowds.



# NEWARK POLICE DIVISION
# GENERAL ORDER



**J.** **Special Weapons**

Special weapons include those firearms and other weapons specifically designed for use during high-risk situations (e.g., Long guns, automatic weapons, OC/CN/CS launchers).

Special weapons are intended for use by highly trained specialized units (ESU/SWAT) who have been trained in the care, and use of these weapons.

## IV. FIREARMS AND AMMUNITION

**A.** **General Requirements**

Members shall only possess or use firearms and ammunition approved by the Police Division's Public Safety Director or Chief of Police while on duty.

Division Firearms include:

1. Handguns (see Appendix A)

2. Shotguns (see Appendix A)

3. Special Weapons (see Appendix A)

   a. Rifles/Long Guns

   b. Less-Lethal Weapons and Ammunition

**B.** **Pre-Deployment Considerations**

Members shall be guided by the Use of Force General Order #18-20 when considering whether to use a firearm.

Police Division members shall be cognizant that the use of a firearm constitutes deadly force and may only be used when the member reasonably believes such an action is immediately necessary to protect the member or another person from imminent danger of death or serious bodily harm.



# NEWARK POLICE DIVISION
# GENERAL ORDER



Police Division members shall use the utmost care when handling and using firearms.

Members shall ensure that the use of Division-authorized firearms does not pose a substantial risk of injury to innocent persons.

Members shall, when feasible, issue a verbal warning to the subject and other members prior to discharging a firearm.

Members shall be guided by the Firearms Range training, and Manufacturer recommendations for the care, maintenance, storage, and carrying of Division-issued firearms.

### C.    Post-Deployment Considerations

When a member discharges a firearm he or she **shall**:

1. Immediately after rendering the scene safe, provide aid in accordance with their training and experience to any injured person;

2. Notify E.M.S.;

3. Notify the on-duty supervisor to respond to the scene;

4. Secure the scene;

5. Identify any witnesses;

6. Follow instructions from the on-duty supervisor; and

7. Report and document the discharge by completing all relevant Division reports in accordance with the Use of Force Reporting, Investigation, and Review General Order #18-21.

In accordance with New Jersey Attorney General Directive 2006-05, discharges of a firearm by law enforcement officers are investigated by the Essex County Prosecutor's Office (E.C.P.O.). Therefore, the scene of any discharge shall be secured pending response by the E.C.P.O. Investigative Personnel.



# NEWARK POLICE DIVISION
# GENERAL ORDER



### Exceptions

Police Division members are not required to report, and no investigation is required, for discharges of Division-approved firearms during recreational shooting at an appropriate site (range), or during Division -required firearms training.

Police Division issued firearms **shall not** be used for sports or recreational hunting activities.

## D.   Handguns

### 1.   Authorization - On-duty

Division members shall carry the Division-issued and authorized handgun and ammunition while on duty.

Uniformed members shall keep their duty handgun in the Division-provided and authorized holster.

Plain clothes members shall keep their duty handgun in a holster they purchase that is approved by the Firearms Range and which conforms to Division specifications (see G.O. #67-04 Secondary Firearms).

Uniformed and plain clothes members may also carry a back-up handgun. The back-up handgun must be purchased by the member, conform to Division specifications, and must be authorized by the Division.

Members must also qualify with the back-up handgun in order to carry it while on or off duty. Furthermore, members must also re-qualify on a semi-annual basis with the back-up handgun. The member must provide his/her own Division-authorized ammunition during qualification at the Firearms Range. Members shall be guided by **G.O. #67-04 Secondary Firearms** when considering the purchase of an on-duty back-up handgun or an off-duty handgun.



# NEWARK POLICE DIVISION
# GENERAL ORDER



**Authorization - Off-duty**

Division members have the option of carrying off-duty the Division-issued handgun or a Division-approved off-duty handgun owned by the member.

Members shall be responsible for the care and maintenance of their Division-issued handgun and any Division-approved off-duty handgun they own.

Members shall carry their *Division-issued handgun* in a holster purchased by the member which conforms to Division specifications, and is approved by the Firearms Range.

Members shall carry their *off-duty handgun* in a holster purchased by the member that conforms to Division specifications, and is approved by the Firearms Range.

Personnel may qualify with their off-duty handgun when they receive in-service training at the Firearms Range or on their off-duty time. Those members who opt to qualify on their off-duty time shall comply with the conditions listed in Section V.C.1 of this Order.

Members shall be responsible for re-qualifying on a semi-annual basis with their off-duty handgun. He/she must provide his/her own Division-authorized ammunition during qualification at the Firearms Range. Refer to **G.O. #67-04 Secondary Firearms** for more information on off-duty handguns.

Members who fail to re-qualify on a semi-annual basis with their off-duty handgun are prohibited from carrying the off-duty handgun at any time.

## E.   Shotguns

### 1.   Authorization to Use

Members shall only use shotguns and ammunition issued by the Division.

Shotguns shall only be carried and used by authorized on-duty Division members.



# NEWARK POLICE DIVISION
# GENERAL ORDER



When members are teamed up in the same Division vehicle only one shotgun per team shall be carried.

Members shall be guided by Firearms Range training concerning the proper procedures for the carrying, storing, loading, and unloading of ammunition, and use of shotguns.

When a member authorized to carry a shotgun signs one out of their command, he or she shall inspect the shotgun for damage. If any damage that may affect the operation of the shotgun is observed, the member shall immediately return the shotgun, submit an administrative report documenting the damage, and request a replacement if available.

Shotguns signed out by members shall be mounted on the shotgun rack inside their Division vehicles. When no rack is available the shotgun shall be stored in the trunk of the Division vehicle.

2. **Supervisor Responsibilities**

Supervisors shall ensure that all members issued a shotgun are authorized to carry the shotgun. Supervisors at any time may request that a member present his/her Firearms Qualification Card, which must be stamped with approval to carry a shotgun. Only members authorized to carry shotguns shall be allowed to sign them out of their command.

All supervisors who are responsible for issuing shotguns and ammunition shall conduct an inventory of all shotguns and ammunition at the beginning and end of their shift, and shall document the inventory in accordance with Division procedures.

When issuing shotguns, the supervisor shall inspect the weapon to ensure that it appears operational before issuing it to the member.

If a shotgun appears to be inoperable or damaged, the supervisor shall submit an Administrative Report indicating the need for repair, and notify the Firearms Range at **973-733-6019 or 7915** to arrange for the repair.



# NEWARK POLICE DIVISION
# GENERAL ORDER



F.   **Special Weapons**

The Commander of SOD shall ensure that members under his/her command receive appropriate training on the care, storage, and use of special weapons.

No member shall be permitted to utilize special weapons without proper training and required periodic qualification.

Rifles/Long Guns and Less-Lethal Weapons and Ammunition are considered special weapons and are kept by the Division and issued as needed to members who are trained in their use.

These weapons are reserved for high-risk incidents such as violent emotionally disturbed persons, barricaded persons, active shooters, hostage situations, and terrorist attacks.

The use of special weapons requires advanced training; therefore, special weapons shall only be carried and used by members trained and qualified in their use.

The Commander of the Special Operations Division (SOD) shall ensure that all special weapons command are tracked, and shall ensure that a monthly inventory of all special weapons is conducted.

V.   **FIREARMS RANGE**

A.   **Organizational Structure**

1.   The Firearms Range is organizationally placed under the Training Division on the Newark Police Division's Organizational Plan.

2.   The Firearms Range Commander shall oversee all operations of the Firearms Range, and shall as required provide updates on range operations to the Commander of the Training Division.

3.   The Firearms Range shall be staffed by trained and certified firearms instructors.



# NEWARK POLICE DIVISION
# GENERAL ORDER



**B.** **Responsibilities**

1. The Firearms Range staff shall conduct all firearms training which shall include the care, maintenance, carrying, and use of all Division-issued firearms, and approved off-duty/back-up firearms.

2. The Firearms Range operations shall be conducted in a manner consistent with Division Rules, Regulations, Policies and Procedures, N.J. Attorney General Guidelines, Police Training Commission, State and Federal Laws.

3. The Firearms Range staff shall track and maintain records for all firearms training and other assigned in-service training as designated by the Training Division Commander, Chief of Police, or Public Safety Director. Firearms Range records shall include but will not be limited to:

   a. Dates and times of Firearms Range operation.

   b. Type of training conducted.

   c. Names of members attending training.

   d. Members' scores for all firearms training for both on- and off-duty firearms.

   e. Inventory of all firearms, ammunition, and targets.

   f. Any other records deemed necessary for the proper operation of the Firearms Range.

4. Additional training, specifically in-service semi-annual state and Division mandated training conducted by the Firearms Range staff includes, but is not limited to, the following subject matters:

   a. Use of Force

   b. Domestic Violence

   c. Sexual Harassment

   d. Vehicle Pursuit Policy



# NEWARK POLICE DIVISION
# GENERAL ORDER



    e.    Blood Borne Pathogens

    f.    Right to Know (OSHA)

    g.    Prisoner Watches

    h.    Hazardous Communication

5.    Firearms Range staff shall provide the Office of Professional Standards (OPS) with copies of all members' firearms training records for entry into IA-Pro.

6.    The Firearms Range Commander shall:

    **a.**    Ensure that **all Division firearms** are properly maintained, repaired, tracked, and inventoried.

    **b.**    Issue firearms only to trained and qualified Division members.

    **c.**    Ensure that all Firearms Range Safety Rules (See Appendix B) are followed and enforced, and take appropriate action when they are not.

    **d.**    Ensure to procure and maintain a sufficient supply of ammunition for in-service training.

    **e.**    Prepare an annual firearms report addressed to the County Prosecutor. The report shall first be forwarded to the Office of the Public Safety Director for approval and signature. The report must be sent to the Public Safety Director's Office no later than the 10th of January in order to be sent prior to the January 15th due date as set forth in N.J. Attorney General Guidelines. The report shall detail the following:

        i.    A description of all Division-authorized firearms and ammunition.

        ii.    The Division's training/qualification schedule, including the dates and types of qualification sessions conducted during the report year.



# NEWARK POLICE DIVISION
# GENERAL ORDER



        **iii.**    The number of participants who satisfied qualification requirements and the number of non-qualifying participants during each qualification session for each type of course and weapon: service weapon, off-duty weapon and Division-authorized shotgun.

    **7.**    The Public Safety Director, Chief of Police or designee shall provide a written report to the Essex County Prosecutor of any member who fails to qualify on the service weapon.

## C.   Use of Firearms Range

### 1.   Off-duty Personnel

Off-duty personnel shall be permitted to utilize the Firearms Range facility under the following guidelines:

    **a.**    Off-duty personnel must utilize the range in conjunction with the Division In-Service Training Program.

    **b.**    Appointments must be made in advance by contacting the Range Commander at the Firearms Range at (973)-733-6019.

    **c.**    For reasons of scheduling, only four (4) off-duty personnel per day will be permitted to use the range.

    **d.**    All safety rules must be strictly obeyed. (Appendix B)

    **e.**    Off-duty personnel must supply their own ammunition.

### 2.   Other Police Agencies

The Newark Police Division will permit other police agencies to utilize its firearms range facilities under the following conditions:

    **a.**    All requests must be in written form and addressed to the Public Safety Director for approval.

    **b.**    Once approved, scheduling shall be arranged by the Range Commander.



# NEWARK POLICE DIVISION
# GENERAL ORDER



c.   These other police agencies shall provide their own instructors, ammunition, targets and shall comply with all firearms range rules, procedures and policies.

d.   These other police agencies shall assume all responsibility for their personnel and any liabilities incurred through the actions of their officers.

## VI.   OTHER WEAPONS

### A.   Conducted Energy Devices (CED)

#### 1.   Authorization to Use

Conducted Energy Devices (CED) are issued by the Police Division. Only members who have been trained and authorized by the Essex County Prosecutor's Office in accordance with N.J. Attorney General Guidelines may carry and use CEDs. This authority may be revoked at any time by the Essex County Prosecutor's Office, Public Safety Director or Chief of Police.

Conducted Energy Devices are categorized as a form of enhanced mechanical force under N.J. Attorney General Guidelines.

Members authorized to use CEDs shall be guided by the N.J. Attorney General Guidelines, the Conducted Energy Device General Order #18-10, and the Use of Force General Order #18-20.

CEDs shall be stored at the authorized member's command, in a similar fashion as shotguns, in a secured location.

#### 2.   Pre/Post Deployment Considerations

Refer to the CED General Order #18-10.

#### 3.   Supervisor Responsibilities

Supervisors responsible for the issuance of CEDs shall ensure that they conduct an inventory at the beginning and end of their shift of all CEDs under their control.

Supervisors shall only issue CEDs to trained and authorized Division personnel.



# NEWARK POLICE DIVISION
# GENERAL ORDER



Supervisors shall be guided by the Use of Force Reporting, Investigation, and Review General Order #18-21, and the Conducted Energy Devices General Order #18-10.

**B.**   **Oleoresin Capsicum Spray (OC)**

    **1.**   **Authorized Use**

Members are **prohibited** from using any OC spray that is not authorized by the Division.

OC spray is provided by the Division to all members trained in its use, who shall also carry the Division-issued OC spray at all times when in full police uniform.

The Division issued OC spray *must be labeled EDW- Electronic Discharge Weapon Tested and Safe/Non-Flammable*.

OC is categorized as an element of mechanical force under N.J. Attorney General Guidelines and the Use of Force General Order (III, J).

    **2.**   **Pre-Deployment Considerations**

Members shall avoid the use of OC spray in hospitals, nursing homes, schools, areas where children may be affected (playgrounds), or where bystanders may be affected.

Members **shall not** use OC spray when wind, weather, or tactical conditions do not allow for the safe and proper use of the chemical agent.

Members **shall not** use OC spray near open flames.

OC spray is used as a means of control to minimize the potential for injury to members, offenders, or other persons during a use of force incident. OC is generally a safe, effective and humane method for members to protect themselves or other persons against actively resisting and/or combative persons, or vicious animals.

Members shall be guided by the Use of Force General Order #18-20 when considering whether to use OC spray.



# NEWARK POLICE DIVISION
# GENERAL ORDER



Members shall, if feasible and safe to do so, issue a warning prior to using OC spray.

Members shall not use OC spray in a moving vehicle or upon the person positioned on the driver side of any running vehicle.

3. **Post-Deployment Considerations**

Members who use OC spray upon a person shall as soon as practicable

a. Reassure the person that they will recover;

b. Place the person in a fresh air environment;

c. Allow the person to flush out exposed areas with clean cool water;

d. Allow the person to remove contact lenses if worn; and

e. Contact EMS to evaluate the person.

Members shall document on the appropriate Division forms the use of the OC spray.

A supervisor shall be notified and requested to respond to any incident where a member uses OC spray.

4. **Supervisor Responsibilities**

Supervisors shall respond to all deployments of OC spray and shall be guided by the Use of Force General Order #18-20 and the Use of Force Reporting, Investigation, and Review General Order #18-21.

Supervisors shall, at a minimum, inspect annually members' OC spray to ensure that it is not expired, and that it is in compliance with Division Rules, Regulations, Policies and Procedures, and this G.O. Supervisors shall document the results of their inspections on the Supervisor's Field Inspection Report.



# NEWARK POLICE DIVISION
# GENERAL ORDER



5.  **Property & Evidence Division Responsibilities**

    The commander of the Property and Evidence Division shall ensure that a sufficient quantity of OC spray is procured and stored at the Property & Evidence Division to equip the entire Police Division as needed.

    Members shall further refer to the Use of Chemical Agents and Non-Lethal Aerosol Incapacitating Agent General Order #68-2 for additional information concerning OC and other Chemical Agents.

C.  **Other Chemical Agents**

    The following other chemical agents (e.g., CN/CS) are intended to be used only by the Special Weapons and Tactics Team (SWAT) or Emergency Services Unit (ESU) members.

    Only members who have successfully completed a Division approved training course in the proper use of CN, and CS shall be authorized to use them.

    The use of CN/CS chemical agents in any form (e.g., spray, gas) by a Division member requires that the member complete a use of force report. The member will further be guided by the relevant provisions contained in the Use of Force Reporting, Investigation, and Review General Order.

    The reporting for the deployment of these other chemical agents shall also be documented in the SWAT team's After Action Report.

    1.  **Chloracetophenone (CN) & Orthochlorobenzalmalononitrile (CS) – Chemical Agents Authority to Use**

        a.  **Authorized Use**

            The authority to use CN or CS rests with the ranking member of SWAT or ESU.

        b.  **Pre-Deployment Considerations**

            In a riotous or unruly crowd, incident members must first attempt other less intrusive methods to disperse the crowd.



# NEWARK POLICE DIVISION
# GENERAL ORDER



An escape route for the crowd must be available.

Division members in the immediate area must be equipped with gas masks.

To ensure effective deployment, weather conditions, such as wind, should be considered.

If deployment is authorized, notify E.M.S. to respond. This will allow for immediate aid to be available for any person(s) who may have an adverse reaction to the CN or CS.

c.      **Post-Deployment Considerations**

If any person is injured as a result of the use of a chemical agent, EMS shall be notified to respond. Members shall also provide aid in accordance with their training and experience.

d.      **Supervisor Responsibilities**

The SWAT Commander or ESU Commander or their designee shall review the use of CN/CS after each incident or operation to ensure that the device(s) was/were properly deployed and functional. All Deployments and unusual occurrences shall be documented in the mission After Action Report.

D.    **Police Batons**

1.     **Authorized Use**

Members of the Division are authorized to carry and use Police Batons.

Members are responsible for purchasing their own Police Batons. All Police Batons must conform to Division specifications and must be approved by the Training Division (see Basic Uniform Regulations G.O. #63-22).



# NEWARK POLICE DIVISION
# GENERAL ORDER



Members are prohibited from carrying or using Police Batons that are not approved by the Training Division.

Members shall carry a Police Baton at all times when in full police uniform.

### 2.   Pre-Deployment Consideration

Members shall be guided by the Use of Force General Order when considering the use of a Police Baton.

Batons are considered a form of mechanical force in accordance with N.J. Attorney General Guidelines. They can be used to block or strike when active resistance is experienced by a member. Batons are generally not considered lethal weapons, but do have the potential to be lethal if improperly used or when the circumstances warrant the use of a baton as a lethal weapon.

Members shall be aware of what are known as red zones when using a Police Baton (e.g., head, neck, groin).   Strikes to these areas constitute deadly force and are not authorized unless the use of deadly force is authorized as per the Use of Force General Order.

### 3.   Post-Deployment Consideration

When a member uses a Police Baton to strike a person during an incident warranting the use of such force, and an injury is observed or alleged, the member shall notify EMS and render aid commensurate to their training and experience as needed.

The member shall also document the use of such force in accordance with the Division Use of Force General Order #18-20 and the Use of Force Reporting, Investigation, and Review General Order #18-21.

A supervisor must be notified and must respond to all incidents where a Police Baton is used to strike a person regardless of whether the person is injured.



# NEWARK POLICE DIVISION
# GENERAL ORDER



### E.    Distraction Devices

Distraction devices are designed for a variety of purposes that do not necessarily constitute a use of force. They can be used when dealing with violent or armed persons to distract (noise), create cover (smoke), and other tactical purposes. The use of distraction devices reduces the risk of injury to members and other persons.

#### 1.    Authorized Use

Except in emergent situations, the use of a distraction device requires the authorization of the SWAT Commander or SWAT Team Leader.

#### 2.    General Deployment

Generally, the use of Distraction Devices may be considered whenever their use would enhance safety and mitigate risks associated with any given mission.

These situations include, but are not limited to:

i.     Barricaded persons

ii.    Hostage situations

iii.   High-risk warrant service (Intelligence indicates violent offenders, weapons present, fortified structures etc.)

iv.    Presence of aggressive canines that exhibit behavior threatening to SWAT or ESU members.

NOTE: Every tactical situation has its own unique circumstances and obstacles, and must be resolved with its own unique solution. SWAT or ESU members must rely on their training and experience, as well as common sense and sound judgment, when utilizing this equipment.

#### 3.    Pre-Deployment Considerations

Prior to deploying a Distraction Device, personnel shall consider intelligence information and circumstances to determine if devices may be safely deployed. Unless justification can be clearly articulated, Distraction Devices shall not be deployed in the following circumstances:



# NEWARK POLICE DIVISION
# GENERAL ORDER



a. Young children are present in the target area.

b. Elderly persons are present in the target area.

c. Flammable vapors or flammable liquids are present in the target area.

A portable fire extinguisher shall be readily accessible whenever these devices are to be deployed.

Distraction Devices may be deployed by hand or initiated by pole.

Distraction Devices may be deployed at the breach point or away from the breach point if deemed necessary.

SWAT or ESU members should, whenever possible, quickly visually inspect the area of deployment and deploy the device approximately one meter off the breach point.

### 4. Post-Deployment Considerations

If any person is injured as a result of the use of a Distraction Device, EMS shall be immediately notified to respond. Members shall also provide aid in accordance with their training and experience.

### 5. Supervisor Responsibilities

The SWAT Commander or ESU Commander or their designee shall review the use of Distraction Devices after each incident or operation to ensure that the device(s) was/were properly deployed and functional. All Deployments and unusual occurrences, shall be documented in the mission After Action Report.

## VII.   TRAINING & RE-QUALIFICATIONS

### A.   Firearms Training – Police Recruit

The Training Division & Firearms Range shall conduct its police recruit firearms training program in compliance with the mandates and qualifying standards established by the N.J. Police Training Commission.



# NEWARK POLICE DIVISION
# GENERAL ORDER



**B.**   **Firearms In-Service Re-Qualifications**

The Firearms Range Commander shall develop and provide a practical training course for members involving the use of barricades, vehicles, and urban scenarios. The Range Commander shall review and update this course quarterly.

All Officers shall qualify at least twice annually at the Firearms Range for any firearm the officer will carry or use while on duty following the procedures and requirements established by the New Jersey State Attorney General Guidelines for Firearms Qualification.

When a member successfully passes the qualification course, the Range Commander will issue a card (Firearms Qualification Card) to that member indicating the date the member passed the course. The member shall maintain possession of the card, and produce it upon request by a supervisor. The member shall also provide a copy of the card to their Command for record-keeping purposes.

Members are responsible for ensuring they qualify at the Firearms Range twice per year.

Members must complete the required semi-annual re-qualification course to continue to carry and use authorized firearms in accordance with N.J. Attorney General Guidelines, Division Rules, Regulations, Policies and Procedures.

The Firearms Range shall notify Division Commanders of all members assigned to their Commands in need of re-qualification. This notification shall be made one month in advance from when the member is in need of re-qualification.

Members who fail to meet the training requirements will receive remedial instruction and will be rescheduled in order to comply with the training requirements.

If after remedial training and subsequent attempts to qualify the member still does not fire a passing score, the supervising firearms instructor shall report this information to the Chief of Police and Public Safety Director. The Chief of Police and the Public Safety Director will then determine what action is appropriate and maintain whatever records are appropriate.



# NEWARK POLICE DIVISION
# GENERAL ORDER



Members who fail to meet the training requirements for the use of authorized firearms shall relinquish their Division issued firearm.

Members who fail to qualify after remedial training within a reasonable time will be subject to disciplinary action, up to and including termination of employment.

The Executive Officer of each Command shall be responsible for scheduling members within their Command for the bi-annual firearm range re-qualification.

The Executive Officer shall provide a list of members they have scheduled for re-qualification to the Firearms Range one (1) week in advance of the scheduled training.

Each Command shall maintain records of attendance at the Firearms Range for personnel assigned to their Command.

## C. Other Weapons Training

The Essex County Prosecutors Office is responsible for all initial Conducted Energy Device (CED) user training in accordance with N.J. Attorney General Guidelines. The Firearms Range shall be responsible for all CED training re-certifications.

The Firearms Range shall be responsible for the routine inventory of Division-wide CEDs.

The tracking of training for the use of special weapons, other than firearms, shall be the responsibility of the Special Operations Commander.

The SOD Commander shall ensure members receive proper training and retraining in accordance with N.J. Attorney General Guidelines and Manufacturer recommendations.

Members shall be guided by the Firearms Range and the Training Division regarding any and all training or re-qualification concerning all other weapons not covered above.




# NEWARK POLICE DIVISION
# GENERAL ORDER

## VIII. EFFECTS OF THIS ORDER

All previous Memorandums and Orders that are in conflict with this Order are repealed.

BY ORDER OF

**ANTHONY F. AMBROSE**
**PUBLIC SAFETY DIRECTOR**

AFA/BO/ma

c: Darnell Henry, Chief of the Police Division

**Related General Orders**

G.O. #63-22 Basic Uniform Regulations
G.O. #67-04 Secondary Firearms
G.O. #68-02 Use of Chemical Agents and Non-Lethal Aerosol Incapacitating Agent
G.O. #05-03 Police Officers Carrying Firearms
G.O. #08-05 Emotionally Disturbed Person
G.O. #16-02 Officer Involved Critical Incident Management
G.O. #18-20 Use of Force
G.O. #18-21 Use of Force Reporting, Investigation, and Review

**Attorney General Guidelines & Directives**



# NEWARK POLICE DIVISION
# GENERAL ORDER



# APPENDIX A

## AUTHORIZED DIVISION FIREARMS AND OTHER WEAPONS

**A.**  Hand guns:

- Sig Sauer P229 9mm Semi-Automatic (*Division Handgun*)
- Sig Sauer P229 40mm Semi-Automatic
- Glock Model 22 .40 cal. Semi-Automatic

**B.**  Shot guns:

- Remington Model 870 and 870P 12-gauge Shotguns
- Benelli M1 12-gauge Shotgun

**C.**  Long guns:

- Colt Model AR-15 .223 cal. Semi-Automatic
- Colt M4 Model Commando .223 cal. Rifle Semi/Automatic
- Colt M4 Model A2 .223 cal. Rifle Semi/Automatic
- Benelli M16 Assault Rifle
- Remington Model 700TWS Bolt Action Centerfire Rifle 26" Barrel .308 Winchester (Ammunition: Remington 308 Windmag)
- FN Herstal M-249 .223 cal. Automatic Assault Weapon

**D.**  Chemical Agents:

- Oleoresin Capsicum (OC)
- Chloracetophenone (CN)
- Orthochlorobenzalmalononitrile (CS)

**E.**  Conducted Energy Device (CED):

- Taser Class III – X2 w/Cam.

**F.**  Police Batons:

- Monadnock PR24
- Monadnock 22: Expandable Baton w/Power Tip



# NEWARK POLICE DIVISION
# GENERAL ORDER



- Foam Batons

G.  Ammunition:

- .223 Ammunition
- 9mm hollow-point Ammunition
- 9mm ball Ammunition
- .40 ball Ammunition
- .40 hollow-point Ammunition
- Segmented Slugs Ammunition (for Shotguns)
- 00 Buck Ammunition (for Shotguns)
- Less-than-lethal Ammunition:
    - Foam Round Bean Bags
    - Chemical Agent Rounds (OC/CN/CS)
- Hatton Rounds

H.  **Launchers:**

- 37mm Single-Shot Launcher
- 37mm Multi-Shot Launcher
- 40mm Multi-Shot Launcher



# NEWARK POLICE DIVISION
# GENERAL ORDER



## APPENDIX B

### Firearms Range Safety Rules

A.  Any violation of the following Rules may result in disciplinary action:

B.  **NO** horseplay is allowed at the Firearms Range.

C.  Weapons will remain holstered at all times unless otherwise instructed by the Range Commander or the firearms instructor.

D.  When on the firing line, drawn weapons will be pointed down range and level to the ground.

E.  Any weapon malfunctions, or misfires, will be immediately reported to an instructor.

F.  Only shooters and instructors are permitted on the firing line.

G.  All personnel on the firing line must wear ear and eye protection.

H.  Unsupervised firing of weapons is prohibited. Firearms Range Personnel must be present when weapons are discharged at the Firearms Range.

I.  No armor piercing and or tracer ammunition is allowed at the Firearms Range. *Exception*: Specialized Units, such as the Emergency Response Team (ERT), are allowed to fire such rounds.

J.  The use of cross-draw (in the pants) holsters and shoulder holsters shall be prohibited at the range. Only those holsters approved by the Department shall be utilized.

K.  The following safety rules shall apply when responding to the Firearms Range:

    1.  Any officer having any physical disability, limitation, illness or other condition that would affect their ability to participate safely in any aspect of the firearms program shall immediately notify the supervising firearms instructor.

    2.  Any officer under the influence of any prescription/non-prescription drug or alcohol shall immediately notify the supervising firearms instructor.

    3.  Never draw or re-holster a weapon with your finger in the trigger guard or on the trigger guard.

    4.  Never go forward on the firing line unless instructed to do so by a firearms instructor.



# NEWARK POLICE DIVISION
# GENERAL ORDER



5.     While on the firing line, never bend over to retrieve dropped articles until instructed to do so by a firearms instructor.

6.     No talking on the firing line, except by or with a firearms instructor.

7.     No eating, chewing tobacco or smoking on the firing line.

8.     All officers must pay strict attention to the Firearms Range Instructors.

9.     Never anticipate a command.

10.    Never permit the muzzle of a firearm to touch the ground.

11.    Range staff/armorers shall conduct a safety check of all weapons before and after a training session.

12.    The Supervisor in charge of qualification training on a particular day as well as the officer/participant shall make sure that the ammunition they are using is a "Service Load" (ammunition authorized by the agency and issued for duty use) or "Equivalent Load" (ammunition which is equivalent to the Service Load designed for training use) and is of the same caliber for the firearm in which it is used, and it is not damaged in any way.

13.    Before firing any firearm that is unfamiliar to you, make sure that you understand exactly how it functions. A lack of familiarity with the firearm can result in serious accidents.

14.    Always wash hands after leaving the range to reduce the possibility of lead contamination.

15.    The Firearms Range's Commanding Officer shall ensure that personnel equipped to provide first aid are present on the firearms range during all qualification activities. (This person can be a certified member of a local volunteer first aid squad, an agency member certified as a first responder or emergency medical technician, or a member of the agency who is otherwise adequately trained.

