# United States v. City of Newark, et al., Civil Action No. 16–1731 (MCA) (MAH)

# CONSENT DECREE

## Independent Monitor – Final Report

Peter C. Harvey
Independent Monitor
September 8, 2025



**Final Report of the Independent Monitor of the Newark Police Division**

DATED: September 8, 2025

This is the Final Report from Independent Monitor Peter C. Harvey regarding the progress of the City of Newark (the "City") and the Newark Police Division ("NPD") in implementing the reforms required by the Consent Decree (hereinafter, the "Consent Decree") to which they agreed with the United States Department of Justice ("DOJ").[1]  This Consent Decree was filed with the United States District Court for the District of New Jersey and is an Order of the Court.

Part I of this Final Report lays out the history and background of the Consent Decree. Part II describes the Independent Monitor's duties and authority under the Consent Decree.  Part III explains the Independent Monitor's methodology for assessing NPD's progress implementing the requirements of the Consent Decree.  Part IV describes the specific reforms that the Consent Decree required NPD to undertake, NPD's progress implementing those reforms, and the Independent Monitor's assessment of NPD's reform efforts.  Finally, Part V provides concluding remarks from the Independent Monitor.

## I.    HISTORY AND BACKGROUND

Newark has a complex history regarding policing.  The complicated dynamics between the police and the residents of Newark has, at times, led to strained relationships between law enforcement and the communities they serve.  Most notably, a police beating of a Black taxi driver in 1967 sparked the "Newark Rebellion," a major episode of civil unrest that left 26 dead and hundreds injured.  These historic problems continued into more recent years.

---

[1] In the police reform context, consent decrees are a common means by which DOJ enforces its investigative findings that a police department has engaged in a pattern or practice of constitutional violations.  They are settlements between police agencies and local governments, on the one hand, and DOJ, on the other, that establish federal oversight of a police department.  They establish a federal court-enforced improvement plan that requires police agencies and local governments to meet specific goals before federal oversight of the agency is removed.  Typically, a federal judge administers the consent decree and appoints an Independent Monitor to oversee and report on the Parties' progress under the consent decree.

In 2010, the American Civil Liberties Union ("ACLU") petitioned DOJ to investigate NPD. *See* Ex. 1 (ACLU Petition). Citing a lengthy record of lawsuits, criminal indictments, and civilian complaints, the ACLU's petition alleged that NPD officers systemically violated the constitutional rights of Newark residents, including by using excessive force and making stops and arrests without legal justification. The petition further alleged that these acts of misconduct resulted from NPD's failure to appropriately train, supervise, and discipline its officers.

In response to the ACLU's petition, in 2011, the DOJ opened an investigation of NPD. DOJ's investigation took three years and involved extensive stakeholder interviews, review of NPD documents, and data analysis. Ex. 2 (DOJ Report) at 5. In 2014, DOJ released a report confirming many of the ACLU's allegations. DOJ found a "pattern or practice of constitutional violations in the NPD's stop and arrest practices, its response to individuals' exercise of their rights under the First Amendment, the Department's use of force, and theft by officers." *Id*. at 1. It further found that these constitutional violations were, in part, attributable to "deficiencies in the NPD's systems that are designed to prevent and detect misconduct." *Id*.

In the wake of the DOJ Report, the City of Newark entered into negotiations with DOJ regarding steps to reform NPD. Ultimately, the City entered into the Consent Decree in 2016 in the United States District Court for the District of New Jersey (the "Court"). *See* Ex. 3 (Consent Decree).[2]

---

[2] DOJ and the City originally submitted a proposed consent decree to the Court on March 30, 2016. Notice of Joint Motion for Entry of Consent Decree, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. Mar. 30, 2016), Dkt. No. 2,. Before the Court could approve the March 30, 2016 version, the Parties filed an amended consent decree. Supplemental Motion for Entry of Consent Decree, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. Apr. 29, 2016), Dkt. No. 4. The Court approved the amended consent decree on May 5, 2016. Consent Decree, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 5, 2016), Dkt. No. 5. In this Report, the phrase "Consent Decree" refers to the amended Consent Decree approved by the Court on May 5, 2016, as amended on February 2, 2018. The Parties and the Court agreed on several occasions to modify provisions of the Consent Decree. *See* Dkt. Nos. 12 (Order Amending Paragraphs 14, 17 and 18 of the Consent Decree) (Oct. 19, 2016), 24 (Joint Stipulation and Order to Amend the Consent Decree) (Dec. 22, 2016), 74 (Stipulated Order to Amend Consent Decree) (Feb. 2, 2018), 278 (Order Extending Monitoring Period) (May 12, 2022), 360 (Order Granting Parties' Joint Motion for Partial

Under the Consent Decree, NPD became obligated to reform a variety of its policies and practices under the supervision of the Court, the DOJ, and an Independent Monitor. The City and DOJ (collectively, the "Parties") jointly proposed that Peter C. Harvey—a partner at the law firm Patterson Belknap Webb & Tyler LLP and former Attorney General of New Jersey—be appointed as the Independent Monitor.

On May 5, 2016, the Court approved the Consent Decree and the appointment of Mr. Harvey as Independent Monitor. Consent Decree, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 5, 2016), Dkt. No. 5.

In 2016, the Consent Decree originally contemplated that the Independent Monitor would be appointed for a period of five years, with a possible extension of two additional years if needed to assist NPD and the City with compliance. Consent Decree ¶ 206. Hence, the original Consent Decree was scheduled to expire in 2021. However, the COVID-19 pandemic severely impaired NPD's ability to implement necessary reforms and the Independent Monitor's ability to assess NPD's progress. *See* Ex. 25 (Twenty-First Semi-Annual Report, dated May 31, 2023) at 4-5. Accordingly, after the original five year period ended, the City and DOJ concluded that NPD needed additional time to fulfill the aims of the Consent Decree and agreed to extend the Independent Monitor's term. *Id.* at 5. To that end, the Court approved an extension through October 31, 2023. *Id.*; *see also* Order Extending Monitoring Period, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 12, 2022), Dkt. No. 278. The extended term involved some modifications to the Independent Monitor's duties. For example, the original Consent Decree required the Independent Monitor to provide quarterly updates on NPD's progress, but the extension reduced that requirement to semi-annual reports. *Id*. at 5.

---

Termination) (May 17, 2024), and 412 (Order Extending Monitoring Period) (Mar. 31, 2025), *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J.). Where relevant, these amendments are discussed in this Report.

On May 14, 2024, during ongoing discussions regarding an additional extension to the Consent Decree, the City and DOJ jointly requested that the Court partially terminate the Consent Decree with respect to certain provisions related to Training and Training Records, Community Engagement, Investigatory Stops, and Property and Evidence.  Proposed Order Granting Parties' Joint Motion for Pretrial Termination, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 14, 2024), Dkt. No. 357.

The Court entered an Order granting the Parties' Joint Motion for Partial Termination of the Consent Decree on May 17, 2024.  Specifically, the Court terminated the City's and NPD's obligations under Consent Decree Paragraphs 5-12, 14-19, 21-24, 25-28, 43, 55-62, and 103-110. *See* Order Granting Parties' Joint Motion for Partial Termination, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 17, 2024), Dkt. No. 360.  For the subject matter areas not covered by the Court's May 17, 2024 Order, the Consent Decree remained in full effect and those topics were subject to review by the Independent Monitor.

In late 2024,  the Parties agreed on a final extension of the Consent Decree to give the Independent Monitor an opportunity to complete two reviews—a second supervision audit and a review of NPD's Internal Affairs practices—and this report.  *See* Order Extending Monitoring Period, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. Mar. 31, 2025), Dkt. No. 412.

## II.    INDEPENDENT MONITOR'S AUTHORITY UNDER THE CONSENT DECREE

The Consent Decree entrusted the Independent Monitor with a number of responsibilities. The Independent Monitor was required to "assess [NPD's] progress in implementing, and achieving compliance with, the [Consent Decree];" "report on the status of implementation to" the City, DOJ, and the Court; "work with [DOJ, the City, and NPD] to address any barriers to compliance;" and "assist [DOJ, the City, and NPD] to informally resolve any disputes or

differences." Consent Decree ¶ 169. In furtherance of these responsibilities, the Consent Decree obligated the Independent Monitor to, among other things:

- Audit NPD's compliance with the Consent Decree, Consent Decree ¶ 173;

- Provide technical assistance and recommendations to NPD regarding improvements to its practices, Consent Decree ¶ 181; and

- Release reports on NPD's progress to the Court and to the public, Consent Decree ¶¶ 182, 183.[3]

To assist in the performance of these duties, the Independent Monitor engaged a team of subject matter experts (collectively, the "Independent Monitoring Team"). Ex. 4 (First Quarterly Report, dated April 24, 2017) at 5-7. The Independent Monitoring Team consists of former law enforcement professionals and academics with expertise in various police functions. *Id.* The team also included community advocates. *Id.* Some members of the Independent Monitoring Team hailed from local institutions—such as the New Jersey Institute for Social Justice and the Rutgers University Police Institute (now referred to as the Rutgers Miller Center on Policing and Community Resilience)—and provided both subject-matter and community expertise. *Id.* Others were recruited from police departments nationwide and provided invaluable perspective on best practices in policing. *Id.* A full list of the Independent Monitoring Team's members is included in Exhibit 29. The Independent Monitor is grateful to the members of the Independent Monitoring Team for their important and invaluable contributions to improving policing in Newark by analyzing policies, training, and actual on-the-street policing practices, and providing NPD with technical assistance.

---

[3] The Independent Monitoring Team's quarterly, semi-annual and reassessment reports are attached as Exhibits 4 through 28.

III.     **INDEPENDENT MONITOR'S METHODOLOGY FOR ASSESSING COMPLIANCE**

*A. Policy Review*

During the first three years after the 2016 implementation of the Consent Decree, the work of the Independent Monitoring Team focused on collaborating with NPD to improve its policies, procedures, and training protocols in the areas covered by the Consent Decree.  In 2019, after NPD implemented the new policies in certain areas and trained personnel on these new policies, the Independent Monitoring Team began audits of NPD's compliance with the Consent Decree.  Ex. 13 (Ninth Quarterly Report, dated October 25, 2019) at 21.

Additionally, the Independent Monitoring Team provided technical assistance with NPD's policy development and implementation, and assessment regarding whether NPD had developed the new or revised policies required by the Consent Decree.  The Independent Monitoring Team's subject matter experts reviewed draft policies; created so-called "crosswalks" between relevant paragraphs of the Consent Decree and the draft policies; and determined whether the draft policies covered each relevant Consent Decree requirement.

During the Consent Decree period, NPD developed and adopted the following new policies to comply with Consent Decree requirements:

- General Order 18-16, *Arrests With or Without an Arrest Warrant* (revised May 17, 2023 and March 3, 2025);
- General Order 17-06, *Bias-Free Policing*;
- General Order 18-05, *Body Worn Cameras* (revised November 13, 2024);
- General Order 18-13, *Community Policing Policy* (revised July 11, 2023);
- General Order 18-25, *Complaint Intake & Investigation Process*;[4]
- General Order 18-14, *Consensual Citizen Contacts and Investigatory Stops*;
- General Order 18-26, *Disciplinary Process and Matrix*;
- General Order 18-22, *Firearms and Other Weapons*;

---

[4] Although NPD developed General Orders 18-25 and 18-26 during the Consent Decree period, they did not go into effect due to litigation.  The litigation is discussed in greater detail in **Section IV.H** below.

- General Order 18-12, *First Amendment Right to Observe, Object To, and Record Police Activity*;
- General Order 18-06, *In-Car Camera* (revised March 3, 2025);
- General Order 19-03, *LGBTQ Community and Police Interactions* (revised April 29, 2021);
- General Order 18-24, *Property & Evidence Division*;
- General Order 18-23, *Property & Evidence Management* (revised July 23, 2021);
- General Order 18-15, *Searches With or Without a Search Warrant* (revised May 27, 2021 and March 3, 2025);
- General Order 18-20, *Use of Force* (revised April 8, 2022);
- General Order 18-21, *Use of Force Reporting, Investigation and Review*.

Some of these policies, such as those addressing use of force, replaced decades-old policies that were no longer consistent with modern law enforcement standards. Others, such as the body-worn and in-car camera policies, were entirely new for NPD or were designed to govern new NPD initiatives.

### B. Updating Written and Live Training

In assessing NPD's development and implementation of Consent Decree-required training, the Independent Monitoring Team ensured NPD's training materials contained the appropriate content and observed live training instruction to verify that training was properly conducted. The Independent Monitoring Team also reviewed NPD training records to assess whether NPD had provided the required training to its officers.

### C. Assessing On-The-Street Compliance

Most importantly, the Independent Monitoring Team conducted audits to determine whether NPD had achieved Operational Compliance (*i.e.*, whether NPD officers were, in practice, following the policies and training that NPD had established as well as applicable federal and state law).[5] The Independent Monitoring Team's audits required extensive review of NPD records and data—including police reports and body-worn camera video. In most cases,

---

[5] Operational Compliance is also sometimes referred to as "Overall Compliance."

they involved the Independent Monitoring Team's review of a randomly selected sample of relevant incidents to determine if NPD officers participating in the incident acted in accordance with NPD policy and relevant law.  Prior to beginning an audit, in consultation with NPD and DOJ, the Independent Monitoring Team designed an audit methodology for each specific reform area covered by the Consent Decree.  Each audit required review of several metrics of Consent Decree compliance.  For example, for the Independent Monitoring Team's Body-Worn and In-Car Camera audits (discussed in greater detail later in this Final Report), the Independent Monitoring Team reviewed a randomly selected sample of body-worn and in-car camera footage to determine whether officers were following NPD policy requiring activation of cameras, deactivation of cameras, communication with members of the public around camera use, and proper categorization of videos that were captured and stored in NPD's system.

The sampling method varied for each area under review.  For instance, for the second and third use of force audits, the Independent Monitoring Team reviewed all incidents during a given timeframe.  For other audits—such as stops, searches and arrests and bias-free policing—the Independent Monitoring Team selected for review a random sample of all applicable cases during a given timeframe.  Where the Independent Monitoring Team reviewed a sample of incidents (as opposed to all incidents during a given time frame), it typically did so because of resource constraints.  The sample sizes selected for Independent Monitoring Team's audits were sufficient to yield substantive and actionable insights into NPD's compliance with Consent Decree requirements in the areas reviewed.

To determine whether NPD was demonstrating Operational Compliance, the Independent Monitoring Team analyzed the actions of each officer involved in an event or incident being reviewed, including whether all reporting requirements had been satisfied.  As part of its

analysis, the Independent Monitoring Team typically divided Operational Compliance into two components: (1) *substantive compliance* (*i.e.*, whether officers' actions in the field comported with NPD policy and relevant law); and (2) *documentation compliance* (*i.e.*, whether officers completed and submitted all required reports and accurately documented the event or incident per NPD policy). By separately assessing NPD's substantive compliance and documentation compliance, the Independent Monitoring Team facilitated NPD's ability to identify areas in which it may focus its resources to address deficiencies, if any, and improve practices where necessary. If officers complied with policy and relevant law (both substantively and with respect to documentation) in at least 95% of the cases reviewed by the Independent Monitoring Team, the Independent Monitoring Team deemed NPD to be in "substantial compliance."