16.    The Firearm Range's Commanding Officer shall ensure that adequate first aid supplies are on-site at all times.

# APPENDIX E

| # | Consent Decree Paragraph | NPD Policy |
|---|---|---|
| 1 | 67(a) | General Order 18-20, *Use of Force*: Sections II, III.D.2 and VII.A.2 |
| 2 | 67(b) | General Order 18-20, *Use of Force*: Section II |
| 3 | 67(c) | General Order 18-20, *Use of Force*: Sections IV.A.2, VIII A.2 and VIII.A.3 |
| 4 | 67(d) | General Order 18-20, *Use of Force*: Section II |
| 5 | 67(e) | General Order 18-20, *Use of Force*: Sections III.E, III.L and VI.A.4 |
| 6 | 67(f) | General Order 18-20, *Use of Force*: Section III.E |
| 7 | 67(g) | General Order 18-20, *Use of Force*: Section V.B.2 |
| 8 | 67(h) | General Order 18-20, *Use of Force*: Section V.B.3 |
| 9 | 67(i) | General Order 18-20, *Use of Force*: Section III.B.4 |
| 10 | 67(j) | General Order 18-20, *Use of Force*: Section VI.C.1.d.ii |
| 11 | 67(k) | General Order 18-20, *Use of Force*: Section V.B.1 |
| 12 | 67(l) | General Order 18-20, *Use of Force*: Section X |
| 13 | 68 | General Order 18-20, *Use of Force*: Section XII |
| 14 | 69 | General Order 18-20, *Use of Force*: Section XII |
| 15 | 70 | General Order 18-20, *Use of Force*: Section XII |
| 16 | 71 | General Order 18-22, *Firearms and Other Weapons*: Section IV.A |
| 17 | 72 | General Order 18-20, *Use of Force*: Section VI.D |
| 18 | 73 | General Order 18-20, *Use of Force*: Section VI.C.1.d |
| 19 | 74 | General Order 18-20, *Use of Force*: Section XII; General Order 18-22, *Firearms and Other Weapons*: Section VII.B |
| 20 | 75 | General Order 18-21, *Reporting, Investigation and Review*: Sections II and VII |
| 21 | 76 | General Order 18-21, *Reporting, Investigation and Review*: Section VI |
| 22 | 77 | General Order 18-21, *Reporting, Investigation and Review*: Sections III.A, III.B and III.C; General Order 18-20, *Use of Force*: Section VII.A.3 |
| 23 | 78 | General Order 18-21, *Reporting, Investigation and Review*: Sections IV and VII |

| # | Consent Decree Paragraph | NPD Policy |
|---|---|---|
| 24 | 78(a) | General Order 18-20, *Use of Force*: Section XI; General Order 18-21, *Reporting, Investigation and Review*: Section VII |
| 25 | 78(b) | General Order 18-21, *Reporting, Investigation and Review*: Section VIII |
| 26 | 78(c) | General Order 18-21, *Reporting, Investigation and Review*: Section VIII |
| 27 | 78(d) | General Order 18-21, *Reporting, Investigation and Review*: Section VIII |
| 28 | 79(a) | General Order 18-21, *Reporting, Investigation and Review*: Section V; General Order 18-20, *Use of Force*: Section XI |
| 29 | 79(b) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.A.3, VII.B.3 and VII.C.3 |
| 30 | 79(c) | General Order 18-21, *Reporting, Investigation and Review*: Section V.B.2 |
| 31 | 79(d) | General Order 18-21, *Reporting, Investigation and Review*: Sections IV.B.5 and IV.B.6 |
| 32 | 79(e) | General Order 18-21, *Reporting, Investigation and Review*: Section VI |
| 33 | 80 | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.A.3, VII.B.3 and VII.C.3 |
| 34 | 81 | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.1, VII.B.3, VII.C.1 and VII.C.3 |
| 35 | 82(a) | General Order 18-21, *Reporting, Investigation and Review*: Section VII |
| 36 | 82(b) | General Order 18-21, *Reporting, Investigation and Review*: Section VII |
| 37 | 82(c) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 and VII.C.3 |
| 38 | 82(d) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.A.3, VII.B.3 and VII.C.3 |
| 39 | 82(e) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.A.3, VII.B.3 and VII.C.3 |
| 40 | 82(f) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 and VII.C.3 |
| 41 | 82(g) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 and VII.C.3 |
| 42 | 82(h) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 and VII.C.3 |

| # | Consent Decree Paragraph | NPD Policy |
|---|---|---|
| 43 | 83 | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 & VII.C.4 |
| 44 | 84 | General Order 18-21, *Reporting, Investigation and Review*: Section V.B.4 (Memo: 2018-88) |
| 45 | 84(a) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII B.3 and VII.C.4 |
| 46 | 84(b) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII B.3 and VII.C.4 |
| 47 | 84(c) | General Order 18-21, *Reporting, Investigation and Review*: Sections VII.B.3 and VII.C.4 |
| 48 | 85 | General Order 18-21, *Reporting, Investigation and Review*: Section IV.C.1.b |
| 49 | 86 | General Order 18-21, *Reporting, Investigation and Review*: Section V.B |
| 50 | 87 | General Order 18-21, *Reporting, Investigation and Review*: Sections VIII.A.1 and VIII.A.2 |
| 51 | 88 | General Order 18-21, *Reporting, Investigation and Review*: Section V.B |
| 52 | 89 | General Order 18-21, *Reporting, Investigation and Review*: Section V.B.4 |
| 53 | 90 | General Order 18-21, *Reporting, Investigation and Review*: Section IV |
| 54 | 91(a) | General Order 18-21, *Reporting, Investigation and Review*: Section IV.B.2.a |
| 55 | 91(b) | General Order 18-21, *Reporting, Investigation and Review*: Section IV.B.2.b |
| 56 | 91(c) | General Order 18-21, *Reporting, Investigation and Review*: Section IV.B.2.c |
| 57 | 92 | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 58 | 93 | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.3 |
| 59 | 94(a) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 60 | 94(b) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 61 | 94(c) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 62 | 94(d) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 63 | 94(e) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 64 | 94(f) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |

| # | Consent Decree Paragraph | NPD Policy |
|---|---|---|
| 65 | 94(g) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 66 | 94(h) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 67 | 94(i) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 68 | 94(j) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 69 | 94(k) | General Order 18-21, *Reporting, Investigation and Review*: Section VII.C.4 |
| 70 | 95 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |
| 71 | 96 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |
| 72 | 97 | General Order 18-21, *Reporting, Investigation and Review*: Section IX |
| 73 | 98 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |
| 74 | 99 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |
| 75 | 100 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |
| 76 | 102 | General Order 18-21, *Reporting, Investigation and Review*: Section VIII.B |

# APPENDIX F

Use of Force Incident Numbers for Low Level Use of Force Incidents Reviewed

1.  19-187
2.  19-189
3.  19-191
4.  19-192
5.  19-194
6.  19-196
7.  19-198
8.  19-199
9.  19-200
10. 19-201
11. 19-202
12. 19-204
13. 19-206
14. 19-207
15. 19-208
16. 19-210
17. 19-212
18. 19-214
19. 19-216
20. 19-218
21. 19-219
22. 19-221
23. 19-222
24. 19-223
25. 19-225
26. 19-226
27. 19-227
28. 19-229
29. 19-231
30. 19-232
31. 19-234
32. 19-235
33. 19-243
34. 19-244
35. 19-246
36. 19-247
37. 19-249
38. 19-250
39. 19-252
40. 19-255
41. 19-258
42. 19-260
43. 19-262

44. 19-263
45. 19-266
46. 19-268
47. 19-272
48. 19-275
49. 19-276
50. 19-277
51. 19-278
52. 19-279
53. 19-281
54. 19-282
55. 19-283
56. 19-285
57. 19-288
58. 19-290
59. 19-291
60. 19-292
61. 19-294
62. 19-295
63. 19-296
64. 19-298
65. 19-300
66. 19-301
67. 19-303
68. 19-306
69. 19-307
70. 19-309
71. 19-310
72. 19-312

Use of Force Incident Numbers for Intermediate/Serious Level Use of Force Incidents Reviewed
1. 19-197
2. 19-205
3. 19-230
4. 19-256
5. 19-257
6. 19-261
7. 19-265
8. 19-271
9. 19-273
10. 19-286
11. 19-287
12. 19-304

# APPENDIX G

I.      **Results of Outcome Assessment**[1]

The following outcomes reflect the Monitoring Team's collection and analysis of data pursuant to Paragraph 174(b) of the Newark Consent Decree.  All findings were derived from the total population of data that NPD provided to the Monitoring Team for the audit period, unless otherwise indicated.  Because the Monitoring Team could not obtain accurate and complete NPD Use of Force data for periods prior to the audit period, the results of this Outcome Assessment will constitute a baseline of NPD's outcome data for use in future Monitoring Team outcome assessments.[2]

A.      *The level of force used per arrest by NPD*

**Table 1A** displays the percentage of arrests conducted by NPD that either (1) involved the use of force by officers or (2) did not involve the use of force.  As the table shows, force was used in 3.2% of NPD's arrests.

There were 128 Use of Force Incidents during the audit period.  As shown in **Table 1B**, in 89 (69.5%) of those incidents, the subject was arrested.

**Table 1C** shows the highest level of force used by any officer in each arrest where force was used.  A majority of NPD's arrests that involved the use of force, involved a Low Level of Force (87.6%) as compared to Intermediate (11.2%) and Serious Force (1.1%).

| Table 1A - Total NPD Arrests | | |
|---|---|---|
| NPD Arrests | Number | Percent |
| No Force | 2697 | 96.8% |
| Force | 89 | 3.2% |
| Total | 2786 | 100.0% |

---

[1] The rates referenced in sections Consent Decree Paragraph 174(b) i, ii, iii, iv, and vi, were compiled and computed from data provided by the NPD from IA Pro which is utilized by the OPS and AFIT.

[2] The Monitoring Team did not request data required by Consent Decree Paragraph 174(b)(ix) for this Outcome Assessment.

| Table 1B - Total Uses of Force | | |
|---|---|---|
| Uses of Force | Use of Force Incidents | Percent |
| Uses of Force with Arrest | 89 | 69.5% |
| Uses of Force without Arrest | 39 | 30.5% |
| Total | 128 | 100.0% |

| Table 1C - Level of Force Used per Arrest | | |
|---|---|---|
| Level of Force | Number of Arrests | Percent |
| Low | 78 | 87.6% |
| Intermediate | 10 | 11.2% |
| Serious | 1 | 1.1% |
| Total | 89 | 100.0% |

**B.**   *The level of force by types of force used*

As shown in **Table 1B**, there were 128 Use of Force Incidents during the audit period. **Table 2A** below displays the highest level of force used by any officer involved in each Use of Force Incident.  Low Level Force made up 91.4% of all Use of Force Incidents during the audit period, while Intermediate Force and Serious Force accounted for 7.8% and 0.8% respectively.

**Table 2B** shows the highest type of force used by any officer involved in each incident.

| Table 2A - Level of Force | | |
|---|---|---|
| Level of Force | Use of Force Incidents | Percent |
| Low | 116 | 90.6% |
| Intermediate | 11 | 8.6% |
| Serious | 1 | 0.8% |
| Total | 128 | 100.0% |

| Table 2B – Type of Force Used | | |
|---|---|---|
| Force Type | Use of Force Incidents | Percent |
| Compliance Hold | 79 | 61.7% |
| Hands and Fist | 31 | 24.2% |
| Compliance Hold & Hands and Fist | 2 | 1.6% |
| Kicks and Feet | 2 | 1.6% |
| Chemical Agent | 3 | 2.3% |
| Other | 11 | 8.6% |
| Total | 128 | 100.0% |

**C.**   *The level of force by geographic data and type of arrest*

During the audit period, there were 89 Use of Force Incidents in which the subject was arrested.  **Table 3A** shows the geographic location of those Use of Force Incidents in which a person was arrested.  **Table 3B** reports the most serious charge in each arrest.

| Table 3A - Arrests by Geographic Area | | |
|---|---|---|
| Location | Number of Arrests | Percent |
| 5th Precinct | 21 | 23.6% |
| 2nd Precinct | 20 | 22.5% |
| 6th Precinct | 11 | 12.4% |
| 7th Precinct | 10 | 11.2% |
| 1st Precinct | 9 | 10.1% |
| 3rd Precinct | 9 | 10.1% |
| 4th Precinct | 3 | 3.4% |
| Unspecified | 6 | 6.7% |
| Total | 89 | 100.0% |

| Table 3B - Arrests by Most Serious Charge | | |
|---|---|---|
| Most Serious Charge | Number of Arrests | Percent |
| Process (eluding, false report, obstruction, resisting, resisting arrest, resisting obstruction) | 35 | 39.3% |
| Person (aggravated assault, aggravated assault/weapon, restraint, domestic violence, robbery, simple assault) | 24 | 27.0% |
| Controlled Dangerous Substance ("CDS") (CDS, CDS distribution, possession of CDS) | 11 | 12.4% |
| Property (burglary, criminal mischief, shoplifting) | 6 | 6.7% |
| Other (e.g., possession of a weapon, trespass) | 13 | 14.6% |
| Total | 89 | 100.0% |

      **D.**    *The rate of force used, measured against the subject's race or ethnicity, gender, and age*

As shown in **Table 1B**, there were 128 Use of Force Incidents during the audit period. **Table 4A** displays the recorded gender of the subject in each of those incidents. **Table 4B** shows the recorded race or ethnicity of the subject. **Table 4C** presents the ages of the subjects in the 84 incidents reviewed.[3]

| Table 4A - Uses of Force by Gender | | |
|---|---|---|
| Gender | Use of Force Incidents | Percent |
| Male | 104 | 81.3% |
| Female | 24 | 18.8% |
| Total | 128 | 100.0% |

---

[3] Complete "Age" data was not available for all Use of Force incidents during this audit period. However, the Monitoring Team's review of incidents of use of force allowed it to determine "Age" data for the cases under review.

| Table 4B - Uses of Force by Race or Ethnicity | | |
|---|---|---|
| Race or Ethnicity | Use of Force Incidents | Percent |
| Black | 100 | 78.1% |
| Hispanic | 17 | 13.3% |
| White | 11 | 8.6% |
| Total | 128 | 100.0% |

| Table 4C - Rate of Force by Age | | |
|---|---|---|
| Age | Use of Force Incidents | Percent |
| <18 | 6 | 7.1% |
| 18-21 | 13 | 15.5% |
| 22-25 | 10 | 11.9% |
| 26-30 | 21 | 25.0% |
| >30 | 34 | 40.5% |
| Total | 84 | 100.0% |

   **E.**   *The rate of force complaints that are sustained, overall and by force type; sources of complaint (internal or external); type of arrest; types of force complained of*

   **Table 5** displays the disposition of Use of Force Complaints during the audit period.[4]

| Table 5 - Complaint or Excessive Use of Force Misconduct | |
|---|---|
| Sustained | 1 |
| Not Sustained | 2 |
| Unfounded | 1 |

---

[4] All 4 of the complaints resolved during this audit period were internal complaints.  Further details of the internal review process will be the subject of a separate audit.

| Table 5 - Complaint or Excessive Use of Force Misconduct | |
|---|---|
| Pending | 0 |

**F.**   *Use of force incidents that the Monitoring Team found violated NPD policy broken down by: force type; type of arrest; force implement used; and number of officers involved*

Of the 84 Use of Force Incidents reviewed, **Table 6A** and **Table 6B** represent those incidents in which there were either substantive or documentation-related policy violations, respectively.

| Table 6A - Substantive Policy Violations | | |
|---|---|---|
| Substantive | Use of Force Incidents | Percent |
| Compliant Incidents | 78 | 92.9% |
| Non-Compliant Incidents | 6 | 7.1% |
| Total | 84 | 100.0% |

| Table 6B - Documentation Policy Violations | | |
|---|---|---|
| Documentation | Use of Force Incidents | Percent |
| Compliant Incidents | 63 | 75.0% |
| Non-Compliant Incidents | 21 | 25.0% |
| Total | 84 | 100.0% |

In the 27 Use of Force Incidents found to have substantive or documentation policy violations, **Table 6C** represents the highest level of force used by an officer in those incidents.

| Table 6C - Policy Violations by Level of Force | | |
|---|---|---|
| Level of Force | Use of Force Incidents | Percent |
| Low | 24 | 88.9% |
| Intermediate | 2 | 7.4% |

| Table 6C - Policy Violations by Level of Force | | |
|---|---|---|
| Level of Force | Use of Force Incidents | Percent |
| Serious | 1 | 3.7% |
| Total | 27 | 100.0% |

The Monitoring Team found 27 Use of Force Incidents to have substantive or documentation policy violations.  **Table 6D** reports the highest type of force used by an officer in those 27 incidents.

| Table 6D - Policy Violations by Force Implement Used | | |
|---|---|---|
| Force Implement Used | Use of Force Incidents | Percent |
| Compliance Hold | 19 | 70.4% |
| Hands and Fist | 4 | 14.8% |
| Kicks and Feet | 1 | 3.7% |
| Chemical Agent | 1 | 3.7% |
| Other | 2 | 7.4% |
| Total | 27 | 100.0% |

The subject was arrested in all 27 use of force incidents found to have substantive or documentation policy violations.  **Table 6E** reports the most serious charge in each arrest.

| Table 6E - Arrests in Policy Violation Incidents by Most Serious Charge | | |
|---|---|---|
| Most Serious Charge | Use of Force Incidents | Percent |
| Person | 7 | 25.9% |
| Process | 7 | 25.9% |
| CDS | 2 | 7.4% |
| Property | 1 | 3.7% |
| Others | 10 | 37% |

| Table 6E - Arrests in Policy Violation Incidents by Most Serious Charge | | |
|---|---|---|
| Total | 27 | 100.0% |

# Appendix D

**Report of the Independent Monitor's First Audit of the Newark Police Division's Community-Oriented Policing and Engagement Practices**

Table of Contents

I.      Reviewers ....................................................................................................................1

II.     Introduction ...............................................................................................................1

III.    Review Period ............................................................................................................1

IV.     Executive Summary ...................................................................................................2

V.      Analysis .....................................................................................................................4

        A.      Consent Decree Paragraph 14 ..........................................................................4

        B.      Consent Decree Paragraph 15 ..........................................................................9

        C.      Consent Decree Paragraph 16 ........................................................................10

        D.      Consent Decree Paragraph 17 ........................................................................13

        E.      Consent Decree Paragraph 18 ........................................................................15

        F.      Consent Decree Paragraph 19 ........................................................................17

        G.      Consent Decree Paragraph 20 ........................................................................17

        H.      Consent Decree Paragraph 21 ........................................................................18

        I.      Consent Decree Paragraph 24 ........................................................................19

        J.      Consent Decree Paragraph 174(e)(iv) ...........................................................19

VI.     Observations and Recommendations ........................................................................20

        A.      Ensure Compliance with NPD Policies and Proper Documentation of Engagement Efforts ........................................................................................20

        B.      Develop Tools to Measure the Efficacy of Community Engagement .................21

        C.      Organize and Digitize Community Engagement Records ...................................21

        D.      Protect Community Service Officers' Time .......................................................22

This is Independent Monitor Peter C. Harvey's report of the results of the Independent Monitoring Team's first audit of the City of Newark's (the "City") and Newark Police Division's ("NPD") compliance with Consent Decree requirements relating to community-oriented policing and engagement.

## I.      Reviewers

The following members of the Independent Monitoring Team participated in this audit:

> Brooke Lewis, Esq., New Jersey Institute for Social Justice
> Robert Haas, Commissioner, Cambridge Police (Ret.)
> Robert Wasserman, Senior Vice President, Hillard Heintze
> Linda Tartaglia, Rutgers Center on Policing
> Rosalyn Parks, Ph.D., Rutgers Center on Policing
> Jonathan Norrell, Rutgers Center on Policing

## II.      Introduction

Paragraph 173 of the Consent Decree instructs the Independent Monitoring Team, led by Independent Monitor Peter C. Harvey, to audit the City's and NPD's compliance with Consent Decree reforms.  By letter dated March 6, 2020, the Independent Monitor issued notice to the Parties to the Consent Decree, the City, NPD, and U.S. Department of Justice ("DOJ") (collectively, "the Parties") that the Monitoring Team would begin its *first audit* of NPD's compliance with certain provisions of the Consent Decree relating to Community-Oriented Policing and Engagement, and specifically, Consent Decree Paragraphs 14-21, 24, and 174(e). *See* Exhibit A (March 6, 2020 notice letter).  As a general matter, these Consent Decree provisions require NPD to:

> engage constructively with the community to promote and
> strengthen partnerships and to achieve collaborative, ethical, and
> bias-free policing . . . [and] integrate concepts of community and
> problem-oriented policing into its management, policies and
> procedures, recruitment, training, personnel evaluations,
> resource deployment, tactics, and accountability systems to
> increase cooperation and trust between it and the community.

*See* Consent Decree § V; Consent Decree ¶ 174(e).  The Parties raised no objection to any aspect of the Monitoring Team's notice letter, including the proposed methodology for this audit that was described therein.

## III.      Review Period

The review period for this audit was six months, and specifically, April 1, 2019 through September 30, 2019 (the "Audit Period").  The Monitoring Team selected a six-month audit period to ensure that NPD had an opportunity to demonstrate that it had completed certain tasks that the Consent Decree requires to be completed on a quarterly basis.  Due to the COVID-19

pandemic, members of the Monitoring Team reviewed NPD's records related to this audit remotely from September 2020 through January 2021.[1]

## IV.   Executive Summary

Since entering into the operative Consent Decree on May 5, 2016, the City and NPD leadership have endeavored to transition NPD towards a community-oriented policing model that contemplates police officers as community problem-solvers in constant pursuit of ways to improve the quality of service they offer to the Newark community through a variety of law enforcement and non-law enforcement means.  Under this model, NPD officers must take proactive steps to engage their constituents and gain a deeper understanding of the unique contours of the neighborhoods that comprise each precinct.

To that end, on April 1 and April 4, 2019, NPD adopted sophisticated Division-wide community-oriented policing policies, which, among other things, operationalized Consent Decree reforms in this area.  Under this new paradigm, each of NPD's Precinct Commanders is charged with performing detailed assessments of the neighborhoods within their command and then using the results of these assessments to drive police activities.  Also, pursuant to the Consent Decree, NPD developed police training that educated officers and supervisors on the community-oriented policing model adopted by NPD as well as relevant best practices. Together, NPD's policies and training were progressive, laudable, and approved by the Monitoring Team.

The goal for this audit was to determine whether NPD in practice is complying with the Consent Decree—and NPD's policies that implement Consent Decree requirements.  As DOJ noted in its 2014 report of its investigation that led to the Consent Decree, historically, there has been a disconnect at NPD between its policies and practices, particularly with regard to record-keeping.  For example, DOJ found that NPD officers' stops of Newark residents were poorly documented (or not documented at all), and that supervisors either did not review these records or simply did not hold line officers accountable to follow the relevant policies.[2]  While policies express NPD's priorities and training instructs officers on how to accomplish the policy goals, the open question is how (or, whether) NPD's Consent Decree interventions have changed the character of the relationship between NPD officers and Newark residents.

In the Audit Period, the Monitoring Team found that NPD had made efforts to engage the Newark community by (i) improving partnerships with community groups, (ii) hosting periodic events with Newark residents, and (iii) regularly discussing the quantity of community engagement during leadership meetings.  However, these efforts were *ad-hoc* and inconsistent. Also, these efforts did not follow Consent Decree requirements.  As a result, NPD as an institution, with some exceptions, has not collected and recorded the data it needs from the community to execute a meaningful community-oriented policing strategy.  The state of NPD's

---

[1] On March 20, 2020, NPD's Public Safety Director requested a suspension of all on-site inspections and audits due to the public health emergency caused by the novel COVID-19 virus.

[2] Investigation of the Newark Police Department, U.S. Dep't of Justice & U.S. Attorney's Office, District of New Jersey, July 22, 2014, *available at* **https://www.newarkpdmonitor.com/wp-content/uploads/2016/06/DOJ_Report.pdf**.

record management systems has only compounded NPD's deficiencies in this area. NPD's records were disorganized, contradictory at times, and stored in hard copy, all of which precludes NPD's ability to digest and leverage its community engagement efforts.

As noted in this report, NPD has made important strides in improving the transparency of its operations and increasing the quantity of community contacts. However, four-plus years into the Consent Decree, NPD still lacks compliance in most of the substantive Consent Decree requirements for community-oriented policing and engagement as revealed by this audit. Unlike certain subject areas of the Consent Decree that require wholesale restructuring, such as adopting new data systems, many of the Consent Decree provisions relating to community-oriented policing and engagement are discrete and readily achievable. A few examples illustrate this point. NPD could easily comply with Paragraph 16 of the Consent Decree by ensuring that each Precinct has two full-time Community Service Officers. It has not done so consistently during the Audit Period. NPD could comply with Paragraph 18 by hosting (and documenting) quarterly community meetings. It has not done so consistently during the Audit Period. NPD could comply with Consent Decree Paragraph 17 by developing a tool to measure the effectiveness of its community engagement. It has not done so during the Audit Period. The Monitoring Team is hopeful that NPD will focus its resources on this area of the Consent Decree, and that NPD will be able to demonstrate substantial improvements in the Monitoring Team's second audit.

| Overview of First Community-Oriented Policing and Engagement Audit Results | | |
|---|---|---|
| **Consent Decree** | **Description** | **Compliance?** |
| Paragraph 14 | NPD will provide "direction and training" to officers on how to achieve effective community engagement. | No |
| Paragraph 15 | NPD will assess and revise its staffing allocation to improve community-oriented policing practices. | Provisional |
| Paragraph 16 | NPD must assign two Community Service Officers to each precinct who will become familiar with community and not be assigned to calls for service except in exigent circumstances. | No |
| Paragraph 17 | NPD must implement a mechanism to measure the breadth, extent, and effectiveness of its community engagement practices. | No |
| Paragraph 18 | NPD must issue quarterly reports on community engagement efforts. One report must address the results of the staffing assessment required by Paragraph 15. | No |
| Paragraph 19 | NPD and the City must develop practices to seek and respond to input from the community regarding the Consent Decree's implementation. | No |
| Paragraph 20 | NPD and the City must make all studies, analyses, and assessments required by the Consent Decree available on NPD and City websites. | No |
| Paragraph 21 | NPD must adopt a policy to collect and maintain all data and records necessary to facilitate transparency around NPD's policies and practices. | Yes |
| Paragraph 24 | NPD and the City must cooperate with the annual surveys required by the Consent Decree and publish the survey results on NPD and City websites. | No |

## V.    Analysis

### A.    Consent Decree Paragraph 14

Consent Decree Paragraph 14 states, in pertinent part (*emphasis added*):

> NPD will provide ***direction and training*** to officers on the benefits of and means to achieve effective community engagement, including which police tactics and strategies are more likely to alienate community members, and how to employ alternatives to those tactics and strategies where consistent with public safety.  Within 60 days of the Operational Date and annually thereafter, the NPD will provide eight hours of structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives [].

To determine whether NPD has complied with Paragraph 14, the Monitoring Team assessed whether NPD has provided "direction" and "training" on the subjects enumerated therein. "Direction" means having a written policy that NPD follows in practice.  "Training" means developing and administering a police training.

Prior to this audit, the Monitoring Team determined that NPD had devised and adopted written community-oriented policing policies, the Community Policing Policy, *G.O. 18-13* ("Community Policing Policy") and Neighborhood Policing Plan Public Safety Memorandum 18-313A ("Neighborhood Policing Plan Memorandum") (collectively, "the Policies") and training that satisfied Consent Decree Paragraph 14.[3]  *See* Exhibit B (Community Policing Policy, appending the Neighborhood Plan Memorandum).  The Policies set forth a Division-wide community-oriented policing strategy, and the steps that NPD officers must take to execute it.

In this audit, the task for the Monitoring Team is to determine whether NPD practices its policies in accordance with Consent Decree requirements.  With this in mind, the Monitoring Team selected four key provisions from the Policies that require NPD officers to engage the Newark community and then document their efforts.  In the following, we explain which sections

---

[3] On February 19, 2019, the Monitoring Team approved NPD's Community Policing Policy, *G.O. 18-13* and Neighborhood Policing Plan Public Safety Memorandum 18-313A, issued on April 4, 2019 and April 1, 2019, respectively.  These policies provide NPD officers with comprehensive instructions on how to seek and respond to community feedback, collaborate with communities to address public safety concerns, and evaluate citizen complaints to improve community-oriented policing practices.  Also, on February 2, 2020, the Monitoring Team determined that NPD's revised community-oriented policing training satisfied the "training" component of Paragraph 14.

The Monitoring Team's assessments of the various iterations of the policies and training discussed here can be found in the Monitoring Team's First, Second, Third, Fourth, Fifth, Sixth, Seventh and Thirteenth Quarterly Reports, which are available on Independent Monitoring Team's website: **https://www.newarkpdmonitor.com/reportsresources/**.

of the Policies we audited, which records we requested, and whether NPD was able to produce records that evidenced its compliance with relevant sections of its Policies.

1.     *Neighborhood Policing Plans*

The Neighborhood Policing Plan Memorandum is the foundational document for NPD's community-oriented policing strategy.  It requires Precinct Commanders to work closely with community stakeholders and identify innovative, non-law enforcement strategies to redress public safety or quality-of-life concerns within a specific neighborhood.  These efforts, carried out over three phases, are documented in administrative submissions, referred to collectively as the *Neighborhood Policing Plans*.  While the *Neighborhood Policing Plans* for each precinct can (and should) change over time, they are the guiding documents for how each Precinct Commander will direct community engagement in the neighborhoods comprising his or her Precinct.

Phase One is "Identifying Neighborhoods," which requires Precinct Commanders to select two neighborhoods within their precinct that will be the focus of their *Neighborhood Policing Plans*.  When selecting the two neighborhoods, Precinct Commanders should aim to address root causes of crime and should consider such factors as quality-of-life complaints from residents.

Phase Two is "Establishing Partnerships," which requires Precinct Commanders to (1) receive feedback from residents by conducting a survey, the results of which will be analyzed by NPD leadership, and (2) host a community meeting.

Phase Three is "Problem-Solving," which requires Precinct Commanders to develop innovative, non-law enforcement solutions, such as leveraging City and other community resources, to solve public safety and quality of life concerns.

Precinct Commanders are required to document their efforts at each Phase; together, these documents are a Precinct's *Neighborhood Policing Plans*.

For this audit, the Monitoring Team requested from NPD all of the documents that comprise NPD's *Neighborhood Policing Plans*, including documents NPD created at Phases One, Two, and Three, the results of the community survey conducted at Phase Two in each Precinct, and any follow-up reports.  In response, NPD submitted nineteen (19) documents from Phases One, Two, and Three of the Precinct *Neighborhood Policing Plans* and eleven (11) follow-up reports from within the Audit Period.  NPD provided no evidence of a community survey conducted in any precinct.