Generally, the Independent Monitoring Team sought to audit each Consent Decree area at least twice. If at least two consecutive audits showed substantial compliance as to a given metric assessed, then the Independent Monitoring Team generally deemed NPD compliant in that area and stopped auditing that performance area. In practice, the Independent Monitoring Team was not always able to follow this audit protocol.[6]

---

[6] In Fall 2024, during discussions amongst the Parties regarding the extension of the Consent Decree, the Independent Monitoring Team conveyed to the Parties its intention to conduct the following audits: (1) *Third* Searches audit; (2) *Second* Community-Oriented Policing audit; (3) *Third* Arrests audit; (4) *First* and *Second* Internal Affairs audits; (5) *Second* Supervision audit; and (6) *Third* and *Fourth* Bias-Free policing audits. The Independent Monitoring Team also explained to the Parties that the Independent Monitoring Team's ability to conduct a Data Systems audit was contingent upon the City and NPD's readiness, including NPD's Early Warning System vendor making necessary changes to its software and, once the parties indicated and the Independent Monitor confirmed that the City and NPD were ready, the Independent Monitoring Team would schedule an audit of this subject area. The Parties agreed that the Independent Monitoring Team to audit NPD's Data Systems. The Parties agreed that the Independent Monitor's assessments would be limited to two streamlined reviews of NPD's supervision practices and Internal Affairs practices. The Court approved the Parties' agreement. *See* ¶¶ 2, 4, Order Extending Monitoring Period, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. Mar. 31, 2025), Dkt. No. 412.

IV.     **CONSENT DECREE IMPLEMENTATION**

The Consent Decree required NPD to reform its practices in the following areas: (a) training (including keeping accurate and timely training records), (b) community engagement and civilian oversight, (c) stops, searches, and arrests, (d) bias-free policing, (e) use of force, (f) body-worn cameras ("BWC") and in-car cameras ("ICC"), (g) property and evidence, (h) internal affairs, (i) data systems, and (j) supervision.  This section summarizes the basis for reform in each area; NPD's efforts undertaken in each area during the Consent Decree period; and the Independent Monitoring Team's assessment of NPD's progress.

*A.  Training Records and Training*

Modern police departments must provide comprehensive training to their officers and meticulously maintain records of that training.  Effective training equips police officers with the critical skills needed for constitutional policing and allows officers to adapt to evolving challenges, maintain public trust, and enhance officer performance.  Without accurate training records, it becomes significantly harder for police departments to assess officer preparedness, investigate complaints, administer discipline to officers, and implement meaningful reforms.

The DOJ's 2014 report cited "NPD's failure to provide adequate training and sufficiently track the training it does provide" as a significant cause of "patterns of misconduct" by NPD officers.  Ex. 2 (DOJ Report) at 44.  DOJ reported that NPD offered limited training opportunities, and that few officers attended even the handful of training opportunities NPD offered.  *Id*.  Additionally, DOJ reported that NPD did not maintain important training records, such as documents showing which officers attended which training sessions and documents capturing the material covered in each training session.  *Id*.

11

In light of the deficiencies DOJ identified, several provisions of the Consent Decree required NPD to improve its training practices.  Under the Consent Decree, NPD became obligated to "provide officers a minimum of 40 hours of in-service training each year," and the training was required to "incorporate current law, professional police standards, and best practices."  Consent Decree ¶ 9.  The Consent Decree also required NPD to train its officers on the requirements of the Consent Decree, and any new policies or procedures implementing any requirement of the Consent Decree.  Consent Decree ¶¶ 10-11.  Finally, NPD became obligated to "maintain complete and consistent training records for all officers."  Consent Decree ¶ 12.

Over the course of the Consent Decree period, NPD made significant progress towards improving its training practices.  Soon after the Consent Decree was approved, NPD complied with its obligation to train its officers on the Consent Decree's requirements.  *See* Ex. 4 (First Quarterly Report, dated April 24, 2017) at Section IV(B).  In 2019, NPD issued a new General Order on Training Standards (No. 18-28), and updated that General Order in 2025.  General Order 18-28 requires officers to attend annual training on (a) Body-Worn Cameras; (b) Community Policing; (c) Stops, Searches, and Arrests; (d) Bias-Free Policing; (e) Use of Force; and (f) other subjects.  *See* G.O. 18-28, Section III(A)(3).  Additionally, the General Order establishes standards for other important aspects of officer training, such as curriculum development, instructor selection and training, and assessment of officers who participate in training.  *Id*. at Sections III-V.

Finally, NPD opened a new training facility in 2024.  *See* Eric Kiefer, *Newark Cops, Firefighters, Community Will Share New Training Center*, Patch (Mar. 4, 2024), https://patch.com/new-jersey/newarknj/newark-cops-firefighters-community-will-share-new-training-center.  The construction of Newark's new multi-million-dollar Public Safety Training

Complex marks a historic investment in NPD, as well as Newark's other first responders.  City leaders, along with State and community partners, deserve credit for recognizing that modern policing requires state-of-the-art tools and facilities, and making this project a reality.  For decades, NPD police recruits and in-service officers trained in an antiquated and dilapidated facility that was not up to current standards, lacking modern technology, sufficient space, and resources to support scenario-based learning and community engagement.  The new complex replaces that aging infrastructure with a modern, 100,000-square-foot facility designed to prepare officers for the challenges of 21st-century public safety, ensuring Newark's police and public safety professionals receive the training they, and the community they serve, deserve.

In sum, these developments—including NPD's substantial investment in a new training center—will help NPD build on the improvements it made during the Consent Decree period and continue to achieve the Consent Decree's goal of ensuring that NPD officers are consistently trained in the requirements of constitutional policing.

NPD's progress in improving its training practices was borne out by three training-related audits conducted by the Independent Monitoring Team.  Those audits focused on NPD's compliance with the Consent Decree's requirements that NPD administer required training to its personnel and maintain accurate training records.  In the first training records audit, conducted in 2019, the Independent Monitoring Team assessed whether NPD had maintained records of training on Community-Oriented Policing; Use of Force; Stops, Searches, and Arrests; and Body-Worn and In-Car Cameras.  Ex. 14 (Tenth Quarterly Report, dated January 13, 2020) at 10-13.  The Monitoring Team reviewed a sample of 377 officers and found that 100% of officers had complete and correct training records.  *Id*.  The audit also revealed that NPD had retained necessary materials to document the information covered in those training courses.  *Id*.  The

second Audit, conducted in 2020, assessed whether records of training on those same four subjects were properly retained in NPD's electronic records database. Ex. 20 (Sixteenth Quarterly Report, dated July 9, 2021) at Appendix C. In the second audit, the Independent Monitoring Team found that NPD's training records database had properly documented use of force training for 100% of officers reviewed; stop, search, and arrest training for 100% of officers reviewed, body-worn camera training for 99.47% of officers reviewed; and community-oriented policing training for 97.33% of officers reviewed. *Id*. Finally, the third audit assessed whether NPD had administered required Bias-Free Policing training and retained appropriate records. The Independent Monitoring Team found that NPD had administered the Bias-Free Policing training to 97% of the officers in the Audit sample and maintained accurate records of the training it administered, and the officers who had received it. Ex. 24 (Twentieth Quarterly Report, dated April 28, 2022) at 5-6. Based on these three Audits, the Independent Monitor concluded that NPD was compliant with the Consent Decree provisions requiring NPD to improve its training and related record-keeping.

In May 2024, the Court terminated Consent Decree Paragraphs 5-12, as they relate to the development of policy and training. The Independent Monitoring Team agrees with the Court's decision. *See* Order Granting Parties' Joint Motion for Partial Termination, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 17, 2024), Dkt. No. 360.

### *Recommendation*

In the future, the Independent Monitor hopes that NPD will consider four steps to build upon the progress that it has made with respect to effectively training its officers:

***Hiring a full-time Training Director***. During the Consent Decree period, the Independent Monitor recommended that NPD hire a full-time training director to "oversee the

14

development of all the training courses that [NPD] must implement to comply with the requirements of the Consent Decree." Ex. 11 (Seventh Quarterly Report, dated April 16, 2019) at 13. However, NPD declined to do so and, instead, assigned a supervisory officer with the rank of Captain to serve as a part-time training director. *Id.* By hiring a full-time Training Director with no responsibilities other than training officers and supervisors, NPD would preserve knowledge, standards, and organizational values so they are not diluted or lost to turnover over time. Moreover, a full-time Training Director would provide consistent leadership, accountability, and expertise to ensure every recruit and in-service officer is prepared with the skills, judgment, and professionalism required to provide effective public safety.

      ***Inviting community members to attend officer training and provide feedback***. The Independent Monitor also recommended that NPD include community members as part of officer training in order to give officers a better understanding of community needs, but as of the issuance of this report, NPD has not incorporated this reform into its practices.

      ***Assigning full-time instructors to the Training Division***. These instructors should work under the supervision of a full-time Training Director, and should be competent in skills of adult learning modalities. Unlike traditional classroom education, adult learning acknowledges that recruits and officers bring prior knowledge, life experience, and different learning styles into the training environment. Effective training doesn't just lecture—it engages. It uses scenario-based exercises, problem-solving discussions, and hands-on practice to ensure that lessons are understood, retained, and applied under real-world conditions. By embracing adult learning strategies and documenting these modalities within their written curriculum, NPD can ensure that its state-of-the-art facility is matched by state-of-the-art instruction, preparing officers not

just to succeed in the classroom, but to lead with professionalism and sound judgment in the field.

**_Implementing a curriculum design unit under the direction of the Training Director_**. Core to any training or educational program is a documented curriculum that creates the foundation of effective, relevant, and dependable training.  It is essential to distinguish between a curriculum, on the one hand, and curricular support tools such as PowerPoint presentations or daily schedules.  The latter serve merely as aids, rather than comprehensive guides for professional development.  By contrast, a true curriculum is a document that defines core competencies, sets measurable objectives, and integrates scenario-based learning, ensuring every class builds on the next with purpose and consistency.  This is the gold standard that NPD should strive to achieve, and it should pursue this goal by devoting resources to curriculum design.

The Independent Monitor continues to believe that these steps will ensure that NPD training remains aligned with legal developments and best practices in policing, and fosters community confidence in NPD by ensuring that officers are made aware of community needs from their very first day on the force.

## B.  *Community Engagement and Civilian Oversight*

Community engagement and civilian oversight are foundational to police reform and providing high-quality policing services to the public.  Proper community engagement efforts foster collaborative relationships between law enforcement and the public, allowing for shared problem-solving, improved communication, and policing strategies that are responsive to local public safety needs.  Relatedly, civilian oversight can enhance transparency, deter misconduct, and hold police departments accountable for their actions.  That result is particularly true when

the civilian oversight body is independent from law enforcement and political influence, adequately funded, and allowed proper access to records and police department personnel.

Over the years preceding the Consent Decree, community trust and confidence in NPD— and criminal justice in Newark more broadly—had eroded because of NPD's deficient policing practices. When the ACLU petitioned DOJ for an investigation into NPD, it noted that systemic misconduct by NPD had "left innocent Newark residents distrustful of the police, unsure whether an encounter with them will lead to them being 'protected and served' or beaten and arrested." Exhibit 1 (ACLU Petition) at 3 (alterations omitted). DOJ's investigation echoed the ACLU's assessment. It found that "[t]he NPD's policing practices ha[d] eroded the community's trust, and the perception of the NPD as an agency with insufficient accountability has undermined the confidence of other Newark criminal justice stakeholders as well." Exhibit 2 (DOJ Report) at 1. The DOJ investigation confirmed that community trust in NPD was particularly undermined by officers' practice of conducting illegal stops, racially disparate enforcement practices, misuse of quality of life citations, officer use of excessive force, theft by officers, and failure to conduct meaningful internal investigations. *See id*. at 11 (stops); 16-18 (racial disparities); 21 (quality of life citations); 24-25 (excessive force); 31-32 (theft); 38-39 (internal affairs). Additionally, members of the LGBTQ community reported particular concerns about the lack of cultural competence and harassment by NPD officers. *Id*. at 48.

Before the City of Newark entered into the Consent Decree, it had begun the process of creating a civilian oversight entity. In 2016, the Newark City Counsel enacted an ordinance establishing the Civilian Complaint Review Board ("CCRB") to serve the civilian oversight function. Ex. 19 (Fifteenth Quarterly Report, dated January 28, 2021) at 16. The Consent Decree required the City of Newark to continue those efforts by "implement[ing] and

maintain[ing] a civilian oversight entity" that would "review [NPD's] internal investigations," monitor trends in police misconduct and discipline, and "recommend[] changes to NPD's policies and practices."  Consent Decree ¶ 13.  The CCRB is operational today, although intervening legal developments have limited its ability to conduct independent investigations. Shortly after the City enacted legislation to establish the CCRB, a union representing NPD officers filed a lawsuit on August 8, 2016, claiming that the CCRB was not permitted by state law.  Ex. 19 (Fifteenth Quarterly Report, dated January 28, 2021) at 16.  The case worked its way through the state courts, ultimately landing at the New Jersey Supreme Court.  In 2020, the Supreme Court partially sided with the union, holding that the CCRB could not investigate incidents that were concurrently under investigation by NPD Internal Affairs, and that the CCRB could not exercise subpoena power.  *Id*. at 17.  Advocates have proposed state legislation that would restore these powers to the CCRB.  To date, these efforts have been unsuccessful.

Beyond the civilian oversight entity, the Consent Decree required reforms in a variety of the substantive areas where community members had raised concerns about NPD practices.  *See generally* Consent Decree Section VI (stops); VII (bias-free policing); VIII (use of force); X (theft).  In view of the historically troubled relationship between NPD and the citizens of Newark, the Consent Decree also required NPD to undertake certain steps to rebuild community trust in its police department that went beyond simply improving the substantive areas of police practice where NPD had been deficient.

For example, the Consent Decree required NPD to train officers on community engagement strategies; restructure staffing and deployment to promote community engagement, including by assigning two officers in each precinct who would be responsible for community engagement; and implement strategies to measure and report on community engagement

activities.  Consent Decree ¶¶ 14-18.  NPD was required to improve its practices around sharing information with the public:  the Consent Decree obligated NPD to develop a transparency policy and to post certain information about Consent Decree progress on the Internet in the languages most commonly spoken in Newark (English, Spanish, and Portuguese).  Consent Decree ¶¶ 20-21.  Finally, the Consent Decree required NPD to measure the progress of its efforts to improve its relationship with the Newark community in several ways, including by "seek[ing] and respond[ing] to input from the community" through strategies like "comment cards and town hall meetings," and by conducting annual surveys of "the Newark community's experience with" NPD.  Consent Decree ¶¶ 19, 22-24.

During the course of the Consent Decree, NPD took some important steps to improve its community policing and engagement practices.  In the early years of the Consent Decree, NPD developed its first ever community policing policy.  NPD adopted this new policy as a General Order in 2019, and updated it in 2023.  NPD also implemented a program to train all officers on the new policy and community policing strategies.  *See* Ex. 20 (Sixteenth Quarterly Report, dated July 9, 2021) at Appendix C.  During the Consent Decree period, NPD also worked to improve its outreach to the community, including by hosting events with Newark residents and improving partnerships with community groups.  Ex. 22 (Eighteenth Quarterly Report, dated October 15, 2021) at Appendix D.