The Monitoring Team reviewed the *Neighborhood Policing Plans* to evaluate whether Precinct Commanders completed and documented all of the steps outlined in the *Neighborhood Policing Plan Memorandum*.  None of the *Neighborhood Policing Plans* fully complied.  In particular, the Monitoring Team noted that none of the *Neighborhood Policing Plans* included the community survey required at Phase Two.  Further, many of the *Neighborhood Policing Plans* failed to address root causes of crime and other quality of life concerns.  They also failed to develop any non-law enforcement tactics.  For instance, three of the six Phase One plans improperly relied on *only* crime patterns when selecting neighborhoods, and three of the seven

Phase Three plans adopted law enforcement problem-solving strategies, such as increasing arrests and "aggressively" patrolling the neighborhood.

In total, we found that 90.47%[4] of Precinct Commanders completed a *Neighborhood Policing Plan* for each of the three phases.  The compliance rate is 95%.  However, no Phase One, Two, or Three plan met all of NPD's own requirements.

| NPD Precinct Compliance with the Requirements for Phases One, Two, and Three of NPD's *Neighborhood Policing Plans* | | | |
|---|---|---|---|
| Precinct | Phase One | Phase Two | Phase Three |
| 1 | 71.43% | 40% | 36.36% |
| 2 | 85.71% | 20% | 18.18% |
| 3 | 42.86% | 20% | 72.73% |
| 4 | 71.43% | 30% | 54.55% |
| 5 | 57.14% | 50% | 54.55% |
| 6 | 42.86% | 20% | 54.55% |
| 7 | 0% | 0% | 0% |
| Average: | 53.06% | 25.71% | 41.56% |

2.    *Quarterly Community Stakeholder Meetings*

Community Policing Policy Section VIII (B)(2)(d) requires the Commander of the Community Affairs/Clergy Unit to ensure that "dialogue is maintained by way of regular meetings, no less than quarterly, with community stakeholders to discuss how community policing efforts are meeting the public safety goals and needs of the community."

The Monitoring Team requested records verifying NPD's Quarterly Community Stakeholder Meetings.  NPD provided the Monitoring Team with records of various community events that transpired during the Audit Period, including eight sign-in sheets from various events and six Weekly Reports from a particular officer within the Community Affairs/Clergy Unit. However, none of these records address the meetings required by Community Policing Policy Section VII (B)(2)(d).  Additionally, NPD was unable to produce any record that the Quarterly Community Stakeholder Meetings transpired during the Audit Period.

NPD's practices are not compliant with its Community Policing Policy Section VIII (B)(2)(d).

3.    *Monthly Precinct Community Meetings*

Community Policing Policy Section VII (B)(4)(a) requires Precinct Commanders to "host monthly community meetings within each precinct and in alternate locations within the

---

[4] The Seventh Precinct was missing a *Neighborhood Policing Plan* for Phases One and Two.  All other precincts had submitted Plans for each Phase.  As a result, NPD submitted 19 of the required 21 plans, which comprises a 90.47% score.

community to allow community residents, other community stakeholders and police to discuss chronic problems in the community where an ongoing dialogue can exist."

The Monitoring Team requested NPD records verifying these monthly Precinct Community Meetings. NPD generally referred the Monitoring team to its Community Engagement Database, which catalogs community engagement activities throughout the Division, and 318 of NPD's Community Policing After Action Reports prepared during the Audit Period pursuant to Community Policing Policy. NPD was not able to produce any documentation of those meetings. Even if the relevant records were to exist—and there is no indication that they do—NPD's inability to easily identify and make them available obviates any value these records could add to NPD's community-oriented policing strategies.

NPD's practices are not compliant with Community Policing Policy Section VII (B)(4)(a).

4.    *Community Complaints*

Community Policing Policy Section VIII (H)(l) requires the Commander of the Office of Professional Standards to conduct a quarterly review "to evaluate the effectiveness of the Division's Community Policing Policy as it relates to the number of community member[s'] complaints against Division members and the reported allegations" and offer "recommended strategies to positively impact complaints made against Division members by members of the community."

The Monitoring Team requested records of these quarterly reviews to determine if they comport with the applicable requirements, specifically (1) whether the review evaluates community complaints against Division members to assess the effectiveness of NPD's Community Policing Policy and (2) whether the review includes recommended strategies for addressing the problems raised in the complaints. In response, NPD stated that the Office of Professional Standards—its Internal Affairs unit—conducts disciplinary history reviews on a weekly, monthly and quarterly basis, and provided the Monitoring Team with a sample review, dated January 10, 2020. NPD also stated that internal and external complaints are discussed during the weekly COMSTAT meeting, that are "command meetings to analyze and discuss statistical crime information to determine crime levels and crime trends."[5]

After reviewing this information, the Monitoring Team found that NPD had conducted no quarterly review within the meaning of Community Policing Policy Section VIII (H)(l). The only review that NPD did provide was outside of the six-month Audit Period and did not "include recommended strategies to positively impact complaints made against Division members by members of the community" as required by Community Policing Policy Section VIII (H)(l). Additionally, a discussion of internal and external complaints during NPD's weekly COMSTAT meeting does not satisfy the requirements of NPD's Community Policing Policy Section VIII (H)(l) because such discussions do not document any recommendations for how to improve NPD's community-oriented policing practices based on the complaints.

---

[5] NPD's COMSTAT webpage can be found here:  **http://npd.newarkpublicsafety.org/comstat**.

NPD's practices are not compliant with its Community Policing Policy Section VIII (H)(l).

The following chart summarizes NPD's compliance with Consent Decree Paragraph 14.

| Overview of Paragraph 14 Audit Results | | |
|---|---|---|
| **Task** | **Authority** | **Compliance?** |
| Each Precinct Commander must create a Three-Phase *Neighborhood Policing Plan*. | Neighborhood Policing Plan Memorandum | No. 90.7% of the *Neighborhood Policing Plans* were completed. |
| Each Precinct Commander must identify two neighborhoods within their precinct in which they will work collaboratively with residents to solve a specific public safety or quality of life concern. The neighborhoods cannot be selected solely on crime patterns. Precinct Commanders must document these efforts. | Neighborhood Policing Plan Memorandum, Phase One "Identifying Neighborhoods" | No. 0% of the Phase One Neighborhood Policing Plans satisfied all the criteria for selecting two neighborhoods at Phase One. |
| Each Precinct Commander must conduct a community survey and host a community meeting to receive feedback from residents on the proposed problem-solving strategy and document those efforts. | Neighborhood Policing Plan Memorandum, Phase Two "Establishing Partnerships" | No. 0% of the Neighborhood Policing Plans followed all the steps for establishing partnerships at Phase Two. |
| Each Precinct Commander must create innovative, non-law enforcement solutions to address the public safety or quality-of-life concerns identified at Phase One and document those efforts. | Neighborhood Policing Plan Memorandum, Phase Three "Problem-Solving" | No. 0% of the Neighborhood Policing Plans followed all the steps and met all of the problem-solving process of Phase Three. |
| The Commander of the Community Affairs/Clergy Unit must host quarterly Community Stakeholder meetings. | Community Policing Policy Section VIII (B)(2)(d) | No. There was no record verifying that a quarterly Community Stakeholder meeting was hosted during the Audit Period. |
| Each Precinct Commander must host a monthly Precinct Community Meeting | Community Policing Policy Section VII (B)(4)(a) | No. There was no record verifying that a Precinct Community Meeting was hosted during the Audit Period. |
| The Commander of the Office of Professional Standards must review citizen complaints made against Division members and, based on the review, offer recommendations for improving NPD's community-oriented policing practices. | Community Policing Policy Section VIII (H)(l) | No. There was no record verifying that a review, with recommendations, was conducted by the Commander of the Office of Professional Standards during the Audit Period. |

## B.     Consent Decree Paragraph 15

Paragraph 15 states:

> [By July 9, 2017[6]], NPD will assess and revise its staffing
> allocation and personnel deployment to support community
> policing and problem-solving initiatives, and will modify any
> deployment strategy that is incompatible with effective
> community-oriented policing.  This assessment and modified
> deployment strategy will be provided to the Monitor and DOJ
> for review and approval.

To audit compliance with Paragraph 15, the Monitoring Team evaluated whether NPD had (1) assessed its deployment strategy, (2) developed a strategic plan for deployments to support community-oriented policing, and (3) implemented that plan during the Audit Period.  Some context concerning the history of NPD's work on these tasks is necessary before providing the results of the Monitoring Team's audit.

In September 2018, prior to the Audit Period, NPD submitted a document to the Monitoring Team entitled "Newark Staffing Final Report."  This document was NPD's first attempt to satisfy the requirements of Paragraph 15.  After reviewing the document, the Monitoring Team found that it did not meet the requirements of the Consent Decree because, among other issues, NPD's staffing factor, meaning, the ratio of officers in a police department to residents, was too low and would not allow NPD to meet the basic standards used to determine the requisite staffing levels in each NPD Precinct.  Accordingly, NPD revised its Staffing Assessment.  It submitted a new draft to the Monitoring Team on or about June 2019.  However, these revisions did not include a citywide precinct staffing analysis.  For example, the revised Staffing Assessment failed to account for NPD's two new precincts.

In January 2020, after the Audit Period, NPD submitted a revised staffing assessment (the "2020 Assessment").  *See* Exhibit C.  The 2020 Assessment accurately assessed the number of police officers necessary to execute a community-oriented policing model.  In particular, the 2020 Assessment used a benchmark where officers would spend at least 30% of their time on community engagement, trust building, and problem-solving—and not be responsible for calls to service except in exigent circumstances.  Since January, again, after the Audit Period, NPD has represented to the Monitoring Team that it has been gradually increasing the number of its police officers assigned to the precincts, but that it has yet to achieve the staffing levels described in the 2020 Assessment.  The Monitoring Team understands that this delay is primarily attributable to factors beyond NPD's control, namely, the COVID-19 pandemic, which forced NPD to modify its deployment strategies in response to this acute public health

---

[6] The Consent Decree initially had required NPD to complete the tasks related to a staffing assessment within 180 days of approval of a Monitor, which was November 1, 2016.  NPD did not meet this deadline.  On December 22, 2016, the Consent Decree was amended to, among other things, require NPD to complete the Paragraph 15 requirements by July 9, 2017.  NPD did not meet that deadline.

9

crisis, and, separately, a significant rate of attrition among its officers, whom NPD is working to replace.

In its second audit on this subject, the Monitoring Team will review whether its staffing meets the benchmarks it set forth in the 2020 Assessment.

**C.      Consent Decree Paragraph 16**

Consent Decree Paragraph 16 states, in pertinent part:

> NPD will assign two officers for each precinct who will become familiar with the geographic area, its issues, problems, and community leaders; whose principal duty will be to identify and address the community's priorities; and who are not assigned to answer calls for service except in exigent circumstances.

For this audit, the Monitoring Team asked NPD to produce records that would show whether:  (1) NPD assigned at least "two officers [known as "Community Service Officers" or "CSOs"] for each precinct," (2) the CSOs became "familiar with the geographic area, its issues,[7] problems, and community leaders" and identified and addressed "the community's priorities," and (3) the CSOs were "not assigned to answer calls for service except in exigent circumstances."

At NPD's suggestion, the Monitoring Team reviewed (1) NPD Precinct rosters that purportedly showed whether CSOs were assigned to each Precinct during the Audit Period, (2) Community Policing After Action Reports ("CPAAR"), weekly reports required by Community Policing Policy Section 18-13 IX (A) that can show whether a CSO is addressing community priorities, and (3) Computer Aided Dispatch ("CAD") Reports, which show all calls for service answered by all CSOs throughout the Audit Period.

1.      *Were Two CSOs Assigned to Each Precinct?*

NPD provided the Monitoring Team with a total of 59 Precinct rosters from NPD's seven precincts.  We note that these rosters were not evenly distributed across the precincts because there was no standard schedule for precincts to report their rosters.  Each precinct published a roster on an *ad-hoc* basis.  Based on these rosters, NPD's Second, Third, Fifth, Sixth, and Seventh Precincts did, in fact, have at least two full-time CSOs for the duration of the Audit

---

[7] The Seventh Precinct rosters were printed with a February 17, 2020 date at the top of the page.  Beneath this date, there were the following dates written at the top of each of the six pages: 4/8/19, 5/7/19, 6/11/19, 7/1/19, 8/6/19, 9/3/19.  NPD informed the Monitoring Team that the February 17, 2020 date is the date the rosters were printed and the handwritten dates represent the date the assignments in each roster were made.

Period.  The Fourth Precinct had one full-time CSO and one part-time CSO for the duration of the Audit Period[8].  The First Precinct had only one CSO for the duration of the Audit Period.[9]

| CSOs Assigned to Each Precinct According to NPD Rosters | | |
|---|---|---|
| Precinct | Number of CSOs (2 Required) | Compliance? |
| 1 | 1 | No |
| 2 | 2 | Yes |
| 3 | 2 | Yes |
| 4 | 1 Full-Time & 1 Part-Time | No |
| 5 | 2 | Yes |
| 6 | 2 | Yes |
| 7 | 2 | Yes |

Because each precinct did not demonstrate that it had two CSOs assigned for the duration of the Audit Period, NPD has not complied with this portion of Paragraph 16.

### 2.    *Did the CSOs Become Familiar with the Community?*

To assess whether CSOs became familiar with the community, the Monitoring Team randomly sampled 98 of the 318 CPAARs (Community Policing After Action Reports) submitted by NPD for the Audit Period and reviewed them to determine whether each report documented information required by Community Policing Policy Section 18-13 IX (A).  That policy requires documentation of, for example, issues learned from community members, youth events attended and established, community events attended, and innovative plans for improving quality of life for residents.  Each CSO is required to submit a CPAAR weekly.  The Monitoring Team sampled 7 of the 26 weeks in the Audit Period at random.  For these 7 weeks, there should have been at least 98 CPAARs submitted (one from each of the two CSOs assigned to each of the seven Precincts) and reviewed by the Monitoring Team.  However, of these 98 reports, 41 were missing from the sample, and assigned a compliance score of zero.

The Monitoring Team's review found that *no* CPAAR in the sample documented *all* of the required reporting categories, and a significant number noted nothing of substance from week-to-week.  For example, many reports simply listed "None" for all or most of the reporting categories.  Also, some reports appeared to be facsimiles of reports submitted in previous weeks or reports submitted by other CSOs working within the same precinct.

The lack of substance in a large number of the CPAAR suggests one or more of the following possibilities:  (1) CSOs are not engaging with their communities; (2) CSOs are not

---

[8] Four of the six rosters submitted from the Fourth Precinct showed a third officer assigned to work as a CSO and a School Resource Officer simultaneously. This hybrid assignment does not meet the definition of a CSO set forth in Paragraph 16.

[9] During the Audit Period, NPD had seven police Precincts.  Since then, the City of Newark has announced they will transform the First Precinct into a museum commemorating the Newark Rebellion as well as the headquarters for the newly established Office of Violence Prevention.

accurately documenting their activities; (3) supervisors are not ensuring that these reports are completed fully and accurately; and (4) supervisors are not incorporating information from these reports into the Precinct community-oriented policing strategy.

3.  *Are CSOs Answering Calls for Service?*

Paragraph 16 requires that CSOs dedicate their time to engaging with the community and only allows them to be assigned to answer calls for service in exigent circumstance. To determine if CSOs were being assigned to answer calls for service only in exigent circumstances, the Monitoring Team reviewed CAD Reports (Computer Assisted Dispatch Reports) for each CSO that document all calls for service to which each CSO responded during the Audit Period.

NPD provided CAD Reports for 15 CSOs. The following chart shows what percentage of calls for service were due to exigent circumstance or reasonably related to community-oriented policing practices. A score of 100% means all of the calls for service were related to exigent circumstances or community policing activities. A score of 95% is required for compliance.

| Officer | Calls for Service Related to Exigent Circumstances or Community Policing | Compliance? |
|---|---|---|
| Officer A[10] | 95.84% | Yes |
| Officer B | 77.6% | No |
| Officer C | 92.44% | No |
| Officer D | 77.6% | No |
| Officer E | 81.04% | No |
| Officer F | No CAD Report submitted by NPD | No |
| Officer G | 72.73% | No |
| Officer H | 92.18% | No |
| Officer I | 16.67% | No |
| Officer J | No CAD Report submitted by NPD | No |
| Officer K | 48.39% | No |
| Officer L | 59.75% | No |
| Officer M | 62.5% | No |
| Officer N | 46.43% | No |
| Officer O | 52.76% | No |
| Officer P | 83.12% | No |
| Officer Q | 67.11% | No |
| Officer R | No CAD Report submitted by NPD | No |

---

[10] We assigned a letter to each CSO in lieu of their names.

Of note, there were material inconsistencies between the information contained on the Precinct rosters and the CAD Reports.  For example:

- One CSO was not assigned on the rosters, but nonetheless submitted CPAARs for the First Precinct and had a CAD Report

- Three CSOs were assigned on the Rosters and submitted CPAARs for the Third, Fourth, and Fifth Precincts, but had no CAD Reports.

Additionally, the only CSO in compliance was assigned to the First Precinct, the precinct that listed only one CSO on its roster.  The First Precinct's single CSO was the only CSO in NPD who was assigned to only calls for service in exigent circumstances or in instances related to community-oriented policing nearly 100% of the time.

| Overview of Paragraph 16 Audit Results | | |
|---|---|---|
| Consent Decree Requirement | Records Produced | Compliance? |
| Two CSOs per precinct | Precinct Rosters | No |
| CSOs Becoming Familiar with the Community | CPAAR | No |
| CSOs Not Responding to Calls for Service Except in Exigent Circumstances | CAD Reports | No |

### D.     Consent Decree Paragraph 17

Paragraph 17 states, in pertinent part:

> NPD will implement mechanisms to periodically measure the breadth, extent, and effectiveness of its community partnerships and problem-solving strategies, including officer outreach, particularly outreach to youth.

To audit NPD's compliance with Paragraph 17, the Monitoring Team asked NPD whether it measures the following items with respect to community partnerships and problem solving strategies:  (1) the "breadth," meaning, whether NPD captures a range of different categories of community partnership and problem-solving strategies, (2) the "extent," meaning, how frequently each category of community partnership and problem-solving strategy is used, and (3) the "effectiveness," meaning, whether community partnership and problem-solving strategies are achieving the desired outcome.

In response, NPD informed the Monitoring Team that it addresses the requirements of Paragraph 17 in the COMSTAT process, during which NPD's senior leadership analyzes and discusses statistical crime information to determine crime trends at a weekly meeting.  NPD submitted a sample COMSTAT Executive Summary report and a sample PowerPoint presentation used during a COMSTAT meeting that discusses some of NPD's community engagement efforts.  We discuss these records in the following.

The sample COMSTAT Executive Summary for the week of February 16, 2020—outside of the Audit Period—tracks the raw number of "Community Engagements," including "Community Engagement," "Youth Engagement," and "Community Walks," undertaken by NPD officers in the prior week, the prior 28-days, and the prior year-to-date. *See* Exhibit D (COMSTAT Executive Summary). Although outside of the Audit Period, this type of record would ostensibly satisfy the first and second requirements of Paragraph 17: that NPD measure the breadth and extent of their community engagement efforts. The sample PowerPoint Presentation submitted by NPD consisted of photographs of NPD members attending and hosting community engagement events and activities. However, there is no information in this presentation or the COMSTAT Executive Summary that demonstrates any attempt by NPD to measure the effectiveness of its community engagement activities.

The Monitoring Team commends NPD for tracking the different types and quantity of its engagement, and its practice of discussing this data with senior leadership at COMSTAT meetings. However, NPD's COMSTAT process did not identify or measure progress toward any particular goals for NPD's various community engagement efforts. Thus, the information NPD has collected did not provide any institutional insight into what types of engagements are adding value and in what ways. NPD must evaluate the quality of its efforts to progress beyond a rudimentary community engagement system.

| Overview of Paragraph 17 Audit Results | | |
|---|---|---|
| **Consent Decree Requirement** | **Records Produced** | **Compliance?** |
| Measure the "breadth" of engagement | COMSTAT Executive Summary; COMSTAT PowerPoint with photographs of Division members participating in community engagement activities. | Yes |
| Measure the "extent" of engagement | COMSTAT Executive Summary; COMSTAT PowerPoint with photographs of Division members participating in community engagement activities. | Yes |
| Measure the "efficacy" of engagement | COMSTAT Executive Summary; COMSTAT PowerPoint with photographs of Division members participating in community engagement activities. | No |

### E.    Consent Decree Paragraph 18

Paragraph 18 states:

> Within 120 days of the Operational Date, and thereafter on a quarterly basis, NPD will prepare a publicly available report of its community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution.  This report shall also identify the results of the assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement.

This Consent Decree provision requires that NPD:  (1) prepare a publicly available report of its community policing efforts overall **and** by precinct, (2) cite in these reports the specific problems addressed and steps taken by NPD and the community toward their resolution, and (3) identify the results of the NPD's staffing allocation and personnel deployment assessment required by Consent Decree Paragraph 15, including obstacles faced and recommendations for future employment.

First, the Monitoring Team asked NPD whether it has established any rule that requires publication of a quarterly report as described in Paragraph 18.  NPD responded that it meets these requirements through a quarterly report filed by its Community Affairs/Clergy Unit pursuant to Community Policing Policy Section VIII(B)(2)(f).  NPD produced two reports from the Audit Period, both of which were available online.[11]

Next, the Monitoring Team examined these two reports to determine whether they cite the specific problems to be addressed and identify steps taken by NPD and the community towards their resolution.  NPD has embodied these requirements in Community Policing Policy Section VIII(B)(2)(f), which requires that these reports address seven issues.

---

[11] The reports can be found on NPD's Consent Decree website, located at: **https://www.npdconsentdecree.org/community-engagement-report**.

The following chart shows whether the reports cited the issues required by Paragraph 18 and the relevant section of NPD's policy:

| Issue | Requirements | Compliance? |
|---|---|---|
| 1 | Community policing efforts overall and by precinct, including specific problems addressed and steps taken by NPD and the community towards their resolution. | Yes |
| 2 | A description of current concerns voiced by the community. | Yes |
| 3 | A description of potential problems that have a bearing on law enforcement activities within the community. | No, not addressed. |
| 4 | A statement of progress made toward addressing previously identified concerns and problems. | No, not addressed. |
| 5 | A statement of recommended actions that address previously identified concerns and problems. | No, not addressed. |
| 6 | An analysis on implemented strategies, broken down by crime type, geographic area, and the community perceptions, or misperceptions of crime. | No, not addressed. |
| 7 | An evaluation of crime prevention programs and strategies that will be conducted based on crime data | No, not addressed. |

Finally, the Monitoring Team examined whether any of the reports commented on the results of the staffing assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement.  Because NPD completed its staffing assessment in January 2020, after the Audit Period, the Monitoring Team reviewed NPD's quarterly community policing reports subsequent to that date to evaluate whether they commented on staffing.  NPD provided the Monitoring Team with six quarterly reports outside the Audit Period; none commented on the requirements of Paragraph 15.

| Overview of Paragraph 18 Audit Results | | |
|---|---|---|
| **Consent Decree Requirement** | **Records Produced** | **Compliance?** |
| NPD will "prepare a publicly available [quarterly] report of its community policing efforts overall and in each precinct." | NPD's First and Second Quarterly Reports (April and July 2019, respectively) | Yes |
| The report will "include[e] specific problems addressed and steps taken by NPD and the community toward their resolution." | NPD's First and Second Quarterly Reports (April and July 2019, respectively) | No.  NPD included 28.57% of the information required by Community Policing Policy Section VIII (B)(2)(f), less than the 95% required for compliance. |
| "This report shall also identify the results of the assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement." | NPD's First and Second Quarterly Reports (April and July 2019, respectively) | No.  None of the reports comment on the staffing assessment because it was not in effect as of the date of the reports. |

16

### F.   Consent Decree Paragraph 19

Paragraph 19 states:

> NPD and the City will implement practices to seek and respond
> to input from the community about [the Consent Decree's]
> implementation.  Such practices may include direct surveys,
> comment cards, and town hall meetings.

NPD elected to operationalize the requirements of Paragraph 19 through Community Policing Policy Section VII(B)(4)(c), which requires NPD to host monthly "town hall-style" meetings, known to NPD as "CommUnity & Cops Meetings," "that are designed to seek and respond to input from the community regarding the implementation of Consent Decree mandates including training and policy development."  For this audit, NPD provided the Monitoring Team with 22 sign-in sheets to CommUnity & Cops Meetings and a URL to NPD's Consent Decree website, where NPD has published flyers, meeting presentations, and community feedback.[12]

Because Community Policing Policy Section VII(B)(4)(c) requires monthly town hall meetings, the Monitoring Team was expecting that NPD's records would show six CommUnity & Cops Meetings for the six-month Audit Period of April 1, 2019 through September 30, 2019.  NPD's records only evidenced three meetings that could have conceivably related to the Consent Decree during this period.[13]  NPD was unable to provide any other written record or oral representation that other Consent Decree-related meetings took place.  NPD also did not provide the Monitoring Team with the results of any "direct surveys" described in Consent Decree Paragraph 19.

Thus, the Monitoring Team finds that NPD is neither compliant with Paragraph 19 nor its own Community Policing Policy Section VII(B)(4)(c).

### G.   Consent Decree Paragraph 20

Consent Decree Paragraph 20 states:

> All NPD studies, analyses, and assessments required by this
> Agreement will be made publicly available, including on NPD
> and City websites, in English, Spanish, and Portuguese, to the
> fullest extent permitted under law.

To audit the requirements of Consent Decree Paragraph 20, the Monitoring Team reviewed the NPD's and City's websites to confirm that "[a]ll NPD studies, analyses, and assessments" required by the Consent Decree to be "made publicly available, including NPD and

---

[12] NPD's Consent Decree website can be found here:  **https://www.npdconsentdecree.org/**.

[13] The sign-in sheets identifying these three Consent Decree-related meetings were entitled (1) "Consent Decree Update-Sixth Status Report," which was dated June 18, 2019, (2) "Newark LGBTQ and Public Safety Stakeholder Meeting," dated June 24, 2019, and "Community Stakeholders Feedback Meeting Bias-Free Policing," dated August 27, 2019.

City websites, in English, Spanish, and Portuguese, to the fullest extent permitted under law." The "studies, analyses, and assessments" required by the Consent Decree include any report issued by the Independent Monitoring Team, the City's Status Reports, the results of any Consent Decree-related surveys, and any report created by NPD pursuant to the Consent Decree.

The Monitoring Team reviewed the City's and NPD's websites to assess whether the aforementioned Consent Decree documents were posted.[14]  NPD's main website[15] has a tab titled, "Consent Decree," that links to a different website[16] hosted by NPD and specifically dedicated to Consent Decree issues.  This Consent Decree website, available in English, Spanish, and Portuguese, posts, among other things, (i) Consent Decree survey results, (ii) NPD's Consent Decree Policies, (iii) information about NPD's body-worn camera program; (iv) the Independent Monitoring Team's and City's Consent Decree reports; and (iv) a page titled "Transparency Data," that contains a wide range of data concerning NPD's policing activities.[17]  The Monitoring Team noticed some differences between the English and Spanish/Portuguese versions of the Consent Decree website, and namely, that the Consent Decree documents were only available on the English version.  By contrast, the City's website[18] makes no reference to the Consent Decree or any other document or report cited by Paragraph 20.

NPD is on the cusp of complying with Paragraph 20 and needs to make only a few small changes to ensure accessibility to all documents and analyses on the Spanish and Portuguese language versions of its Consent Decree website.  NPD also should post the Independent Monitoring Team's Fourteenth and Fifteenth Quarterly Reports that were released recently.  The City could achieve compliance with Paragraph 20 by simply including a link on its webpage to NPD's Consent Decree website.

H.      **Consent Decree Paragraph 21**

Paragraph 21 states:

>           NPD will implement a policy to collect and maintain all data and
>           records necessary to facilitate transparency and wide public
>           access to information related to NPD policies and practices, as
>           permitted by law.

NPD informed the Monitoring Team that it has addressed this Consent Decree requirement by issuing on February 22, 2019 *General Order 13-03*, titled, "Transparency

---

[14] Note that the Monitoring Team reviewed these websites as they exist as of the date of this Audit Report to avoid relying on archived webpages, to the extent they existed for the Audit Period.

[15] NPD's main website is located here:  **http://npd.newarkpublicsafety.org/**.

[16] NPD's Consent Decree website is located here:  **https://www.npdconsentdecree.org/**.

[17] NPD has not translated each individual report—including the ones produced by the Monitoring Team or DOJ—into Spanish and Portuguese.  But, it is not clear that the Consent Decree requires them to do so, so long as a Spanish or Portuguese-language speaker could navigate to these documents, and NPD's attempts to engage non-English speakers are done in the appropriate language.

[18] The City's website is located here:  **https://www.newarknj.gov/**.

Policy," that it subsequently amended on June 17, 2020 *via Public Safety Memorandum 20-247* to address a New Jersey State Attorney General Directive concerning public access to certain police records. After reviewing of these policies, the Monitoring Team finds that they satisfy the requirements of Consent Decree Paragraph 21 by requiring the "collect[ion] and maint[enance] [of] all data and records necessary to facilitate transparency and wide public access to information related to NPD policies and practices, as permitted by law."

Pursuant to this policy, NPD has created a "Transparency Data" webpage, that publishes detailed monthly data reports in several categories, including NPD's field inquiries, use of force, community complaints, officer discipline, and more.[19] Thus, NPD has achieved provisional compliance with Paragraph 21. NPD will achieve full compliance if it is found to be in full compliance during the Monitoring Team's second audit of NPD's community-oriented policing and engagement practices, which will be forthcoming.

### I.      Consent Decree Paragraph 24

Paragraph 24 states:

> NPD and the City will cooperate with the design and conduct of the surveys by, for example, helping to organize focus groups of officers and obtaining and providing previous survey instruments and data. The reports of the baseline and annual surveys will be provided to the Court and be publicly distributed and available on the City's and NPD's websites.

To audit compliance with Paragraph 24, the Monitoring Team assessed whether NPD and the City have (1) assisted with "the design and conduct of surveys," and (2) provided survey results to the Court and public via the City's and NPD's websites.

We report that since the beginning of the Consent Decree, NPD has readily assisted the Monitoring Team in organizing focus groups of police officers and provided any survey data that the Monitoring Team had requested. Consistent with the results of the Monitoring Team's audit of Paragraph 20, NPD has published survey results on its Consent Decree website, but the City has not.[20] Again, the City and NPD are on the cusp of complying with Paragraph 24, and need only ensure that Consent Decree survey results are posted to the City's website, or simply include a link on the City's website to NPD's Consent Decree website.