NPD even took some steps to improve its community policing practices that went beyond the requirements of the Consent Decree.  For example, NPD implemented a policy to improve officers' interactions with members of the LGBTQ community.  Ex. 19 (Fifteenth Quarterly Report, dated January 28, 2021) at 17-20.  Additionally, members of the Independent Monitoring Team walked precincts with NPD precinct commanders and community members to identify

issues and concerns of the community.  From these conversations, NPD built individualized strategic neighborhood plans for each precinct to focus on the needs of the communities within each precinct.  As part of these individualized plans, NPD liaised with other City agencies, such as the Public Works Department, to address community needs beyond the scope of policing. However, tracking the resolution of these problem-oriented projects continues to be a problem for NPD.

In April of 2024, NPD sent the DOJ and the Independent Monitoring Team a report outlining efforts it had made in the areas of community engagement and civilian oversight. Among other things, the report highlights the establishment of significant funding for Newark's Office of Violence Prevention & Trauma Recovery; the development of several new effective Community Engagement policies and procedures and revamped Community Policing training; and the implementation of a community engagement database to track community contacts made by NPD.  The report also claims that these reforms were connected to improved outcomes including increased crime clearance rates, lower rates of violent crime, and fewer excessive force complaints.  However, the Independent Monitoring Team was not able to audit the data that was the basis for NPD's report, and cannot confirm that the improved outcomes identified by NPD are causally related to improved community policing practices.

As explained above, in May 2024, the Court terminated Consent Decree Paragraphs 14-19 and 21-24, as they relate to Community Engagement.  *See* Order Granting Parties' Joint Motion for Partial Termination, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 17, 2024), Dkt. No. 360.  While NPD has been relieved of some of the Consent Decree requirements related to community engagement, the Independent Monitoring Team's sole audit of NPD's community policing practices—conducted in 2021 using data from 2019— revealed areas for continued

20

growth, specifically with respect to Consent Decree Paragraphs 17, 18, 19 and 21. The Independent Monitoring Team's audit covered nine of the Consent Decree paragraphs related to community policing. Ex. 22 (Eighteenth Quarterly Report, dated October 15, 2021) at Appendix D. It concluded that NPD was compliant with *only one* of the nine covered paragraphs, which covered a data collection policy. *Id*. The Independent Monitoring Team concluded NPD was not compliant with Consent Decree paragraphs requiring NPD to, among other things, assign two officers to each precinct focused on community engagement, make certain information available to the public, and solicit and assess feedback from the community. *Id*. After the Independent Monitoring Team released its audit, NPD revised its community policing policy and claimed it made other improvements to its community policing practices. However, the Independent Monitoring Team has not conducted a second audit of NPD's community policing compliance and cannot verify NPD's assertion regarding this task.[7]

Additionally, NPD did not satisfy the Consent Decree requirement to develop community engagement strategies focused specifically on youth. Consent Decree ¶¶ 14(a); 17. In 2018, the Independent Monitoring Team conducted listening sessions with Newark youth in order to gain information that NPD could use to improve youth engagement. Ex. 13 (Ninth Quarterly Report, dated October 25, 2019) at 7-15. Based on those listening sessions, the Independent Monitoring Team recommended that NPD develop a comprehensive youth engagement strategy, including, at minimum, holding community fora on youth engagement, developing officer training on youth engagement, and incorporating "[a]ppearance [p]rofiling" into bias-free policing training. *Id.* at

---

[7] In November 2023, the Independent Monitor advised the Parties that the Independent Monitoring Team intended to conduct its *Second* Community-Oriented Policing Audit and complete its report in February 2024. In response, the Parties asked the Independent Monitoring Team to *pause* work on the audit. Subsequently, on or about May 14, 2024, the Parties filed a Joint Motion, seeking to terminate the provisions of the Consent Decree pertaining to Community Engagement. On May 17, 2024, this Court entered an Order granting the relief requested by the Parties.

14.  However, NPD has not yet used this information to develop a comprehensive youth engagement strategy.  Ex. 18 (Fourteenth Quarterly Report, dated September 28, 2020) at 10. While NPD reports that it has developed "Youth Engagement Strategy" training, NPD has not presented that training for review and consideration by the Independent Monitoring Team nor has NPD explained how its Youth Engagement Strategy training and other efforts satisfy Consent Decree Paragraph 17.

### *Recommendation*

NPD's efforts to improve community engagement have seemingly resulted in some level of improved police-community relations in Newark; however, determining the extent and impact of NPD's progress requires additional focus.  NPD does not appear to conduct any systemic evaluations of its current community engagement programs, making it very difficult to determine which, if any, initiatives produce substantive outcomes.  Unclear metrics have prevented a meaningful data-driven assessment.  NPD should consider engaging the CCRB or another independent entity to fully assess whether NPD's community engagement efforts are having the impact that NPD believes they are.

Going forward, NPD should also implement a robust youth engagement strategy with concrete, measurable outcomes as a step towards fostering trust and enhancing public safety within the community.  Youth grow up to be adults and their impressions of police formed in their teen years often carry forward to their perceptions of the police when they become adults. Proactive engagement can help bridge this gap, allowing officers to build relationships with young people, understand their challenges, and provide positive interventions before situations escalate to such a devastating degree.

***Community Surveys:***

In the early years of the Consent Decree period, the Independent Monitoring Team worked with NPD and polling firms to conduct the required annual surveys on Newark residents' experiences with policing. *See, e.g.,* Ex. 19 (Fifteenth Quarterly Report, dated January 28, 2021) at 2-12; Ex. 12 (Eighth Quarterly Report, dated August 9, 2019) at 6-12; Ex. 5 (Second Quarterly Report, dated October 6, 2017) at 5-6. The Court's 2022 Order extending the Consent Decree released the Independent Monitoring Team from its obligation to conduct this survey, but required NPD to continue conducting annual surveys regarding policing. Ex. 24 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 21 n.5. NPD complied with this requirement in 2023 and conducted a survey in conjunction with researchers at Fairleigh Dickinson University. *Id.* at 21-22.

The community surveys showed that, to some degree, Newark citizens' impressions of NPD improved over the course of the Consent Decree period. For example, the community surveys showed a substantial decrease in the percentage of Newark citizens who reported that they had never had a positive experience with NPD over the Consent Decree period. Ex. 19 (Fifteenth Quarterly Report, dated January 28, 2021) at 4. Similarly, the rate of Newark residents reporting that NPD officers were "helpful, even when [they] didn't have to be" increased substantially over the course of the Consent Decree period. *Id.* at 5. These improvements were borne out by the positive and peaceful interactions between NPD and citizens of Newark during the 2020 protests that followed the killing of George Floyd in Minneapolis by police officers in that city. Ex. 18 (Fourteenth Quarterly Report, dated September 28, 2020) at 6-10. Indeed, during a period that was tumultuous in many American cities, national media outlets cited Newark as a model of positive police-community relations.

*See, e.g.*, Hari Sreenivasan, *How Newark's protest preparations have helped maintain calm*, PBS

(June 6, 2020), https://www.pbs.org/newshour/show/how-newarks-protest-preparations-have-

helped-maintain-calm; Tracey Tully & Kevin Armstrong, *How a City Once Consumed by Civil*

*Unrest Has Kept Protests Peaceful*, N.Y. Times (June 1, 2020),

https://www.nytimes.com/2020/06/01/nyregion/newark-peaceful-protests-george-floyd.html.

This recognition is a testament to the hard work of NPD in improving community engagement

during the Consent Decree period.  Still, the community surveys suggest that there is room for

improvement.  *See FDU Poll: Newark residents feel less safe, have less positive views of police*,

Fairleigh Dickinson University (July 20, 2023), https://www.fdu.edu/news/fdu-poll-newark-

residents-feel-less-safe-have-less-positive-views-of-police/.

### C.  Stops, Searches, and Arrests[8]

Stops, searches, and arrests are among the core tasks of any police department.  A

fundamental component of police reform involves ensuring that these important and sensitive

tasks are performed in accordance with federal and state constitutional principles.  To ensure

public trust and departmental legitimacy, a police department must conduct stops, searches, and

arrests in a constitutional manner.  When officers adhere to the Fourth Amendment of the United

States Constitution and Article 1, Section 7 of the New Jersey Constitution—ensuring that

actions are based on reasonable suspicion or probable cause and respecting individual rights—it

mitigates the potential for disproportionate impact on marginalized communities, fosters a sense

of fairness, and helps repair fractured police-community relationships.

The DOJ's investigation of NPD identified significant deficiencies in NPD's stop, search,

and arrest practices.  Under the Fourth Amendment to the United States Constitution and Article

---

[8] "Stops, Searches, and Arrests" refers to investigatory stops and detentions, searches with or without a search warrant, and arrests with or without an arrest warrant, respectively.

1, Section 7 of the New Jersey Constitution, a police officer may not conduct a stop or search without individualized suspicion that the target of the stop or search has engaged in wrongdoing. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing the U.S. Constitution); *State in the Interest of J.G.*, 701 A.2d 1260, 1265 (N.J. 1997) (citing the New Jersey Constitution). To assess whether NPD officers were complying with both the United States and New Jersey Constitutions, the DOJ's investigation involved a review of nearly 40,000 reports on stops conducted by NPD officers over a three-year period. Exhibit 2 (DOJ Report) at 8. The DOJ determined that in a majority of stop reports, NPD officers had not provided an explanation of individualized suspicion that passed muster under relevant legal precedent. *Id*. at 8-11. Additionally, in a significant number of stop reports, NPD officers had not provided *any* justification for the stop whatsoever. *Id*. Furthermore, DOJ's review of NPD reports revealed that NPD officers frequently arrested individuals who had ***not*** committed any crime, but who were perceived by officers as disrespectful. *Id*. at 11-15. Of particular note, NPD's arrest reports in drug cases were often inadequate. *Id*.

Because the DOJ investigation revealed several areas of concern around NPD's stop, search, and arrest practices, several provisions of the Consent Decree required NPD to undertake reform in these areas. Among other things, the Consent Decree prohibited NPD officers from conducting investigatory stops without reasonable suspicion that the person stopped had committed a crime; required NPD to ensure that officers properly articulated the basis for stops in their reports; and imposed certain other limitations on problematic stop practices. *See* Consent Decree ¶¶ 25-28. The Consent Decree also imposed restrictions on certain search practices, such as searches of motor vehicles and searches based on alleged consent from the individual being searched. *See* Consent Decree ¶¶ 29-42. Additionally, the Consent Decree required NPD to

provide additional training to officers on conducting lawful stops, searches, and arrests, and it required additional supervisory review and data collection on stops, searches, and arrests. *See* Consent Decree ¶¶ 43-54. Finally, the Consent Decree required NPD to ensure that officers complied with their First Amendment obligations regarding the rights of the public to observe, object to, and record police activity. *See* Consent Decree ¶¶ 55-62.

NPD's effort to comply with the Consent Decree provisions related to stops, searches, and arrests has been commendable. With the assistance of the Independent Monitoring Team, NPD revised its policies concerning stops, searches, arrests, and First Amendment-protected activity, and implemented them as General Orders. *See* Ex. 23 (Nineteenth Quarterly Report, dated December 28, 2021) at Appendix C (discussing stops policy); Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at Appendix B (discussing searches policy); Ex. 13 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at Appendix G (discussing arrests policy). Those General Orders remain in effect today, and NPD has continued to revise and improve them over time, as recently as earlier in 2025. *See* General Order 18-12, *First Amendment Right to Observe, Object to, and Record Police Activity*; General Order 18-14, *Consensual Citizen Contacts and Investigatory Stops*; General Order 18-15, *Searches With or Without a Search Warrant*; General Order 18-16, *Arrests With or Without an Arrest Warrant*. NPD also fulfilled its obligation to provide supplemental officer training on stops, searches, and arrests, and to implement annual in-service training on these topics. Ex. 23 (Nineteenth Quarterly Report, dated December 28, 2021) at Appendix C.

The Independent Monitoring Team's audits of NPD's stop, search, and arrest practices revealed that NPD's policy and training improvements translated to significant on-the-ground improvement in NPD's stop practices, and moderate improvement in search and arrest practices,

particularly among uniformed officers.  However, the Independent Monitoring Team determined

that, in a substantial percentage of searches and arrests it reviewed, NPD officers were still

falling short of requirements related to proper documentation.  The Independent Monitoring

Team believes these deficiencies are largely (but by no means wholly) attributable to lapses in

the performance and culture of supervision and management within NPD.  *See infra* Section

IV.J.

The Court previously terminated Consent Decree Paragraphs 25-28 and 43 as they relate

to Investigatory Stops and Detentions, Searches, and Arrests as well as Paragraphs 55-62,

addressing compliance with the First Amendment right to observe, object to, and record officer

conduct.  The Independent Monitoring Team agrees with the Court's decision, with the caveats

expressed in the recommendations below and throughout this Report.

1.    Stops

NPD's stop practices, including adherence to NPD policy regarding the First Amendment

right to observe, object to, and record officer conduct, were audited by the Independent

Monitoring Team twice.  The first audit reviewed approximately 200 stops conducted during the

period from October 1, 2019 to December 31, 2019.  Ex. 23 (Nineteenth Quarterly Report, dated

December 28, 2021) at 2-6.  It found that only 71.57% of stops were compatible with all

requirements of the law, NPD policy, and the Consent Decree, largely because NPD officers

were not properly documenting the stops they conducted.  *Id*. at 4.  In the vast majority of stops

reviewed (92.89%), the Independent Monitoring Team found that the stop was substantively

compliant with NPD's stop policy, as well as federal and state law.  *Id.*  However, the

Independent Monitoring Team found that the rate of compliance with stop documentation

requirements was significantly lower—NPD officers had complied with documentation

requirements in only 78.68% of stops reviewed, with some stops missing required body-worn camera footage or complete stop reports. *Id.* at 5.

After NPD made further reforms to its policy and training practices, the Independent Monitoring Team audited NPD's stop practices a second time, reviewing approximately 200 stops occurring in the period from April 1, 2022 to May 31, 2022. Ex. 27 (Twenty-Third Semi-Annual Report, dated January 16, 2024) at 6-8. The Independent Monitoring Team observed significant improvement in this second audit. The audit revealed that 95.36% of stops reviewed complied with all requirements of the law, NPD policy, and the Consent Decree, including substantive requirements related to the conduct of the stop itself and requirements related to how officers must document the stops they conduct. *Id.* at 7. In 100% of the stops reviewed, the officers conducting the stop complied with the substantive requirements of NPD policy and relevant law. *Id.* And in 95.36% of the stops reviewed, the involved officers properly documented the stop according to NPD policy. *Id.* at 7-8.

NPD's improvement in its stop practices over the course of the Consent Decree period is laudable.

| STOPS | | |
|---|---|---|
| Compliance Type | First Audit | Second Audit |
| **Substantive Compliance** | 92.89% (183 of 197 events reviewed) | 100% (196 of 196 events reviewed) |
| **Documentation Compliance** | 78.68% (155 of 197 events reviewed) | 95.36% (185 of 196 events reviewed) |
| **Overall Compliance** | 71.57% (141 of 197 events reviewed) | 95.36% |

As stated above, the Court previously terminated Consent Decree Paragraphs 25-28, which pertain to Investigatory Stops and Detentions as well as Paragraphs 55-62, addressing

compliance with the First Amendment right to observe, object to, and record officer conduct. The Independent Monitoring Team agrees with the Court's decision.