### J.      Consent Decree Paragraph 174(e)(iv)

Consent Decree Paragraph 174(e)(iv) requires the Monitor to conduct outcome assessments that will include collecting and analyzing the following data to establish a baseline

---

[19] NPD posts what it describes as "Transparency Data" on its main webpage, located here: **https://npd.newarkpublicsafety.org/statistics/transparency**, and on its Consent Decree webpage, located here: **https://www.npdconsentdecree.org/transparency-data**.

[20] Note that the Monitoring Team reviewed these websites as they exist today to avoid relying on archived webpages, to the extent they existed for the Audit Period.

and assess change over time, including:  NPD's "effectiveness at implementing [its] community engagement and law enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas."

During the course of this audit, NPD stated that it could produce, at a minimum, aggregate data for the following fields:  (a) efficacy of community engagement, (b) arrest rates, (c) community contacts, and (d) crime rates in command areas as this information is collected pursuant to the COMSTAT process.  However, because we found in this audit that the COMSTAT process does not measure the efficacy of NPD's community engagement practices, the Monitoring Team will reserve its assessment of NPD's compliance with Paragraph 174(e)(iv) until NPD has demonstrated its capacity to do so.  At that time, the Monitoring Team will ask NPD to produce *all* of the information cited by Paragraph 174(e)(iv) over the course of a multi-year period.  The Monitoring Team remains available to help NPD prepare for that data request, and in particular, assist NPD develop a tool to measure the efficacy of community engagement.

## VI.  Observations and Recommendations

Based on the results of this audit, the Monitoring Team offers NPD four recommendations that will help it achieve Consent Decree compliance and improve its community-oriented policing practices:

> (A)   ensuring compliance with NPD's policies and proper documentation of engagement efforts;

> (B)   developing tools to measure efficacy of engagement efforts;

> (C)   organizing community engagement records; and

> (D)   ensuring that CSOs spend their time engaging the community.

We discuss each in turn.

## A.   Ensure Compliance with NPD Policies and Proper Documentation of Engagement Efforts

It is clear that NPD has developed a community-oriented policing program guided by well-developed policies, but that the Division as a whole does not adhere to them in practice.  As a threshold matter, NPD should take immediate steps to ensure that supervisors understand its community-oriented policing policies, and each subdivision's role in carrying out a Division-wide strategy.  NPD should educate its senior leaders and officers as to what is expected of them and deter non-compliance with the letter of its policies in this area, just as it should in all other areas of policing.

NPD's documentation practices are an area of immediate concern.  NPD cannot translate dialogue with the Newark community into action without proper records concerning what meeting took place, who participated, what concerns were raised, and whether any concerns have been addressed.  Proper documentation (1) stores institutional knowledge, (2) allows NPD supervisors to assess the efficacy of their engagement efforts, and (3) ensures that officers are, in

fact, complying with NPD policies.  If NPD were to lack records of a community meeting required by the Policies, for example, a member of the Newark community could reasonably infer that (1) the meeting never happened, (2) NPD is not following the letter of the Policies, and (3) NPD may engage the community in an ad-hoc basis, but this engagement does not fit into any broader community engagement strategy.

### B.      Develop Tools to Measure the Efficacy of Community Engagement

NPD must develop a mechanism for measuring the effectiveness of its community engagement efforts, and specifically, track the rate at which each method of community engagement, including youth engagement, achieves its intended goal.  NPD's Neighborhood Policing Plan Memorandum is the start of NPD's solution-oriented community engagement; now, NPD should direct resources towards ensuring that the Memorandum is followed.

### C.      Organize and Digitize Community Engagement Records

NPD's community engagement records generally lack organization, uniformity, and oversight.  This principle is evident not only from the results of the audit, but from the manner in which NPD responded to the Monitoring Team's document requests.  For example:

- When the Monitoring Team requested records of NPD's monthly and quarterly community meetings, NPD produced several meeting sign-in sheets.  These documents were deficient in several ways in that they contain no meaningful information about (i) what was discussed, (ii) NPD's follow-up, to comments or suggestions made by community residents, and (iii) how such comments could fit into NPD's broader engagement activities in the Precinct.  These sign-in sheets also made oblique references to NPD's Community Policing After Action Reports ("CPAAR"), but did not identify where the relevant reports were stored on its systems, or even if specific records existed.  It is clear that NPD had simply not maintained records of its monthly and quarterly community engagement meetings.  The use of these meager documents also raises the question of whether, or not, NPD held the meetings at all.  This approach cannot serve as the basis for any functioning community engagement program.

- In response to the Monitoring Team's request for *Neighborhood Policing Plan* documents within the Audit Period, of the 84 documents that NPD produced, 32 were both *prior to* the Audit Period and *prior to* the date that the *Neighborhood Policing Plan Memorandum* was even formally promulgated, and 13 were duplicates.

- In response to the Monitoring Team's request for all CPAAR during the Audit Period, NPD was unable to determine how many reports should exist within that period, and ultimately produced an index of reports to the Monitoring Team where 17 within the sample were labeled with the incorrect time period.

- There are significant discrepancies among NPD records and, specifically, NPD's Precinct rosters, CAD reports, and CPAAR.  First, Precinct rosters are not issued

on any standardized schedule: one precinct issued four rosters for the six-month Audit Period, and another issued 25. Second, these records are inconsistent. One CSO was not assigned on the rosters but had CPAARs and a CAD Report, while three CSOs were assigned on the rosters and submitted CPAARs but had no CAD Reports.

When NPD finally did produce documents to the Monitoring Team for this audit, the Monitoring Team learned that an NPD officer had to physically drive to each precinct in-person to make copies of documents that only existed in hard copy. Then, NPD put all of these records in a box and delivered it to the Monitoring Team. When asked for digital records so that the Monitoring Team's subject matter experts could review these documents remotely from their respective offices in view of health concerns associated with the COVID-19 pandemic, NPD then scanned each piece of paper from the box into PDF documents. The difficulty in identifying and accessing these police records makes them essentially unusable. The success of NPD's community-oriented policing practices relies on accurate, complete, and organized reporting. Without a sufficient reporting system, neither NPD, nor the Monitoring Team, can be sure that community-oriented policing is being practiced consistently throughout the Division.

A digital reporting template would help NPD accurately document the community engagement requirements of Community Policing Policy, *G.O. 18-13* and Public Safety Memorandum 18-313A, and specifically, the Neighborhood Policing Plans, Quarterly Community Stakeholder Meetings, Precinct Community Meetings, CPAARs, and CommUnity & Cops Meetings. Reporting templates would prompt officers to include all of the information required by the relevant NPD policies, and to the extent not done already, spend their time engaging the community in the manner specified by these policies. Supervisors could call up these digital records in an instant.

### D. Protect Community Service Officers' Time

The data showed a considerable number of CSOs are being used to answer calls for service that are *not* related to exigent circumstances or community-oriented policing activities. Additionally, this audit demonstrated that a few of NPD's Precincts have not consistently assigned two CSOs. It would be helpful for NPD leadership to clarify to its Precinct Commanders and supervisors what CSOs are supposed to be doing and how they fit into NPD's policing strategy, especially given the results of this audit in evaluating Paragraph 14 of the Consent Decree, which found that several community engagement activities required by NPD's Policies and the Consent Decree were not completed.

* * *

The Monitoring Team remains available to assist NPD in achieving greater compliance with the Consent Decree and enhancing its community-oriented policing practices.

The Consent Decree requires that both the City and NPD post this report on their websites. *See* Consent Decree Paragraph 20 ("All NPD studies, analyses, and assessments required by this agreement will be made publicly available, including on NPD and City websites . . . to the fullest extent permitted under law."); Paragraph 166 ("all NPD audits, reports, and

outcomes analyses . . . will be made available, including on City and NPD websites, to the fullest extent permissible under law.").  The Monitor expects the City and NPD to do so expeditiously.


Dated: June 7, 2021                                    Peter C. Harvey
                                                       Independent Monitor

# EXHIBIT A

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

March 6, 2020

Peter C. Harvey
Partner
(212) 336-2810
pcharvey@pbwt.com

*Via Email*

Kenyatta Stewart, Esq.
  Corporation Counsel
Avion Benjamin, Esq.
  First Assistant Corporation Counsel
City of Newark, Department of Law
Room 316, City Hall
Newark, NJ 07102

Anthony F. Ambrose
  Director
Department of Public Safety
Newark Police Division
City of Newark
480 Clinton Avenue
Newark, NJ 07108
(973) 733-6007

Re:   **First Community Policing and Engagement Audit:  45-Day Notice**

Dear Mr. Stewart and Director Ambrose:

Please consider this letter as the 45-days' notice required by Consent Decree Paragraph 180.  The Independent Monitoring Team will begin its first audit of the Newark Police Division's ("NPD") compliance with certain paragraphs of the Consent Decree relating to community policing and engagement.  (*See* Consent Decree ¶ 173 requiring the Monitor to "conduct compliance reviews or audits as necessary to determine whether the City and NPD have implemented and continue to comply with the requirements [of the Consent Decree].").

In Section I, II, III, and IV, we describe (i) the Consent Decree requirements to be audited, (ii) the audit time period, (iii) the auditors, and (iv) the results of our preaudit meetings and document requests.  In Section V, we describe our methodology for auditing NPD's compliance with these Consent Decree paragraphs.  In Section VI, we provide a set of document requests for which we request a response by April 22, 2020.

March 6, 2020
Page 2

### I.      Consent Decree Paragraphs to Be Audited

The Monitoring Team will audit NPD's compliance with Consent Decree ¶¶ 14-21 and 24 of Section V, entitled, "Community Engagement and Civilian Oversight."  Section V of the Consent Decree requires, among other things, that NPD "engage constructively with the community to promote and strengthen partnerships and to achieve collaborative, ethical, and bias-free policing" as well as "integrate concepts of community and problem-oriented policing into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems to increase cooperation and trust between it and the community."

Additionally, the Monitoring Team will ask NPD whether it has the capacity to produce the data necessary to perform the outcome assessment described in Consent Decree ¶ 174(e)(iv), which requires the Monitor to analyze the following aggregate data to establish a baseline and assess change over time:  NPD's "effectiveness at implementing NPD's community engagement and law enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas[.]"

### II.      Audit Period

The audit will cover the period from April 1, 2019 through September 30, 2019 (the "Audit Period").  The Monitoring Team selected a six-month Audit Period because Community Policing Policy, G.O. 18-13 requires certain reports and reviews to be prepared on a quarterly basis, which may not be captured within a three-month audit period.

### III.      Auditors

The audit will be led by the Monitoring Team Subject Matter Experts in Community Policing and Engagement:  (a) Cambridge Police Commissioner Robert Haas (Ret.), (b) Brooke Lewis, Trustee Social Justice Legal Advocacy Fellow of the New Jersey Institute for Social Justice, and (c) Kira Shepherd, Director of Criminal Justice Reform of the New Jersey Institute for Social Justice.

### IV.      Preaudit Meetings and Preaudit Document Requests

On November 7, 2019, December 6, 2019, and January 10, 2020, members of the Monitoring Team met with representatives from NPD to prepare for this community policing and engagement audit.  The purposes for these meetings were to (1) discuss the paragraphs of the Consent Decree that the Monitoring Team will cover in its first audit of NPD's community policing and engagement, (2) identify repositories of information that would allow the Monitoring Team to assess NPD's compliance with the relevant paragraphs of the Consent Decree, (3) discuss how the Monitoring Team will assess compliance, and (4) discuss how NPD has implemented the requirements outlined in Community Policing Policy, G.O. 18-13 and

March 6, 2020
Page 3

Public Safety Memorandum 18-313A, Neighborhood Policing Plans (Attachment A of G.O. 18-13, dated April 1, 2020).

On February 11, 2020, the Independent Monitoring Team sent a document and data request to NPD to gain further insight into how NPD tracks and measures its community engagement practices. Specifically, the Monitoring Team wanted to learn what types of records would show the requested information and the quantity of those records. On February 25, 2020, NPD informed the Monitoring Team that the documents had been compiled and are available for review at police headquarters in hard copy. In response to this information, the Monitoring Team requested that (1) NPD provide an index to the production; (2) NPD provide this information electronically, and (3) if NPD could not provide the information electronically, then it should provide copies of its records to the Monitoring Team.

On February 27, 2020, NPD provided a chart identifying some of the categories of documents for each document request, and delivered two banker boxes of documents to the Monitoring Team. Several of the documents are organized into folders based on the numbered requests, but others are not labeled. The records are voluminous, and did not respond to the Monitoring Team's request for the number of each of those records.

## V.    **Audit Methodology**

To assess NPD's compliance with Consent Decree ¶¶ 14-21, 24, and 174(e)(iv), the Monitoring Team will consider whether NPD has followed the letter of the applicable Consent Decree tasks, and evaluate whether NPD is following its own policies and procedures, which it adopted in response to these Consent Decree tasks. The applicable policies and procedures can be found in Community Policing Policy, G.O. 18-13 and Public Safety Memorandum 18-313A. In this section, we explain the Monitoring Team's methodology for auditing each Consent Decree task as well as the documents and records that the Monitoring Team will review. The purpose of this section is to outline for the Parties how the Monitoring Team will evaluate NPD's compliance. In the next section, we list the documents that we will require to perform these evaluations.

### **Consent Decree Paragraph 14**

Consent Decree Paragraph 14 requires that NPD provide eight hours of in-service training on certain enumerated topics related to community policing, including: (a) the "means to achieve effective community engagement;" (b) "methods and strategies to improve public safety and crime prevention through community engagement, including how to establish formal partnerships with community organizations;" (c) "how to work with communities to set public safety and crime prevention priorities;" and (d) "how to create opportunities for positive youth interaction."

To date, the Monitoring Team has found that both NPD's Community Policing Policy, G.O. 18-13 and Public Safety Memorandum 18-313A—issued on April 4, 2019 and April 1,

March 6, 2020
Page 4

2019, respectively—address all of these requirements, and that in particular, they require NPD to undertake and document a number of community engagement efforts and strategies. NPD's curriculum for its in-service training on community policing also addresses all of these requirements; this training has been administered throughout the Department.

Now, the Monitoring Team will assess whether NPD is actually practicing these community policing and engagement strategies as required by Community Policing Policy, G.O. 18-13 and Public Safety Memorandum 18-313A. To make this assessment, the Monitoring Team will review (a) NPD's Quarterly Community Stakeholder Meetings to see if they comport with the applicable requirements in Community Policing Policy, G.O. 18-13 VIII (B)(2)(d); (b) monthly Precinct Community Meetings to determine whether, or not, the meetings comport with the requirements in Community Policing Policy, G.O. 18-13 VII (B)(4)(a); (c) the quarterly reviews prepared by the Commander of the Office of Professional Standards to see if they comport with Community Policing Policy, G.O. VIII (H)(1); and (d) the administrative submissions, also known as the Neighborhood Policing Plans, to see if they comport with the requirements of Public Safety Memorandum 18-313A.

When reviewing these documents, the Monitoring Team will ask a series of binary questions; meaning, questions requiring a "yes" or "no" answer that explore whether NPD has completed the community engagement tasks required by its policies. If NPD has complied with an audit question 95% of the time (or 95% of the sample reviewed), the Monitoring Team will conclude that NPD has achieved sufficient compliance with this particular task for this Audit Period. Once NPD has achieved 95% compliance with every question in the audit for two consecutive audit periods, the Monitoring Team will conclude that NPD has complied with Paragraph 14.

The Community Policing Policy, G.O. 18-13 became effective on April 4, 2019. Therefore, the Monitoring Team expects to review records for at least one quarterly Community Stakeholder Meeting; six Monthly Precinct Community Meetings; and at least one Quarterly Review prepared by the Office of Professional Standards. The latest version of Public Safety Memorandum 18-313A became effective on April 1, 2019. The Monitoring team expects to review at least twenty-one administrative submissions; one submission from each of the seven precincts for each of the three phases outlined in the memorandum.

**Consent Decree Paragraph 15**

Consent Decree Paragraph 15 requires that "[w]ithin 180 days of the Operational Date, NPD will assess and revise its staffing allocation and personnel deployment to support community policing and problem-solving initiatives, and will modify any deployment strategy that is incompatible with effective community-oriented policing."

To audit compliance with Paragraph 15, the Monitoring Team will evaluate whether NPD has (1) assessed and revised its staffing allocation and personnel deployment to support community policing and problem-solving initiatives, and (2) modified any deployment strategy

March 6, 2020
Page 5

that the assessment revealed was incompatible with community-oriented policing.  Document request number 12, below, seeks information responsive to these issues.

### Consent Decree Paragraph 16

Consent Decree Paragraph 16 requires that NPD "assign two officers for each precinct who will become familiar with the geographic area, its issues, problems, and community leaders; whose principal duty will be to identify and address the community's priorities; and who are not assigned to answer calls for service except in exigent circumstances."

To audit compliance with Paragraph 16, the Monitoring Team will review records showing (1) which CSOs were assigned to each precinct, including rosters and log sheets, during the Audit Period; (2) Computer Aided Dispatch reports submitted during the Audit Period; and (3) all Community Policing After Action Reports required by Community Policing Policy, G.O. 18-13 IX.  The Monitoring Team will review a randomized sample of the CAD reports, log sheets, rosters, and Community Policing After Action Reports submitted by all CSOs during the Audit Period.

When reviewing these documents, the Monitoring Team will ask three binary questions, which track the plain language of Consent Decree Paragraph 16:  (1) did NPD assign at least "two officers for each precinct who [became] familiar with the geographic area, its issues, problems, and community leaders"; (2) did these officers "identify and address the community's priorities"?; and (3) are these officers "not assigned to answer calls for service except in exigent circumstances"? To determine if the CSOs are "familiar with the geographic area, its issues, problems, and community leaders" and if they "identif[ied] and address[ed] community priorities," the Monitoring Team will ask a series of binary questions to confirm that the Community Policing After Action Reports prepared by CSOs contain all of the information required by Community Policing Policy, G.O. 18-13 IX (A).

If 95% of the of the CAD reports reviewed, 95% of the log sheets reviewed, and 95% of rosters reviewed show that two CSOs were assigned to each precinct and were not assigned to answer calls for service except in exigent circumstances, then the Monitoring Team will conclude that NPD is in sufficient compliance with this portion of Paragraph 16 for the Audit Period d.

If 95% percent of the Community Policing After Action Reports reviewed contain all of the information required by Community Policing Policy, G.O. 18-13 IX (A), then the Monitoring Team will conclude that NPD is in sufficient compliance with Paragraph 16's requirement that CSOs are "familiar with the geographic area, its issues, problems, and community leaders" and "identif[ied] and address[ed] community priorities" during the Audit Period.  Once NPD has

March 6, 2020
Page 6

achieved 95% compliance with every question in the audit for two consecutive audit periods, the Monitoring Team will conclude that NPD has complied with Paragraph 16.

**Consent Decree Paragraph 17**

Consent Decree Paragraph 17 requires that "[w]ithin 90 days of the Operational Date, NPD will implement mechanisms to periodically measure the breadth, extent, and effectiveness of its community partnerships and problem-solving strategies, including officer outreach, particularly outreach to youth." During the preaudit meetings, NPD informed the Monitoring Team that it uses a community engagement database to address Consent Decree Paragraph 17. In its response to the preaudit document and data request, NPD noted that it also uses the COMSTAT process to address this requirement.

The Monitoring Team will audit Paragraph 17 by requesting NPD submit a statement describing how it uses the database and COMSTAT process to (1) periodically measure the breadth of NPD's community partnerships and problem-solving strategies (*i.e.* does NPD capture different categories of community partnership and problem-solving strategies)?; (2) the extent of NPD's community partnerships and problem-solving strategies (*i.e.* does NPD capture how frequently each category of community partnership and problem-solving strategy is used)?; and (3) does NPD measure the effectiveness of its community partnerships and problem-solving strategies (*i.e.* does the database and/or the COMSTAT process capture and measure whether each community partnership and problem-solving strategy achieved its desired outcome)? The Monitoring Team will then assess NPD's claims by, for example, examining NPD's community policing database and/or attending a series of COMSTAT meetings.

**Consent Decree Paragraph 18**

Consent Decree Paragraph 18 requires that "[w]ithin 120 days of the Operational Date, and thereafter on a quarterly basis, NPD will prepare a publicly available report of its community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution."

To audit compliance with Consent Decree Paragraph 18, the Monitoring Team will review quarterly reports prepared by the Community Affairs/Clergy Unit as required by Community Policing Policy, G.O. 18-13 VIII (B)(2)(f). When reviewing the quarterly reports, the Monitoring Team will ask a series of binary questions to confirm that the quarterly reports are issued quarterly and contain all of the information required by Community Policing Policy, G.O. 18-13 VIII (B)(2)(f), which includes "community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution."

If 95% percent of the quarterly reports prepared during the Audit Period satisfy all of the requirements of Community Policing Policy, G.O. 18-13 VIII (B)(2)(f), NPD will be in sufficient compliance with Paragraph 18 for the Audit Period. Once NPD has achieved 95%

March 6, 2020
Page 7

compliance with every question in the audit for two consecutive audit periods, the Monitoring Team will conclude that NPD has complied with Paragraph 18.

Paragraph 18 also requires that the initial report "identify the results of the assessment NPD has conducted pursuant to paragraph 15, including identification of obstacles faced and recommendations for future improvement." Accordingly, the Monitoring Team will confirm that there is a quarterly report from the Community Affairs/Clergy Unit that addresses this requirement.

Community Policing Policy, G.O. 18-13 became effective on April 4, 2019. Therefore, the Monitoring Team expects to review at least one quarterly report prepared by the Community Affairs/Clergy Unit during the Audit Period.

### Consent Decree Paragraph 19

Consent Decree Paragraph 19 requires NPD and the City to "implement practices to seek and respond to input from the community about [the Consent Decree]'s implementation."

During the preaudit meetings and in its response to the Monitor's preaudit document request, NPD informed the Monitoring Team that it addresses this Consent Decree requirement through Community Policing Policy, G.O. 18-13 VII (B)(4)(c), which requires NPD to host monthly "town hall-style" meetings "that are designed to seek and respond to input from the community regarding the implementation of Consent Decree mandates including training and policy development." To audit compliance with Consent Decree ¶ 19, the Monitoring Team will review records of these meetings. When reviewing the records, the Monitoring Team will ask a series of binary questions to confirm that the Consent Decree and Planning Unit is hosting CommUnity and Cops meetings according to the requirements outlined in Community Policing Policy, G.O. 18-13 VII (B)(4)(c).

If 95% of the records show that the CommUnity and Cops meetings are in compliance with all of the requirements of Community Policing Policy, G.O. 18-13 VII (B)(4)(c), then NPD will be in sufficient compliance with Paragraph 19 for the Audit Period. Once NPD has achieved 95% compliance with every question in the audit for two consecutive audit periods, the Monitoring Team will conclude that NPD has complied with Paragraph 19.

### Consent Decree Paragraph 20

Paragraph 20 requires "[a]ll NPD studies, analyses, and assessments" required by the Consent Decree to be "made publicly available, including NPD and City websites, in English, Spanish, and Portuguese, to the fullest extent permitted under law" during the Audit Period.

To audit the requirements of Consent Decree Paragraph 20, the Monitoring Team will review the NPD's and City's websites to confirm that "[a]ll NPD studies, analyses, and assessments" required by the Consent Decree to be "made publicly available, including NPD and

March 6, 2020
Page 8

City websites, in English, Spanish, and Portuguese, to the fullest extent permitted under law" for the Audit Period, and to the extent possible, during the Audit Period.

### Consent Decree Paragraph 21

Consent Decree Paragraph 21 requires NPD to "implement a policy to collect and maintain all data and records necessary to facilitate transparency and wide public access to information related to NPD policies and practices, as permitted by law." In its response to the Monitor's preaudit document request, NPD informed the Monitoring Team that it has addressed this Consent Decree requirement through its G.O. 13-03, entitled, "Transparency Policy," dated February 22, 2019.

The Monitoring Team will review this policy to determine whether it requires "collect[ion] and maint[enance] [of] all data and records necessary to facilitate transparency and wide public access to information related to NPD policies and practices, as permitted by law." *See* Consent Decree ¶ 21.

### Consent Decree Paragraph 24

Consent Decree Paragraph 24 requires NPD, among other things, to make "[t]he reports of the baseline and annual surveys" required by the Consent Decree "publicly distributed and available on the City's and NPD's websites" during the Audit Period. To audit compliance with Paragraph 24, the Monitoring Team will request that NPD provide the exact URL address to the City and NPD's websites for these surveys and reports for the Audit Period, and to the extent possible, URLs for posting during the Audit Period.

### Consent Decree Paragraph 174(e)(iv)

Consent Decree Paragraph 174(e)(iv) requires the Monitor to conduct outcome assessments that will include collecting and analyzing the following data to establish a baseline and assess change over time: NPD's "effectiveness at implementing NPD's community engagement and law enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas[.]"

Document request 15 seeks a statement from NPD on whether it can produce aggregate data from the Audit Period for the following fields, at minimum: (a) efficacy of community engagement, (b) arrest rates, (c) community contacts, and (d) crime rates in command areas. If NPD cannot produce such data, we request a projection of when it will be able to do so.

March 6, 2020
Page 9

**Documents and Data Requested**

The Monitoring Team requests the following data and records in electronic format for the Audit Period (April 1, 2019 through September 30, 2019) by April 22, 2020.

We also request that by that same date, NPD respond to this letter with (1) a description of the data and records it will be producing in response to each of these document requests, (2) a description of where to find the relevant information within the documents, (3) an index to the production, and (4) an explanation if it cannot produce documents responsive to the request. We remain available to discuss any of these requests with the City or NPD at their convenience.

1. Documents sufficient to show all of its Community Stakeholder Meetings required by Community Policing Policy, G.O. 18-13, VIII (B)(2)(d);

2. Documents sufficient to show Precinct Community Meetings in each precinct required by Community Policing, G.O. 18-13, VII (B)(4)(a);

3. Documents sufficient to show CommUnity and Cops Meetings required by Community Policing Policy, G.O. 18-13, VII (B)(4)(c);

4. All quarterly reviews prepared by the Commander of the Office of Professional Standards required by Community Policing Policy, G.O. 18-13, VIII (H)(1);

5. All quarterly reports prepared by the Commander of the Community Affairs/Clergy Unit required by Community Policing Policy, G.O. 18-13, VIII (B)(2)(f);

6. All administrative submissions prepared according to Public Safety Memorandum 18-313A, Neighborhood Policing Plans (Attachment A of Community Policing Policy, G.O. 18-13, dated April 1, 2019);

7. The results of the surveys conducted at "Phase Two—Establishing Partnerships" (described on page 2 of Public Safety Memorandum 18-313A, Neighborhood Policing Plans (Attachment A of Community Policing Policy, G.O. 18-13, dated April 1, 2019));

8. Records sufficient to show which Community Service Officers ("CSOs") were assigned to each precinct;

9. Documents sufficient to show all Computer Aided Dispatch ("CAD") records showing the types of calls and incidents CSO officers performed;

10. All log sheets submitted by CSOs;

11. All Community Policing After Action Reports required by G.O. 18-13 IX;

March 6, 2020
Page 10

12. All staffing assessments required by the Consent Decree; a short statement with citations to supporting documents, if any, describing how NPD has modified its deployments in response to a staffing assessment; and any other information that could help the Monitoring Team assess NPD's compliance with Consent Decree ¶ 15;

13. A statement describing NPD's "mechanisms to periodically measure the breadth, extent, and effectiveness of its community partnerships and problem-solving strategies, including officer outreach, particularly outreach to youth" required by Consent Decree ¶ 17, including supporting documentation, if any;

14. G.O. 13-03, entitled, "Transparency Policy," dated February 22, 2019, and a short statement describing whether it has been promulgated to the Department, and if so, when;

15. A statement describing what data NPD can produce in aggregate form relating to the issues identified in Consent Decree ¶ 174(e)(iv), and in particular, NPD's "effectiveness at implementing NPD's community engagement and law enforcement strategies, including metrics such as arrest rates, community contacts, and crime rates in command areas," and if applicable, NPD's projected date for being able to provide this data.

16. A list of the URL web addresses to the City's and NPD's websites which contain the reports of the baseline and annual surveys required by the Consent Decree ¶ 24.

Please do not hesitate to contact either the Monitoring Team Subject Matter Experts ("SMEs"), Cambridge Police Commissioner Robert Haas (Ret.), Brooke Lewis, Trustee Social Justice Legal Advocacy Fellow of the New Jersey Institute for Social Justice, and Kira Shepherd, Director of Criminal Justice Reform of the New Jersey Institute for Social Justice, or me, to further discuss any of these matters.

Sincerely,

Peter C. Harvey

cc:     Steven H. Rosenbaum
            Chief – Civil Rights Division
        Jude Volek, Esq.
            Special Counsel
        Jeffrey R. Murray, Esq.
        Corey M. Sanders, Esq.
        Patrick Kent, Esq.
            Trial Attorneys

March 6, 2020
Page 11

     United States Department of Justice
     Special Litigation Section ·
     Civil Rights Division
     950 Pennsylvania Ave., N.W.
     Washington, D.C. 20530

     Craig Carpenito, Esq.
       United States Attorney
     Caroline Sadlowski, Esq.
       Counsel to the U.S. Attorney
     Kristin Vassallo, Esq.
       Deputy Chief - Civil Division
     Kelly Horan Florio
       Civil Rights Unit - Civil Division
     Office of the United States Attorney
     District of New Jersey
     Rodino Federal Building
     970 Broad Street
     Newark, NJ 07102

# EXHIBIT B

 

# DEPARTMENT OF PUBLIC SAFETY MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | **POLICE DIVISION** | **DATE:** | **APRIL 4, 2019** |
| **FROM:** | **ANTHONY AMBROSE**<br>**PUBLIC SAFETY DIRECTOR** | **NUMBER:** | **19-112** |
| **SUBJECT:** | <u>**IMPLEMENTATION OF G.O. 18-13**</u><br><u>**RE: COMMUNITY POLICING**</u> | **FILE REF:** | **PUB 4** |

The purpose of this memorandum is to announce the issuance of the Newark Police Division's new ***Community Policing General Order 18-13***.

**All** Newark police officers, shall be community service oriented, interacting with all people they come in contact with. All members shall engage in community policing while on patrol, responding to calls, and interacting with residents and other members of the community.

The goal of the Newark Police Division is to foster a true collaborative partnership through positive interaction with the community, build public trust between the Division and the community, and promote safe communities by reducing crime. To achieve these goals, the Newark Police Division shall embrace a customer service concept and build upon public trust.