    2.   Searches

The Independent Monitoring Team conducted two audits of NPD's search practices. The first search audit evaluated approximately 200 searches conducted by NPD officers during the period from June 1, 2021 to July 31, 2021. Ex. 26 (Twenty-Second Semi-Annual Report dated May 31, 2023) at 3. This audit revealed significant deficiencies. Only 48% of searches reviewed during the first audit complied with all legal, policy, and Consent Decree requirements. *Id*. at 4. The Independent Monitoring Team observed that only 65% of the searches it reviewed in the first audit were substantively compliant, meaning that in a significant percentage of searches reviewed, the search lacked legal justification or was conducted in a manner inconsistent with the law or NPD policy. *Id.* at 5. Moreover, NPD officers properly documented the searches they conducted in only 52.5% of searches reviewed. *Id*. In light of these findings, the Independent Monitoring Team recommended revisions to NPD policy, additional officer training on NPD's search policy, and supplemental supervisory review of search reports. *Id*. at 84-86.

The Independent Monitoring Team observed considerable improvement in the second audit. The second audit covered the period from November 1, 2022 to December 31, 2022 and assessed 235 search events. Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 5-9. Importantly, the Independent Monitoring Team determined that in the second audit, NPD officers followed substantive NPD policy and legal requirements for searches in 95.74% of the searches they conducted, up more than 35% from the first audit. *Id*. at 7. Despite the gains in its

substantive compliance score, NPD's overall compliance rate was only 85.96% in the second audit—below the 95% threshold.  *Id*. at 8.

The Monitoring Team pointed to persistent deficiencies in documentation of searches by NPD officers as a main reason for NPD's overall compliance rate staying below the 95% threshold in the second searches audit.  During the audit, the Independent Monitoring Team identified patterns in these deficiencies surrounding search documentation—for example, in several instances, the written report prepared by the officers involved in the search was inconsistent with available body-worn or in-car camera footage.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 8-9.

The Independent Monitoring Team made several recommendations to NPD about how it could continue to improve policy, training, and supervision to remedy the deficiencies identified in the second searches audit.  *Id.* at 9.

| SEARCHES | | |
|---|---|---|
| Compliance Type | First Audit | Second Audit |
| **Substantive Compliance** | 65% (130 of 200 events reviewed) | 95.74% (225 of 235 events reviewed) |
| **Documentation Compliance** | 52.50% (105 of 200 events reviewed) | 88.94% (209 of 235 events reviewed) |
| **Overall Compliance** | 48% (96 of 200 events reviewed) | 85.96% (202 of 235 events reviewed) |

Based on the progress exhibited by NPD in this subject area, the Independent Monitoring Team recommends that the Court relieve NPD of its obligations pursuant to Consent Decree Paragraphs 29-34, as they pertain to Searches.  The Independent Monitoring Team's audits show that in the vast majority of cases, the typical officer is appropriately establishing the requisite probable cause or reasonable suspicion before a search.  However, significant issues persist with

respect to search documentation.  Specifically, the Independent Monitoring Team is concerned by the persistence of events for which the written documentation of the search fails to match the actions depicted on body-worn or in-car camera footage.  The occurrence of even a trace of this type of inconsistency can destroy an agency's legitimacy and standing with the community.  It can also expose the department to short- and long-term litigation, an increase in citizen complaints, and protracted embarrassment.  As NPD moves forward from the Consent Decree, it must continue to emphasize the importance of proper search documentation through training, supervision, and accountability for officers who do not meet standards.

      3.    Arrests

The first audit of NPD's arrest practices examined approximately 200 arrests conducted during the period from October 1, 2021 to November 30, 2021. Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at 10.  In the first audit, the Independent Monitoring Team determined that NPD officers were largely complying with NPD policy, the Consent Decree, and the law when making arrests.  Specifically, the Independent Monitoring Team concluded that 95.02% of arrests reviewed were consistent with all applicable substantive and documentation requirements.  *Id*. at 11.  In nearly all arrests reviewed—99%—the officers substantively complied with law and policy, meaning that the officers had appropriate legal justification for the arrest and followed the law and NPD policies around making arrests.  *Id.*  In a slightly smaller percentage of arrests reviewed, 95.52%, the Independent Monitoring Team determined that the officers making the arrest properly documented the arrest in written reports.  *Id.*

The Independent Monitoring Team observed some slippage in NPD's compliance in the second audit of NPD's arrest practices.  The second arrest audit covered over 200 arrests conducted by NPD officers between October 1, 2022 and November 30, 2022.  Ex. 28 (Twenty-

Fourth Semi-Annual Report, dated March 15, 2024) at 13.  The overall compliance rate decreased from 95.02% in the first arrest audit to only 81.3% in the second arrest audit, largely driven by a noticeable decrease in NPD's documentation compliance score.  *Id*. at 16.  While the Independent Monitoring Team observed that nearly all arrests (over 99%) were substantively compliant, compliance with reporting requirements decreased from 95.52% in the first audit to only 82.7% in the second.  *Id*. at 15.

The Independent Monitoring Team advised NPD on steps it should take to improve its arrest reporting practices, including increased supervisory review of arrest reports.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 16.

| ARRESTS | | |
|---|---|---|
| **Compliance Type** | **First Audit** | **Second Audit** |
| **Substantive Compliance** | 99% (199 of 201 events reviewed) | 99.1% (223 of 225 events reviewed) |
| **Documentation Compliance** | 95.52% (192 of 201 events reviewed) | 82.7% (186 of 225 events reviewed) |
| **Overall Compliance** | 95.02% (191 of 201 events reviewed) | 81.3% (183 of 225 events reviewed) |

Based on the progress exhibited by NPD in this subject area, the Independent Monitoring Team recommends that the Court relieve NPD of its obligations pursuant to Consent Decree Paragraphs 35-42, as they pertain to Arrests.

*Recommendation*

To prevent any further regression and ensure the enduring impact of the progress made, the Independent Monitoring Team recommends that NPD take the following steps:

***Proactive Review of Officer Reports and Video Footage***.  As mentioned above, the Independent Monitoring Team was concerned by persistent discrepancies between officers'

written incident reports and the corresponding body-worn and in-car camera video footage. To address these discrepancies, supervisory and managerial personnel must adopt a more proactive posture by routinely inspecting reports and corresponding video footage to ensure consistency.

*Training and Accountability Around Accurate Reporting*. NPD must place greater emphasis on ensuring that all forms of documentation are prepared completely and accurately by officers, and that supervisors are inspecting reports for comprehensiveness and consistency prior to final submission. Success in this area may require integration of these principles into accountability instruments (e.g., CompStat, "town hall" meetings, performance evaluations, etc.), along with the institution of intense training and progressive discipline for officers and supervisors.

*Internal Review*. NPD must implement and adhere to a system of regular internal reviews of its stops, searches, and arrests. This process would be facilitated by upgrades to existing data collection and analysis systems, which are addressed in greater detail in other areas of this report.

This proactive approach will help NPD identify and address any deficiencies or areas of improvement and ensure that advancements achieved in these critical areas are sustained, even after federal oversight concludes.

### D. Bias-Free Policing

Bias-free policing is essential to police reform efforts because it directly addresses systemic inequities and helps police departments build and maintain public trust. By actively addressing and mitigating bias through policy development, training, and accountability measures that ensure police behaviors that minimize bias, police departments involved in reform

efforts can foster legitimacy, encourage community cooperation, and ultimately lead to more effective and just public safety outcomes.

Prior to the Consent Decree, many residents of Newark had raised concerns about perceived racial disparities in policing in Newark.  Ex. 2 (DOJ Report) at 17.  Using population demographics as a benchmark, the DOJ investigation into NPD confirmed significant racial disparities in Newark police activity.  For example, DOJ determined that, while only 53.9% of Newark's population was Black at the time of its investigation, approximately 80% of NPD's stops and arrests were of Black individuals.  *Id*. at 16.  This disparity meant that Black individuals in Newark were approximately *two and a half times* more likely to be stopped or arrested by NPD than white individuals.  *Id*. at 19, 21.  Similar disparities were evident in other areas of police work, with Black individuals stopped by police 2.7 times more likely to be searched by NPD than white individuals and 3.1 times more likely to be frisked.  *Id*. at 20.  Racial disparities were observed in all parts of the city of Newark, despite significant demographic differences between various neighborhoods.  *Id*.  The DOJ investigation also indicated that NPD's misuse of Quality of Life citations was a significant driver of racial disparities in Newark law enforcement, *id*. at 21, and that efforts to identify and reduce racial disparities in policing were hampered by NPD's failure to collect and analyze relevant data on race.  *Id*. at 18.

Given these findings, the Consent Decree required NPD to take steps to address improper racial disparities in its policing practices and reduce the appearance of bias in officer decision-making.  Under the Consent Decree, NPD was required to train all of its officers on bias-free policing.  Consent Decree ¶ 63.  The Consent Decree also required NPD to adopt policies prohibiting its officers from using race, or any other irrelevant demographic category, as an

indicator of criminal suspicion when taking law enforcement action.  Consent Decree ¶ 64.

Finally, the Consent Decree required NPD to collect and analyze demographic data on its

enforcement activities to identify any unwarranted racial disparities in police activity, and to

publicize its findings.  Consent Decree ¶ 65.

### NPD's Groundbreaking Bias-Free Policing Policy

NPD took some steps required by the Consent Decree to address racial disparities in its

policing practices.  In consultation with the Independent Monitoring Team, NPD developed a

policy uncommon in American police departments: a bias-free policing policy.  NPD adopted

that policy as General Order 17-06, *Bias-Free Policing* in 2017.  As required by the Consent

Decree, General Order 17-06 mandates bias-free policing training for all NPD officers, improved

data collection, and additional supervisory review of potential bias incidents.  To minimize the

appearance of potential bias and improve citizen confidence in NPD operations, General Order

17-06 also requires NPD officers to provide certain information when stopping members of the

public, such as their name, agency affiliation, and basis for the stop, under the rationale that these

elements of procedural justice are instrumental to conveying impartiality and respect toward

people stopped by police.  The Independent Monitoring Team concluded that General Order 17-

06 complies with the requirements of the Consent Decree.  *See* Ex. 28 (Twenty-Fourth Semi-

Annual Semi-Annual Report, dated March 15, 2024) at Appendix F.  The Independent

Monitoring Team also determined that NPD complied with its Consent Decree obligation to train

its officers on bias-free policing strategies.  *Id.*

### Audits of NPD's Bias-Free Policing Policy

The Independent Monitoring Team conducted two audits of NPD's bias-free policing

practices.  Importantly, because racial disparities in policing of the sort that DOJ identified are

often the confluence of many deficient policies and practices, the Independent Monitoring

Team's audits of NPD's progress towards becoming a bias-free police department did not focus

on whether the racial disparities observed by DOJ were decreasing.  Instead, they assessed

whether NPD was taking certain discrete, measurable steps to comply with its policy and the

Consent Decree that would not only increase public confidence in the department, but allow

NPD leadership and members of the public to identify any troubling racial disparities.  The first

element of the Independent Monitoring Team's bias-free policing audit involved an assessment

of whether NPD officers, when stopping people for investigation and traffic enforcement, were

complying with the bias-free policing policy requirement that officers introduce themselves,

provide certain information to the person being stopped, and conduct themselves in a

professional manner.  The second element of the audit addressed whether NPD was complying

with its obligation to collect, analyze, and make public demographic data on its enforcement

activities that would provide transparency on enforcement practices and facilitate assessment of

indicators of potential bias.

The Independent Monitoring Team's first bias-free policing audit included a review of

nearly 200 stops occurring between July 1, 2022 and September 30, 2022 in connection with the

first element of the audit (*i.e.*, officer actions during stops).  Ex. 28 (Twenty-Fourth Semi-Annual

Report, dated March 15, 2024) at 9.  In most of these instances, officers were courteous,

respectful, and acted in a manner unlikely to raise concerns of bias.  *Id*. at 12.  However, the

Independent Monitoring Team determined that only 82% of the stops reviewed were fully

compliant with the bias-free policing policy.  *Id*. at 11.  In a substantial percentage of stops

reviewed, officers did *not* comply with the substantive requirements of the policy requiring them

to provide certain information to individuals stopped.  *Id*.  Additionally, the Independent

Monitoring Team found that, in about 10% of stops reviewed, officers did *not* document information required by the bias-free policing policy in their reports.  *Id*.  The Independent Monitoring Team recommended that NPD provide officers with additional training on the bias-free policing policy and made other recommendations on how NPD can conduct policing operations in a manner that maintains the confidence of the community it serves.  *Id*. at 12-13.

The Independent Monitoring Team's findings were largely the same in the second bias-free policing audit.  The second audit covered 188 stops occurring between July 1, 2023 through September 30, 2023.  Ex. 30 (Second Bias-Free Policing Audit Report) at 4-5.  Again, the Independent Monitoring Team found that in most incidents reviewed, officers were professional, courteous, and respectful, and conducted themselves in a way that would give a reasonable observer little reason to believe that the encounter was motivated by bias.  *Id.* at 14.  However, the Independent Monitoring Team found that only 80.3% of the stops reviewed were compliant with both the substantive and documentation requirements of the bias-free policing policy.  *Id*. at 6.  Specifically, the Independent Monitoring Team found that 87.8% of stops reviewed were compliant with substantive policy requirements, with non-compliance largely attributable to officers not complying with the policy's requirement that officers introduce themselves and provide a reason for the stop.  *Id*. at 11.  This non-compliance was particularly pronounced among plainclothes officers.  *Id.*  The Independent Monitoring Team also found that 83.5% of events reviewed were compliant with documentation requirements, with failures often arising because NPD was unable to provide certain probative body-worn camera footage for the incident, in violation of policy requiring NPD officers to record incidents and preserve records.  *Id.* at 12.

The Independent Monitoring Team made additional recommendations to NPD on policy revisions and additional officer training to address the issues observed in the second audit, particularly focused on the need to ensure that plainclothes officers were complying with the bias-free policing policy.  Ex. 30 (Second Bias-Free Policing Audit Report) at 15-18.

| BIAS-FREE POLICING | | |
|---|---|---|
| Compliance Type | First Audit | Second Audit |
| Substantive Compliance | 88% (158 of 178 events reviewed) | 87.8% (165 of 188 events reviewed) |
| Documentation Compliance | 91% (162 of 178 events reviewed) | 83.5% (157 of 188 events reviewed) |
| Overall Compliance | 82% (146 of 178 events reviewed) | 80.3% (151 of 188 events reviewed) |

In addition to assessing compliance with the bias-free policing policy, the Independent Monitoring Team also assessed whether NPD was complying with its obligation to collect, analyze, and make public demographic data on its enforcement activities, as required by Paragraph 65 of the Consent Decree.[9]  On this data collection and analysis element of the assessment, the Independent Monitoring Team concluded that NPD had made a promising start, but needed to do more in order to come into full compliance with Consent Decree requirements.  Ex. 30 (Second Bias-Free Audit Report) at 7.  Specifically, the Independent Monitoring Team determined that NPD was collecting demographic data on police stops and making that data public.  *Id*.  However, NPD was not taking necessary steps to analyze whether that data showed concerning patterns, such as comparing the raw data to benchmarks and determining whether any

[9] The Independent Monitoring Team assessed NPD's compliance with Paragraph 65 only once—during the second bias-free policing audit—because NPD did not provide the required data for analysis at the time of the first bias-free policing audit.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at Appendix F (explaining that the Independent Monitoring Team could only assess NPD's Paragraph 65 compliance if NPD "produces to the Monitoring Team demographic analyses that it conducted pursuant to" that paragraph at the time of the audit).

disparities observed were the result of unbiased and effective policing or racially disparate enforcement. *Id*. The Independent Monitoring Team offered NPD suggestions on how it could improve its data analysis practices, including development of a robust internal data analysis capability that would allow NPD to examine its own data for patterns of bias and explain its methods to the public in a clear manner that would inspire public confidence in the results. Ex. 30 (Second Bias-Free Audit Report) at 18.