The Commander of the Community Affairs/Clergy Unit shall be responsible for the overall management, monitoring, and auditing of the implementation of the Division's Community Policing Policy and shall ensure that:

a.  community activities and events are developed, scheduled, and conducted consistent with the Division's Community Policing Policy.
b.  administrative support and training are provided for the successful implementation of the Division's Community Policing Policy.
c.  Community Policing Policy materials and promotional items are made available on the NPD website.
d.  dialogue is maintained by way of regular meetings **no less than quarterly** with community stakeholders to discuss how community policing efforts are meeting the public safety goals and needs of the community.
e.  each precinct commander is notified, in writing, if funding is available to be used and managed as outlined in existing policy.
f.  a **quarterly report** is prepared, and submitted through the chain of command to the Public Safety Director, that includes, at minimum, the following elements:
   i.   community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution;
   ii.  a description of current concerns voiced by the community;
   iii. a description of potential problems that have a bearing on law enforcement activities within the community;
   iv.  a statement of progress made toward addressing previously identified concerns and problems;

     v.     a statement of recommended actions that address previously identified concerns and problems; and

     vi.    an analysis conducted on implemented strategies by crime type, geographic area, and the community perceptions, or misperceptions, of crime. The analysis will document the evaluation of crime prevention programs and strategies and will be conducted based on crime data.

g.    a review of city-wide community relations endeavors through the COMSTAT process is conducted **weekly** to analyze the breadth, extent and effectiveness of the implemented problem-solving strategies and community partnerships including officer outreach, particularly outreach to youth.; and

h.    coordination of efforts with each Precinct Commander and their Community Service Officers.

All Police Division members shall acknowledge receipt and compliance with this memorandum via PowerDMS by Thursday, April 25, 2019.

BY ORDER OF

_____

**ANTHONY F. AMBROSE**
**PUBLIC SAFETY DIRECTOR**

AFA/BO:lc

Attachment: General Order 18-13

c: Darnell Henry, Chief of Police




# NEWARK POLICE DIVISION
# GENERAL ORDER

| SUBJECT: | GENERAL ORDER NO. |
|---|---|
| **COMMUNITY POLICING POLICY** | **18-13** |
| SUPERSEDES: | DATED: |
| **NEW** | **APRIL 4, 2019** |

Related Policies:

General Order 80-1 (Responsibilities of Command and Supervisory Personnel)
General Order 63-15 (Organization of Police Department)
General Order 08-02 (COMSTAT Unit)
General Order 09-07 (Police Division Issued Cellular or Smart Phones, Tablets and Electronic Devices)
General Order 17-06 (Bias-Free policing)
General Order 18-01 (Juvenile Services Section)
General Order 18-24 (Property and Evidence Division)
General Order 18-27 (Community Engagement Account)

This order contains the following numbered Sections:

I.     **PURPOSE**

II.     **POLICY**

III.     **DEFINITIONS**

IV.     **RESPONSIBILITY FOR COMPLIANCE**

V.     **TRAINING**

VI.     **ORGANIZATIONAL STRUCTURE**

VII.     **PROCEDURES**

VIII.     **RESPONSIBILITIES**

IX.     **REPORTING REQUIREMENTS**

X.     **EFFECT OF THIS ORDER**



# NEWARK POLICE DIVISION
# GENERAL ORDER



## I.     PURPOSE

This General Order sets forth the Newark Police Division's Community Policing Policy.  The purpose of this Order is to establish a clear directive as to how the Newark Police Division will promote and build community partnerships, engage constructively with the community, ensure collaborative problem solving, and increase community confidence in the Division.

## II.    POLICY

The Newark Police Division must do everything in its power to ensure positive interactions between the Division and all members of the community.  **All** Newark police officers, shall be community service oriented, interacting with all people they come in contact with.  **All members** shall engage in community policing while on patrol, responding to calls, and interacting with residents and other members of the community. The Division, therefore, seeks every opportunity to establish and maintain close ties with the community and to provide services that meet the community's needs.

Additionally, it is the goal of the Newark Police Division to foster a true collaborative partnership through positive interaction with the community, build public trust between the Division and the community, and promote safe communities by reducing crime. To achieve these goals, the Newark Police Division and its members shall approach all interactions with the public as opportunities to enhance the perception of the police and build upon public trust.  The Division shall implement strategies in neighborhoods within each precinct to combat emerging and chronic crime issues and neighborhood disorder, and ensure unified and effective implementation of the Community Policing Policy by continued follow-up.

## III.   DEFINITIONS

A.   <u>Community Policing</u>- is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to address proactively the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime.

B.   <u>Community Service Officer (CSO)</u>- A Newark Police Division Officer assigned to a precinct who study and learn in detail the geographic area, its issues, problems, and its community leaders; whose principle duty will be to identify and address the community's priorities; and who is not assigned to answer calls for service except in exigent circumstances.

C.   <u>COMSTAT</u> - Comstat, short for "Command Status," is a multi-layered, dynamic, crime reduction tool based on the "SARA" problem solving methodology. The "SARA" methodology instructs that officers *Scan* the problem, *Analyze* the factors that contribute to the problem, *Respond* with the appropriate resources, and then *Assess* the results. Commanders at all levels of the police department are held accountable for their performance based on the data measured by



# NEWARK POLICE DIVISION
# GENERAL ORDER



the above method; therefore, it is essential that the analysis of crime and statistical data are channeled upward to the COMSTAT Unit by the various Commands throughout the city. (Reference: General Order 08-02 Comstat Unit, Section I).

D.   Desk Lieutenant- Under the direction of a captain, a Desk Lieutenant performs, supervises, trains, disciplines and evaluates personnel by reporting all deficiencies. A Desk Lieutenant is generally responsible for the overall operation of the command and the conduct and performance of all personnel including supervisory personnel. (Reference: General Order 80-1 Responsibilities of Command and Supervisory Personnel, Paragraph VII, Section B).

E.   Executive Officer Lieutenant- An executive officer is the second in command of a precinct/division and shall assume the responsibilities of the commanding officer in their absence. The executive officer is generally responsible for assisting the precinct captain in ensuring effective and efficient delivery of services within their command. (Reference: General Order 80-1 Responsibilities of Command and Supervisory Personnel, Paragraph VII, Section A).

F.   Precinct- A precinct is commanded by a captain and is a geographical area of the City, which provides general police services (patrol, investigative and administrative).  Members of the division assigned to patrol duties are generally assigned to one of the main precincts. (Reference: General Order 63-15 Organization of the Police Department, Section II. Paragraph C. and Section IV., Paragraph E).

G.   Sector- a designated geographical area within a particular precinct, within which division members are assigned regularly so that they may become familiar with the local residents.

H.   Sector Integrity- the action of assigning the **same officers** to work in the **same neighborhoods** on the **same shifts**, increasing their familiarity with local residents and local problems. Supervisors, and officers work together to maintain "sector integrity," meaning that the officers and sector cars do **not** leave the boundaries of their assigned sectors, *except* in precinct-wide emergencies.

## IV.   RESPONSIBILITY FOR COMPLIANCE

All Division members shall be responsible for complying with this policy. Command and Supervisory Officers will review, understand and comply with this policy and shall also ensure that all subordinate personnel read and acknowledge understanding of this directive.

## V.   TRAINING

The Training Division will develop and provide topic-specific training to enhance the efficient implementation of the Division's Community Policing Policy and shall ensure:

A.   Division members are trained on the concepts of Community Policing – Improving Police Efficacy and Building Trust. The goal of this training is for officers to understand the core concepts of Community Policing in order to build better relationships within the



# NEWARK POLICE DIVISION
# GENERAL ORDER



communities that they serve. Continuing training will also be conducted to reinforce the principles of Community Policing using visual and scenario based training that promotes the development and strengthening of partnerships between the police and community;

B.    Community members are trained, during the Public Safety Academy, on concepts of procedural justice and legitimacy to better understand how a police officer should interact with the public during a traffic stop or other contact;

C.    Police recruits and newly promoted supervisors are trained on community engagement methods and techniques to build positive relationships within the community;

D.    Community Service Officers receive advance training in community engagement methods and strategies to strengthen relationships between the NPD and the community; and

E.    All Division members are trained in de-escalation techniques.

## VI.    ORGANIZATIONAL STRUCTURE

A.    Decentralized Implementation

1.    The Division recognizes that the unique and diverse nature of the City requires unique and diverse solutions that will address challenges faced by all members within the community.

2.    Precinct Commanders have the autonomy to address the specific concerns of the communities they serve and to use available personnel and discretionary resources under their command to target crime, emerging violence, public quality of life concerns, fear of crime, or other issues related to public disorder.

3.    Precinct Commanders are responsible for implementing Neighborhood Policing Plans appended to this policy, which include strategies and tailoring techniques that are unique to their precinct's crime conditions to provide a more localized approach to problem-solving and crime reduction.

B.    Geographic Responsibility

1.    Officers shall work in the same neighborhoods on the same shifts, increasing their familiarity with local residents and local problems. The radio dispatchers, supervisors, and officers shall work together to maintain *"sector integrity,"* meaning that the sector officers and sector cars do not leave the boundaries of their assigned sectors, except in precinct-wide emergencies. Precincts shall be sufficiently staffed to permit enough time for the sector officers to not be exclusively assigned to answering calls for service.



# NEWARK POLICE DIVISION
# GENERAL ORDER



Instead they shall use their down time to engage with neighborhood residents, identify local problems, and work toward solutions.

2.  Maintaining sector integrity allows assigned officers to better recognize emerging crime trends and community issues that are most prominent in their respective sectors. Sector integrity gives officers assigned to a sector the autonomy to engage with the community, as well as a stake in their assignment and the area they serve, and a sense of pride in realizing the goals relating to crime suppression within their sector.

3.  Sector integrity promotes positive engagement with the community and offers members an opportunity to develop lasting positive relationships with the public they serve. Maintaining sector integrity offers the community consistency in outreach, engagement, and allows for Division members to attend community meetings and community events within their sectors.

4.  Supervising sergeants will actively manage and deploy the resources under their command to maintain sector integrity in response to calls for service, where practical. Maintaining sector integrity will allow officers to spend more time in their respective areas, increasing their opportunities to strengthen community relationships.

5.  This structure encourages accountability for crime levels and community engagement in a member's geographic area of responsibility, which can be reviewed through the COMSTAT process.

## VII.   PROCEDURES

A.  Procedural justice refers to the concept of fairness in the processes that resolves disputes. The way in which community members develop opinions about specific interaction with officers are based primarily upon two things:  (1) the outcome of the encounter and (2) the process of the encounter. An individual's perception of whether an officer is applying the law fairly will shape his or her sense of procedural justice. In short, procedural justice is concerned not only on what officers do, but also with the way that they do it.

1.  Division members shall employ the concepts of procedural justice at all times and during every encounter, focusing on these four guiding principles:

a.  **Fairness**: The first guiding principle of procedural justice is fairness and consistency. Perceptions of fairness are driven not only by outcomes, but also by the fairness and consistency of the processes used to reach those outcomes. For example, if a member of the public receives a speeding ticket (negative outcome), but was treated fairly and respectfully during the interaction with the officer issuing the ticket (positive process), then the driver is more likely to feel that the



# NEWARK POLICE DIVISION
# GENERAL ORDER



encounter was fair and is less likely to either contest the ticket or register a complaint against the officer.

b.   **Voice**: The second guiding principle of procedural justice concerns voice. All people want to be heard, and involving people or groups in the decisions that affect them influences their assessment of a given situation. Everyone wants to feel as though they have a measure of control over their fate. Having a voice in situations that may be somewhat out of their control (such as whether they get a traffic ticket) helps them to feel that their opinion matters and that someone is listening to their side of the story, taking them seriously, and giving consideration to their concerns.  For example, if a community member involved in a minor car crash is provided an opportunity to tell their side of the story to a police officer, their overall assessment of the interaction with that police officer will likely be positive. Giving that community member voice in that moment will affect their perception of policing and police officers in the future.

c.   **Transparency:** The third guiding principle of procedural justice is transparency and openness of process. Transparency means that the processes by which decisions are made do not rely upon secrecy or deception. In other words, decisions unfold out in the open as much as possible as opposed to behind closed doors. Nobody likes to feel that his or her future is being decided upon another person's arbitrary whim. When officers are as transparent as possible, community members are more likely to accept officers' decisions—even if they are unfavorable to them.

An example:  Newark residents complained to their local NPD patrol officers that people were drinking alcohol and urinating in a downtown park after dark. These behaviors made the park unsanitary, unsafe, and unusable. NPD officers go to the park to meet with potential perpetrators. At these meetings, NPD outlines the community's concerns and clearly explains applicable ordinances. NPD officers then work with City agencies to install additional park lighting and portable toilets. The combination of improvements to the public space space, meetings with those Newark residents who frequent the park to get buy-in, and responsiveness to community concerns reigns in misbehavior. This problem-solving approach offers a more sustainable, community-centric approach to this public safety issue than mass arrests of those violating park ordinances.

d.   **Impartiality**: The fourth guiding principle of procedural justice is impartiality and unbiased decision making. Impartial decisions are made based on relevant evidence or data rather than on personal opinion, speculation, or guesswork. When officers take the extra-few minutes to make apparent to others the data used to make decisions, understanding and acceptance readily ensue.  As indicated in the previous example, NPD outlined the problems and concerns of neighbors in the area and clearly explained the ordinances regulating behavior in the park. This approach not only exhibits impartiality in NPD's approach to problem solving



# NEWARK POLICE DIVISION
# GENERAL ORDER



but also will build trust between police and the community members frequenting that area.

3.  Police legitimacy means people have trust and confidence in the police, accept police authority, and believe officers are fair.  Division members shall build public confidence and strive to achieve legitimacy by employing concepts of procedural justice.

4.  Division members shall treat all people with dignity and respect at all times, and during every interaction shall employ the concepts of procedural justice. During each interaction, Division members shall strive to attain the highest degree of ethical behavior and professional conduct at all times.

B.  Community Engagement and Partnerships

1.  It is the responsibility of all Division members, regardless of rank, position, or unit of assignment, to positively engage members of the community with the goal of fostering productive relationships and a collaborative effort to promote safer communities.

2.  Community engagement efforts shall be made available in Spanish, Portuguese and other languages most likely to be encountered in the community being served.

3.  The Division continues its open dialogue by way of community partnerships and engagement strategies (listed in Section V., paragraph B., sentence 4.) with the community as an opportunity to share experiences and identify differing viewpoints. These dialogues will be productive, based in facts, and continuous; and will not occur just in times of crisis. The Division will work with communities to identify their concerns, develop effective crime prevention activities, and coordinate the collaborative response.

4.  The Division has established and will continue to establish a variety of community partnerships and engagement strategies which are designed to encourage positive community interactions and relationships. These strategies include, but are not limited to:

    a.  **Precinct Community Meeting:** Precinct Commanders will host monthly community meetings within each precinct and in alternate locations within the community to allow community residents, other community stakeholders and police to discuss chronic problems in the community where an ongoing dialogue can exist. These community meetings provide an opportunity for police and community residents to exchange information about conditions in each neighborhood, to identify crime and disorder problems, and to develop strategies to combat those problems. The meetings also provide an opportunity for precinct commanders and community members to get to know one another.

    b.  **Foot Patrols:** Recognizing that community policing involves a symbiotic relationship between officers and those they serve in making a neighborhood a safe place to live, the Division shall make foot patrols a priority. Developing this



# NEWARK POLICE DIVISION
# GENERAL ORDER



connection involves communication through regular contacts. Officers on foot patrol have an opportunity to stop and talk to those with whom they come in contact.  An officer has time to have a conversation and learn what is going on in the neighborhood. These personal interactions generally develop a sense of security for those who live or work in the neighborhood the officer patrols. Those feelings of security can translate into a deeper trust between the officer and those he or she serves.

c.   **CommUnity and Cops:** meetings are town hall style meetings held monthly by the Consent Decree and Planning Division that are designed to seek and respond to input from the community regarding the implementation of Consent Decree mandates including training and policy development. To achieve real and sustainable reform in the Newark Police Division the community and the Division must work together. These meetings serve as a key mechanism for building partnerships with the community.

d.   **Enhanced Media Communication:** The Division will use traditional media (print and broadcast), social media including but not limited to Facebook, Twitter, and Nextdoor, the NPD's official Website located at **npd.newarkpublicsafety.org** and the "Newark PD App" mobile application, to continually communicate with the public. This communication must strike a delicate balance between protecting the investigation and keeping the public well informed. The dissemination of criminal investigation information, including police-involved shootings, will be accurate and timely.  Information on community engagement, including upcoming NPD sponsored community programs shall be maintained on NPD's official Website and shall have feedback mechanisms in place, which will allow the community to provide feedback on NPD Policies and training.

e.   **Juvenile Services Section:** The Juvenile Services Section is responsible for the safety, well-being, and processing of all juveniles taken into custody. This section is also responsible for developing/continuing programs designed to prevent juvenile delinquency; diverting juvenile offenders out of the juvenile justice system; facilitating stationhouse adjustments; participating in community recreational youth programs. The Commander of the Juvenile Services Section shall have line authority over the Precinct School Resource Officers (direct, day-to-day contact and assignment) and the Precinct Commanders shall have staff authority over the Precinct School Resource Officers (administrative-vacations, sick days, etc.).
(Reference: General Order 63-15 Organization of the Police Department, Section IV., Paragraph G and General Order 18-01 Juvenile Services Section).



# NEWARK POLICE DIVISION
# GENERAL ORDER



f.   **Operation Conversation - Cops and Kids:** where performance, improvisation and conversation help inner-city teenagers and police officers develop a positive relationship.

g.   **Gang Resistance Education and Training (G.R.E.A.T.)** Program is taught by sworn Division members with the objective of helping young people become responsible members of their communities by teaching and reinforcing how to set realistic goals, resist pressures, positively resolve conflicts, and truly understand how gangs impact the quality of life in any community, regardless of the economic level.

h.   **Enhanced procedural communication with victims of crime:** A victim-centered approach to investigating crimes is essential to accomplish the law enforcement mission. Victims who can tell their story and testify as a witness are key to successful investigations and prosecutions. When encountering a potential victim, it is important to remember that victims may not be comfortable coming forward and working with law enforcement. They may need help to feel stable, safe, and secure. Victims may fear law enforcement or not tell a complete story.  It is crucial to understand that victims need support and understanding in order to help make the case investigation—and subsequent prosecution a success.

When Division members encounter a victim of a crime in the course of their duties, it is critical that they begin to develop rapport and establish trust by:

   i.   Taking time to explain who they are, answer questions they might have, and acknowledge and address their fears;

   ii.  Being sensitive to cultural differences and language barriers and using an interpreter when needed;

   iii. Conducting interviews in a setting in which the victim feels safe when feasible, only after the victim's needs have been assessed and any urgent needs have been met;

   iv.  Being patient and giving the victim time to stabilize and begin their recovery process; and

   v.   Investigators shall assume an informal role as a victim advocate by advising victims of any critical changes in the status of the investigation promptly and ensuring that victims are given the right to be heard at all stages of the criminal investigative process with the understanding that information sharing may be diminished due to the pressing needs of the criminal investigation.




# NEWARK POLICE DIVISION
# GENERAL ORDER

i.    **Community COMSTAT:** The Division holds this meeting in different neighborhoods on a quarterly basis, where citizens are able to get a "behind the scenes" look on how each precinct commander is held accountable by the Public Safety Director and the Chief of Police for the rise and/or fall of crime rates affecting their neighborhoods.

j.    **The Public Safety Academy:** aimed at fostering a close working relationship with the members of our community, and different faith-based groups; the academy specifically focuses on building trust and establishing close cooperation, while in the process becoming more transparent as an agency. During their time in the academy, community members become more familiar with the operational procedures of the Police and Fire Divisions, as well as those of the Office of Emergency Management. The participants in this partnership graduate from the academy after completing a 6-9 week program.

k.    The **Gun Buy Back Program:** offers an opportunity for participants to turn-in firearms, B-B guns, and replica weapons to Division personnel. This program is outlined in the Division Special Order entitled "Gun Buy Back Program." Weapons recovered from the Gun Buy Back Program are destroyed following procedures outlined in G.O. 18-24 Property and Evidence Division.

l.    **Trauma to Trust: Police/Community Collaborative Training Sessions:** Training to increase the capacity for police and the community to respond positively to trauma in the wake of violence. The goal of this training is to understand the symptoms of community trauma and vicarious trauma as well as build necessary skills to address and problem-solve when trauma arises. These trainings will focus on the development and maintenance of trust between police and community members/partnerships.

m.    **Newark Community Street Team (NCST) Public Safety Roundtable:** where, on an ongoing basis, South Ward residents, NPD commanders, elected officials and community based service providers participate in a community driven forum to discuss ways to reduce violence and crime.

n.    **Retaliation Protocol (NCST):** is an innovative approach for the reduction of retaliatory violence through a rapid response to incidents of violence by High Risk Interventionist members of the NCST with the purpose to control rumors, provide victim support and help restore a sense of safety in the community.

C.    Problem-Solving Policing

1.    The Division is committed to reducing crime, particularly violent crimes, in all communities by using a problem-solving approach to policing. Using this approach, community issues and crime incidents are examined to identify their root causes, to




# NEWARK POLICE DIVISION
# GENERAL ORDER

develop new comprehensive methods for addressing the issues, and to encourage a proactive, collaborative and comprehensive approach to problem-solving policing and community relations.

2. Problem-solving policing requires that police officers and members of the community work cooperatively to:

   a. **Scan** to identify problems that cause concern for the community and the police;

   b. **Analyze** to determine the causes of problems and develop useful solutions;

   c. **Respond** by implementing the best course of action; and

   d. **Evaluate** regularly and assess the chosen course of action to determine its effectiveness.

3. Division Members shall utilize this four step problem-solving approach known as the **S.A.R.A. Model**. If success has not been achieved, then further analysis and a different set of responses may be needed.

## VIII.  RESPONSIBILITIES

A. Division-Wide Responsibilities

1. All Command personnel will support implementing the Division's Community Policing Policy for the bureaus/division and units under their command. This support will include, but is not limited to:

   a. designating unit members to regularly attend meetings or other community events;

   b. ensuring that members under their command proactively engage the community and conduct non-enforcement encounters; and

   c. consulting with the Commander of the Community Affairs/Clergy Unit , to recommend modifications in the implementation of the Department's community relations strategy or unit-level participation.

2. Precinct Commanders will review every six months the current precinct-level strategies for which they have geographical responsibilities, for the purpose of:

   a. recommending specific strategies, use of resources, or additional precinct strategies to supplement the effectiveness of the current strategies, and




# NEWARK POLICE DIVISION
# GENERAL ORDER

       b.     providing the necessary resources and support for the successful implementation of the strategies.

B.     Community Affairs/Clergy Unit

    1.     While the community-relations strategy of each precinct and area will be unique to the community it serves, the Commander of the Community Affairs/Clergy Unit, has the authority and responsibility to establish additional guidelines and protocols in an effort to promote a consistent and efficient implementation of the Division's Community Policing Policy.

    2.     The Commander of the Community Affairs/Clergy Unit shall be responsible for the overall management, monitoring, and auditing of the implementation of the Division's Community Policing Policy and shall ensure that:

        a.     community activities and events are developed, scheduled, and conducted consistent with the Division's Community Policing Policy.

        b.     administrative support and training are provided for the successful implementation of the Division's Community Policing Policy.

        c.     that Community Policing Policy materials and promotional items are made available on the NPD website.

        d.     dialogue is maintained by way of regular meetings **no less than quarterly** with community stakeholders to discuss how community policing efforts are meeting the public safety goals and needs of the community.

        e.     each precinct commander is notified, in writing, if funding is available to be used and managed as outlined in existing policy.

        f.     a **quarterly report** is prepared, and submitted through the chain of command to the Public Safety Director, that includes, at minimum, the following elements:

            i.     community policing efforts overall and in each precinct, including specific problems addressed and steps taken by NPD and the community toward their resolution;

           ii.     a description of current concerns voiced by the community;

          iii.     a description of potential problems that have a bearing on law enforcement activities within the community;

          iv.     a statement of progress made toward addressing previously identified concerns and problems;



# NEWARK POLICE DIVISION
# GENERAL ORDER



        v.       a statement of recommended actions that address previously identified concerns and problems; and

        vi.      an analysis conducted on implemented strategies by crime type, geographic area, and the community perceptions, or misperceptions, of crime. The analysis will document the evaluation of crime prevention programs and strategies and will be conducted based on crime data.

    g.      a review of city-wide community relations endeavors through the COMSTAT process is conducted **weekly** to analyze the breadth, extent and effectiveness of the implemented problem-solving strategies and community partnerships including officer outreach, particularly outreach to youth; and

    h.      coordination of efforts with each Precinct Commander and their Community Service Officers.

C.    Operations Bureau

    1.    Precinct commanders **shall**:

        a.      provide for the overall management, monitoring, and auditing of their precinct's implementation of the Division's Community Policing Policy;

        b.      ensure the Neighborhood Policing Plans (**Attachment-A**) are developed for designated neighborhoods within each precinct and ensure that the plan is completed, re-analyzed and re-implemented on a bi-annual basis;

        c.      ensure the precinct's law enforcement efforts are supported by actively organizing community members to become involved in the problem-solving process to include bringing community members to Comstat meetings;

        d.      participate in community meetings;

        e.      ensure that communities that have taken back their neighborhoods are given the necessary support to sustain safe communities;

        f.      ensure community organizers participate in community meetings;

        g.      designate two Division members to serve as the Community Service Officers and ensure that the Community Service Officers are assigned the following:

            i.      individual unit number in the 90/91 series (190/191, 290/291, 390/391, 490/491, 590/591, 690/691);

            ii.    a vehicle;




# NEWARK POLICE DIVISION
# GENERAL ORDER

      iii.    a city-issued cellular telephone (Reference NPD General Order 09-07 Police Division Issued Cellular Smart Phones, Tablets and Electronic Devices);

h.    ensure the Community Service Officers' name and unit number shall be reflected on the daily tour sheet;

i.    ensure the Community Service Officers are assigned to a 4/2 flex schedule (0900-1700/1400-2200 hours);

j.    ensure Community Service Officers are provided with a point of contact list for all houses of worship, schools, businesses, shelters, and community groups;

k.    ensure the Community Service Officers are provided with a point of contact list for all city agencies (i.e. Sanitation, Traffic & Signals, Code Enforcement, etc.);

l.    ensure referrals and/or problem-solving are addressed by the Community Service Officers;

m.    ensure Community Service Officers are informed about all events and crime occurring within the command;

n.    ensure Community Service Officers receive training from the Community Affairs Unit on the procedure for establishing Neighborhood Block Watch Associations and target hardening;

o.    ensure all Neighborhood Block Watch Associations are registered within the respective command and with the Community Affairs Unit;

p.    ensure complaints received on the Community Complaint Form are tracked and addressed;

q.    Refer to the Reporting Section of this memorandum regarding reporting requirements;

r.    develop, monitor, and provide for the overall management of the precinct-level strategies with input from the community and the appropriate precinct personnel; and

s.    be accountable for their command's crime prevention efforts and quality of life concerns. A review of community relations endeavors through the COMSTAT process will provide a forum for analyzing the effectiveness of the implemented strategies and the Division's support of field operations. Additionally, this review will provide the Divisions executive management members a level of oversight to:




# NEWARK POLICE DIVISION
# GENERAL ORDER

        i.     monitor the precincts' response to the public's concerns as it relates to that precinct's chronic crime conditions;

        ii.    coordinate with the mobilization efforts of the Community Affairs/Clergy Unit and other governmental and non-governmental agencies;

        iii.   sustain participation in the Division's community programs and attendance at community events (e.g., Occupy the Block, community meetings);

        iv.   identify the Division's community policing policy's relationship to complaints against Division members made by members of the community;

2. Precinct Executive Officers **shall**:

    a.   monitor, assign, and ensure the closure of automated Community Concerns assigned to their precinct;

    b.   ensure City service requests are initiated and followed-up upon with the appropriate agency/unit;

    c.   coordinate with the community service officer and provide support for the implementation of the community relations strategy at the precinct level;

    d.   on a **daily basis**, be accountable for the proper implementation of this directive.

3. Desk Lieutenants **shall**:

    a.   manage operations, including personnel and material resources, to provide support for the implementation of the community policing policy at the patrol level;

    b.   monitor the Computer Aided Dispatch (QUEUE) and dispatched radio assignments to identify calls for service that may require a problem-solving-oriented response;

    c.   monitor their officer initiated non-enforcement related interactions with community members and organizations;

    d.   ensure units in their assigned shift maintain sector integrity whenever possible.

4. Field Supervisors **shall**:




# NEWARK POLICE DIVISION
# GENERAL ORDER

a.      attend and actively participate in community meetings and community events, when notified and available;

b.      coordinate with the Community Service Officer to discuss problems raised at the community meetings or identified through other means (e.g., community member identified, personal observations);

c.      participate in community activities and positively engage members of the community throughout their tour of duty.

NOTE: A Police Action and Event number will be generated for any community interaction utilizing the appropriate codes which will be used to record officer-initiated non-enforcement related interactions with community members, organizations, and businesses.

5.      Community Service Officers **shall**:

a.      Complete an electronic log sheet or a detective log sheet and utilize the following assignment codes:

   i.      216 code for community meetings
   ii.     217 code for community outreach- crime prevention
   iii.    218 code for community outreach- walk and talk

b.      Identify Community Interest Areas within the command and provide a detailed list on the Community Policing After Action Report (Reference: Section VII. Reporting Requirements, Paragraph A.,).