Recognizing NPD's progress and the existing room for improvement in this area, the Independent Monitoring Team does not object to NPD being relieved from the Consent Decree provisions related to Bias-Free policing; however the Independent Monitoring Team recommends that NPD be required to present to the Court for its approval, a comprehensive plan for correcting the remaining deficiencies described above and in the second bias-free policing audit report. The Independent Monitoring Team expects that any plan developed by NPD would include regular internal and/or external evaluations of its practices.

### E. Use of Force

Excessive force is the police conduct that most captures the attention of the public. Videos of excessive force often go viral on the Internet and cause Americans to question the fairness of police in their community. These videos also frighten many citizens. Accordingly, addressing use of force issues directly impacts the most critical outcomes of police-civilian interactions: safety, legitimacy, and trust. Excessive or unjustified uses of force—including force that causes severe injury or death—profoundly damages community relationships and erodes public confidence in law enforcement. Reform efforts can reduce instances of excessive force and hold officers accountable for inappropriate uses of force. Important reforms necessary to improve a police department's use of force practices include implementing policies that,

among other things, (1) prioritize de-escalation of tense interactions, (2) require officers to exhaust all reasonable alternatives prior to using force, (3) ban dangerous tactics (*i.e.* chokeholds), and (4) mandate clear reporting of force used. As a result of successfully implemented reforms, police departments can enhance public safety and rebuild the essential trust necessary for effective law enforcement.

The DOJ investigation revealed a concerning pattern of excessive force by NPD officers—indeed, over 20% of incidents reviewed by DOJ involved unconstitutionally excessive force. Ex. 2 (DOJ Report) at 23. In many instances, these uses of excessive force resulted in serious injuries to members of the public. *Id*. at 24. DOJ determined this routine use of excessive force was, in part, a function of deficient NPD practices around tracking and reviewing use of force by its officers. In many instances, officers failed to properly document the force they had used in written reports, even failing to complete required Force Reports in certain instances. *Id*. at 25-26. DOJ also found that supervisors were failing to review reports mentioning the use of force, and that the Internal Affairs unit was not reviewing cases in which officers used serious or deadly force, in violation of NPD policy. *Id*. at 28-29.

Accordingly, the Consent Decree included several provisions requiring NPD to reform use of force policy, training, and supervision. The Consent Decree obligated NPD to develop and implement a new use of force policy. Consent Decree ¶ 66. The new use of force policy was to include specific provisions limiting certain types of force, such as neck holds and head strikes, to situations in which deadly force was authorized. Consent Decree ¶ 67. The new policy was also to include restrictions on the use of force against handcuffed individuals. *Id*. The Consent Decree also required officers to obtain additional training and certification requirements for first aid and the use of weapons. Consent Decree ¶¶ 68-70. It addressed the

possession and use of firearms by NPD officers.  It prohibited officers from using unauthorized weapons, significantly limited the circumstances in which officers are permitted to fire at moving vehicles, and required documentation and tracking of all incidents in which officers displayed their firearms.  Consent Decree ¶¶ 71-73.  Finally, the Consent Decree imposed a broad set of requirements around the reporting of force by involved officers and supervisory review of officers' use of force.  Consent Decree ¶¶ 75-89.  Those requirements included the creation of a new team devoted to reviewing serious use of force incidents and a use of force review board. Consent Decree ¶¶ 90-102.

NPD implemented many use of force reforms as required by the Consent Decree.  In the first years of the Consent Decree period, NPD developed three new General Orders addressing issues related to use of force: General Order 18-20, *Use of Force*; General Order 18-21*, Use of Force Reporting, Investigation and Review*; and General Order 18-22, *Firearms and Other Weapons*.  Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at Appendix C. The Independent Monitoring Team reviewed each of those policies, concluded that they contained nearly all of the requirements of the Consent Decree, and approved the policies as compliant with the Consent Decree.[10]  General Order 18-21 established the All-Force Investigations & Tracking Team ("A-FIT"), the department-wide unit responsible for investigating all uses of force required under the Consent Decree.  The Independent Monitoring Team determined that A-FIT's structure and policies are compliant with the Consent Decree. NPD also established the Use of Force Review Board required by the Consent Decree and staffed and trained its members in accordance with Consent Decree requirements.

---

[10] Although Paragraph 101 of the Consent Decree requires NPD to "include the civilian oversight entity in the review of completed [serious force] investigations," NPD is unable to do so as a result of a court order in a case brought by a police union challenging the scope of the Civilian Complaint Review Board's powers.  *See Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*, 236 A.3d 965 (N.J. 2020).

On three occasions, the Independent Monitoring Team audited NPD's compliance with Consent Decree requirements related to the use of force and observed commendable improvement over the course of the Consent Decree period.

The first audit included a review of 84 use of force incidents from the period between July 1, 2019 to September 30, 2019.  Ex. 22 (Eighteenth Quarterly Report, dated October 15, 2021) at 2-5.  The Independent Monitoring Team concluded that, in 92.9% of the use of force incidents reviewed, officers complied with the substantive Consent Decree requirements by following the law and NPD policy surrounding the use of force (*i.e.*, officers had legal authorization to initiate force, used the minimum amount of force necessary, exhausted all other reasonable means, and stopped using force once it was no longer necessary).  *Id*.  In most of the incidents where officers used force in a manner that was illegal or non-compliant with policy, A-FIT took corrective action.  *Id*.  While this rate of substantive compliance was admirable, the Independent Monitoring Team observed that, in a concerning number of cases, NPD officers were *not* properly documenting uses of force as required by NPD policy.  Officers properly documented uses of force in only 75% of the cases reviewed during the first audit.  *Id*. at 5.  To address these documentation deficiencies, the Independent Monitoring Team recommended that NPD take steps to encourage supervisors to review officer force reports more thoroughly.  *Id*. at Appendix C.

The Independent Monitoring Team's second use of force audit covered 104 incidents occurring between July 1, 2021 and September 30, 2021.  Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at 6.  As in the first audit, the Independent Monitoring Team found that NPD officers substantively complied with the Consent Decree by using force in a manner consistent with policy, the Consent Decree, and the law in the overwhelming majority of

incidents—94.23% in the second audit.  *Id*. at 8.  NPD also displayed improved compliance with use of force documentation requirements in the second audit, with the percent of incidents compliant with documentation requirements increasing by nearly twenty percentage points from 75% in the first audit to 92.31% in the second audit.  *Id*.

The third use of force audit covered the period from July 1, 2022 to September 30, 2022 and examined 91 incidents in which NPD officers used force.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 2.  The Independent Monitoring Team's third audit showed that NPD continued to improve its compliance with substantive requirements related to use of force, with compliance increasing to 96.7% of incidents reviewed.  *Id*. at 4.  However, compliance with use of force documentation requirements decreased relative to the second audit, with the percent of incidents compliant with documentation requirements falling to 87.9%.  *Id*.  To improve NPD's compliance with use of force documentation requirements, the Independent Monitoring Team reiterated its recommendation that supervisors increase their review of use of force reports.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at Appendix C.

| USE OF FORCE | | | |
|---|---|---|---|
| **Compliance Type** | **First Audit** | **Second Audit** | **Third Audit** |
| **Substantive Compliance** | 92.9% (78 of 84 events reviewed) | 94.23% (98 of 104 events reviewed) | 96.7% (88 of 91 events reviewed) |
| **Documentation Compliance** | 75% (63 of 84 events reviewed) | 92.31% (96 of 104 events reviewed) | 87.91% (80 of 91 events reviewed) |
| **Overall Compliance** | 67.86% (57 of 84 events reviewed) | 86.54% (90 of 104 events reviewed) | 84.61% (77 of 91 events reviewed) |

Based on the progress exhibited by NPD in this subject area, the Independent Monitoring Team recommends that NPD be relieved of its obligations pursuant to Consent Decree Paragraphs 66-102, as they pertain to Use of Force.

### F. Body-Worn and In-Car Cameras

Body-worn camera ("BWC") and in-car camera ("ICC") programs are a fixture of modern police departments. BWC and ICC are an important part of ensuring that police departments comply with constitutional standards by providing a mechanism for verifying that officers are complying with legal standards and departmental policy when on duty, and they create a clear documentary record of police activity. They protect both officers and civilians alike.

Before the Consent Decree, NPD did not maintain a BWC or ICC program. The Consent Decree included several provisions requiring NPD to implement BWC and ICC programs to "increase officer accountability, improve NPD legitimacy in the community, and augment NPD's records of law enforcement activities." Consent Decree § IX. Under the Consent Decree, NPD was required to equip all "marked patrol cars with video cameras," and to "require [nearly] all officers . . . to wear body cameras and microphones with which to record enforcement activity." Consent Decree ¶ 103. Recognizing that some "appropriate and lawful" police work requires "undercover work or other . . . clandestine police activity," NPD was required to develop a policy under which certain officers and police vehicles could use concealed cameras or go without cameras when engaging in certain activities. Consent Decree ¶ 104. Additionally, NPD was required to develop a comprehensive BWC/ICC policy (or policies) that include provisions covering issues such as which officers are required to use cameras; when cameras are

required to be used; how members of the public are to be informed of recording; and how BWC/ICC video is to be managed and reviewed.  Consent Decree ¶ 105.

NPD implemented the BWC and ICC programs required by the Consent Decree.  In 2017, it commenced BWC/ICC rollout as a pilot program with a handful of officers and precincts.  Ex. 5 (Second Quarterly Report, dated October 6, 2017) at 42.  By 2018, NPD had fully deployed BWC and ICC in several precincts.  Ex. 10 (Sixth Quarterly Report, dated January 16, 2019) at 46-47.  It completed its rollout of BWC and ICC to all officers and cars in the following years.  In addition to equipping officers and cars with BWC and ICC hardware, NPD developed ICC and BWC policies under the supervision of the Independent Monitoring Team and the DOJ soon after Consent Decree adoption.  Ex. 7 (Fourth Quarterly Report, dated May 4, 2018) at 32.  It adopted those policies as General Order 18-06, *In-Car Camera* and General Order 18-05, *Body-Worn Camera* in 2018 and 2019, respectively.  NPD later revised its BWC General Order in 2024, and its ICC General Order in 2025.  The Independent Monitoring Team reviewed those policies and confirmed that they complied with Consent Decree requirements.  Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at Appendix E.

The Independent Monitoring Team undertook three audits of NPD's compliance with Consent Decree requirements and its policies surrounding the use of BWC and ICC.  The first audit covered the period from May 1, 2019 to June 30, 2019 and addressed only BWC, as NPD's ICC rollout was still in progress during that period.  Ex. 16 (Twelfth Quarterly Report, dated April 27, 2020) at 7-10.  During this audit, the Independent Monitoring Team assessed 270 BWC videos from 200 incidents that would have necessitated BWC activation, per policy.  *Id.*  The audit evaluated whether (1) officers were activating their BWC according to policy; (2) officers

were properly notifying subjects that they were being recorded; (3) officers were deactivating their BWC according to policy; and (4) NPD personnel were properly categorizing the videos that were recorded. *Id.*

The first BWC audit ascertained that NPD personnel partially complied with policy. Specifically, the audit found that NPD personnel were compliant with policy regarding two requirements: BWC *deactivation* and BWC *video categorization*, with 96.55% and 95.02% compliance among the videos reviewed, respectively. *Id.* However, NPD personnel were *not* compliant with policy with respect to: BWC *activation* and *notification*, with compliance below the 95% threshold for both metrics (90.74% for activation and 77.95% for notification). *Id.* To improve NPD's compliance, the Independent Monitoring Team recommended that NPD issue a memorandum on its BWC policy to all officers; develop a refresher training for officers; and improve integration between the BWC system and NPD's computer-aided dispatch system in order to enhance video tracking. *Id.*

The Independent Monitoring Team's second BWC audit and first ICC audit covered the period from June 1, 2021 to June 30, 2021. Ex. 24 (Twentieth Quarterly Report, dated April 28, 2022) at 1-4. For the BWC portion of the audit, the Independent Monitoring Team assessed the same four outcomes that it assessed in the first BWC audit: (i) activation, (ii) deactivation, (iii) categorization, and (iv) citizen notification. *Id.* at 3. The Independent Monitoring Team observed improvement between the first and second audits. The compliance percentage among incidents reviewed increased from 90.74 to 95.11 for activation; 96.55 to 100 for deactivation; and 95.02 to 98.04 for categorization. *Id.* However, in the area of notification, NPD's compliance remained below the 95% compliance threshold, at 78.57%. *Id.*

46

The first ICC audit examined both whether NPD vehicles were equipped with ICC as required by policy, and whether officers were using ICC in a manner that comported with NPD policy. The Independent Monitoring Team inspected 26 NPD vehicles and found that only one was not equipped with ICC, for a compliance rate of 96.15%. *Id*. at 4. The Independent Monitoring Team also found that in every incident reviewed, NPD officers properly deactivated ICC according to policy. *Id*. However, the Independent Monitoring Team also found that NPD was not compliant with certain other aspects of its ICC policy. Specifically, NPD officers only activated ICC in a policy-compliant manner in 84.34% of cases, and ICC video was available for only 50% of instances in which NPD officers transported suspects.

The Independent Monitoring Team conducted a third BWC audit and second ICC audit for the period covering June 1, 2022 to June 30, 2022. Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at 12. The BWC portion of this audit covered only the notification requirement, as NPD had exhibited sufficiently high rates of compliance on activation, deactivation, and categorization in the two prior audits. *Id*. at 12. While the Independent Monitoring Team observed some improvement in BWC notification practices—with compliance increasing from 78.57% to 84.55% in this audit—NPD's compliance rate remained below the 95% threshold. *Id*. at 13. In the ICC portion of the audit, the Independent Monitoring Team observed that NPD officers were continuing to properly deactivate ICC in 100% of incidents reviewed. *Id*. However, while the Independent Monitoring Team observed significant improvement in NPD's compliance with requirements around activating ICC and maintaining ICC footage for the transportation of suspects, compliance for these two metrics remained below the 95% threshold. *Id*.