   Community Interest Areas are defined as:

   i.      Areas known for chronic criminal activity,
   ii.     Locations of prior or emerging critical incidents,
   iii.    Areas where criminal intelligence reports indicate the possibility of future criminal activity,
   iv.     Locations where the community gathers on a regular or semi-regular basis to hold community functions and police presence is requested or otherwise required.

c.      Attend community meetings and provide the Newark Police Division Internal Affairs pamphlet describing the Internal Affairs process in English, Spanish and Portuguese where appropriate;

d.      Communicate daily with the Precinct Commander regarding events occurring within the command, crime trends/patterns, community meetings;

e.      Discuss community issues with the commander and seek advice if necessary;




# NEWARK POLICE DIVISION
# GENERAL ORDER

f.   Become familiar with the issues, problems, priorities in the area;

g.   Establish and maintain positive/constructive relationships with community leaders, religious groups, the business community, and community at large;

h.   Not answer calls for service except for in-progress high priority calls within the assigned area, when practical;

i.   Submit a weekly report on all activity, including follow-up action on referrals;

j.   Attend training in the establishment of Neighborhood Block Watch Associations and target hardening.  This training shall be provided by the Community/Clergy Affairs Unit;

k.   Once trained in establishing Neighborhood Block Watch Associations institute the Block Watches, particularly in areas where crime has occurred;

l.   In instances when a complaint is received it is the responsibility of the Community Service Officer to take the appropriate actions to abate the complaints and document them accordingly;

m.   Provide and maintain a sign-in sheet for community meetings;

n.   Distribute seasonal literature to residents (i.e. snow removal);

o.   Recruit and compile a list of citizens interested in participating in Public Safety Department sponsored events (Public Safety Academy, Community COMSTAT, CERT training, youth oriented events, etc.);

p.   Gather information on the registration of Confidential Informants where appropriate and ensure the information is confidentially forwarded to the appropriate section (i.e. narcotic information forwarded to the Special Enforcement Bureau, shooting information forwarded to the Criminal Investigations Division, etc.);

q.   Be responsible for the Division issued cellular telephone which shall be used to communicate with the community;

r.   Provide the Division issued cellular telephone number to residents, community leaders, clergy members, business personnel, etc., to be handed out on business cards during face to face interactions and made available on the NPD website ;

s.   Follow up with all complaints received, provide referrals when necessary;



# NEWARK POLICE DIVISION
# GENERAL ORDER



    t.      Shall coordinate efforts with the Commander of the Community/Clergy Affairs Unit or his/her designee.

D.      Commander of the Special Victims Division **shall** ensure:

    1.      Community Alerts and Area Crime Patterns are developed, processed, and disseminated using established procedures;

    2.      a liaison is designated as a point of contact for the precinct Community Service Officer to communicate with and serve as a resource to address community issues including:

        a.      domestic violence.
        b.      older adults.
        c.      juveniles.
        d.      community alerts and crime patterns.

    3.      a detective is designated to attend community meetings or other community events, when requested.

E.      Commander of General Crimes Division **shall** ensure that:

    1.      Community Alerts and Area Crime Patterns are developed, processed, and disseminated using established procedures;

    2.      a liaison is designated as a point of contact for the precinct Community Service Officer to communicate with and serve as a resource to address community issues including:

        a.      Burglaries.
        b.      Thefts.
        c.      Thefts from Auto.
        d.      Auto Theft.

    5.      designate a detective to attend community meetings or other community events, when requested.

F.      Commander of Major Crimes Division, **shall** ensure:

    1.      Community Alerts and Area Crime Patterns are developed, processed, and disseminated using established procedures.

    2.      a liaison is designated as a point of contact for the precinct community service officer to communicate with and serve as a resource to address community issues including:

        a.      Homicides
        b.      Shootings.



# NEWARK POLICE DIVISION
# GENERAL ORDER



    c.    Robberies.

    d.    Narcotic Complaints.

    e.    Community alerts and crime patterns.

3.    Designate a detective to attend community meetings or other community events, when requested.

G.    Public Information Office

    1.    The Commander of Public Information Office **shall**:

        a.    keep current and ensure the proper maintenance of the NPD website and its accompanying Newark PD Application for smartphones;

        b.    ensure community relations data and associated databases are consistently updated;

        c.    maintain constant communication with traditional media outlets (print and broadcast) concerning community engagement activities;

        d.    use social media outlets like Twitter and Facebook to continually communicate with the public. This communication must strike a delicate balance between protecting the investigation and keeping the public well-informed;

        e.    ensure that the dissemination of criminal investigation information, including police-involved shootings, will be accurate and timely; and

        f.    ensure all community service officer contact information is posted and updated on the NPD website

H.    Office of Professional Standards

    1.    The Commander of the Office of Professional Standards will conduct **quarterly** reviews to evaluate the effectiveness of the Division's Community Policing Policy as it relates to the number of community member's complaints against Division members and the reported allegations. This review will also include recommended strategies to positively impact complaints made against Division members by members of the community.

    2.    This evaluation will be submitted to the COMSTAT Unit and will be included in the review of the implementation and ongoing review of the Division's Community Policing Policy through the COMSTAT process.

    3.    Complaints against CSOs will be processed in the same manner as complaints against other officers.



# NEWARK POLICE DIVISION
# GENERAL ORDER



## IX.    REPORTING REQUIREMENTS

A.    Each Precinct Commander **shall**:

1.    Ensure officers keep a record of all community engagement activities for inclusion in weekly after action reports.

2.    Ensure Community Service Officers submit a Community Policing After Action Report on an Administrative Report weekly.  The weekly report is to be forwarded to both the Commander of the Community Affairs/Clergy Unit and the Office of the Public Safety Director every Tuesday.

3.    Ensure the weekly report includes:

    a.    Prominent community issues learned from residents, clergy and business owners/managers/employees:

        i.        to include specific problems addressed and
        ii.       steps taken by NPD and the community toward their resolution;

    b.    Established Neighborhood Block Watch Associations;

    c.    Establishment of youth events;

    d.    Youth organization events attended;

    e.    Community meetings attended by members, to include:

        i.        Organization and/or Association Name
        ii.       Organization and/or Association President
        iii       Organization and/or Association Contact Information
        iv.      Location of meeting (specific address listed)
        v.       Time of meeting
        vi       Topics of discussion
        vii.     Division personnel in attendance
        viii.    Calendar of following month community meetings;

    f.    Results of recruitment efforts for Department of Public Safety events;

    g.    Innovative plans to assist the community in improving quality of life;

    h.    Any suggestion that, in the opinion of the Community Service Officer, will enhance and strengthen the relationship between NPD and that particular neighborhood/sector;



# NEWARK POLICE DIVISION
# GENERAL ORDER



    i.       Follow-up contact with residents in the area of violent crime incidents;

    j.       Documentation of complaints received, actions taken, and all referrals initiated;

    k.       Any issues with the department issued cellular telephone;

    l.       Identified community interest areas;

    m.      Any city services that are needed to address quality of life issues in that neighborhood/sector; and

    n.       Any other pertinent information.

**X.**    **RESPONSIBILITY FOR COMPLIANCE**

All Division personnel are responsible for complying with this Order. Supervisory and Command Officers shall ensure that subordinates are aware of, understand, and comply with this Order. All sworn officers will be subject to discipline for violation of any portion of this Order.

**XI.**    **EFFECT OF THIS ORDER**

All previous Division orders and memoranda governing community policing and engagement that are inconsistent or in conflict with this order are hereby rescinded. This order shall become effective immediately.

BY ORDER OF:

_____

ANTHONY F. AMBROSE
PUBLIC SAFETY DIRECTOR

AFA/BO/lc

Attachment A: DPS MEMO 18-313A Neighborhood Policing Plans




# NEWARK POLICE DIVISION
# GENERAL ORDER

ATTACHMENT A

 

# DEPARTMENT OF PUBLIC SAFETY MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | Police Division | **DATE:** | April 1, 2019 |
| **FROM:** | Anthony F. Ambrose<br>Public Safety Director | **NUMBER:**<br>**TICKLER:**<br>**CD:** | 18-313A<br>18-435<br>18-06 |
| **SUBJECT:** | <u>**Neighborhood Policing Plans**</u> | **FILE REF:** | **ADM 6**<br>**xREL 1** |

Public Safety Memorandum 18-313A, Neighborhood Policing Plans, has been amended to reduce the number of targeted neighborhoods per precinct and clarify reporting requirements and expectations.

Community Policing promotes strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder and fear of crime. In keeping with the community policing philosophy, Precinct Commanders shall develop a Neighborhood Policing Plan specific to smaller neighborhoods within their command. These plans will include strategies that are unique to each Precinct's crime conditions, providing a more localized approach to problem-solving and crime reduction. Precinct Commanders will partner with the community, including residents, business owners, faith-based organizations, school officials, and other service organizations. Concentrated efforts will be made to address the issues identified jointly by the community and police as problematic, with realistic solutions.

## <u>Phase One – Identifying Neighborhoods</u>

Commanders shall choose **two (2)** neighborhoods (small geographic areas) within their precincts as their initial target locations. These neighborhoods shall be picked based on data and information available to commanders such as quality of life complaints received through community meetings, location investigation complaints, quality of life calls for service, disorderly and/or disruptive behavior calls for service or complaints, crime data, intelligence, and officer neighborhood canvass results. Neighborhood selection shall not be made based solely on crime patterns. While reviewing complaints, commanders shall keep in mind that the initial phase of their neighborhood policing plan should be geared towards addressing problems/issues that are reasonably treatable and factors, relatively within reach, that limit crime/disorder opportunities. Commanders shall prioritize community policing activities based on those that will have the most positive effect on the community.

Precinct Commanders shall submit an **administrative submission** to the Chief of Police listing the two (2) neighborhoods selected by <u>**Monday, April 15, 2019**</u>. The report shall include <u>**in detail**</u> the quality of life and/or crime/disorder **issues** experienced in the neighborhood, the **analytical methods** used to select each neighborhood, **initial goals and anticipative results**, **key community partners** in the neighborhood, as well as, the **geographic boundaries** of each neighborhood along with the **proposed date of the community meeting** to be held in the neighborhood.

PAGE 2 OF 4
PSM 18-313A NEIGHBORHOOD POLICING PLANS
APRIL 1, 2019

## Phase Two – Establishing Partnerships

During Phase Two, Commanders shall begin contacting and partnering with key community stakeholders such as residents, business owners, faith-based organizations, school employees, etc. In cultivating these community partnerships and working groups, Commanders shall utilize Police Division resources that already are in place such as their Community Service Officers, School Resource Officers, personnel assigned to Community Affairs/Clergy Unit, their field personnel, and detectives. Precinct Commanders shall liaise with the Commanders of each these divisions/units to streamline resources and efforts. Commanders must recognize that field officers engage in community policing on a daily basis, at the front lines, due to their daily interactions with the community. Relationships are established with the community through daily interactions during foot patrols, frequent interaction with business owners, and when responding to calls for service. These officers shall be included in the process of identifying quality of life and crime/disorder issues in the neighborhoods they are assigned to. Likewise, these officers shall be included in the problem solving/solutions discussion.

Community Resource Officers, Community Affairs/Clergy Unit personnel, School Resource Officers, and patrol officers shall be utilized to collect data through the use of surveys. Surveys shall be conducted with residents, business owners, clergy members, and district leaders. Surveys shall also be conducted with Newark Police Crossing Guards in the selected neighborhoods. Completed surveys shall be forwarded to the Community Affairs/Clergy Unit. **The Community Affairs/Clergy Unit Supervisor shall coordinate with the Comstat Unit to have the data reviewed and analyzed.** The Community Affairs/Clergy Unit Supervisor will supply this information to each Precinct Commander.

Commanders shall hold community meetings to discuss why the neighborhood was chosen, what they perceive are the issues, solicit the community's input on what they feel are the issues and to discuss and jointly develop possible solutions. These meetings will serve as an opportunity to collaborate and collectively discuss and address issues in neighborhoods that lead to crime and disorderly behavior. By openly discussing the issues and solutions, residents are empowered to take back their neighborhoods. These meetings shall also be used as an opportunity to inform the community about personal safety and responsibility, as well as property security. Information shall be available via handouts and presentations that provide tips on securing homes, businesses, apartments, vehicles and person.

Community Resource Officers, Community Affairs/Clergy Unit Personnel, School Resource Officers, and patrol officers shall be utilized to promote community meetings. Flyers shall be created and distributed throughout the neighborhood to ensure the greatest possible attendance. Community Affairs/Clergy Unit personnel will also attend scheduled community meetings.

Precinct Commanders shall submit an **administrative submission**, through the chain of command, to the Chief of Police confirming the **dates of the community meetings** for each neighborhood. Included in this report shall be the **names and contact information** of the community stakeholders for each neighborhood. These reports shall be submitted by **Monday, May 20, 2019**.

Precinct Commanders shall submit **follow-up reports for each community meeting** listing the issues, problem solving efforts and actions taken. This report shall be forwarded through the chain of command, to the Chief of Police within seven days of the community meeting. The Office of the Chief of Police shall ensure receipt of each follow up report.

PAGE 3 OF 4
PSM 18-313A NEIGHBORHOOD POLICING PLANS
APRIL 1, 2019

## Phase Three – Problem Solving

Once partnerships are established, issues discussed and agreed upon, solutions shall be discussed and strategies jointly decided on. The goal is to solve the issue/problem and impact the root cause of it, not just simply respond to it. Partnerships can be expanded, based on the issue at hand, to include other city and county agencies, as well as, non-profit, advocacy, and/or service/resource providers. Consideration should be given to the potential contribution each partner can bring to solving the agreed upon issues. Commanders shall establish and develop a working relationship with key members of each of the participating organizations. Commanders shall establish regular, open, two-way communication with all partners involved using in-person meetings, phone calls, email, and appropriate media/social platforms.

Commanders shall utilize division/units within the Police Division as a source of information and as a resource for abating issues. The Illegal Dumping Task Force, Special Police Liaison Unit, A.B.C., Metro, and Criminal Intelligence Section all specialize in areas associated with quality of life issues, disorderly behavior, and crime that impacts quality of life. The Juvenile Services Section and Special Police Liaison can be utilized when dealing with issues surrounding or involving minors. Special Police Officers are regularly assigned to the schools and interact with the student body throughout the school year. Community Affairs/Clergy Unit Personnel shall be actively involved in the problem solving process.

Problem solving shall involve principles of the SARA (Scan, Analyze, Respond, and Assess) model of community policing. Commanders shall discuss this model at community meetings, with their partners, and with their supervisors and officers. SARA can be used to identify problems, analyze associated factors, develop appropriate responses, and evaluate the results. The use of the SARA model helps to develop interactive relationships between the police and community, allows for the combining of resources, and helps to reduce repetitive problematic situations. This model also helps to determine why the issues/problem exists and helps to identify the conditions that contribute to/perpetuate disorder and crime.

As part of the solution, Commanders shall collaborate with the community to identify individuals, places or **behaviors** that are disruptive to the neighborhood. Commanders shall use the crime triangle model to focus on immediate conditions that effect problem-solving efforts. Links among the victim, offender, and location (crime triangle) shall be examined. In addition, factors that can impact the crime triangle shall be examined such as capable guardians for the victim (security guards, teachers, neighbors), handlers for offenders (parents, friends, probation officers) and managers for locations (business owners/employees, park employees).

A brief explanation of the SARA model of community policing is explained below:

>    **Scan**: to identify problems that cause concern for the community and the police;

>    **Analyze**: to determine the causes of problems and develop useful solutions;

>    **Respond**: by implementing the best course of action; and

>    **Assess**: regularly and evaluate the chosen course of action to determine its effectiveness.

Specific problem solving actions must be tailored to the issue/complaint. Responses should include non-enforcement activity. Commanders and their partners must think outside the box. The solution to every problem is not a summons or stern warning. Commanders and their partners should constantly be assessing the neighborhoods for root causes of disorder.

PAGE 4 OF 4
PSM 18-313A NEIGHBORHOOD POLICING PLANS
APRIL 1, 2019

**Bi-monthly reports** shall be submitted to the Office of the Chief of Police **during Phase Three, Problem Solving.** The **first report** shall be submitted by **Monday, June 17, 2019.**

These **reports shall include**:

- Overview of significant crime/disorder incidents and response
- Follow-up contact with residents in area of significant crime/disorder incidents
- Complaints/issued received from residents, clergy and businesses, including:
  - Specific problems addressed
  - Steps taken by police personnel and the community toward resolution
- Documentation of complaints received, actions taken, and all referrals initiated
- Any city services needed to address issues, actions taken to contact them, and results
- Community meetings attended, including:
  - Organization and/or Association Name, President, Contact Information
  - Location, time of meeting, attendees
  - Topics of discussion
- Innovative plans to assist the community in improving quality of life
- Community engagement events established and attended
- Any suggestions that will enhance and strengthen the relationship with the community

**Once neighborhoods are stabilized,** Precinct Commanders shall ensure resources and necessary support are provided to sustain safe communities. Precinct Commanders shall then identify other neighborhoods, **update their Neighborhood Policing Plans**, and begin fostering partnerships in the newly chosen neighborhoods.

Overall **Neighborhood Policing Plans** shall be **updated and revised on a bi-annual basis**. Special attention shall be given to the quality of life/crime/disorderly issues that are predominant during the upcoming time of year. Issues that are prevalent during the warmer, summer months are not necessarily the same as the issues that occur around the holidays or during the colder months. These plans shall be tailored to the specific geographical neighborhoods chosen, again the issues in the Forest Hill section are not the same as the issues downtown or in the Ironbound. Neighborhood Policing Plans, although tailored to precinct neighborhoods, shall be guided by and not deviate from the principles described in the Newark Police Division's Community Strategic Plan.

Precinct Commanders shall be prepared to discuss their Neighborhood Policing Plans, including neighborhood specific crime/issues, problem solving efforts, and community engagement activity **weekly at Comstat.**

The Commander of the Consent Decree and Planning Division shall ensure this directive is uploaded to Power DMS. All Division personnel are responsible for complying with this order, as well as, all related orders and policy.

By Order of:

_____
**Anthony F. Ambrose**
**Public Safety Director**

AFA/DH:kds
c:   Darnell Henry, Chief of Police

# EXHIBIT C





## Newark Police Division Staffing Analysis and Strategy – January 2020

### BACKGROUND

The Newark Police Division is required to assess the staffing and deployment of personnel, as well as modify any deployment strategy that is incompatible with effective community – oriented policing. Paragraph 15 of the Consent Decree between the United States of America, Plaintiff, and the City of Newark, Defendant, No. 2:16-CV-01731-MCA-MAH. Paragraph 15 of the Consent Decree specifically states:

"15. Within 180 days of the Operational Date, NPD will assess and revise its staffing allocation and personnel deployment to support community policing and problem-solving initiatives, and will modify any deployment strategy that is incompatible with effective community-oriented policing. This assessment and modified deployment strategy will be provided to the Monitor and DOJ for review and approval."

### METHODOLOGY DEVELOPMENT

From January 2019 to November 2019 a staffing methodology was jointly developed by the NPD Consent Decree and Planning Division with the subject matter expert for police staffing from the Independent Monitoring Team. The goal of this method of analysis is to determine the minimum number of patrol units needed to facilitate effective community-oriented policing. The NPD and the Independent Monitoring Team agree that the lion's share of effective community-oriented policing should happen at the patrol level. In order to accomplish this, patrol officers need to dedicate 30-35% of their available time to community engagement and problem-solving related to crime and community concerns.

The developed methodology can be adjusted, not just for total number of patrol units needed per precinct, but also for setting the minimum number of patrol units needed for each shift in each different precinct.

Precinct specific information regarding total number of calls for service, the average amount of time spent on calls, average time spend by officers conducting administrative duties, average time not available to answer calls for service due to illness or injury, military duty, vacation leave, mandatory training attendance, meal breaks, and required court appearance have been properly accounted for and factored into the final desired number of individuals to staff patrol division. This final number also dedicates 35% of a patrol unit's time to community engagement / community policing.




## METHOD OF ANALYSIS

The staffing data was analyzed by calculating the total number of hours for one patrol unit (one officer car) could work if they worked every day for eight hours (2920 hours). Then NPD examined the total number of hours one patrol unit are scheduled to work each year, given the four days on and two days off schedule (1944 hours). NPD gathered staffing statistics and determined the average amount of vacation leave for an officer (200 hours), the average number hours officers are away while on military leave (16 hours), the average number hours officers missed work because they were sick or injured (27 hours), the minimum number of hours officers attend mandatory training (56 hours), the average number of hours officers spend in court per year their normal work schedule (10 hours).

| |
|---|
| 1944 Number of hours one officer (in a one officer car) can work in one year without leave |
| -200 Vacation Leave |
| -16 Military Leave |
| -27 Sick / Injury Leave |
| -56 Training |
| -10 Court |
| 1635 Number of hours one officer (in a one officer car) is available for patrol each year |

In order to calculate the relief factor NPD divided the number of hours one officer (in a one-officer patrol unit) is available for patrol each year (1635 hours) by the total number of hours one patrol unit (one officer car) could work if they worked every day for eight hours (2920 hours).

$$2920 / 1635 = 1.785933 \text{ Relief Factor}$$

NPD then calculated the total number of minutes officers work in a shift (480 minutes) and then deducted pre-shift activities such as database log in and vehicle inspection (15 minutes), time alloted for meal (30 minutes), and end of shift activities (30 minutes), leaving officers with 405 minutes to perform police related activities in the field.

| |
|---|
| 480 Number of minutes officers work in one shift |
| -15 Number of minutes for pre shift activities |
| -30 Number of minutes for meal |
| -30 Number of minutes for post shift activities |
| 405 Number of minutes for officers to conduct field activities |




Community Policing involves a significant amount of time for officers to interact with members of the community and engage in problem solving activites. In this analysis the NPD dedicates 35% of a patrol unit's time in the field to conducting such activities (141.75 minutes), leaving a patrol unit with 65% of thier time in the field to answers calls for service (263.25 minutes) .

| | | |
|---|---|---|
| 405 x .35 = 141.75 | Minutes officers need to have available to conduct community engagement |
| 405 x .65 = 263.25 | Minutes officers can answer calls for service |

Each of the seven precincts and each of the three work hour shifts experience different workloads, independent problems, and diverse challenges in policing. To account for this, the NPD used historical data for the total number of calls for service within each precinct (X variable) and the total number of minutes officers were on dispatched assignments within their precinct (Y variable). This result is divided by the number of days in a year (365 days) and then divided by the total number of minutes officers have alloted to answer calls for service (263.25 minutes) and finally multipied by the "relief factor" (calculated above) to determine how many patrol units (rounded up to a whole person) should be utilized within a particilar precinct to provide adaquate employee coverage for answering dispatched assignemnts 65% of the time, while allowing for 35% of officer's time to be dedicated to community policing / problem solving functions.

| Individualized Data Utilized For Each Precinct or Shift | |
|---|---|
| X Variable | Number of calls for service 2019 (X variable) |
| **X** | **Multiplied by** |
| Y Variable | Number of minutes on dispatched assignments (Y variable) |
| **/** | **Divided by** |
| 365 | Number of days in a year |
| **/** | **Divided by** |
| 263.25 | Total minutes an officer can answer calls for serivce - 65% of total available time (previously calculated) |
| **X** | **Multiplied by** |
| 1.785933 | Relief factor (previously calculated) |
| Equals Units | Total number of patrol units needed (rounded up to a whole person) |

The number of patrol units calculated using this methodology can be applied to one or two officer patrol units, and only provides the minimum number of patrol units that should be available among working squads for one day in order to answer the historical volume of calls for service, while setting aside 35% of a patrol units time to participate in community policing.

Because the Newark Police Division utilizes a four-days working, two-days off, rotating schedule for patrol officers there are always two squads working each shift, while one squad is off. Because the above calucalation only accounts for one working day, the final number of units must be divided by two (the number of squads working any particular day) to find out the

Page **3** of **7**





minimum number of units that should be assigned to each squad. Then the minimum number of units is replicated among all three squads to ensure that there is adaquate coverage all 365 days of the year.

## RESULTS OF ANALYSIS

The chart on the following page displays the results of the analysis of information taken from the first 43 weeks of 2019 and adjusted to reflect projected numbers for all of 2019 to determine the patrol function staffing levels for each precinct. They are compared against the current staffing levels within the precincts. Year 2018 numbers could not be used because during part that timeframe the 2nd and the 7th Precincts were one entity. The Precincts will soon see the addition of 48 recent Essex County Police Academy graduates who are completing a temporary duty assignment with the Community Focus Teams. These officers have all been assigned to Precincts following their temporary assignment and have not been added to the totals below. Currently, the Newark Police Division has 74 Police Recruits in training at the Essex County Police Academy and are expected to graduate in March of 2020.

### 2019 Statistics Adjusted for 52 Weeks

| The Minimum Number of Units Needed Each Shift Based on Calculations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Precincts | | | | | | | |
| | 1st | 2nd | 3rd w/ Metro | 4th | 5th | 6th | 7th | Total |
| A Squad - Midnights | 9 | 11 | 13 | 4 | 17 | 7 | 7 | 68 |
| B Squad - Days | 18 | 19 | 26 | 7 | 32 | 13 | 13 | 128 |
| C Squad - Afternoons | 20 | 22 | 24 | 9 | 34 | 15 | 15 | 139 |
| Total | 47 | 52 | 63 | 20 | 83 | 35 | 35 | 335 |

| How Many Units Needed Amoung Three Squads to Provide Minimum Number of Units Everyday | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Precincts | | | | | | | |
| | 1st | 2nd | 3rd w/ Metro | 4th | 5th | 6th | 7th | Total |
| A Squad - Midnights | 14 | 17 | 20 | 6 | 26 | 11 | 11 | 105 |
| B Squad - Days | 27 | 29 | 39 | 11 | 48 | 20 | 20 | 194 |
| C Squad - Afternoons | 30 | 33 | 36 | 14 | 51 | 23 | 23 | 210 |
| Total | 71 | 79 | 95 | 31 | 125 | 54 | 54 | 509 |

| How Many Units Needed Per Precinct vs. Current Number of Officers Assigned | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Precincts | | | | | | | |
| | 1st | 2nd | 3rd w/ Metro | 4th | 5th | 6th | 7th | Total |
| Current # of patrol officers assigned | 30 | 26 | 62 | 36 | 44 | 29 | 29 | 256 |
| Precinct Officers in the field - non patrol | 8 | 8 | 12 | 11 | 25 | 9 | 8 | 81 |
| # of units needed for community policing | 71 | 79 | 95 | 31 | 125 | 54 | 54 | 509 |
| # of additional patrol units necessary | 33 | 45 | 21 | -16 | 56 | 16 | 17 | 172 |




## CHANGES ALREADY MADE

The Newark Police Division immediately began taking steps toward satisfying Paragraph 15 of the Consent Decree while awaiting the results of the Frazier Staffing Study and the development of this staffing analysis and strategy. A list of the changes that were previously made is attached to this document (Appendix A). The appendix displays the staffing changes NPD made prior to this analysis instead of sitting idly by waiting for suggestions before taking action.

## STRATEGY FOR DEPLOYMENT

Staffing evaluations will be conducted annually each February utilizing statistics from the previous year applying the methodology described in this document.

Community policing is an important part of the Newark Police Division crime prevention strategy, alongside timely patrol response, proactive crime-control measures, crime suppression details, effective supervision, thorough follow-up investigations, timely support services, and the completion of necessary administrative tasks. All of the aforementioned components of the Newark Police Division must happen simultaneously in order to deliver proper police services to all who live in and travel through the city of Newark.

### Currently the Newark Police Division Employs

| | |
|---|---|
| Total Sworn Law Enforcement | 1108 |
| Total Officers / Detectives Assigned to Precincts | 452 (approximately 40%) |
| Total Officers Assigned to Patrol in Precincts | 256 (approximately 24%) |
| Police Officers or Detectives | 855 (approximately 77%) |
| Total Officers / Detectives Assigned to Precincts | 452 (approximately 52%) |
| Total Officers Assigned to Patrol in Precincts | 256 (approximately 30%) |
| Police Supervisors | 253 (approximately 23%) |
| Sergeant | 115 |
| Lieutenant | 100 |
| Captain | 33 |
| Deputy Chief | 4 |
| Chief of Police | 1 |

 

Necessary non-patrol units (such as Homicide, Major Crimes Shooting Response Team, General Crimes Detectives, Special Victims Division, and the remainder of the units of the Division) are operating on staffing levels just high enough to keep them operational. An examination of the staffing levels of non-patrol units revealed there no extra officers to spare.

Previous independent staffing studies, like the one conducted by Frazier, have also suggested many of the detective units are in need of additional personnel to handle their workloads. The Fraser analysis of NPD's staffing examined variables outside of the scope of number of units needed in patrol to facilitate community policing, but one thing can be agreed on by all, the NPD will need to aggressively work on hiring qualified candidates in order to meet community expectations and operational needs.

To fill its needs the Newark Police Division has dedicated itself to an aggressive hiring campaign to fill vacancies throughout the organization. These vacancies limit the number of officers that can be assigned to any given unit or patrol. While NPD would like to hire many more officers, time and money does not always allow this to happen as quickly as all parties would like.

In the past several years, NPD has made a strong effort to hire as many qualified candidates as possible. Since the Christie Administration made a move to regionalize all police recruit training at county police academies, Newark's hiring ability has been constrained by the outside county police academies' limitations on how many pupils it can accept into each class and how many classes they are willing to deliver each year.

Newark has tried several approaches to counteract these limitations, like simultaneously sending recruits to multiple different county-run police academies and sending larger groups to the New Jersey State Police Academy in Sea Girt, NJ. The Newark Police Division has forged a new relationship with Essex County, who has recently taken over the Essex County College Police Academy from Essex County College. This will result in NPD being able to send larger groups of police recruits to the Essex County Police Academy more frequently to keep up with staffing needs.

Currently, the Newark Police Division fills vacant positions by current officers working additional shifts on an overtime basis to maintain the desired level of police units.

When new officers are hired, the Newark Police Division is committed to filling the vacancies at the patrol level first in order to achieve the desired levels dictated by the staffing analysis.

The Public Safety Director, in conjuction with the Chief of Police, will use this strategy to determine how many patrol units are necessary in each command, how many patrol officers will be needed to make up those patrol units (one or two officer units), if temporary or permManent transfers or personnel are necessary, what to set to minimum precinct staffing levels




to and, how to disribute future graduating police recruit classes in order to ensrue patrol officers have the time needed for successful community engagement.