The Independent Monitoring Team recommended additional roll-call training on BWC and ICC issues in order to improve compliance with policy. Ex. 26 (Twenty-Second Semi-Annual Report, dated May 31, 2023) at 12.

| BODY-WORN CAMERA | | | |
|---|---|---|---|
| Compliance Type | First Audit | Second Audit | Third Audit |
| Activation | 90.74% (245 of 270 events reviewed) | 95.11% (255 of 266 events reviewed) | n/a—NPD deemed Fully Compliant |
| Notification | 77.95% (152 of 195 events reviewed) | 78.57% (121 of 154 events reviewed) | 85.91% (189 of 220 events reviewed) |
| Deactivation | 96.55% (251 of 261 events reviewed) | 100% (255 of 255 events reviewed) | n/a—NPD deemed Fully Compliant |
| Categorization | 95.02 (248 of 261 events reviewed) | 98.04% (250 of 255 events reviewed) | n/a—NPD deemed Fully Compliant |

In March and April 2023, the Independent Monitoring Team conducted a third ICC review. Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 5. This review involved inspecting 65 NPD vehicles to determine whether they were properly equipped with ICC. *Id*. The Independent Monitoring Team found that, of the 65 vehicles examined, 45 were equipped with functioning ICC systems, one was not, and 19 could not be verified because they were out of service for reasons unrelated to ICC. *Id*. Based on this review, the Independent Monitoring Team determined that NPD was in full compliance with the ICC requirements of the Consent Decree.

| IN-CAR CAMERA | | | |
|---|---|---|---|
| Compliance Type | First Audit | Second Audit | Third Review (Vehicle Inspection) |
| Activation | 84.34% (140 of 166 events reviewed) | 92.19% (177 of 192 events reviewed) | n/a—not covered |
| Deactivation | 100% (100 of 100 events reviewed) | 100% (177 of 177 events reviewed) | n/a—not covered |
| Transportation | 50% (2 of 4 events reviewed) | 92.85% (13 of 14 events reviewed) | n/a—not covered |
| Vehicle Inspection | 96.15% (40 vehicles reviewed; 25 equipped; 1 not equipped; 14 unavailable) | 83.72% (51 vehicles reviewed; 36 equipped; 7 not equipped; 8 unavailable) | 97.8% (65 vehicles reviewed; 45 equipped; 1 not equipped; 19 unavailable) |

In addition to the recommendations made during the course of all the audits, the Independent Monitoring Team spent considerable time and effort providing technical assistance to the Newark Police Department. This technical assistance included working with system vendors and NPD Information Technology staff to address many technical shortcomings in NPD's in-car and body-worn camera systems. These challenges included inability to review video remotely and slow or intermittent playback, as well as missing data and videos. In 2024, NPD began the process of modernizing its in-car and body-worn camera systems to meet current standards and best practices.

In May 2024, the Court terminated Consent Decree paragraphs 103 and 104, relating to the implementation of In-Car and Body-Worn Cameras. The Independent Monitoring Team agrees with the Court's decision.

### G. Property and Evidence

Police departments must implement modern, effective property and evidence policies and procedures to ensure transparency and accountability. These measures are crucial not only to prevent actual instances of officer theft or mishandling but also to eliminate the perception of

such misconduct.  By maintaining a clear, secure, and verifiable chain of custody for all materials in their possession, custody, or control, police departments can bolster public trust and ensure the integrity of evidence that may be used in criminal prosecutions.

The DOJ's investigation uncovered evidence that NPD had failed to address systemic theft from civilians by NPD officers.  Ex. 2 (DOJ Report) at 30-34.  DOJ found that a well-known problem in NPD was widespread theft from arrestees and other civilians who had contact with NPD.  *Id*. at 31.  NPD had failed to act on these many theft reports.  *Id*.  This problem was aggravated by significant deficiencies in NPD's property and evidence management system.  *Id*. at 32.  According to DOJ's findings, NPD failed to take basic precautions to ensure that civilian property was protected against loss or theft, such as routinely using a computerized property management system and implementing protocols to ensure that all property would be counted and inventoried by at least two people.  *Id.*  Even the physical facility where NPD maintained civilian property was substandard, lacking basic security features such as automatic locks.  *Id*.

In light of these findings, the Consent Decree included several provisions requiring NPD to improve its property and evidence management practices in order to guard against loss or theft of civilian property.  The Consent Decree required NPD to implement a policy under which officers seizing civilian property would be required to submit the property, along with a report on the property seized, by the end of their shift.  Consent Decree ¶ 105.  It required NPD to conduct increased oversight of officers handling property, with a particular emphasis on officers in specialized units and officers who routinely handled valuable contraband or cash.  Consent Decree ¶¶ 106-107.  NPD became obligated to report allegations of theft for prosecution, and to transfer certain officers accused of theft out of positions where those officers could have access to civilian property.  Consent Decree ¶¶ 108-109.  Finally, the Consent Decree required NPD to

revamp its property and evidence storage practices, which included obligations to improve the security of the storage facility, implement an electronic records management system, and develop a new policy for officers working in the storage facility.  Consent Decree ¶ 110.

NPD took steps to reform its property and evidence management practices over the course of the Consent Decree period.  In 2018, NPD—working with the Independent Monitoring Team—developed *three* new policies governing the management of property and evidence.  Ex. 14 (Tenth Quarterly Report, dated January 13, 2020) at 2-3.  NPD implemented these policies as General Order 18-23, *Property and Evidence Management*; General Order 18-24, *Property and Evidence Division*, and General Order 16-04, *Municipal Arrest Processing Section*.  After approving these policies, the Independent Monitoring Team worked with NPD to produce a manual for officers working in the Property and Evidence Division.  NPD finalized this manual in 2020.  Ex. 18 (Fourteenth Quarterly Report, dated September 28, 2020) at 12-13.

At the outset of the Consent Decree period, the Independent Monitoring Team toured NPD's central property and evidence storage facility.  The Independent Monitoring Team determined that the facility was in disrepair and lacked critical security features such as cameras, lighting, and locking doors.  Ex. 14 (Tenth Quarterly Report, dated January 13, 2020) at 6.  NPD undertook significant efforts to improve the physical condition of the property and evidence storage facility by restoring damaged portions of the building, upgrading lighting and security cameras, and installing an electronic locking system.  *Id*. at 7.  However, the Independent Monitoring Team concluded that further upgrades were necessary to bring NPD into full compliance with Consent Decree requirements regarding property and evidence management.  *Id*. at 9.

 

***Exterior and Interior of Central Property & Evidence Facility at Beginning of Consent Decree Period***

Given these findings, NPD chose to build a new property and evidence storage facility. This facility opened in 2024.  *See* Eric Kiefer, *Newark Cops, Firefighters, Community Will Share New Training Center*, Patch (Mar. 4, 2024), https://patch.com/new-jersey/newarknj/newark-cops-firefighters-community-will-share-new-training-center.  Shortly thereafter, and before the Independent Monitoring Team could conduct its inspection of NPD's new Property and Evidence facility, the Parties filed a Joint Motion seeking to terminate the provisions of the Consent Decree pertaining to Property and Evidence.

 

*Exterior & Interior of New Central Property & Evidence Facility*

While NPD has expended substantial efforts and resources to improve its property and evidence management practices, the Independent Monitoring Team's audits of NPD's property and evidence management practices revealed that improvement in policy and physical facilities have not yet translated to full compliance with Consent Decree requirements.

The Independent Monitoring Team audited NPD's property and evidence management practices twice: once for the period covering May 1, 2021 to June 30, 2021, and a second time for the period covering May 1, 2022 to June 30, 2022. Ex. 27 (Twenty-Third Semi-Annual Report, dated January 16, 2024) at 1; Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 17. Both audits revealed that, in every case reviewed, NPD officers were complying with policy regarding the correct storage of property and evidence in the appropriate NPD storage facility. Ex. 27 (Twenty-Third Semi-Annual Report, dated January 16, 2024) at 4-5; Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 18.

However, the audits also revealed a concern: in a high percentage of cases, officers were not properly documenting seizures of property or evidence in a manner that comported with NPD policy. Ex. 27 (Twenty-Third Semi-Annual Report, dated January 16, 2024) at 4-5; Ex. 28

(Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 18.  After its first audit, the Independent Monitoring Team recommended additional training on property and evidence policy.  Ex. 27 (Twenty-Third Semi-Annual Report, dated January 16, 2024) at 5.  In the second audit, covering a period one year later than the first, the Independent Monitoring Team observed some improvement in NPD officers' compliance with property and evidence documentation practices, but the rate of compliance nonetheless remained well below the 95% compliance threshold.  Ex. 28 (Twenty-Fourth Semi-Annual Report, dated March 15, 2024) at 18-19.  No further property and evidence audits were conducted by the Independent Monitoring Team and none have been conducted since the opening of the new NPD storage facility.

The audits highlighted that NPD needed to make further changes to its policies and procedures in order to align with law enforcement best practices around the management of property and evidence.  *First*, the Independent Monitoring Team concluded that both officers and supervisors needed additional training on properly documenting the recovery and storage of property and evidence.  *Second*, the Independent Monitoring Team recommended that NPD evaluate its electronic property and evidence management systems to ensure they conform with the standards of the recently completed facility, modern law enforcement norms, and the standards set forth by the New Jersey State Police's Office of Forensic Sciences.

In May 2024, the Court terminated Consent Decree Paragraphs 105-110, concerning Property and Evidence.  *See* Order Granting Parties' Joint Motion for Partial Termination, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J. May 17, 2024), Dkt. No. 360.  The Independent Monitoring Team agrees with the Court's decision.  However, going forward, at minimum, NPD's new Property and Evidence facility should be inspected and assessed to ensure compliance with law enforcement best practices and adherence to the standards of the *Evidence*

*Field Manual* published by the New Jersey State Police's Office of Forensic Sciences. Additionally, NPD should implement the reforms discussed above, as well as those mentioned in the relevant Independent Monitoring Team audit reports.

### H. Internal Affairs

Since 1997, New Jersey law has required police departments to promote law enforcement accountability by maintaining an internal affairs unit that operates according to the standards set out by the New Jersey Attorney General. N.J. Stat. Ann. § 40A:14-181. At the heart of this accountability model is the notion that aneffective and dependable internal affairs unit is an important tool by which law enforcement agencies demonstrate their underlying legitimacy with the communities they serve, and also drive and sustain organizational growth. External oversight and mandates as part of a consent decree can initiate crucial changes in policies and officer behaviors, but an internal affairs unit, among other mechanisms, is an important tool for ensuring thatreforms take hold and higher levels of professionalism become lasting cultural shifts within a police department. An internal affairs unit acts as the department's conscience: vigilantly investigating allegations of misconduct, upholding department standards, and reinforcing accountability from within. Without a well-trained and impartial internal affairs unit, the hard-won gains of reform can easily dissipate once external pressures or oversight diminish, allowing old habits and unwanted behaviors to resurface. Worse, a weakened or compromised internal affairs unit can itself signal an increased level of tolerance for a style of policing that loses community confidence and ultimately makes the environment unsafe for everyone, officers and public alike.

DOJ's investigation identified significant deficiencies in NPD's internal affairs unit (later renamed during the DOJ investigation as the Office of Professional Standards ("OPS")). DOJ

found that, in most cases, NPD's internal affairs unit failed to collect evidence from complainants; failed to objectively assess the evidence it did collect; exhibited bias in favor of officers; and discouraged civilians from making complaints by subjecting them to *Miranda* warnings before taking their statements. Ex. 2 (DOJ Report) at 6 n.3, 41-44. These deficiencies meant that, in many cases, NPD was not holding officers accountable for serious misconduct. For example, DOJ found that, between 2007 and 2012, NPD sustained only *one* complaint of excessive force out of hundreds received, and between 2009 and 2011, NPD sustained only *two* complaints of theft by officers, despite dozens of theft complaints. *Id.* at 6, 38. Additionally, DOJ found that in rare instances where officers were held accountable, NPD's disciplinary decisions were arbitrary and inconsistent. *Id.* at 41-42.

The Consent Decree included 28 provisions requiring NPD to restructure its internal affairs processes. NPD was required to modify the processes by which it received civilian complaints, which included additional training for officers on communicating with complainants and a requirement that NPD conduct integrity audits to ensure officers did not discourage, misconstrue, or marginalize complaints. Consent Decree ¶¶ 112-120. The Consent Decree further required NPD to adopt a centralized tracking system for misconduct complaints; standardize its investigative process; refrain from discrediting evidence simply because it came from a civilian complainant; and ensure that investigations are not conducted by officers with conflicts of interest. *Id.* at ¶¶ 126-136. The Consent Decree imposed new requirements around cases where there were parallel criminal and internal affairs investigations into officer conduct: among other things, it required NPD to complete internal affairs investigations even in cases where a prosecuting agency declined to bring charges. *Id.* at ¶¶ 137-140. The Consent Decree also required NPD to improve staffing, training, and policy for the internal affairs unit, and to

track and monitor data on the progress of internal affairs cases.  *Id*. at ¶¶ 141-149.  Finally, the Consent Decree required NPD to formalize and standardize its officer discipline system through the development and implementation of a written disciplinary matrix.  *Id*. at ¶¶ 152-155.

### *The Independent Monitoring Team's January 2019 Report on IA Investigations*

Shortly after the Consent Decree period began, the Independent Monitoring Team evaluated a sample of internal affairs case files from 2015 and 2016 to provide a baseline assessment of NPD's internal affairs function prior to any reforms, and to guide those reforms. Ex. 10 (Sixth Quarterly Report, dated January 16, 2019) at 14.  The Independent Monitoring Team's evaluation revealed many of the same problems that DOJ's investigation had identified. Specifically, the Independent Monitoring Team found, among other things:

- NPD's method of receiving civilian complaints risked deterring complainants.  *Id*. at 21-22.
- Complaints were often miscategorized.  *Id*. at 22-25.
- NPD failed to adequately communicate with complainants, and when it did, used threatening language.  *Id*. at 26-29.
- Interviews of complainants and officers were often cursory, and in many instances, NPD inappropriately permitted officers to provide only a written account of their actions, often prepared in consultation with their legal representatives.  *Id*. at 29-35.

Based on this review, the Independent Monitoring Team made several recommendations to NPD, including that:

- NPD improve its process for screening and classifying complaints*, id.*at 25.
- Audit the process by which complaints are referred to supervisors, *id.* at 26.
- Rewrite its complainant notification letter and ensure that  additional steps are taken to provide timely updates to complainants, *id.* at 27.
- Develop interview checklists and scripts to guide NPD investigators in conducting interviews of complanants and subject officers, *id*. at 32.
- Ensure that investigators continue to work on cases that have been declined for criminal prosecution by the Essex County Prosecutors' Office, *id.* at 37.

### *Domestic Violence*

An area of particular concern for the Independent Monitoring Team was NPD's handling of allegations of domestic violence by NPD officers. The 2014 investigation by the DOJ identified as an "Area of Concern" NPD's "ignorance or bias concerning victims of sexual assault," which resulted in crucial investigative deficiencies. Ex. 2 (DOJ Report) at 46. Additionally, the so-called "Lautenberg Amendment" (named for former New Jersey Senator Frank Lautenberg) makes it a federal crime for an individual convicted of a domestic violence crime to possess a gun, including police officers. *See* 18 U.S.C. § 922(g)(9). Accordingly, it is of paramount importance for police departments to monitor and respond to allegations of domestic violence against their officers. Moreover, in the early days of the Consent Decree, the Independent Monitoring Team observed several media reports of arrests of NPD officers for domestic abuse and similar offenses.

In order to investigate this issue, as part of the evaluation of a sample of internal affairs cases from 2015 and 2016, the Independent Monitoring Team reviewed OPS' handling of domestic violence complaints against NPD officers and complaints with respect to officers' response to domestic violence calls. Ex. 10 (Sixth Quarterly Report, dated January 16, 2019) at 39-41. The Independent Monitoring Team's review revealed that victims of domestic violence at the hands of NPD officers—especially those with limited English proficiency—faced significant hurdles to having their complaint properly investigated. *Id.* at 40. For example, the Independent Monitoring Team observed many "*Not Sustained*" findings in internal investigations of domestic violence incidents involving NPD personnel as well as short-tempered 911 call takers, dispatchers withholding pertinent information, and officers applying discretionary enforcement standards in an unsympathetic manner. *Id.* at 41.