## APPENDIX A (Personnel – Significant Modifications from 2016 to Present)

## Police Officer New Hires vs. All Sworn Attrition (2016 – 2019)
- Police Officers Hired: **342**
- Sworn (all ranks) Personnel Loss: **292**
- Promotions: **284** with **144** police officers promoted **to sergeant**

## Police Officers Assigned to Precincts
When the staffing analysis was conducted by Frazer: **279 police officers in the 5 precincts**
Currently: **452 police officers in the 7 precincts**

## Reorganization to facilitate Consent Decree Mandates
- **13 new commands/positions were created**
  - ○ 361 sworn members assigned
    - ▪ 73 supervisors
    - ▪ 288 police officers
    - ▪ 9 civilians
- **21 supervisory positions increased** within established commands
- **139 civilian personnel hired**

## Commands and/or assignments created to facilitate Consent Decree mandates
- Consent Decree Unit created: 10 sworn members
- Compliance Unit created: 2 sworn members
- AFIT Unit created: 3 sworn members
- Integrity Control Officers created: 3 sworn members
- Juvenile Services Section created: 11 sworn members
- Community Service Officers established (2 in every precinct): 14 sworn members
- School Resource Officers established (1 in every precinct): 7 sworn members
- Power DMS Unit created: 1 sworn member
- Transparency Unit created: 2 sworn members
- Community Focus Team created: 65 sworn members
- 6th Precinct created: 70 sworn members
- 7th Precinct created: 73 sworn members
- Legal Affairs and Advocate Units established: 6 sworn members
- Municipal Arrest Processing created: 21 sworn members
- Precinct Detective Squads created: 32 sworn members
- Communications: Telephone/Online Reporting Unit: 3 sworn members
- Crime Prevention Teams created (1 in every precinct): 35 sworn members
- 512 Smart Policing Initiative: 5 sworn members
- Auxiliary Police component created – 14 Auxiliary Police Officers appointed

## Personnel reassigned to facilitate Consent Decree mandates

- Candidate: number of detectives increased
- Communications: number of supervisors increased
- Community Affairs/Clergy Unit: number of supervisors and detectives increased
- Office of Professional Standards: number of supervisors increased
- Property Division: number of supervisors increased
- Technology Division: number of detectives increased
- Training Division: number of supervisors and detectives increased
- Special Victims Division: number of supervisors and detectives increased
- Criminal Intelligence Section: number of supervisors and detectives increased
- Narcotics: number of supervisors increased

## Civilian hires to facilitate Consent Decree mandates (2016 – 2019)

- Consent Decree Unit: Training Officer/Community Relations Specialist - 2 hired
- Property Division: Property Clerk position created – 4 hired
- Municipal Holding: Prisoner Guard position created – 2 hired
- ABC: Executive Secretary and Assistant Executive Secretary – 2 hired
- Communications: Public Safety Tele-Communicators – 68 hired
- Legal Affairs: Clerical/Police Aides – 2 hired
- Finance: Clerical – 2 hired
- Technology Division – MIS Specialist – 1 hired
- Special Victims Division – Social Workers – 3 hired
- Special Victims Division – Social Worker Coordinator – 1 hired
- Criminal Intelligence – Crime Analyst – 1 hired
- Traffic Division – Traffic Control Officers – 5 hired
- Narcotics – Chemist – 1 hired
- Crime Scene – Identification Officers - 8 hired
- Public Information – 2 hired
- Attorney – 1 hired
- Personnel Director – 1 hired
- Labor Relations Specialist – 1 hired
- UCR – Data Entry – 2 hired
- Various Commands – 30 Police Aides hired

| Command | Captain | Lieutenant | Sergeant | PO | Civilians |
|---|---|---|---|---|---|
| Consent Decree | 1 | 5 | 2 | 2 | 2 |
| Compliance Unit | | 1 | 1 | | |
| AFIT Team | | 1 | 2 | | |
| Community Service Officers | | | | 14 | |
| School Resource Officers | | | | 7 | |
| 6th Precinct | 1 | 4 | 10 | 55 | 1 |
| 7th Precinct | 1 | 5 | 7 | 60 | 1 |
| Integrity Control Officers | | 2 | 1 | | |
| Juvenile Services | | 1 | 2 | 7 | 1 |
| MAPS | | 3 | | 18 | 2 |
| Power DMS | | | 1 | | |
| Precinct Detective Squads | | | 7 | 25 | |
| Transparency | | 1 | | 1 | |
| CPT | | | 7 | 28 | |
| CFT | | 2 | 3 | 60 | |
| Legal Affairs | | 1 | | 3 | 3 |
| Advocate | | | 1 | 1 | 1 |
| 512 Smart Policing | | | 1 | 4 | |
| CCD: Online/Phone Report | | | | 3 | |
| ABC | | | 1 | | 2 |
| Candidate | | | | 5 | 2 |
| Communications | | 1 | 3 | | |
| Community Affairs/Clergy | | | 1 | 4 | |
| Office of Professional Standards | | 2 | 3 | 1 | |
| Property Division | 1 | | 1 | | 4 |
| Technology Division | | | | 1 | 1 |
| Training Division | 1 | 2 | 2 | 3 | 1 |
| Special Victims Division | 1 | | 2 | 6 | 4 |
| Criminal Intelligence | | | 3 | 10 | 1 |
| Narcotics | | | 1 | | |

## 2016 – 2019 RETIREMENTS BY YEAR

| RANK | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|
| Chief | 1 | 0 | 0 | 0 | 1 |
| Deputy Chief | 0 | 0 | 0 | 1 | 1 |
| Captain | 2 | 2 | 6 | 4 | 13 |
| Lieutenant | 2 | 5 | 8 | 10 | 25 |
| Sergeant | 7 | 1 | 5 | 6 | 19 |
| Police Officer | 41 | 20 | 50 | 40 | 151 |
| TOTAL | 53 | 28 | 69 | 61 | 210 |

## 2016 – 2019 PROMOTIONS BY YEAR

| RANK | 2016 | 2017 | 2018 | 2019 | TOTAL |
|------|------|------|------|------|-------|
| Deputy Chief | 2 | | 1 | 1 | 4 |
| Captain | 12 | 5 | 7 | 8 | 32 |
| Lieutenant | 35 | 28 | 2 | 39 | 104 |
| Sergeant | 19 | 77 | 10 | 38 | 144 |
| **TOTAL** | **68** | **110** | **20** | **86** | **284** |

Police Officer Gain/Loss - 2016 through 2019

Total New Hires PO:        **342**

Total PO Loss:                        **230** to retirements/resignations/termination/death

- **151** PO retirements
- **63** PO resignations
- **10** PO terminations
- **6** PO deaths

Total POs Promoted to Sgt:   **144**

### 2016-Present Newark Police Division Civilian Hires

| Title | Total Civilians | Title | Total Civilians |
|-------|-----------------|-------|-----------------|
| Analyst - Police Operations | 1 | Prisoner Guard | 2 |
| Assistant Personnel Director | 1 | Property Room Clerk | 4 |
| Attorney | 1 | Public Information Officer | 2 |
| Community Relations Specialist LE | 1 | Public Safety Tele-Communicator | 42 |
| Identification Officer | 4 | School Traffic Guard | 49 |
| Data Entry Machine Operator | 3 | Secretary to the Board of ABC | 1 |
| Data Processing Coordinator | 1 | Senior Medical Social Worker | 1 |
| Chief Forensic Chemist | 1 | Training Officer | 1 |
| Labor Relations Specialist | 1 | Traffic Control Officer | 4 |
| Management Information Sys Sp | 1 | Special Law Enforcement Officer | 2 |
| Medical Social Worker | 2 | Police Aide | 15 |

### The Newark Police Division Employs a Total of 344 Civilian Staff Members

| Title | Total Civilians | Title | Total Civilians |
|---|---|---|---|
| Police Operations Analyst | 1 | Investigator, Police Of | 1 |
| Communications Manager | 1 | Investigator, A.B.C | 2 |
| Management Information Systems Specialist | 1 | Chief Clerk, Division | 1 |
| Chief Forensic Chemist | 1 | Police Communications Clerk | 30 |
| Senior Medical Social Worker | 1 | Public Safety Tele-communicator's Trainee | 12 |
| Executive Assistant | 1 | Police Aide | 48 |
| GIS Specialist 2 | 1 | Traffic Control Officer | 5 |
| Data Processing Coordinator | 2 | Identification Officer | 14 |
| Community Relations Specialist, Law Enforcement | 1 | Data Entry Machine Operator | 3 |
| Medical Social Worker | 2 | Stable worker | 1 |
| Secretary to the Board of A.B.C | 1 | Property Clerks | 4 |
| Chief Communications Officer | 1 | Police Records Clerk | 1 |
| Supervising Advocate Victim-Witness Program | 1 | School Traffic Guard | 130 |
| Sign Maker 4 | 1 | Member, A.B.C. Board | 3 |
| Chief Clerk (Department) | 1 | Director | 1 |
| Principal Auditor | 1 | Assistant Personnel Director | 1 |
| Principal Accountant | 1 | Labor Relations Specialist | 1 |
| Prisoner Guards | 2 | Public Information Officer | 1 |
| Principal Operator, Automatic Typewriter | 2 | Public Information Officer | 1 |
| Public Safety Tele-communicator's | 62 | Attorney | 1 |
| Crime Analyst | 1 | Member, Taxicab Commission | 6 |
| Assistant Secretary of the Board of ABC | 1 | Supervisor of Accounts | 1 |

 

# DEPARTMENT OF PUBLIC SAFETY
# NEWARK POLICE DIVISION
## CONSENT DECREE & PLANNING DIVISION

## Staffing Relief Factor

**Steps taken:**

1. Determined amount of post coverage needed: *How many hours of staffing does one post require each year?  365 days x 8 hours per day* = **2920 hours**

2. Calculated amount of available staff time: *How much time is available for working, after subtracting time off for regular days off, vacation, sick leave, and training?*

   a. How many hours per year is an officer scheduled to work, based on a 4 on 2 off work schedule? *244 work days x 8 hours* = **1952 hours**
   b. How many hours per year, on average, is an officer absent from work for vacation, sick leave, military leave and training, etc.? **309.2 hours**
      i. Vacation Leave? **200 hours**
      ii. Military Leave? **16 hours**
      iii. Sick Leave? **27.2 hours**
      iv. Training? **56 hours**
      v. Other (Court, Bereavement, etc.)? **10 hours**
   c. Subtracted (b) from (a) to determine number of hours an officer is available to work.

   1952 hours (a) – 309.2 (b) = **1642.8 hours**

3. Calculated number of Officers required to cover one post.

   a. Divided **post coverage hours** (1) by the number of hours an officer **is available to work** (2).

Assumptions:

- Post assignments are 8 hours long, the same length of time as an officer's work shift
- Post must be staffed 7 days a week, 365 days a year

Calculation:

| | | | |
|---|---|---|---|
| 1. Post Coverage Needed | Number of hours per one 8-hour post each year (#1) | 2920 | 365 x 8 |
| 2. Available Staff Time | Total hours one officer is **scheduled** to work (#2a) | 1952 | 244 x 8 |
| | Average hours an officer is absent per year (#2b) | 309.2 | Leave Calculation |
| | Total hours one officer is **available** to work. (#2) | 1,642.8 | 1952-309.2 |
| 3. Number of officers needed to cover one post | Relief Factor: Number of officers needed, *on average*, to cover one post | **1.78** | 2,920 / 1642.8 |

Data is preliminary and subject to further analysis and revision.          Prepared by NPD Consent Decree and Planning Div.

# STAFFING ANALYSIS

WORK LOAD ANALYSIS FIRST PRECINCT

STEP #1
The Newark Police Division First Precinct handled approximately **51,338** total assignments from January 1, 2018 to December 31, 2018.  (Numbers gathered from the RMS System)

STEP #2
In the analysis of personnel distribution, the average total time taken to handle all assignments is determined.  According to information gathered from the RMS System, the average time taken for an assignment in 2018 in the First Precinct is approximately **100** minutes. Next, the total amount of work time is determined by multiplying the total assignments handled (**51,338**) by the average time per call (**100** minutes). The product, **5,133,800 minutes** is divided by 60 minutes to calculate the **85,563.33 hours** spent responding to and handling assignments in the First Precinct during the calendar year of 2018.

**51,338** assignments **x 100** minutes = **5,133,800** minutes / **60** minutes = **85,563.33** total hours

STEP #3
Next, to determine the number of officers needed to provide law enforcement services for the First Precinct we divide the available officer hours (staffing relief factor # 2c – **1,642.8** hours) into the total projected hours spent handling assignments (Step 2 – **85,563.33** total hours). **85,563.33** (total activity hours) / **1,642.8** (work hours per officer) = **52** officers are needed to handle the work load. (First Precinct is currently staffed with **53** officers assigned to patrol)

STEP #4
The Independent Monitoring Team has recommended Newark Police Officers dedicate 35% of their time to community policing/engagement activities.  The next step is to then calculate how much additional time will be spent based on that recommendation.  35% of the 85,563 hours is equal to an additional 29,947 hours of community policing/engagement totaling **115,510** hours. The total time spent on assignments, plus the recommended community engagement time (**115,510 hours**) is then divided by the **1642.8** hours officers are available to work, which yields a recommended **70** officers or an additional **17** officers assigned to patrol in the First Precinct to achieve the recommended **35%** percent of time available to conduct community policing in the First Precinct.

WORK LOAD ANALYSIS SECOND PRECINCT
(INCLUDES GEOGRAPHIC AREA OF THE NOW 7TH PRECINCT)

STEP #1
The Newark Police Division Second Precinct handled approximately **81,863** total assignments from January 1, 2018 to December 31, 2018.  (Numbers gathered from the RMS System)

STEP #2
In the analysis of personnel distribution, the average total time taken to handle all assignments is determined.  According to information gathered from the RMS System, the average time taken for an assignment in 2018 in the Second Precinct is approximately **133** minutes. Next, the total amount of work time is determined by multiplying the total assignments handled (**81,863**) by the average time per call (**133** minutes). The product, **10,887,779 minutes** is divided by 60 minutes to calculate the **181,462.33 hours** spent responding to and handling assignments in the Second Precinct during the calendar year of 2018.

**81,863** assignments **x 133** minutes **= 10,887,779** minutes / **60** minutes = **181,462** total hours

STEP #3
Next, to determine the number of officers needed to provide law enforcement services for the Second Precinct we divide the available officer hours (staffing relief factor # 2c – **1,642.8** hours) into the total projected hours spent handling assignments (Step 2 – **181,462** total hours). **181,462** (total activity hours) / **1,642.8** (work hours per officer) = **110** officers are needed to handle the work load. The 2nd Precinct combined with the 7th Precinct (opened in November of 2018) is currently staffed with **93** officers total (47 and 46 respectively) assigned to patrol.

STEP #4
The Independent Monitoring Team has recommended Newark Police Officers dedicate 35% of their time to community policing/engagement activities.  The next step is to then calculate how much additional time will be spent based on that recommendation.  35% of the 181,462 hours is equal to an additional 63,511 hours of community policing/engagement totaling **244,973** hours. The total time spent on assignments, plus the recommended community engagement time (**244,973 hours**) is then divided by the **1642.8** hours officers are available to work, which yields a recommended **74** officers per precinct (2nd and 7th) or an additional **27** officers assigned to patrol in the 2nd Precinct and an additional **26** officers in the 7th to achieve the recommended **35%** percent of time available to conduct community policing in the 2nd and 7th Precincts.

# EXHIBIT D



Anthony F Ambrose III
Public Safety Director

# City of Newark
# Police Division



Darnell Henry
Chief of Police

# Comstat
## *Executive Summary*

### Crime Rankings by Precincts

**Week Ending:**
2/16/2020

## *City-Wide*

**Prepared:**
2/18/2020

| **Week-To-Date** | | | **28 Days** | | | **Year-To-Date** | | |
|---|---|---|---|---|---|---|---|---|
| City-Wide | -6% | | City-Wide | -5% | | City-Wide | -6% | |

| **Rank** | **Precinct** | **WTD %** | **Rank** | **Precinct** | **28 Day %** | **Rank** | **Precinct** | **YTD %** |
|---|---|---|---|---|---|---|---|---|
| 1 | 3rd | 67% | 1 | 3rd | 38% | 1 | 3rd | 32% |
| 2 | 4th | 43% | 2 | 4th | 15% | 2 | 4th | 9% |
| 3 | 6th | 9% | 3 | 5th | -7% | 3 | 5th | -7% |
| 4 | 2nd | -21% | 4 | 1st | -11% | 4 | 1st | -9% |
| 5 | 5th | -21% | 5 | 2nd | -11% | 5 | 7th | -16% |
| 6 | 1st | -25% | 6 | 6th | -23% | 6 | 2nd | -18% |
| 7 | 7th | -38% | 7 | 7th | -27% | 7 | 6th | -25% |

*\*\*Arrest data source is Records Management.\*\*\*Gun Recovery data source is Ballistics Lab*
*Data is preliminary and subject to further analysis and revision.*

Prepared by
NPD Comstat Unit

**Comstat**

# *Comstat*

**NEWARK POLICE**

**City-Wide**

**Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date 2020 | 2019 | %Chg | 28 Day 2020 | 2019 | %Chg | Year-To-Date 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| Murder | 1 | 4 | -75% | 1 | 7 | -86% | 2 | 7 | -71% |
| Rape | 5 | 2 | 150% | 16 | 15 | 7% | 25 | 24 | 4% |
| Robbery | 8 | 18 | -56% | 49 | 67 | -27% | 77 | 105 | -27% |
| Agg. Assault | 31 | 28 | 11% | 87 | 90 | -3% | 135 | 148 | -9% |
| Burglary | 13 | 12 | 8% | 59 | 52 | 13% | 83 | 98 | -15% |
| Theft F/A | 20 | 16 | 25% | 92 | 89 | 3% | 156 | 145 | 8% |
| Theft | 16 | 18 | -11% | 71 | 79 | -10% | 121 | 144 | -16% |
| Auto Theft | 34 | 38 | -11% | 141 | 145 | -3% | 246 | 230 | 7% |
| *TOTAL* | **128** | **136** | **-6%** | **516** | **544** | **-5%** | **845** | **901** | **-6%** |
| Non-Fatal Shooting Inc. | 4 | 5 | -20% | 12 | 13 | -8% | 19 | 17 | 12% |
| Non-Fatal Shooting Vic. | 7 | 9 | -22% | 16 | 20 | -20% | 23 | 24 | -4% |
| Carjacking | 2 | 3 | -33% | 3 | 14 | -79% | 7 | 16 | -56% |

## Arrests

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 218 | 171 | 27% | 924 | 651 | 42% | 1,543 | 1,155 | 34% |
| Murder | 0 | 1 | -100% | 0 | 1 | -100% | 0 | 1 | -100% |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 4 | 1 | 300% | 15 | 13 | 15% | 21 | 19 | 11% |
| Agg. Assault | 15 | 19 | -21% | 63 | 62 | 2% | 114 | 103 | 11% |
| Burglary | 5 | 7 | -29% | 26 | 15 | 73% | 40 | 31 | 29% |
| Theft | 5 | 3 | 67% | 10 | 13 | -23% | 11 | 21 | -48% |
| Auto Theft | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| *TOTAL* | **30** | **31** | **-3%** | **115** | **104** | **11%** | **187** | **175** | **7%** |
| Guns - Recovered | 4 | 7 | -43% | 21 | 47 | -55% | 42 | 67 | -37% |
| Gun - Arrests | 4 | 7 | -43% | 13 | 31 | -58% | 29 | 43 | -33% |
| Gun - Arrests - Pct | 1 | 1 | 0% | 8 | 7 | 14% | 16 | 10 | 60% |
| Gun - Arrests - Intel | 1 | 3 | -67% | 2 | 10 | -80% | 4 | 12 | -67% |
| Gun - Arrests - Fugitive | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 2 | -100% |
| Gun - Arrests - Other | 0 | 1 | -100% | 0 | 7 | -100% | 1 | 10 | -90% |
| DWI | 6 | 1 | 500% | 15 | 10 | 50% | 21 | 14 | 50% |
| PCT | 148 | 153 | -3% | 650 | 581 | 12% | 1,064 | 1,014 | 5% |
| PCT SQD | 1 | 0 | #DIV/0! | 2 | 1 | 100% | 3 | 4 | -25% |
| PCT CPT | 39 | 0 | #DIV/0! | 193 | 0 | #DIV/0! | 321 | 0 | #DIV/0! |
| Fugitive | 5 | 3 | 67% | 14 | 11 | 27% | 27 | 14 | 93% |
| CIB | 13 | 1 | 1200% | 29 | 18 | 61% | 46 | 30 | 53% |
| C.N.D. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Outside/Command | 12 | 14 | -14% | 36 | 40 | -10% | 82 | 93 | -12% |

## Summons - Inquiries - Accidents - Overdoses

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Summons- Parking | 1,219 | 817 | 49% | 5,242 | 3,710 | 41% | 7,653 | 6,149 | 24% |
| Summons- Moving | 1,819 | 1,113 | 63% | 7,598 | 5,174 | 47% | 11,981 | 8,895 | 35% |
| Summons- Radar | 88 | 0 | #DIV/0! | 478 | 0 | #DIV/0! | 448 | 0 | #DIV/0! |
| Stops | 995 | 609 | 63% | 4,550 | 2,459 | 85% | 7,285 | 3,974 | 83% |
| QOL Sum- Precincts | 31 | 25 | 24% | 117 | 157 | -25% | 212 | 246 | -14% |
| Overdoses | 5 | 3 | 67% | 24 | 14 | 71% | 47 | 25 | 88% |
| Police Accidents | 4 | 3 | 33% | 10 | 8 | 25% | 15 | 13 | 15% |
| MV Accidents | 199 | 161 | 24% | 745 | 817 | -9% | 1,261 | 1,369 | -8% |
| Pedestrian Struck | 16 | 15 | 7% | 64 | 58 | 10% | 100 | 89 | 12% |
| Walk & Ride | 22 | 9 | 144% | 103 | 34 | 203% | 129 | 62 | 108% |

## Community Engagements

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 358 | 0 | #DIV/0! | 1,122 | 0 | #DIV/0! | 1,784 | 0 | #DIV/0! |
| Youth Engagement | 24 | 0 | #DIV/0! | 71 | 0 | #DIV/0! | 96 | 0 | #DIV/0! |
| Community Walks | 36 | 0 | #DIV/0! | 90 | 0 | #DIV/0! | 134 | 0 | #DIV/0! |

## IOP

| Command | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| 1st | 0 | 1 | -100% | 6 | 6 | 0% | 6 | 9 | -33% |
| 2nd | 0 | 2 | -100% | 0 | 3 | -100% | 2 | 7 | -71% |
| 3rd | 2 | 0 | #DIV/0! | 6 | 1 | 500% | 7 | 5 | 40% |
| 4th | 2 | 0 | #DIV/0! | 6 | 2 | 200% | 8 | 2 | 300% |
| 5th | 1 | 3 | -67% | 6 | 12 | -50% | 16 | 15 | 7% |
| 6th | 0 | 1 | -100% | 5 | 2 | 150% | 6 | 6 | 0% |
| 7th | 0 | 1 | -100% | 2 | 2 | 0% | 3 | 4 | -25% |
| Metro | 0 | 1 | -100% | 0 | 3 | -100% | 1 | 3 | -67% |
| CIB | 1 | 0 | #DIV/0! | 2 | 3 | -33% | 6 | 5 | 20% |
| Communications | 0 | 2 | -100% | 5 | 4 | 25% | 7 | 12 | -42% |
| Other | 2 | 0 | #DIV/0! | 15 | 11 | 36% | 16 | 19 | -16% |
| Unknown | 1 | 0 | #DIV/0! | 6 | 1 | 500% | 6 | 2 | 200% |
| Total | 9 | 11 | -18% | 59 | 50 | 18% | 84 | 89 | -6% |

*Data is preliminary and subject to further analysis and revision.*

Prepared by
NPD Comstat Unit

*Represents crime increases*   *N/A= Not Available*

# Comstat

**1st Precinct**

**Comstat Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **%Chg** | **2020** | **2019** | **%Chg** | **2020** | **2019** | **%Chg** |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 1 | 2 | -50% | 3 | 3 | 0% | 7 | 3 | 133% |
| Robbery | 2 | 0 | #DIV/0! | 9 | 9 | 0% | 14 | 14 | 0% |
| Agg. Assault | 4 | 6 | -33% | 10 | 15 | -33% | 16 | 26 | -38% |
| Burglary | 2 | 2 | 0% | 9 | 11 | -18% | 12 | 13 | -8% |
| Theft F/A | 3 | 3 | 0% | 14 | 11 | 27% | 21 | 16 | 31% |
| Theft | 3 | 4 | -25% | 14 | 13 | 8% | 26 | 26 | 0% |
| Auto Theft | 0 | 3 | -100% | 11 | 17 | -35% | 21 | 30 | -30% |
| *TOTAL* | **15** | **20** | **-25%** | **70** | **79** | **-11%** | **117** | **128** | **-9%** |
| Non-Fatal Shooting Inc. | 2 | 4 | -50% | 4 | 6 | -33% | 6 | 6 | 0% |
| Non-Fatal Shooting Vic. | 2 | 4 | -50% | 4 | 6 | -33% | 6 | 6 | 0% |
| Carjacking | 0 | 0 | #DIV/0! | 0 | 3 | -100% | 0 | 4 | -100% |

## Arrests

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 24 | 20 | 20% | 110 | 82 | 34% | 193 | 153 | 26% |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 3 | 0 | #DIV/0! | 3 | 0 | #DIV/0! | 3 | 0 | #DIV/0! |
| Agg. Assault | 3 | 5 | -40% | 7 | 14 | -50% | 10 | 21 | -52% |
| Burglary | 0 | 0 | #DIV/0! | 3 | 2 | 50% | 5 | 2 | 150% |
| Theft | 0 | 0 | #DIV/0! | 2 | 2 | 0% | 2 | 4 | -50% |
| Auto Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *TOTAL* | **6** | **5** | **20%** | **15** | **18** | **-17%** | **20** | **27** | **-26%** |
| Guns- *Recovered* | 1 | 1 | 0% | 4 | 5 | -20% | 7 | 6 | 17% |
| Gun- *Arrests* | 1 | 1 | 0% | 3 | 4 | -25% | 6 | 5 | 20% |
| Gun- *Arrests - Pct* | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| Gun- *Arrests - Intel* | 0 | 1 | -100% | 0 | 1 | -100% | 0 | 1 | -100% |
| Gun- *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun- *Arrests - Other* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| DWI | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| PCT | 21 | 19 | 11% | 75 | 79 | -5% | 127 | 147 | -14% |
| PCT SQD | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 2 | -50% |
| PCT CPT | 0 | 0 | #DIV/0! | 29 | 0 | #DIV/0! | 54 | 0 | #DIV/0! |
| Fugitive | 2 | 1 | 100% | 3 | 1 | 200% | 3 | 1 | 200% |
| CIB | 1 | 0 | #DIV/0! | 2 | 2 | 0% | 4 | 3 | 33% |
| C.N.D. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Outside/Command | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 4 | 0 | #DIV/0! |

## Summons - Inquiries - Accidents - Overdoses

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Summons- *Parking* | 55 | 13 | 323% | 292 | 115 | 154% | 458 | 195 | 135% |
| Summons- *Moving* | 220 | 115 | 91% | 920 | 512 | 80% | 1,523 | 846 | 80% |
| Summons- *Radar* | 30 | 0 | #DIV/0! | 139 | 0 | #DIV/0! | 172 | 0 | #DIV/0! |
| Stops | 146 | 99 | 47% | 607 | 377 | 61% | 986 | 588 | 68% |
| QOL Sum- *Precincts* | 3 | 9 | -67% | 15 | 31 | -52% | 32 | 41 | -22% |
| Overdoses | 1 | 0 | #DIV/0! | 4 | 1 | 300% | 5 | 2 | 150% |
| Police Accidents | 0 | 0 | #DIV/0! | 0 | 3 | -100% | 0 | 3 | -100% |
| MV Accidents | 23 | 18 | 28% | 85 | 90 | -6% | 150 | 160 | -6% |
| Pedestrian Struck | 3 | 0 | #DIV/0! | 9 | 7 | 29% | 16 | 12 | 33% |
| Walk & Ride | 6 | 0 | #DIV/0! | 26 | 2 | 1200% | 33 | 4 | 725% |

## Community Engagements

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 15 | 0 | #DIV/0! | 72 | 0 | #DIV/0! | 250 | 0 | #DIV/0! |
| Youth Engagement | 5 | 0 | #DIV/0! | 14 | 0 | #DIV/0! | 20 | 0 | #DIV/0! |
| Community Walks | 2 | 0 | #DIV/0! | 4 | 0 | #DIV/0! | 4 | 0 | #DIV/0! |

## IOP

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **1st Precinct IOP** | **0** | **1** | **-100%** | **6** | **6** | **0%** | **6** | **9** | **-33%** |
| **External Complaints** | 0 | 0 | **#DIV/0!** | 3 | 1 | **200%** | 3 | 2 | **50%** |
| *Demeanor* | 0 | 0 | #DIV/0! | 2 | 1 | 100% | 2 | 1 | 100% |
| *Neglect* | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **Internal Complaints** | 0 | 1 | **-100%** | 3 | 5 | **-40%** | 3 | 7 | **-57%** |
| *Disobedience* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 2 | -100% |
| *Neglect* | 0 | 1 | -100% | 1 | 4 | -75% | 1 | 5 | -80% |

*\*\*Arrest data source is Records Management.\*\*\*Gun Recovery data source is Ballistics Lab*

**Prepared by** — *Data is preliminary and subject to further analysis and revision.*

**NPD Comstat Unit** — *Represents crime increases* — *N/A=Not Available*

# Comstat

**2nd Precinct**

**Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 2 | 5 | -60% | 2 | 6 | -67% |
| Robbery | 1 | 3 | -67% | 6 | 12 | -50% | 10 | 19 | -47% |
| Agg. Assault | 7 | 7 | 0% | 19 | 16 | 19% | 22 | 27 | -19% |
| Burglary | 2 | 3 | -33% | 9 | 8 | 13% | 11 | 17 | -35% |
| Theft F/A | 6 | 7 | -14% | 28 | 31 | -10% | 46 | 46 | 0% |
| Theft | 2 | 4 | -50% | 10 | 17 | -41% | 18 | 31 | -42% |
| Auto Theft | 8 | 9 | -11% | 29 | 27 | 7% | 44 | 41 | 7% |
| *TOTAL* | 26 | 33 | -21% | 103 | 116 | -11% | 153 | 187 | -18% |
| Non-Fatal Shooting Inc. | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 1 | 1 | 0% |
| Non-Fatal Shooting Vic. | 0 | 0 | #DIV/0! | 2 | 1 | 100% | 2 | 1 | 100% |
| Carjacking | 1 | 0 | #DIV/0! | 1 | 2 | -50% | 1 | 2 | -50% |