To address these shortcomings, the Independent Monitoring Team recommended that NPD improve the culture of its Internal Affairs/OPS unit by (1) updating its policies, (2) developing an internal affairs procedural manual, (3) conducting regular training regarding domestic violence and sexual assault allegations by persons knowledgeable in the area, (4) hiring non-sworn personnel with expertise in the dynamics of abusive relationships to serve as a liaison for victims, and as an advisor to OPS, and (5) carefully evaluating the Internal Affairs/OPS leadership to ensure that those with responsibility for managing the unit were appropriately handling domestic violence complaints involving NPD officers.  *Id.*

There is some evidence that NPD's internal affairs unit is treating domestic violence allegations against NPD officers with the seriousness they deserve.  In data reported to the New Jersey Attorney General beginning in 2021, NPD reported that it was conducting several internal affairs investigations into domestic violence allegations (both criminal and non-criminal) each year.[11]  However, the New Jersey Attorney General data indicate that NPD did not often impose major disciplinary sanctions on officers as a result of its domestic violence investigations.[12] Moreover, data collected by the New Jersey Attorney General, media reports, and information provided to the Independent Monitoring Team by NPD pursuant to Consent Decree Paragraph

---

[11] Specifically, NPD reported 15 "non-criminal" domestic violence investigations to the Attorney General in 2021; 13 "non-criminal" and 12 "criminal" domestic violence investigations in 2022; 17 "non-criminal" domestic violence investigations in 2023; and 5 "criminal" and 5 "non-criminal" domestic violence investigations in 2024. *See* New Jersey Law Enforcement Internal Affairs (IA) Investigations, available at https://www.njoag.gov/iadata/.

[12] The New Jersey Attorney General requires all New Jersey police agencies to submit an annual report of "major discipline" imposed on officers, with "major discipline" defined as termination, reduction in rank, or suspension of more than 5 days. *See* https://www.njoag.gov/majordiscipline/.  NPD did not impose major discipline in any domestic violence cases in 2021 or 2024. NPD imposed major discipline in one 2022 case involving domestic violence—it terminated Lt. John Formasino, who was convicted of murdering his estranged wife with his service weapon.  Major Discipline Reporting January 1, 2022 to December 31, 2022, p. 89, NEW JERSEY OFFICE OF THE ATTORNEY GENERAL, available at https://www.nj.gov/oag/iapp/docs/Major-Discipline-1-01-22-to-12-31-22.pdf.   It imposed major discipline in two domestic violence cases in 2023.  Major Discipline Reporting January 1, 2023 to December 31, 2023, pp. 154-55, NEW JERSEY OFFICE OF THE ATTORNEY GENERAL, available at https://www.njoag.gov/wp-content/uploads/2024/08/Major-Discipline-1-01-23-to-12-31-23.pdf.

199,[13] suggest that domestic violence by NPD officers remains a serious concern.[14]  NPD should continue working to implement the Independent Monitoring Team's recommendations around domestic violence-related reform and evaluate any additional steps that may be necessary.

### NPD's Internal Affairs Policies and Protocols

NPD took steps to reform its internal affairs unit during the Consent Decree period, including taking some action towards improving the culture of the unit.  Early in the Consent Decree period, NPD worked with the Independent Monitoring Team and other consultants to develop a revised set of internal affairs policies.  These policies—which included guidance for commanders and supervisors, a standard procedure for complaint intake and investigations, and a disciplinary process and matrix—were finalized in 2019.  Ex. 15 (Eleventh Quarterly Report, dated April 27, 2020) at 5-6.  After the policies were complete, NPD also prepared an internal affairs manual to provide a set of standard operating procedures for internal affairs officers.  Ex. 25 (Twenty-First Semi-Annual Report, dated May 31, 2023) at 4.

The City and NPD erred, however, by developing these revised policies in isolation, rather than in consultation with the relevant NPD employee unions.  Because NPD's new internal affairs policies impacted the terms and conditions of officer employment, they ran the risk of being challenged by NPD employee unions if implemented unilaterally rather than

---

[13] Consent Decree paragraph 199 provides that "NPD will notify the Monitor and DOJ as soon as practicable, and in any case within 24 hours, of any critical firearm discharge, in-custody death, or arrest of any officer."

[14] Since the Independent Monitoring Team conducted its review of NPD's handling of domestic violence complaints, it has become aware of additional reporting of NPD officers' involvement in domestic violence incidents.  *See e.g.*, Alice Gainer, *Former Newark Lt. John Formasino sentenced to 79 years in prison in murder of his estranged wife, Christie Formasino*, CBS News (Dec. 19, 2022) available at https://www.cbsnews.com/newyork/news/former-newark-lt-john-formasino-faces-sentencing-in-murder-of-his-estranged-wife-christie-formasino/; *see also* Major Discipline Reporting January 1, 2023 to December 31, 2023, pp. 154-55, New Jersey Office of the Attorney General, available at https://www.njoag.gov/wp-content/uploads/2024/08/Major-Discipline-1-01-23-to-12-31-23.pdf (detailing PO Jeanette DeJesus' indictment for criminal law offenses related to a domestic violence incident and suspension of PO Ricardo Mendieta for engaging in a domestic violence dispute "that rapidly escalated into a physical altercation resulting in his arrest.").  As such, this issue has remained a focus of the Independent Monitor.

through the established collective bargaining process.  While DOJ and the Independent

Monitoring Team could play no role in negotiating with the unions, the City and NPD simply

elected not to do so.  Consequently, NPD employee unions challenged the new policies as

unlawful unilateral changes to previously-bargained personnel policies and protections embodied

in existing collective bargaining agreements ("CBAs").

Specifically, in 2015 and 2016, two Newark police unions challenged portions of the

revised policies, such as the officer disciplinary matrix, before the New Jersey Public Employees

Relations Commission ("PERC").  PERC held that the City and NPD violated their duty under

the CBAs and New Jersey labor law to bargain with the unions regarding certain discipline-

related provisions of the new policies ordered NPD to rescind the challenged changes.  Instead of

undertaking the collective bargaining process in the wake of the PERC decision, the City

appealed the PERC decision to the Appellate Division of the Superior Court of New Jersey

("Appellate Division").  Ultimately, the Appellate Division affirmed PERC's determination.  *See

City of Newark v. Fraternal Order of Police, Newark Lodge No. 12*, 2023 WL 6439402 (N.J.

App. Div. Oct. 3, 2023).  While the *City of Newark* litigation meant that NPD could not

implement many provisions of its revised internal affairs and disciplinary policies, the court did

not reject the policies as inherently illegal.  Rather, the court's ruling merely prohibited NPD

from implementing the policies without first subjecting them to the collective bargaining and,

where necessary, use of bargaining impasse procedures.  But notwithstanding the court's

direction in October 2023, the City and NPD have not sought to bargain with, or even propose

changes to, labor representatives.  Therefore, NPD's failure to implement Consent Decree-

compliant policies is largely a result of its own inaction.

### *NPD's Disposition of Discipline*

Despite setbacks from its failure to follow the required process to implement Consent Decree-compliant policies, NPD has managed to make some changes in its approach to officer accountability while following existing, previously-bargained disciplinary processes and standards.  The DOJ's original investigation revealed that, as of 2014, NPD had not disciplined a single officer for engaging in excessive force in more than five years and that NPD's internal affairs unit, the Office for Professional Standards, had sustained only one civilian complaint of excessive force from 2007 through 2012.  Ex. 2 (DOJ Report) at 3.  Subsequent data provided by NPD suggests that, even under its older, bargained-for disciplinary processes and standards, NPD leadership has become more willing and able to take disciplinary action against officers found to have committed misconduct, including terminations, suspensions and types of sanctions:

| Disposition[15] | Year 2018 | Year 2019 | Year 2020 | Year 2021 | Year 2022 | Year 2023 | Year 2024 | Year 2025 (partial) |
|---|---|---|---|---|---|---|---|---|
| Disciplinary Hearings Held | 269 | 232 | 138 | 110 | 249 | 288 | 275 | 92 |
| Personnel Disciplined | 221 | 220 | 131 | 98 | 231 | 247 | 240 | 73 |
| Total Suspension Days | 1,024 | 889 | 1,001 | 437 | 1,501 | 681 | 483 | 208 |
| Terminations | 5 | 2 | 1 | 0 | 2 | 4 | 2 | 0 |

---

[15] Information in this table is based on transparency data provided by NPD, available at https://www.newarkpublicsafety.org/npd/transparency-data/.  The New Jersey Attorney General also publishes officer disciplinary data involving major disciplinary actions for NPD and other New Jersey police departments, which is available at https://www.njoag.gov/majordiscipline/.  The data published by the Attorney General differs somewhat from the data provided by NPD—for instance, NPD reported terminating two officers in 2024, but the Attorney General's report does not list any NPD officers terminated in 2024.  This is because NPD reports personnel action in the year it is taken, while the Attorney General does not include personnel action in its data until all administrative appeals and lawsuits are resolved and the personnel action becomes final.

NPD's officer accountability efforts have included holding officers accountable for using excessive force.  For example, in June 2023, NPD suspended an officer who used "profane language and excessive force on a prisoner."[16]  Similarly, in March 2023, NPD suspended an officer "for use of force" because he improperly "used pepper spray on a prisoner, who was restrained."[17]

Officers also have been held accountable for certain forms of egregious misconduct through criminal prosecution.  For example, in 2019, NPD officer Jovanny Crespo improperly opened fire with his service weapon on a car during a chase, killing one passenger and injuring another.  NPD terminated Officer Crespo and cooperated with the Essex County Prosecutor's Office in a prosecution of Officer Crespo on charges of aggravated manslaughter.  In 2024, Officer Crespo was convicted and sentenced to 27 years in prison.  *See* Richard Cowen*, N.J. cop who shot 2 during high speed chase is sentenced to prison*, NJ.com (Jun. 3, 2024), https://www.nj.com/essex/2024/05/nj-cop-who-shot-2-during-high-speed-chase-is-sentenced-to-prison.html.

### The Independent Monitoring Team's 2025 Limited Review of Internal Affairs

As described above, NPD's revised internal affairs policies remained in flux for much of the Consent Decree period due to the *City of Newark* litigation and the City and NPD's decision not to attempt any form of bargaining while the litigation was pending.  As a result, the parties and Independent Monitoring Team recognized that auditing NPD's compliance with Consent Decree provisions—many of which relied upon changes to previously-bargained policies—

---

[16] *See* Professional Standards Data – June 2023, available at https://www.newarkpublicsafety.org/wp-content/uploads/2023/07/6-June-2023-updated.pdf.  NPD has not made available disciplinary action data from years prior to 2018.

[17] *See* Professional Standards Data – June 2023, available at https://www.newarkpublicsafety.org/wp-content/uploads/2023/03/3-March-2023-transparency-report-website.pdf

would not be viable until resolution of the litigation and the passage of sufficient time for the City and NPD to propose any desired policy changes.  By the summer of 2024, however, it became clear that NPD would not be taking steps to revise its policies or submit them for collective bargaining at any point in the near future.  Accordingly, the Independent Monitoring Team engaged the Parties, and later the Court, to discuss conducting some form of limited review of NPD's internal affairs *practices*, even as policy development lagged. .

Ultimately, the Court approved in March 2025 a limited review that would focus largely upon certain core Consent Decree requirements as exhibited in a small, 26-case sample of internal affairs investigations completed in 2024 or 2025.  From the very beginning, the Parties, Independent Monitoring Team, and Court recognized that such a limited review would require using a more limited methodology than typical for the Independent Monitoring Team's audits and, consequently, would provide more of a "snapshot" of the NPD's accountability system than a detailed survey.  Accordingly, the Independent Monitoring Team is reluctant to draw definitive conclusions from this review.

However, the limited review suggested that internal affairs is an area where NPD has made only modest progress during the Consent Decree.[18]  Although the widespread availability of body-worn and in-car camera technology has made it easier for NPD to prove or disprove allegations of misconduct, NPD lags seriously in critical areas such as documenting complaint intakes, conducting interviews, and fairly and credibly weighing the totality of evidence obtained in investigations.  These weaknesses surfaced most prominently in the most challenging cases: those in which where officer culpability was genuinely in dispute, as opposed to those cases in

---

[18] Some of this lack of progress arises from external factors, such as delay associated with the collective-bargaining process.  Other delays arise from the City and NPD's own choices, such as the choice to not attempt bargaining during the *City of Newark* litigation or during the 20 months since the litigation concluded.

the review sample where officer culpability was largely established at the outset by various means (work by other law enforcement agencies, conclusive video evidence, or officer admissions of misconduct).  For example, the Independent Monitoring Team found that NPD officers rarely, if ever, document oral complaints from citizens by recording them, despite the widespread availability of body-worn cameras within the department.  As another example, the Independent Monitoring Team also found that internal affairs investigators rarely use video recordings during officer interviews in order to explore discrepancies between written statements and video evidence.

In some areas, NPD has failed to overcome setbacks in developing policy and training to improve its accountability system: the Independent Monitoring Team found that NPD has not taken steps since the 2023 Appellate Division decision to update its internal affairs policies in a manner consistent with both Consent Decree requirements and the court's decision.  In others, the NPD has simply done little or nothing to satisfy Consent Decree requirements.  For example, while the Consent Decree requires internal affairs investigators to make recommendations for potential improvements to policy or training based on the findings of internal affairs investigations, the Independent Monitoring Team saw no evidence that NPD was complying with this requirement.  Similarly, while the Consent Decree requires NPD to conduct integrity audits to ensure the complaint intake process is fair and accessible, the Independent Monitoring Team saw no evidence that NPD was complying, or even working to comply, with this requirement.

*Recommendation*

NPD must take steps to improve its internal affairs function as it moves on from the Consent Decree.  NPD has not worked to develop new internal affairs policies that are consistent

with Consent Decree requirements, policing best practices, and the requirements of New Jersey labor law.  Accordingly, NPD is still working under pre-Consent Decree policies in many areas of the internal affairs function.  In the coming years, NPD should prioritize taking the necessary steps to implement state-of-the-art internal affairs policies, doing so unilaterally where the Appellate Division's decision permits and in concert with Newark police unions where bargaining is required.  Once policies are comprehensively revised, NPD must ensure that officers and internal affairs investigators are effectively trained on those policies, and supervisors must ensure that the revised policies are being implemented on a day-to-day basis.  Then, NPD will need to undertake an in-depth review of its internal affairs process to assess whether it has remediated the deficiencies identified by the Independent Monitoring Team during the Consent Decree period.

### I.  *Data Systems*

In its report on unconstitutional conduct by NPD, the DOJ concluded that many of the failings it identified were downstream from inadequate data collection and analysis by NPD.  Ex. 2 (DOJ Report) at 3.  For example, the DOJ found that NPD did not systemically "maintain, track, or analyze demographic data for its law enforcement actions," which prevented NPD from identifying and addressing unwarranted racial disparities in stops, searches, and arrests.  *Id*. at 17-18.  The DOJ further found that NPD failed to meaningfully track data on its officers' use of force, which "limit[ed] the ability of the NPD to track and analyze officer use of force of practices for accountability, training, or officer safety purposes."  *Id*. at 23.  And the DOJ found that NPD did maintain an early warning system, which could be used to "identify patterns of [problematic] activity by officers and groups of officers for supervisory review and intervention."  *Id*. at 43.