## Arrests

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 35 | 19 | 84% | 117 | 86 | 36% | 200 | 148 | 35% |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 0 | 1 | -100% | 2 | 5 | -60% | 4 | 6 | -33% |
| Agg. Assault | 4 | 4 | 0% | 14 | 7 | 100% | 19 | 15 | 27% |
| Burglary | 0 | 4 | -100% | 4 | 4 | 0% | 7 | 6 | 17% |
| Theft | 2 | 0 | #DIV/0! | 2 | 2 | 0% | 3 | 4 | -25% |
| Auto Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *TOTAL* | 6 | 9 | -33% | 22 | 18 | 22% | 33 | 31 | 6% |
| Guns - *Recovered* | 0 | 0 | #DIV/0! | 3 | 5 | -40% | 5 | 6 | -17% |
| Gun - *Arrests* | 0 | 0 | #DIV/0! | 0 | 4 | -100% | 1 | 5 | -80% |
| Gun - *Arrests - Pct* | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 1 | 2 | -50% |
| Gun - *Arrests - Intel* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun - *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| Gun - *Arrests - Other* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| DWI | 3 | 0 | #DIV/0! | 4 | 6 | -33% | 7 | 8 | -13% |
| **PCT** | 25 | 19 | 32% | 98 | 74 | 32% | 161 | 134 | 20% |
| **PCT SQD** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **PCT CPT** | 6 | 0 | #DIV/0! | 11 | 0 | #DIV/0! | 24 | 0 | #DIV/0! |
| **Fugitive** | 0 | 0 | #DIV/0! | 2 | 5 | -60% | 6 | 6 | 0% |
| **CIB** | 2 | 0 | #DIV/0! | 2 | 2 | 0% | 2 | 2 | 0% |
| **C.N.D.** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Outside/Command** | 2 | 0 | #DIV/0! | 4 | 5 | -20% | 7 | 6 | 17% |

## Summons - Inquiries - Accidents - Overdoses

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| Summons - *Parking* | 197 | 148 | 33% | 780 | 734 | 6% | 1,151 | 1,376 | -16% |
| Summons - *Moving* | 96 | 20 | 380% | 418 | 407 | 3% | 721 | 765 | -6% |
| Summons - *Radar* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Stops | 71 | 79 | -10% | 401 | 333 | 20% | 741 | 552 | 34% |
| QOL Sum - *Precincts* | 1 | 0 | #DIV/0! | 3 | 14 | -79% | 10 | 20 | -50% |
| Overdoses | 0 | 0 | #DIV/0! | 4 | 0 | #DIV/0! | 10 | 0 | #DIV/0! |
| Police Accidents | 1 | 0 | #DIV/0! | 2 | 2 | 0% | 2 | 4 | -50% |
| MV Accidents | 34 | 25 | 36% | 149 | 130 | 15% | 250 | 218 | 15% |
| Pedestrian Struck | 2 | 1 | 100% | 11 | 7 | 57% | 14 | 13 | 8% |
| Walk & Ride | 0 | 0 | #DIV/0! | 0 | 2 | -100% | 0 | 2 | -100% |

## Community Engagements

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 11 | 0 | #DIV/0! | 27 | 0 | #DIV/0! | 64 | 0 | #DIV/0! |
| Youth Engagement | 0 | 0 | #DIV/0! | 3 | 0 | #DIV/0! | 8 | 0 | #DIV/0! |
| Community Walks | 3 | 0 | #DIV/0! | 5 | 0 | #DIV/0! | 9 | 0 | #DIV/0! |

## IOP

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| **2nd Precinct IOP** | 0 | 2 | -100% | 0 | 3 | -100% | 2 | 7 | -71% |
| **External Complaints** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 2 | -50% |
| *Demeanor* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 2 | -50% |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Internal Complaints** | 0 | 2 | -100% | 0 | 3 | -100% | 1 | 5 | -80% |
| *Disobedience* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |

*\*\*Arrest data source is Records Management.\*\*\*Gun Recovery data source is Ballistics Lab*

**Prepared by** — *Data is preliminary and subject to further analysis and revision.*

**NPD Comstat Unit** — *Represents crime increases* — *N/A=Not Available*

# Comstat

**3rd Precinct**

**Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
| Murder | 1 | 1 | 0% | 1 | 1 | 0% | 1 | 1 | 0% |
| Rape | 1 | 0 | #DIV/0! | 4 | 3 | 33% | 4 | 5 | -20% |
| Robbery | 5 | 5 | 0% | 19 | 11 | 73% | 27 | 18 | 50% |
| Agg. Assault | 4 | 2 | 100% | 15 | 6 | 150% | 22 | 9 | 144% |
| Burglary | 3 | 1 | 200% | 8 | 7 | 14% | 14 | 14 | 0% |
| Theft F/A | 5 | 1 | 400% | 15 | 14 | 7% | 31 | 25 | 24% |
| Theft | 2 | 1 | 100% | 12 | 8 | 50% | 20 | 17 | 18% |
| Auto Theft | 9 | 7 | 29% | 27 | 23 | 17% | 47 | 37 | 27% |
| *TOTAL* | 30 | 18 | 67% | 101 | 73 | 38% | 166 | 126 | 32% |
| Non-Fatal Shooting Inc. | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 2 | -100% |
| Non-Fatal Shooting Vic. | 1 | 2 | -50% | 1 | 3 | -67% | 1 | 4 | -75% |
| Carjacking | 1 | 1 | 0% | 2 | 2 | 0% | 4 | 2 | 100% |

## Arrests

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 29 | 21 | 38% | 118 | 102 | 16% | 202 | 175 | 15% |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 1 | 0 | #DIV/0! | 5 | 0 | #DIV/0! | 7 | 1 | 600% |
| Agg. Assault | 2 | 0 | #DIV/0! | 9 | 3 | 200% | 15 | 7 | 114% |
| Burglary | 2 | 1 | 100% | 5 | 4 | 25% | 7 | 5 | 40% |
| Theft | 1 | 1 | 0% | 2 | 4 | -50% | 2 | 6 | -67% |
| Auto Theft | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| *TOTAL* | 7 | 2 | 250% | 22 | 11 | 100% | 32 | 19 | 68% |
| Guns- Recovered | 1 | 0 | #DIV/0! | 2 | 3 | -33% | 6 | 8 | -25% |
| Gun- Arrests | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 4 | 5 | -20% |
| Gun- Arrests - Pct | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| Gun- Arrests - Intel | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| Gun- Arrests - Fugitive | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun- Arrests - Other | 0 | 0 | #DIV/0! | 0 | 2 | -100% | 1 | 4 | -75% |
| DWI | 1 | 0 | #DIV/0! | 4 | 2 | 100% | 4 | 4 | 0% |
| PCT | 20 | 17 | 18% | 79 | 87 | -9% | 138 | 143 | -3% |
| PCT SQD | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 2 | -100% |
| PCT CPT | 2 | 0 | #DIV/0! | 14 | 0 | #DIV/0! | 29 | 0 | #DIV/0! |
| Fugitive | 2 | 0 | #DIV/0! | 4 | 0 | #DIV/0! | 7 | 0 | #DIV/0! |
| CIB | 1 | 0 | #DIV/0! | 7 | 0 | #DIV/0! | 10 | 0 | #DIV/0! |
| C.N.D. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Outside/Command | 4 | 4 | 0% | 14 | 14 | 0% | 18 | 30 | -40% |

## Summons - Inquiries - Accidents - Overdoses

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| Summons- Parking | 380 | 403 | -6% | 1,956 | 1,725 | 13% | 2,828 | 2,760 | 2% |
| Summons- Moving | 296 | 214 | 38% | 1,373 | 1,307 | 5% | 2,237 | 2,276 | -2% |
| Summons- Radar | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Stops | 199 | 129 | 54% | 939 | 533 | 76% | 1,443 | 850 | 70% |
| QOL Sum- Precincts | 11 | 12 | -8% | 56 | 81 | -31% | 102 | 109 | -6% |
| Overdoses | 0 | 0 | #DIV/0! | 3 | 2 | 50% | 5 | 4 | 25% |
| Police Accidents | 1 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 4 | 1 | 300% |
| MV Accidents | 68 | 63 | 8% | 242 | 279 | -13% | 392 | 469 | -16% |
| Pedestrian Struck | 5 | 6 | -17% | 25 | 20 | 25% | 33 | 31 | 6% |
| Walk & Ride | 2 | 1 | 100% | 47 | 10 | 370% | 59 | 13 | 354% |

## Community Engagements

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 206 | 0 | #DIV/0! | 595 | 0 | #DIV/0! | 756 | 0 | #DIV/0! |
| Youth Engagement | 7 | 0 | #DIV/0! | 29 | 0 | #DIV/0! | 31 | 0 | #DIV/0! |
| Community Walks | 2 | 2 | #DIV/0! | 9 | 0 | #DIV/0! | 15 | 0 | #DIV/0! |

## IOP

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| 3rd Precinct IOP | 2 | 0 | #DIV/0! | 6 | 1 | 500% | 7 | 5 | 40% |
| External Complaints | 1 | 1 | 0% | 5 | 1 | 400% | 5 | 5 | 0% |
| Demeanor | 0 | 1 | -100% | 2 | 1 | 100% | 2 | 2 | 0% |
| Neglect | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 2 | -100% |
| Internal Complaints | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 2 | 4 | -50% |
| Disobedience | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| Neglect | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |

**Arrest data source is Records Management. ***Gun Recovery data source is Ballistics Lab

| Prepared by | *Data is preliminary and subject to further analysis and revision.* | |
|---|---|---|
| NPD Comstat Unit | Represents crime increases | N/A=Not Available |

# Comstat

**4th Precinct**

**Week Ending:** **2/16/2020**

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg |
| **Murder** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **Rape** | 2 | 0 | #DIV/0! | 3 | 0 | #DIV/0! | 4 | 1 | 300% |
| **Robbery** | 0 | 1 | -100% | 1 | 4 | -75% | 1 | 7 | -86% |
| **Agg. Assault** | 2 | 2 | 0% | 7 | 6 | 17% | 9 | 9 | 0% |
| **Burglary** | 1 | 0 | #DIV/0! | 5 | 2 | 150% | 6 | 4 | 50% |
| **Theft F/A** | 0 | 0 | #DIV/0! | 3 | 3 | 0% | 7 | 7 | 0% |
| **Theft** | 2 | 1 | 100% | 4 | 4 | 0% | 5 | 8 | -38% |
| **Auto Theft** | 3 | 3 | 0% | 8 | 8 | 0% | 17 | 10 | 70% |
| ***TOTAL*** | 10 | 7 | 43% | 31 | 27 | 15% | 50 | 46 | 9% |
| **Non-Fatal Shooting Inc.** | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| **Non-Fatal Shooting Vic.** | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| **Carjacking** | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |

## Arrests

| | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| ***All Arrests*** | 29 | 24 | 21% | 123 | 114 | 8% | 204 | 185 | 10% |
| **Murder** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Rape** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Robbery** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Agg. Assault** | 1 | 2 | -50% | 5 | 4 | 25% | 9 | 6 | 50% |
| **Burglary** | 1 | 0 | #DIV/0! | 1 | 2 | -50% | 1 | 2 | -50% |
| **Theft** | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 1 | 2 | -50% |
| **Auto Theft** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| ***TOTAL*** | 2 | 2 | 0% | 7 | 7 | 0% | 11 | 10 | 10% |
| **Guns** - *Recovered* | 0 | 0 | #DIV/0! | 0 | 8 | -100% | 1 | 12 | -92% |
| **Gun** - *Arrests* | 0 | 0 | #DIV/0! | 0 | 2 | -100% | 0 | 2 | -100% |
| **Gun** - *Arrests - Pct* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Gun** - *Arrests - Intel* | 0 | 0 | #DIV/0! | 0 | 2 | -100% | 0 | 2 | -100% |
| **Gun** - *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Gun** - *Arrests - Other* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| **DWI** | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 1 | 1 | 0% |
| **PCT** | 21 | 21 | 0% | 90 | 106 | -15% | 152 | 175 | -13% |
| **PCT SQD** | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **PCT CPT** | 7 | 0 | #DIV/0! | 32 | 0 | #DIV/0! | 48 | 0 | #DIV/0! |
| **Fugitive** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **CIB** | 0 | 0 | #DIV/0! | 0 | 5 | -100% | 0 | 7 | -100% |
| **C.N.D.** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Outside/Command** | 0 | 3 | -100% | 0 | 3 | -100% | 2 | 3 | -33% |

## Summons - Inquiries - Accidents - Overdoses

| | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| **Summons** - *Parking* | 119 | 87 | 37% | 396 | 271 | 46% | 642 | 444 | 45% |
| **Summons** - *Moving* | 479 | 287 | 67% | 1,884 | 1,130 | 67% | 2,857 | 2,121 | 35% |
| **Summons** - *Radar* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Stops** | 174 | 89 | 96% | 682 | 397 | 72% | 1,082 | 750 | 44% |
| **QOL Sum** - *Precincts* | 11 | 2 | 450% | 26 | 13 | 100% | 35 | 30 | 17% |
| **Overdoses** | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 3 | 1 | 200% |
| **Police Accidents** | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **MV Accidents** | 10 | 5 | 100% | 40 | 35 | 14% | 62 | 62 | 0% |
| **Pedestrian Struck** | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 2 | 2 | 0% |
| **Walk & Ride** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |

## Community Engagements

| | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| **Community Engagement** | 7 | 0 | #DIV/0! | 37 | 0 | #DIV/0! | 70 | 0 | #DIV/0! |
| **Youth Engagement** | 5 | 0 | #DIV/0! | 7 | 0 | #DIV/0! | 12 | 0 | #DIV/0! |
| **Community Walks** | 1 | 0 | #DIV/0! | 10 | 0 | #DIV/0! | 15 | 0 | #DIV/0! |

## IOP

| | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg | **2020** | **2019** | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| **4th Precinct IOP** | 2 | 0 | #DIV/0! | 6 | 2 | 200% | 8 | 2 | 300% |
| **External Complaints** | 1 | 0 | #DIV/0! | 1 | 1 | 0% | 1 | 1 | 0% |
| *Demeanor* | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| **Internal Complaints** | 1 | 0 | #DIV/0! | 5 | 1 | 400% | 7 | 1 | 600% |
| *Disobedience* | 0 | 0 | #DIV/0! | 1 | 1 | 0% | 2 | 1 | 100% |
| *Neglect* | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |

*\*\*Arrest data source is Records Management. \*\*\*Gun Recovery data source is Ballistics Lab*

**Prepared by**

*Data is preliminary and subject to further analysis and revision.*

NPD Comstat Unit    Represents crime increases    N/A=Not Available

# Comstat

**5th Precinct**

Week Ending:                    2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
| Murder | 0 | 1 | -100% | 0 | 4 | -100% | 0 | 4 | -100% |
| Rape | 0 | 0 | #DIV/0! | 3 | 1 | 200% | 5 | 4 | 25% |
| Robbery | 0 | 5 | -100% | 9 | 22 | -59% | 15 | 31 | -52% |
| Agg. Assault | 7 | 8 | -13% | 19 | 31 | -39% | 37 | 49 | -24% |
| Burglary | 4 | 3 | 33% | 17 | 11 | 55% | 26 | 23 | 13% |
| Theft F/A | 2 | 2 | 0% | 16 | 13 | 23% | 26 | 27 | -4% |
| Theft | 5 | 6 | -17% | 17 | 22 | -23% | 26 | 28 | -7% |
| Auto Theft | 9 | 9 | 0% | 46 | 33 | 39% | 75 | 61 | 23% |
| *TOTAL* | 27 | 34 | -21% | 127 | 137 | -7% | 210 | 227 | -7% |
| Non-Fatal Shooting Inc. | 1 | 1 | 0% | 5 | 3 | 67% | 8 | 5 | 60% |
| Non-Fatal Shooting Vic. | 3 | 2 | 50% | 7 | 7 | 0% | 10 | 9 | 11% |
| Carjacking | 0 | 1 | -100% | 0 | 4 | -100% | 1 | 5 | -80% |

## Arrests

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 44 | 57 | -23% | 220 | 165 | 33% | 401 | 299 | 34% |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 0 | 0 | #DIV/0! | 4 | 8 | -50% | 5 | 9 | -44% |
| Agg. Assault | 2 | 6 | -67% | 16 | 22 | -27% | 38 | 35 | 9% |
| Burglary | 0 | 1 | -100% | 4 | 2 | 100% | 11 | 6 | 83% |
| Theft | 2 | 1 | 100% | 2 | 2 | 0% | 2 | 3 | -33% |
| Auto Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *TOTAL* | 4 | 8 | -50% | 26 | 34 | -24% | 56 | 53 | 6% |
| Guns- *Recovered* | 1 | 4 | -75% | 7 | 20 | -65% | 14 | 27 | -48% |
| Gun- *Arrests* | 1 | 4 | -75% | 4 | 16 | -75% | 10 | 21 | -52% |
| Gun- *Arrests - Pct* | 0 | 0 | #DIV/0! | 2 | 5 | -60% | 7 | 6 | 17% |
| Gun- *Arrests - Intel* | 1 | 1 | 0% | 1 | 4 | -75% | 2 | 5 | -60% |
| Gun- *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| Gun- *Arrests - Other* | 0 | 1 | -100% | 0 | 3 | -100% | 0 | 3 | -100% |
| DWI | 1 | 1 | 0% | 2 | 1 | 100% | 2 | 1 | 100% |
| PCT | 25 | 47 | -47% | 142 | 134 | 6% | 252 | 225 | 12% |
| PCT SQD | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| PCT CPT | 10 | 0 | #DIV/0! | 46 | 0 | #DIV/0! | 78 | 0 | #DIV/0! |
| Fugitive | 0 | 2 | -100% | 4 | 5 | -20% | 8 | 6 | 33% |
| CIB | 8 | 1 | 700% | 17 | 8 | 113% | 25 | 17 | 47% |
| C.N.D. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Outside/Command | 1 | 7 | -86% | 11 | 18 | -39% | 38 | 51 | -25% |

## Summons - Inquiries - Accidents - Overdoses

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| Summons- *Parking* | 236 | 32 | 638% | 789 | 199 | 296% | 1,132 | 340 | 233% |
| Summons- *Moving* | 473 | 178 | 166% | 1,702 | 487 | 249% | 2,506 | 969 | 159% |
| Summons- *Radar* | 48 | 0 | #DIV/0! | 178 | 0 | #DIV/0! | 276 | 0 | #DIV/0! |
| Stops | 192 | 61 | 215% | 868 | 202 | 330% | 1,348 | 309 | 336% |
| QOL Sum- *Precincts* | 4 | 0 | #DIV/0! | 7 | 5 | 40% | 11 | 11 | 0% |
| Overdoses | 2 | 2 | 0% | 4 | 6 | -33% | 12 | 12 | 0% |
| Police Accidents | 2 | 2 | 0% | 3 | 2 | 50% | 6 | 3 | 100% |
| MV Accidents | 38 | 27 | 41% | 128 | 163 | -21% | 220 | 266 | -17% |
| Pedestrian Struck | 4 | 5 | -20% | 8 | 14 | -43% | 18 | 19 | -5% |
| Walk & Ride | 12 | 7 | 71% | 27 | 10 | 170% | 29 | 16 | 81% |

## Community Engagements

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 36 | 0 | #DIV/0! | 166 | 0 | #DIV/0! | 297 | 0 | #DIV/0! |
| Youth Engagement | 2 | 0 | #DIV/0! | 5 | 0 | #DIV/0! | 6 | 0 | #DIV/0! |
| Community Walks | 10 | 0 | #DIV/0! | 12 | 0 | #DIV/0! | 16 | 0 | #DIV/0! |

## IOP

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| 5th Precinct IOP | 1 | 3 | -67% | 6 | 12 | -50% | 16 | 15 | 7% |
| External Complaints | 1 | 0 | #DIV/0! | 3 | 3 | 0% | 6 | 6 | 0% |
| *Demeanor* | 0 | 0 | #DIV/0! | 0 | 2 | -100% | 1 | 1 | 0% |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 2 | -100% |
| Internal Complaints | 0 | 3 | -100% | 2 | 9 | -78% | 10 | 9 | 11% |
| *Disobedience* | 0 | 2 | -100% | 1 | 4 | -75% | 6 | 4 | 50% |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |

**Arrest data source is Records Management.***Gun Recovery data source is Ballistics Lab

| Prepared by | Data is preliminary and subject to further analysis and revision. | |
|---|---|---|
| NPD Comstat Unit | Represents crime increases | N/A=Not Available |

# Comstat

**6th Precinct**

**Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
| Murder | 0 | 2 | -100% | 0 | 2 | -100% | 0 | 2 | -100% |
| Rape | 1 | 0 | #DIV/0! | 1 | 3 | -67% | 2 | 3 | -33% |
| Robbery | 0 | 3 | -100% | 4 | 3 | 33% | 6 | 5 | 20% |
| Agg. Assault | 2 | 1 | 100% | 7 | 9 | -22% | 13 | 18 | -28% |
| Burglary | 1 | 2 | -50% | 3 | 8 | -63% | 4 | 17 | -76% |
| Theft F/A | 3 | 1 | 200% | 8 | 8 | 0% | 12 | 13 | -8% |
| Theft | 1 | 0 | #DIV/0! | 6 | 8 | -25% | 11 | 15 | -27% |
| Auto Theft | 4 | 2 | 100% | 11 | 11 | 0% | 19 | 16 | 19% |
| *TOTAL* | 12 | 11 | 9% | 40 | 52 | -23% | 67 | 89 | -25% |
| Non-Fatal Shooting Inc. | 1 | 0 | #DIV/0! | 2 | 1 | 100% | 3 | 2 | 50% |
| Non-Fatal Shooting Vic. | 1 | 1 | 0% | 2 | 2 | 0% | 3 | 3 | 0% |
| Carjacking | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |

## Arrests

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 25 | 23 | 9% | 113 | 69 | 64% | 172 | 111 | 55% |
| Murder | 0 | 1 | -100% | 0 | 1 | -100% | 0 | 1 | -100% |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 3 | -67% |
| Agg. Assault | 1 | 1 | 0% | 4 | 9 | -56% | 9 | 13 | -31% |
| Burglary | 0 | 1 | -100% | 2 | 1 | 100% | 2 | 3 | -33% |
| Theft | 0 | 1 | -100% | 1 | 2 | -50% | 1 | 2 | -50% |
| Auto Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *TOTAL* | 1 | 4 | -75% | 8 | 13 | -38% | 13 | 22 | -41% |
| Guns- *Recovered* | 1 | 2 | -50% | 3 | 6 | -50% | 7 | 7 | 0% |
| Gun- *Arrests* | 1 | 2 | -50% | 3 | 5 | -40% | 6 | 5 | 20% |
| Gun- *Arrests - Pct* | 1 | 1 | 0% | 2 | 1 | 100% | 4 | 1 | 300% |
| Gun- *Arrests - Intel* | 0 | 1 | -100% | 1 | 3 | -67% | 2 | 3 | -33% |
| Gun- *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun- *Arrests - Other* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| DWI | 1 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 4 | 0 | #DIV/0! |
| **PCT** | 13 | 23 | -43% | 62 | 68 | -9% | 99 | 109 | -9% |
| **PCT SQD** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **PCT CPT** | 7 | 0 | #DIV/0! | 45 | 0 | #DIV/0! | 58 | 0 | #DIV/0! |
| **Fugitive** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 1 | 0% |
| **CIB** | 1 | 0 | #DIV/0! | 1 | 1 | 0% | 5 | 1 | 400% |
| **C.N.D.** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Outside/Command** | 4 | 0 | #DIV/0! | 5 | 0 | #DIV/0! | 9 | 0 | #DIV/0! |

## Summons - Inquiries - Accidents - Overdoses

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Summons- *Parking* | 160 | 84 | 90% | 706 | 379 | 86% | 942 | 572 | 65% |
| Summons- *Moving* | 178 | 258 | -31% | 966 | 956 | 1% | 1,654 | 1,265 | 31% |
| Summons- *Radar* | 10 | 0 | #DIV/0! | 161 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Stops | 120 | 128 | -6% | 650 | 417 | 56% | 1,095 | 559 | 96% |
| QOL Sum- *Precincts* | 1 | 1 | 0% | 8 | 7 | 14% | 13 | 19 | -32% |
| Overdoses | 1 | 1 | 0% | 2 | 3 | -33% | 2 | 4 | -50% |
| Police Accidents | 0 | 1 | -100% | 0 | 1 | -100% | 0 | 2 | -100% |
| MV Accidents | 14 | 11 | 27% | 45 | 59 | -24% | 83 | 96 | -14% |
| Pedestrian Struck | 1 | 2 | -50% | 5 | 4 | 25% | 8 | 4 | 100% |
| Walk & Ride | 2 | 0 | #DIV/0! | 3 | 8 | -63% | 7 | 22 | -68% |

## Community Engagements

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 76 | 0 | #DIV/0! | 213 | 0 | #DIV/0! | 270 | 0 | #DIV/0! |
| Youth Engagement | 3 | 0 | #DIV/0! | 8 | 0 | #DIV/0! | 14 | 0 | #DIV/0! |
| Community Walks | 17 | 0 | #DIV/0! | 47 | 0 | #DIV/0! | 72 | 0 | #DIV/0! |

## IOP

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **6th Precinct IOP** | **0** | **1** | **-100%** | **5** | **2** | **150%** | **6** | **6** | **0%** |
| **External Complaints** | 0 | 1 | -100% | 4 | 0 | #DIV/0! | 4 | 5 | -20% |
| *Demeanor* | 0 | 0 | #DIV/0! | 4 | 0 | #DIV/0! | 4 | 3 | 33% |
| *Neglect* | 0 | 1 | -100% | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| **Internal Complaints** | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 2 | 1 | 100% |
| *Disobedience* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| *Neglect* | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |

*\*\*Arrest data source is Records Management.\*\*\*Gun Recovery data source is Ballistics Lab*

**Prepared by**          *Data is preliminary and subject to further analysis and revision.*

**NPD Comstat Unit**          *Represents crime increases*          *N/A=Not Available*

# Comstat

**7th Precinct**

**Week Ending:** 2/16/2020

## Crime Complaints

| | Week-To-Date | | | 28 Day | | | Year-To-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 2 | -50% |
| Robbery | 0 | 1 | -100% | 1 | 6 | -83% | 4 | 11 | -64% |
| Agg. Assault | 5 | 2 | 150% | 10 | 7 | 43% | 16 | 10 | 60% |
| Burglary | 0 | 1 | -100% | 8 | 5 | 60% | 10 | 10 | 0% |
| Theft F/A | 1 | 2 | -50% | 8 | 9 | -11% | 13 | 11 | 18% |
| Theft | 1 | 2 | -50% | 8 | 7 | 14% | 15 | 19 | -21% |
| Auto Theft | 1 | 5 | -80% | 9 | 26 | -65% | 23 | 35 | -34% |
| *TOTAL* | **8** | **13** | **-38%** | **44** | **60** | **-27%** | **82** | **98** | **-16%** |
| Non-Fatal Shooting Inc. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| Non-Fatal Shooting Vic. | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| Carjacking | 0 | 1 | -100% | 0 | 2 | -100% | 0 | 2 | -100% |

## Arrests

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| *All Arrests* | 32 | 7 | 357% | 123 | 33 | 273% | 171 | 84 | 104% |
| Murder | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Rape | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Robbery | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| Agg. Assault | 2 | 1 | 100% | 8 | 3 | 167% | 14 | 6 | 133% |
| Burglary | 2 | 0 | #DIV/0! | 7 | 0 | #DIV/0! | 7 | 7 | 0% |
| Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Auto Theft | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *TOTAL* | **4** | **1** | **300%** | **15** | **3** | **400%** | **22** | **13** | **69%** |
| Guns- *Recovered* | 0 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 2 | 1 | 100% |
| Gun- *Arrests* | 0 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| Gun- *Arrests - Pct* | 0 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| Gun- *Arrests - Intel* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun- *Arrests - Fugitive* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Gun- *Arrests - Other* | 0 | 0 | #DIV/0! | 0 | 1 | -100% | 0 | 1 | -100% |
| DWI | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **PCT** | 23 | 7 | 229% | 104 | 33 | 215% | 135 | 81 | 67% |
| **PCT SQD** | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **PCT CPT** | 7 | 0 | #DIV/0! | 16 | 0 | #DIV/0! | 30 | 0 | #DIV/0! |
| **Fugitive** | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! |
| **CIB** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **C.N.D.** | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| **Outside/Command** | 1 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 4 | 3 | 33% |

## Summons - Inquiries - Accidents - Overdoses

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| Summons- *Parking* | 72 | 50 | 44% | 323 | 287 | 13% | 500 | 462 | 8% |
| Summons- *Moving* | 77 | 41 | 88% | 335 | 375 | -11% | 483 | 653 | -26% |
| Summons- *Radar* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| Stops | 93 | 24 | 288% | 403 | 200 | 102% | 590 | 366 | 61% |
| QOL Sum- *Precincts* | 0 | 1 | -100% | 2 | 6 | -67% | 9 | 16 | -44% |
| Overdoses | 1 | 0 | #DIV/0! | 6 | 2 | 200% | 10 | 2 | 400% |
| Police Accidents | 0 | 0 | #DIV/0! | 2 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| MV Accidents | 12 | 12 | 0% | 56 | 61 | -8% | 104 | 98 | 6% |
| Pedestrian Struck | 1 | 1 | 0% | 5 | 5 | 0% | 9 | 8 | 13% |
| Walk & Ride | 0 | 1 | -100% | 0 | 2 | -100% | 1 | 4 | -75% |

## Community Engagements

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| Community Engagement | 7 | 0 | #DIV/0! | 12 | 0 | #DIV/0! | 77 | 0 | #DIV/0! |
| Youth Engagement | 2 | 0 | #DIV/0! | 5 | 0 | #DIV/0! | 5 | 0 | #DIV/0! |
| Community Walks | 1 | 0 | #DIV/0! | 3 | 0 | #DIV/0! | 3 | 0 | #DIV/0! |

## IOP

| | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg | 2020 | 2019 | %Chg |
|---|---|---|---|---|---|---|---|---|---|
| **7th Precinct IOP** | **0** | **1** | **-100%** | **2** | **2** | **0%** | **3** | **4** | **-25%** |
| **External Complaints** | 0 | 1 | -100% | 1 | 0 | #DIV/0! | 1 | 4 | -75% |
| *Demeanor* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| *Neglect* | 0 | 1 | -100% | 0 | 0 | #DIV/0! | 0 | 1 | -100% |
| **Internal Complaints** | 0 | 0 | #DIV/0! | 1 | 0 | #DIV/0! | 2 | 0 | #DIV/0! |
| *Disobedience* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |
| *Neglect* | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | 0 | #DIV/0! |

*\*\*Arrest data source is Records Management.\*\*\*Gun Recovery data source is Ballistics Lab*

**Prepared by** — *Data is preliminary and subject to further analysis and revision.*

**NPD Comstat Unit** — *Represents crime increases* — *N/A=Not Available*