In order to rectify the deficiencies that the DOJ identified, several provisions of the Consent Decree required NPD to "develop, implement, and maintain contemporary records and management systems to allow [for] the close and effective supervision" of officers. Consent Decree § XIV. Specifically, the Consent Decree required NPD to create a computerized early warning system to "track and analyze information regarding the activities of all NPD personnel," such as use of force incidents, allegations of unlawful conduct, disciplinary action, and officer training history. Consent Decree ¶¶ 156-157. NPD was required under the Consent Decree to develop an early warning system that could automatically identify potentially problematic patterns of behavior for supervisory intervention and that would include the electronic transfer of information from other data systems, to maximize efficiency. Consent Decree ¶¶ 158, 160. Additionally, NPD was required to develop a protocol under which commanders and supervisors would conduct periodic reviews of all officers under their command. Consent Decree ¶ 159. Finally, NPD was required to upgrade its existing electronic records management system to interface with the early warning system and other NPD data systems. Consent Decree ¶¶ 162-163.

Unfortunately, NPD did not take the necessary steps to improve its data systems in the manner that the Consent Decree contemplated and required. Throughout the Consent Decree period, the Independent Monitoring Team provided significant technical assistance with data systems reform, including by educating NPD Information Technology staff on best practices. Early in the Consent Decree period, the Independent Monitoring Team encouraged NPD to retain staff or consultants devoted to work on NPD data systems, given the specialized knowledge and expertise required. Ex. 6 (Third Quarterly Report, dated January 15, 2018) at 35-36. The Independent Monitoring Team recommended vendors to NPD and assisted NPD staff in working

with the vendor it engaged.  Although the Consent Decree period commenced in 2016, NPD did not engage a data systems consultant until 2018.  Ex. 10 (Sixth Quarterly Report, dated January 16, 2019) at 48.  The consultant submitted its thorough and comprehensive report in late 2018, concluding that NPD's information technology and data systems required comprehensive restructuring at a cost of approximately $31 million.  Ex. 13 (Ninth Quarterly Report, dated October 25, 2019) at 3-7.  The report provided NPD with guidance on the steps it would need to take to bring its data systems into compliance with Consent Decree requirements.  However, in the wake of the report, NPD took no meaningful action to implement those recommendations.  *See* Ex. 13 (Nineteenth Quarterly Report, dated December 28, 2021) at 9-16.  The Independent Monitoring Team's ability to conduct an audit of NPD's data systems is contingent upon the Parties' readiness, including NPD's Early Warning System vendor making necessary changes to its software.

Due to the limited progress in this area, the Independent Monitoring Team was unable to conduct a meaningful review of NPD's data systems and implementation of an early warning system.

Although the financial burden associated with implementing a state-of-the-art data system is significant, that cost is a reflection of the number of decades that NPD's data systems have been neglected.  It is regrettable that NPD failed to bring its data systems in line with Consent Decree requirements during the nearly decade-long Consent Decree period.  As the DOJ explained in its report, NPD's inadequate data systems left the department blind to many of the deficient practices that the DOJ identified.  The data system requirements of the Consent Decree were intended to set NPD up for success after the termination of the Consent Decree by providing NPD supervisors with invaluable information on its weaknesses that could allow for

important self-correction.  Although NPD has done a great deal of important work to reform its practices during the Consent Decree period, its failure to take action in the critically important area of data systems means that NPD will be flying blind into the post-Consent Decree period, with limited insight into whether there has been backsliding on the department's important progress.  As NPD moves on from the Consent Decree, it is important that the City take advantage of future opportunities to improve NPD's data systems.  For the reasons described above, the Independent Monitoring Team cannot recommend that NPD be relieved of its obligations related to Data Systems.

### J.  Supervision

The importance of supervisory officers to the successful implementation of reforms within a police department cannot be overstated.  Their influence permeates nearly every aspect of the reform process, from crucial areas like use of force, stops, searches, and arrests, to the effective implementation of body-worn cameras and appropriate documentation of police activity.  As frontline leaders, supervisors are directly responsible for translating policy changes into altered behaviors among officers on the ground.  They are uniquely positioned to identify nascent issues with individual officers and address them proactively, thereby preventing isolated incidents from escalating into widespread, systemic problems that could derail reform efforts and further erode public trust.

The DOJ's investigation into NPD found that inadequate supervision was a cause of many of the deficiencies that it had identified.  For example, the DOJ found that supervisors failed to conduct meaningful review of many instances in which officers used force.  *See* Ex. 2 (DOJ Report), at 42.  This supervisory failure around use of force was, in part, the result of NPD's inadequate policies and procedures for its supervisors.  For instance, NPD lacked a policy

requiring supervisors to respond to the scene upon learning of an officer's use of force, and it similarly lacked a policy requiring supervisors to meaningfully review officer use of force reports. *Id*. Similarly, the DOJ found that supervisors were failing to provide necessary oversight of officer stop, search,arrest incidents to ensure that officers were following the law. *Id*. This absence of supervision contributed to a dynamic in which NPD officers were routinely making stops, searches, and arrests without the degree of cause required by the Constitution. *Id* at 8.

Because of the supervisory deficiencies that the DOJ identified, the Consent Decree included several provisions requiring NPD to improve its policies and practices around supervision. Under the Consent Decree, NPD was required to implement policies prohibiting officers from conducting certain types of high-risk stops and searches without supervisory approval, and requiring supervisors to provide additional oversight of certain types of high-risk arrests. Consent Decree ¶¶ 27(a), 32, 38-40. Supervisors were required to examine all arrestees upon arrival at NPD facilities to assess whether the arrestee was injured or required medical attention. Consent Decree ¶ 41. The Consent Decree also required supervisors to regularly review body-worn camera footage of stops, searches, and arrests, as well as stop, search, arrest reports, in order to assess compliance with policy. Consent Decree ¶¶ 44, 45, 48-50. Similar supervisory review was required in cases where officers used force, with specific obligations for supervisors to respond to use of force events, review the conduct of the involved officers, and report the use of force within the chain of command. Consent Decree ¶¶ 79, 83, 85. Additionally, the Consent Decree established a process to review force used by supervisors. Consent Decree ¶ 79, Finally, the Consent Decree required officers to immediately report all

allegations of misconduct by fellow officers to a supervisor, and required supervisors to promptly share that information with internal affairs personnel.  Consent Decree ¶ 119.

NPD took some steps to revise its policies and procedures in order to bring them into compliance with Consent Decree provisions related to supervision.  However, the Independent Monitoring Team's assessments revealed that, in practice, NPD supervisors were not complying with Consent Decree requirements.

The Independent Monitoring Team began its first supervision audit in June 2023.  Ex. 31 (First Supervision Audit Report) at 3.  Members of the Independent Monitoring Team quickly identified serious deficiencies in NPD's maintenance of records relevant to the audit and suggested that the audit be suspended to allow for corrective action.  *Id*. at 4.  The Independent Monitoring Team provided NPD with an interim report on March 15, 2024 that set out the deficiencies it had identified, in order to give NPD an opportunity to take remedial action.  *Id*.  NPD nonetheless requested that the Independent Monitoring Team continue the audit without further corrective action, and the Independent Monitoring Team complied.

The first supervision audit assessed 258 incidents for supervisor compliance with relevant Consent Decree requirements.  *Id*. at 6.  The 258 incidents reviewed included 66 use of force incidents, 97 stop, search, and arrest incidents, and 95 body-worn camera/in-car camera incidents.  *Id*.  The audit found widespread noncompliance with Consent Decree requirements. The rate of compliance was 12% for use of force incidents and 24% for stop, search, and arrest incidents.  *Id.*  None of the 95 body-worn camera/in-car camera incidents were compliant with Consent Decree requirements related to supervision.  *Id*.

The first supervision audit identified many serious deficiencies.  Among others, the Independent Monitoring Team found that supervisors were routinely failing to review body-worn

camera and in-car camera footage to ensure that officers complied with policy and wrote reports that corresponded to the events that actually occurred.  *Id*. at 11-12, 24-25.  The Independent Monitoring Team also found that supervisors were misclassifying some use of force incidents as "low-level," rather than "intermediate-level."  *Id*. at 15.  This misclassification meant that in some cases, NPD did not undertake the required supplemental review procedures applicable to intermediate and serious use of force incidents.  Additionally, the Independent Monitoring Team found that officers were routinely using "copy and paste" language in their reports, in violation of NPD policy.  *Id*. at 17.  Moreover, despite the widespread and serious nature of these deficiencies, supervisors were failing to take corrective action.  *Id*. at 21.  The Independent Monitoring Team provided a comprehensive set of recommendations on necessary reforms, including increased training for supervisors.  *Id*. at 28.

After NPD advised that it had provided supplemental supervisory training, the Independent Monitoring Team conducted a second, limited review of NPD's supervision practices.  *See* Ex. 32 (Supervision Limited Review Report).  This review involved incidents occurring between April 1, 2025 and April 30, 2025, and examined 72 incidents (39 use of force and 33 stop, search, and arrest).  *Id.* at 3-5.  This review only covered a small sample size of incidents and used a more limited methodology than the first supervision audit, so the Independent Monitoring Team was unable to draw definitive conclusions from this review.  However, the Independent Monitoring Team observed little-to-no improvement between the first audit and the second, limited review.  Only 33% of use of force incidents examined during the limited review were compliant, and only 12% of the stop, search, and arrest incidents examined were compliant.  *Id.* at 4.  The Independent Monitoring Team also observed that many of the same serious deficiencies observed in the first Supervision audit, such as misclassification of use

of force incidents, approval of "copy and paste" report language, and failure to review incident video, recurred during the limited review. Moreover, it determined that NPD still lacked a systemic process for supervisory review of incident videos, even though the Independent Monitoring Team had raised this deficiency during the first supervision audit.

### *Recommendation*

Police departments are hierarchical organizations. They cannot function without effective supervision and oversight at all levels. Accordingly, improved supervision is necessary to ensure that NPD's gains during the Consent Decree period persist for years to come. Thus, NPD must devote significant effort to strengthening its supervision practices. During the Independent Monitoring Team's reviews of NPD's supervision practice, it determined that many NPD supervisors, at all levels of the organization, lack an understanding of relevant General Orders and how to implement them. Accordingly, any reform of NPD's supervision practices must begin with ensuring that NPD supervisors adhere to the already in-place General Orders that set forth important requirements for supervisors. To do so, NPD must also implement robust supervisory training and oversight.

The Independent Monitoring Team recommends that NPD be required to present for Court approval a comprehensive plan for correcting the remaining deficiencies described above. The Independent Monitoring Team expects that any plan developed by NPD would include (1) additional training for supervisors, (2) improved oversight of line-level supervisors to ensure they are complying with NPD policy on a day-to-day basis, and (3) regular internal and/or external evaluations of its supervisory practices.

### V.    CONCLUSION

NPD made significant strides during the Consent Decree period. To name only a few important reforms:

- NPD comprehensively restructured its policies, procedures, and training protocols during the Consent Decree period, giving officers and supervisors the guidance they need to engage in legal and effective policing every day.

- NPD wrote and implemented a nearly first-in-the-nation bias-free policing policy, the violation of which subjects officers to discipline, including termination.

- NPD developed and implemented BWC and ICC programs citywide, giving a clear record of officer engagement with civilians that protects officers and civilians alike.

- NPD built a new facility for officer training.

- NPD also built a new facility for storage of property and evidence.

- NPD recommitted to meaningful civilian oversight and community engagement, which will help to heal the frayed bonds between NPD and the community it serves.

These reforms have resulted in material change on the streets of Newark. As summarized in this Final Report, the Independent Monitoring Team extensively assessed NPD's progress over the course of the Consent Decree period and saw meaningful improvement on the outcomes that matter most to the people of Newark, such as fewer instances of excessive force and fewer improper police stops. These improvements are a testament to the hard work of NPD in making needed reforms to give the people of Newark the ethical, constitutional policing they deserve.

However, NPD's work of reform is far from complete. NPD must take additional steps in order to align itself with best practices in policing and to ensure that it operate in a legal and constitutional manner. To name a few examples, NPD must:

- Implement modern computerized data systems that would allow supervisors to identify signs of isolated misconduct and address them before they escalated.

- Ensure that officers are trained consistently and effectively by hiring a full-time training director to oversee all officer training.

- Develop and implement a robust youth engagement strategy.

- Improve training and oversight of supervisors.

- In a manner consistent with the requirements of New Jersey labor law, prepare and implement revised internal affairs policies that comport with the Consent Decree.

Consent decrees are an essential mechanism for police reform, ushering in significant positive transformations for cities, their police departments, and the communities they are sworn to protect. By establishing court-enforceable mandates, these agreements allow police departments to address systemic issues, implement best practices in policy development, training, and accountability. Most importantly, consent decrees, if embraced in earnest by those involved, can foster a culture of constitutional policing, reduce instances of misconduct and excessive force, but also significantly build public trust, which is the cornerstone of effective law enforcement.

Despite the clear benefits to public safety and police professionalism, some voices attempt to diminish the value of consent decrees, often for reasons that appear more aligned with political posturing than genuine concern for the well-being of communities, or even the officers on the ground. These narratives, which sometimes portray reforms as detrimental to "law and order," overlook the foundational principle that true law and order hinges on legitimate, accountable policing that earns community respect. As the District Judge who has overseen the Consent Decree for nearly a decade recently stated, police reform helps "strengthen and build community." Tr. of Jun. 13, 2025 Conf. at 9:6, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J.). Focusing on the short-term inconvenience or perceived cost of reform, rather than the profound, lasting improvements in trust, safety, and justice that consent decrees can deliver, risks undermining critical progress and leaving both citizens and dedicated officers in a more vulnerable position.

Over the course of the nearly decade-long Consent Decree period, the City of Newark expended approximately $10 million on the work of the Independent Monitoring Team. *See*

Consent Decree ¶ 207 ($7.4 million budget for first five years); Dkt. No. 278 ¶ 3 ($2.4 million budget for first extension); Dkt. No. 412 ¶ 8 ($240,000 budget for final extension). Given constrained city budgets and considerable need in the City of Newark, this cost is, of course, substantial. But substandard policing comes with its own costs. For example, over the course of a two-year period before implementation of the Consent Decree, the City paid nearly $5 million to resolve lawsuits alleging misconduct by NPD and its officers. Ex. 1 (ACLU Petition) ¶ 8. In addition to all of the other benefits of ethical and constitutional policing, police reform is ultimately the fiscally responsible path for police departments and the cities they serve.

When stakeholders feel respected and protected, they are more likely to cooperate with officers, share information, and actively participate in public safety efforts, ultimately leading to safer and more harmonious communities. Indeed, the long-term benefits extend to police officers themselves, as departments operating under consent decrees may see improved morale, better training, and a clearer framework for ethical conduct, shielding them from the liability and reputational damage that unchecked misconduct inevitably brings. In other words, consent decrees are "designed . . . to make police officers the best versions of themselves." Tr. of Jun. 13, 2025 Conf. at 8:24-25, *U.S. v. City of Newark*, No. 16-cv-1731 (D.N.J.). Consistent with that understanding, it has been the goal of the Independent Monitor and the subject matter experts on the Independent Monitoring Team throughout the Consent Decree period to help NPD "become the best version of itself." *Id*. at 9:14-15.

As the Consent Decree expires, it is important that NPD, local leaders, and the Newark community alike continue to build on the work done during the Consent Decree. That will require completing the aforementioned steps necessary to become a state-of-the-art police department, such as implementing modern data systems and improving officer supervision. It

will require responding effectively to new developments that may arise in the future.  But with the solid foundation that the Consent Decree process has built, the Independent Monitor hopes NPD is well-positioned to effectively and ethically serve the citizens of Newark for decades to come.